Joel G. MacMull
**Mandelbaum Salsburg, P.C.**
1270 Avenue of the Americas, Suite 1808
New York, NY 10020
Tel. (212) 776-1834
jmacmull@lawfirm.ms

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOANSTREET INC., and IAN LAMPL, Individually, | Civil Action No. 21-cv-6166 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| WYATT TROIA, Individually, | |
| Defendants. | |

Plaintiffs, LoanStreet Inc. and Ian Lampl, by their undersigned counsel, as and for their Complaint state as follows upon information and belief as to all matters:

### NATURE OF THE ACTION

1.  This action is brought by Plaintiffs to recover, *inter alia*, damages caused by defendant Wyatt Troia's libelous communications of knowingly false statements in numerous Internet posts directed to third parties, which include Plaintiffs' prospective job applicants, professional colleagues, employees, friends, potential and existing investors, clients, and close associates.

2.  Defendant's communications contain numerous false statements alleging serious criminal conduct sounding in fraud and material misrepresentations

1

on the part of Plaintiffs which further tend to injure Plaintiffs in their trade, business, profession or office such that the statements constitute defamation *per se*.

3.　　Defendant's communications also contain false and disparaging statements that are in breach of his Employee Non-Disclosure and Invention Assignment Agreement ("NDIAA") dated March 4, 2019.

4.　　The Defendant's actions were malicious in nature, taken solely to damage Plaintiffs' reputation and standing within the business community.

## THE PARTIES

5.　　Plaintiff LoanStreet Inc. ("LoanStreet" or the "Company") is a Delaware corporation with a principal place of business located at 29 West 30th Street, New York, NY 10001.

6.　　Plaintiff Ian Lampl ("Lampl") is a resident of New York and resided within the state at all times relevant to this lawsuit. (LoanStreet and Lampl are collectively referred to as "Plaintiffs".)

7.　　Defendant Wyatt Troia ("Troia" or "Defendant") is a resident of the State of Nebraska and resided within the state at all times relevant to this lawsuit.

## JURISDICTION AND VENUE

8.　　 This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338(a) and (b) and 15 U.S.C. §§ 1116. This Court has supplemental jurisdiction over Plaintiffs' claims under the laws of the State of New York pursuant to 28 U.S.C. § 1367.

9.　　 This Court has personal jurisdiction over the Defendant in that he is responsible for and participated in the unlawful activity described in this Complaint,

4818-1523-7875, v. 1

including the publication as well as facilitating the unlawful conduct complained of herein, and regularly conducts business in the State of New York. This Court further has personal jurisdiction over the Defendant in that (i) he consented to jurisdiction before this Court by executing his NDIAA; and (ii) personal jurisdiction is proper pursuant to CPLR § 302(a) in that he wrongfully caused injury to Plaintiffs in the State of New York and in this District, such that he expected, or should have expected, his acts to have consequences in New York.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and to 28 U.S.C. § 1391(b)(3) because the Defendant is subject to personal jurisdiction in this district.

## BACKGROUND FACTS RELEVANT TO ALL CLAIMS

### LoanStreet: An Industry Innovator

11.     LoanStreet is the first fully integrated online platform that allows users to share, manage, and originate loans, regardless of the size of the loan.  It automates, standardizes, and streamlines syndication from origination to maturity, enabling lenders and investors to buy, sell and manage loans directly on the LoanStreet website, providing a unique solution to help lenders grow and diversify their balance sheets.

12.     LoanStreet was cofounded in 2013 in New York, New York by Lampl.

13.     At the time of this filing, over 1,000 financial institutions, primarily nonprofit credit unions, are registered to do business with LoanStreet.

14.     Prior to founding LoanStreet, Lampl served as Deputy Chief Counsel for the Office of Financial Stability which administered the Troubled Asset Relief

3

Program (TARP) for the United States Department of Treasury ("Treasury"). Lampl joined Treasury to serve his country in the aftermath of the greatest financial crisis since the Great Depression. Lampl provided sound legal advice at a time of economic unrest and transition. In recognition of his accomplishments and contributions to the Department of the Treasury, Lampl received the Treasury Secretary's Honor Award.

15. Most recently, LoanStreet raised an additional $5,000,000 in private equity in December of 2019.

**LoanStreet's Employment of Wyatt Troia**

16. Troia met LoanStreet in New York City in or around February 2019, when Defendant, an applicant for the position of software engineer with LoanStreet, interviewed with the Company.

17. Troia was extended an offer of employment on February 28, 2019, with the term of his employment to begin on or about March 18, 2019.

18. Troia accepted LoanStreet's offer of employment on or about March 4, 2019.

19. In addition to providing Troia with an annual six-figure salary, LoanStreet provided Troia with the Company's standard employee benefits, as well as granted him options to purchase common stock of the Company, subject to approval by the Board of Directors and the terms and conditions of the Company's 2016 Equity Incentive Plan and stock option grant agreement, wherein the initial portion of his common stock options would vest and become exercisable on the first anniversary of his vesting commencement date, provided he continued to be employed by the Company.

4

20.    In fact, Troia received two separate grants of options, the first option grant on July 22, 2019, to purchase 885 shares of common stock of the Company, and the second option grant, on January 15, 2020, to purchase 500 shares of common stock of the Company.  Each option grant had its own vesting schedule.

21.    Indeed, as further reflected below, certain statements made by Troia are defamatory precisely because he purposefully and falsely equates the granting of his options with the vesting of his interest. These are not only two separate legal events, but these distinctions, which are critically important, were spelled out in Troia's initial February 2019 offer letter, and were the subject of further written communications after he received his offer letter.

22.    As a condition of Defendant's employment with LoanStreet, Troia executed an NDIAA dated March 4, 2019, which provided, in relevant part, that he "will not do or say (or omit to do or say) anything that is intended, or might reasonably be expected, to harm or disparage the Company, any of its clients or business partners or prospective client or business partners or any of the Company's employees, or to impair the reputation of any of any of the foregoing, or the reputation of any of the services, products, directors, managers, officers or employees of the Company or any of its clients or business partners."

23.    Troia began his term of employment with LoanStreet on or about March 18, 2019, wherein he proceeded to gain valuable professional experience, in the form of education and training from his relationship with LoanStreet.

24.    At least as early as April 2020, Defendant — eminently aware that his time with the Company was drawing to a close — began to post disparaging and

4818-1523-7875, v. 1

defamatory statements on the Internet about LoanStreet.

25.     In an Internet post dated April 14, 2020, entitled "Worse Professional Experience of My Life," Troia wrote: "Without a doubt the worst job I have ever had. Zero product strategy and the place is run more like a law firm/sweatshop than a technology company. It's a shame because the offering has a ton of potential it's just unlikely to ever get there."

26.     The foregoing statement was followed by another Internet post Troia made a short time later on April 25, 2020, wherein he writes under the heading "Most passive-aggressive place I've ever worked:"

> The founders are not skilled nor experienced leaders, with a bias towards pettiness and cowardice, and have established a poor culture that is the opposite of collaborative. The management are both too eager to hire, and too eager to fire. Rather than providing leadership to get the best of employees, management treats employees with suspicion.

> Poor or disorganized management at a software startup can sometimes be tolerable in a startup if the product work is engaging, but unfortunately that wasn't the case. The overall product strategy was weak. Years of engineering effort went into initiatives that were poorly planned, and unsurprisingly were ultimately scrapped. Do not work at this organization as an engineer if you want to feel that your time is valued.

> LoanStreet aspires to have a valuation like a fintech company, but at their heart they are on track to be just the like the banks and credit unions they work with.

27.     On June 12, 2020, LoanStreet terminated Troia's employment for, among other things, the poor quality of his engineering, his lack of engagement with his team, and his inability to cooperate with his peers or take direction from his superiors.  Although Defendant was employed and compensated for the entire day of work, before he departed he fired off a company-wide direct message using

6

LoanStreet's Slack instance — followed by an identical company-wide email — wherein Troia called the Company and its leadership into disrepute, in direct violation of his contractual obligations under his NDIAA.

28.    More specifically, Troia's June 12, 2020 early evening email to Lampl, wherein he copied the entire Company, included a scathing critique of his direct supervisor and LoanStreet's Vice President of Engineering, Larry Adams.

29.    Troia's email, laden with factual inaccuracies, also suffered from delusions of grandeur; Troia portrayed himself as a near indispensable part of the LoanStreet engineering team.

30.    In his June 12, 2021 email, Troia announced that he would "be doing [his] best to warn all potential future employees to avoid LoanStreet."

31.    That same day, Defendant was provided with a termination letter and release ("Release") which offered him certain benefits he would not otherwise be entitled to, including, most obviously, a several thousand-dollar severance payment.

32.    Defendant refused to sign LoanStreet's Release.

33.    Less than two weeks after Troia was fired, he once again breached his NDIAA, this time writing a post on the popular company review website Glassdoor.com entitled "Good people, worst career development" (errors in original):

> The company changed lot during mess hiring process, it reflected the very disorganized management at a software start-up. Also, zero product strategy, most of the decision making not based on the team and research, it just from the top management team with no explanation. The company have a valuation like a fintech, however, they on track to be just like the banks and credit unions they work with.

**Troia Ramps Up his Malicious and Unlawful Actions Against LoanStreet and Lampl**

34.     All appeared quiet from Troia from June 25, 2020 until June 13, 2021 — approximately one year from the date of his termination from LoanStreet — when suddenly, and without provocation, he began an unabashed online smear campaign against Plaintiffs.

35.     From June 13, 2021, up until the filing of this Complaint, Troia has made a series of false and defamatory statements on various Internet websites with the intent and effect of whipping up an angry mob directed against LoanStreet and Lampl.

36.     By all accounts, the first of Defendant's post-2020 online defamatory statements was posted on Glassdoor.com on June 13, 2021, with the heading "Cheated me out of equity compensation. Exploitative, fraudulent dumpster fire. Positive reviews are coerced or fake."

37.     Defendant's June 13, 2021 statement in its entirety reads (errors in original):

> TLDR: Stay far, far away unless you're truly desperate. LoanStreet is a raging dumpster fire and you will get burned like many before. After 15 months of praising my work and as COVID froze the hiring markets in 2020 - they abruptly fired me and withheld $100k in options that they promised me before I was hired.
>
> The annualized turnover rate in the small NYC office during my time there was around 50%. Every two months or so, someone was fired who said they weren't given any warning and the company would tell the same story that this person was given many warnings and opportunities to respond to feedback. I saw a lot of good workers blindsided, some leaving in tears. I thought it was fishy and eventually it happened to me, despite always having received glowing praise from leadership.

Any promises made to you to entice you to sign an offer should be regarded with extreme skepticism. Get everything in writing and reviewed by a good lawyer.

After hiring employees with a promise of unlimited PTO, management rolled out a PTO tracking tool that explicitly capped PTO at 15 days per year.

Before I joined, Cofounder/COO Christopher Wu told me that the first quarter of my stock options would vest after a year. My offer letter said details on the equity compensation would be provided in a separate equity agreement. I wasn't provided that agreement for nearly a year after my start date, and you can imagine my surprise when I say that I wouldn't begin to vest until nearly 16 months of employment. After 15 months of work. I was abruptly fired and didn't receive a single option.

CEO and Cofounder Ian Lampl refused to discuss the matter. He just pocketed the options he promised me. Based on Lampl's valuation goal for the company, he defrauded me out of over $100k.

Because the offer letter omitted the details of the equity compensation, labor lawyers told me I had no case. Keep in mind, LoanStreet is run by lawyers who used to worth at Cravath, a very prestigious and lucrative NYC law firm. I suspect they knew exactly what they were doing when they wrote the offer letter. If it was just a good-faith mistake, they could have done the right thing and granted me the options I earned. They chose not to.

Ian Lampl is the lowest type of man: one whose word means nothing. He is a rich con man. His bland, polite, and nerdy demeanor is affected to disarm and distract you while he has his hands down your pockets.

Placing my trust in LoanStreet was a costly mistake. If you're reading this. please don't be fooled by the Series B funding or the impressive pedigrees of the leaders: this place is a fraudulent, exploitative mess and you have a good chance of being fired within a year.

CEO Ian Lampl is the ringleader of this racket. but Cofounder/COO Christopher Wu. CTO Larry Adams and the rest of leadership are his spineless sycophants. They either agree with Lampl's despicable abuses of his employees or are too cowardly to stand up for what's right.

This group will twist employees' arms to post positive reviews after they see this one, just like they have in the past. but this review is the real story and just the tip of the iceberg, given LoanStreet's practice of paying fired employees to sign permanent non-disparagement

4818-1523-7875, v. 1

agreements.

You deserve to be treated with dignity. Work elsewhere.

38. Troia, in turn, linked or copied this same or a nearly identical statement to other online platforms, including, but not limited to, an alumni Slack instance operated by HackReactor.com — the operator of a 12-week immersive software engineering coding program, Reditt.com, Google Ads and Teamblind.com.

39. In doing so, he also commented on his original posts, in the process committing additional breaches of his NDIAA while continuing to defame Plaintiffs.

40. Emblematic of his pernicious intentions, Troia not only posted statements to third-party websites railing against Plaintiffs, but he looked to leverage his posts by also commenting on them, thereby fostering a false and continuing narrative as he encouraged readers to "like" and further disseminate his message.

41. This was in addition to Troia's "tagging" of LoanStreet personnel to their profiles on LinkedIn, which in turn resulted in not only a substantial increase in views of Lampl's, LoanStreet and LoanStreet's personnel's LinkedIn profiles, which, under the circumstances, was certainly always met with an initial negative impression, but has also resulted in unsolicited statements being sent to Plaintiffs, some of which contain a threatening and vile tone, such as, for example:

- "Fuck you Christopher Wu you cheating piece of shit."

- "Literally go fuck yourselves. Treat your employees like real people."

- "Fuck You Wu" and "Stop being scum of the earth Wu."

42. An additional post, filled with the same animus as reflected in his prior post, appeared on Reddit.com on or about June 19, 2021, wherein Troia using the

10

handle "Real_Obligation_4449", wrote:

> I worked for LoanStreet in NYC. My equity was supposed to start vesting after 12 months. After I start, they tell me that they actually meant 12 months after the next quarterly board meeting, and I will now start to vest after 16 months. I ask them to change it and they pretend like they're working on it. After 15 months of praising my work, they abruptly fire me Just as COVID is freezing hiring markets, refuse to vest any of the promised equity, and the head of HR (who is also the wife of the CEO and who had spoken to me warmly the night before) refuses to answer my phone calls asking for an explanation, LoanStreet is run by fancy lawyers and were crafty with the offer letter language so I had no legal case.
>
> The only problem I was aware of was that the CTO Larry Adams was upset with me because I discovered and fixed a critical error in code written by one of his favorite engineers. The engineer didn't remember why he had made the change and refused to help me investigate why tests were failing. I privately spoke to him to ask him to be careful with the code in that area because it was tricky, to leave comments if he writes something that might be confusing to another reader, and to feel free to ask me for help in that area since it was my niche in the company. I was trying to do him a favor by not making a more public complaint about it. He ran crying to the CTO, who told me there was no error because we had tests that would have caught it and scolded me for going out of my lane. I wrote a failing test proving that the error existed and that our tests were incomplete. Then I fixed the error. He brusquely told me to fix anything I had broken by making that change. At the next retro "needs improvement" section I said I hoped we could affirm a team norm of being responsible for your code: being able to explain it and to help fix things if it breaks something. Larry got mad and shut down the conversation. For the next few weeks he worked behind my back to get me fired, as I understand it.
>
> CEO Ian Lampl, his wife and head of HR Alyssa Guttman, COO Christopher Wu, General Counsel Thaddeus Pitney, and CTO Larry Adams are all dirtbags or dirtbag-accomplices. Copying my full Glassdoor review. Please follow the link and mark it as helpful so that the message is amplified and as many people are warned as possible.

43.     Troia has posted other similar defamatory statements to various other Internet websites after June 21, 2021.

44.     But if the foregoing breaches of his NDIAA and accompanying

11

defamatory statements were not enough, Troia effectively dared Plaintiffs to do anything about it.  On or about June 21, 2021, he used his account with his present employer, Microsoft Inc., to once again disparage LoanStreet on [www.teamblind.com](www.teamblind.com), as shown below:





45.  Troia's "doubling down" on the alleged truth of his statements was no surprise; approximately contemporaneously with making the above remarks he sought to modify prior statements he had made on Reddit.com and other websites just days earlier. Now, prompted by comments by third parties informing him that

his initial statements may indeed be defamatory, Troia sought to backtrack from the severity of his initial statements, writing, in relevant part:



46.     Of course, Troia's meager effort to "unring the bell" was fruitless, as the damage to Plaintiffs' business and reputation had by this time already been sustained and continues to this day. Moreover, Troia's "modifications," such as they are, are entirely self-serving, in that that merely seek to reduce his legal exposure to Plaintiffs after it was pointed out to him that his statements were defamatory, as opposed to, intending to reduce any harm to Plaintiffs.

47.     Troia's attempt to rationalize his earlier defamatory statements is incredible, does nothing to mitigate the harm he caused, and continues to cause Plaintiffs harm, and, in fact, is a tacit admission that his earlier initial statements are defamatory.

48. If there were any doubt as to the wickedness of Troia's intentions, they can be put to rest. Troia has taken to buying Google Ads using LoanStreet's registered trademark LOANSTREET (U.S. Reg. No. 4,618,232) (the "Mark") to promote his false statements; these statements appear at the top of Google searches for "LoanStreet."

49. Exemplars of Troia's Google Ads, as shown below, when clicked on resolve to his June 2021 Reddit.com post and the now more than 200 comments that accompany                                                                                                   it.

Ad · https://www.reddit.com/ ▾

**LoanStreet horror story - LoanStreet careers**

'They abruptly fired me & withheld the $100k in stock options they promised me' 'You deserve to be treated with dignity. Work elsewhere.'

---

Ad · https://www.reddit.com/csjobquestions/loanstreetshame

**LoanStreet horror story - 'a terrible place to work'**

'They abruptly fired me & withheld the $100k in stock options they promised me' 'You   See photos See outside deserve to be treated with dignity. Work elsewhere.'

---

Ad · https://www.reddit.com/csjobquestions/loanstreetshame

**LoanStreet horror story - 'abruptly fired me'**

'They abruptly fired me & withheld the $100k in stock options they promised me' 'You deserve to be treated with dignity. Work elsewhere.'

---

Ad · https://www.reddit.com/csjobquestions/loanstreetshame

**LoanStreet horror story - LoanStreet engineering**

'They abruptly fired me & withheld the $100k in stock options they promised me' 'You deserve to be treated with dignity. Work elsewhere.'

---

50. The foregoing Google Ads, and others like them, are particularly injurious to LoanStreet because they each independently serve as additional

4818-1523-7875, v. 1

defamatory statements within the context of their publication as a whole and which are based on undisclosed facts or on facts that Plaintiffs' challenge as untrue.

51.     Troia's Google Ad campaign is designed to cause a likelihood of consumer confusion including, *inter alia*, by the use of the same Mark such that the phrase comprising the Mark, "LoanStreet," appears in organic search results for the term "LoanStreet" and link to Troia's false and defamatory statements located at https://www.reddit.com/r/cscareerquestions/comments/o3jpfc/name_and_shame_loan street_ny_cheated_me_out_of/.

52.     Troia's Google marketing campaign deliberately and willfully is designed to, and does, use (i) the Mark in key words for advertising in interstate commerce on Google Ads, so that individuals who use or type the Mark will be presented with Troia's Reddit.com post and, additionally, (ii) the phrase "LoanStreet" in advertisements seen by customers and prospective job applicants, which in context are confusingly similar, and likely to cause confusion as to the affiliation, connection or association, or origin, sponsorship or approval between plaintiff LoanStreet and Troia.

53.     Indeed, Troia baits consumers by using the Mark in keyword advertising, to drive consumers expecting to find LoanStreet, a financial services company, to Troia's defamatory statements, which use the phrase "LoanStreet" in a deceptively similar manner, to confuse, and switch, those consumers searching for LoanStreet to believe they found the Company or statements made by or otherwise endorsed by the Company.

54.     When a consumer searches for LoanStreet and is immediately presented

with ads using the phrase "LoanStreet," under the search term "LoanStreet," it creates confusion as a consequence of the expectation that Google returns businesses related to the search term (which because of LoanStreet's inherently distinctive Mark increases the likelihood of association with the returned search results).

55. Troia's Google Ad campaign also drives up the cost of LoanStreet's own legitimate Google Ad campaign that utilizes its Mark, as Google charges a premium to Adwords users based on the popularity of selected key words.

**Troia's Refusal to Cease His Unlawful Practices**

56. On or about June 16, 2021, Plaintiffs discovered that Troia had published defamatory or disparaging statements about them in violation of New York law and Troia's explicit contractual commitments.

57. On June 24, 2021, Plaintiffs served Troia with a letter explaining that his statements (i) were a breach of his NDIAA; and (ii) constituted, at a minimum, defamation *per se*.

58. Plaintiffs' letter further demanded (i) a retraction of all defamatory and disparaging statements concerning Plaintiffs; (ii) an immediate cessation from publishing any defamatory statements about Plaintiffs; and (iii) full compliance with his contractual obligations under his NDIAA.

59. Through counsel, Troia refused Plaintiffs' attempt to resolve this matter privately on July 2, 2021.

60. Troia was aware that the above defamatory statements set forth above were false when he made them. At the very least, these statements were made in reckless or conscious disregard of the truth.

4818-1523-7875, v. 1

61. Troia has routinely disregarded and continues to blatantly disregard matters of verifiable fact. He is maliciously defaming Plaintiffs for the sole purpose of increasing traffic to his posts. Troia is generating false and misleading information, by creating sensational, "click-bait" headlines and deceitful posts, purchasing Google Ads to directly increase Internet traffic to his false and defamatory posts, all in an effort to negatively affect LoanStreet's reputation, business and revenues, and decrease the valuation of LoanStreet.

62. As a direct and proximate result of the foregoing defamatory statements and tortious actions of Troia, Plaintiffs have sustained, and will continue to sustain, immediate and irreparable harm and injury, including, but not limited to, damage to reputation, loss of profits, loss of business relations with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy. These actions also threaten to destroy the livelihoods of LoanStreet's over-50 employees. The irreparable harm to Plaintiffs will continue, without any adequate remedy at law, unless and until Troia's unlawful conduct is enjoined by this Court.

63. As such, LoanStreet and Lampl now bring claims against Troia for breach of contract, defamation *per se*, defamation, injurious falsehood, federal and common law unfair competition, and seek injunctive relief, as well as monetary damages.

## COUNT I
## BREACH OF CONTRACT

64. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

17

65. LoanStreet and Troia entered into a valid and enforceable agreement which took the form of an NDIAA.

66. LoanStreet in all material respects performed its obligations under the NDIAA.

67. Troia materially breached his NDIAA with LoanStreet as set forth above.

68. Each of Troia's breaches of the NDIAA were willful.

69. LoanStreet has demanded that Troia comply with his obligations set forth in the NDIAA.

70. Despite receiving this demand, Troia has refused to comply with his contractual obligations under the NDIAA.

71. LoanStreet has made substantial efforts at mitigating its damages herein.

72. As a direct and proximate result of Troia's conduct, LoanStreet has suffered damage in an amount to be proven at trial.

73. By reason of the foregoing, Plaintiffs have suffered, and will continue to suffer, harm that cannot be addressed by monetary damages alone which is further provided for in the NDIAA.

## COUNT II
## DEFAMATION *PER SE*

74. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

75. Troia intentionally made knowingly false and defamatory statements of fact about Plaintiffs to third-parties that were reasonably understood by those who

18

read or heard them to be statements of fact regarding Plaintiffs' operation of LoanStreet.

76.     Specifically, Troia's defamatory *per se* statements include, without limitation, the aforementioned false and defamatory assertions, that:

a.     "[LoanStreet] withheld $100k in options that they promised me before I was hired."

b.     "[Lampl] just pocketed the options he promised me";

c.     "[Lampl] defrauded me out of over $100k";

d.     "[Lampl] is a rich con man";

e.     "[LoanStreet] is a fraudulent, exploitative mess";

f.     "Look in the mirror and ask yourselves how your loved ones would feel if they knew you cheat people just to make your big piles of cash a little bigger"; and

g.     "LoanStreet (NY) cheated me out of equity";

(collectively, the "Troia Statements").

77.     The Troia Statements are all false, misleading, and defamatory in that they falsely imply that Plaintiffs are engaged in crimes of moral turpitude by virtue of their fraud and have engaged in matters incompatible with the proper conduct of Plaintiffs' business, trade, or office.

78.     Troia communicated these lies (the Troia Statements) to LoanStreet's prospective job-applicants and the public at large even though he knew them to be untrue when he made the statements.

79.     In publishing the Troia Statements, Troia acted maliciously, oppressively, with an improper and evil motive, and if not with knowledge that the Troia Statements were false, then in reckless or conscious disregard of the truth.

19

80. Troia acted without any privilege or authorization when he published the Troia Statements.

81. Troia disseminated and published the Troia Statements on, at a minimum, the alumni Slack.com instance for Hack Reactor, Glassdoor.com, Reddit.com, Google Ads, and Teamblind.com and in a manner that achieved widespread exposure to a global Internet audience.

82. The Troia Statements were malicious and false statements of fact that expose Plaintiffs to hatred, contempt, or aversion, or induce an evil or unsavory opinion of Plaintiffs in the minds of a substantial number of the community and the financial industry.

83. The Troia Statements were made with the intent to harm and out of hostility towards Plaintiffs.

84. The Troia Statements are defamatory *per se* because Troia has charged Plaintiffs with serious criminal offenses.

85. Moreover, the Troia Statements are defamatory *per se* in that they tend to impugn Plaintiffs' reputations in their business, trade, and profession, and indeed have harmed Plaintiffs in their business, trade, and profession.

86. As a result of the Troia Statements published by Defendant, Plaintiffs' relationships with their potential and existing investors, clients, marketing partners, employees, prospective employees, and vendors have been undermined and damaged.

87. As a result of the Troia Statements published by Troia, Plaintiffs have been forced to make an expenditure of money and resources to remedy the defamation.

4818-1523-7875, v. 1

88.     In addition to the foregoing, Lampl has suffered, and will continue to suffer, non-economic damages, such as personal humiliation, emotional distress, and damage to his reputation and standing in the community.

89.     The Troia Statements were made about and concerning Plaintiffs with the specific intent to cause harm to Plaintiffs, and Troia did so willfully and with malice, and, thus, Plaintiffs are entitled to, in addition to other damages and amounts, an award of punitive and exemplary damages.

90.     As a direct and proximate cause of the false and defamatory statements, Plaintiffs have suffered, and continue to suffer, substantial damages, including, without limitation in the reasonable expectation loss of current and/or future clients and employees, and, accordingly, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT III
## DEFAMATION

91.     Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

92.     Troia published and republished the statements as alleged herein.

93.     Troia's statements contain false assertions of fact, including the false statements referenced above, which include, but are not limited to:

    a.    "Based on Ian Lampl's valuation goal for the company, he defrauded me out of over $100k";

    b.    "They promised me substantial equity with a standard one-year vesting cliff, then abruptly fired me after 15 months of work and refused to grant me the options";

    c.    "After I started, they told me that they actually meant 12 months after the next quarterly board meeting, and I would only start to

21

vest after 16 months. I asked them to change it. They dragged their feet for months, pretending to work on it";

d.      "After 15 months of praising my work, they abruptly fired me . . .";

e.      "LoanStreet fires people without warning . . .";

f.      "The company has been operating with impunity because they fire people without warning";

g.      "After hiring employees with a promise of unlimited PTO, management rolled out a PTO tracking tool that explicitly capped PTO at 15 days per year"; and

h.      "A large percentage of LoanStreet engineers when I was there were bootcamp grads".

(collectively, the "Additional Troia Statements").

94.     As a consequence of the Additional Troia Statements, Plaintiffs have suffered actual and special damages as further set forth herein.

95.     Troia acted with actual malice consisting of the intent to harm Plaintiffs professionally by virtue of, among other things, publishing his statements which falsely criminalizes and sensationalizes Plaintiffs' legitimate business activities.

96.     Troia acted without any privilege or authorization when he published his statements.

97.     In the alternative, Troia acted negligently in his publication of the Additional Troia Statements.

98.     Alternatively, the Additional Troia Statements were made with the knowledge that the statements were false or with reckless disregard as to their truth or falsity, and for the purpose of defaming Plaintiffs. To wit, Troia knew that the Additional Troia Statements were false when he published them because he knew, or

should have known, of the true state of affairs relating to Plaintiffs.

99.    In addition to the foregoing, Lampl has suffered and will continue to suffer non-economic damages, such as personal humiliation, emotional distress, and damage to his reputation and standing in the community.

100.    The Additional Troia Statements were made about and concerning Plaintiffs with the specific intent to cause harm to Plaintiffs, and Troia did so willfully and with malice, and, thus, Plaintiffs are entitled to, in addition to other damages and amounts, an award of punitive and exemplary damages.

101.    As a direct and proximate cause of the false and defamatory statements, Plaintiffs have suffered, and continue to suffer, substantial damages, including, without limitation in the reasonable expectation loss of current and/or future clients and employees, and, accordingly, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT IV
## INJURIOUS FALSEHOOD

102.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

103.    Troia has intentionally made knowingly false statements of fact about Plaintiffs to third parties. Such statements include, without limitation, the Troia Statements as well as other statements identified above.

104.    The Troia Statements as well as other statements are false, misleading, and defamatory.

105.    Troia communicated such false statements to LoanStreet's clients, marketing partners, employees, prospective employees, current and potential

23

investors and vendors and the public at large even though he knew them to be untrue when he made the statements.

106. Troia made the aforementioned false statements maliciously and with the intent to cause harm to Plaintiffs.

107. Troia's misconduct has, at a minimum, caused Plaintiffs to suffer pecuniary losses with respect to the loss of business with certain companies, an inability to hire qualified engineering applicants, and has further caused Plaintiffs as-yet unknown pecuniary losses along with damage to Plaintiffs' reputation.

108. Troia's misconduct has, at a minimum, caused Plaintiffs to suffer pecuniary losses with respect to the money they have had to spend to counteract Troia's defamatory statements and damaging actions, including without limitation, the fees paid to their attorneys to prepare this complaint and litigate this action against Troia, so that Plaintiffs' reputation can be defended and restored.

109. As a direct and proximate cause of the foregoing, Plaintiffs have suffered, and continue to suffer, substantial damages, and, accordingly, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT V
## UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER § 43(a) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(A)

110. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

111. LoanStreet is the owner of a valid and subsisting United States Trademark Registration No. 4,618,232 on the Principal Register for the Mark for

"Providing temporary use of non-downloadable software to facilitate and/or manage the buying or selling of any loan, including whole loans, a portion of any loan, loan assignment, loan participation or any economic interest in a loan" in International Class 42, which was issued by the United States Patent and Trademark Office on October 7, 2014, 2020.

112. LoanStreet, or its predecessor in interest, has used the Mark in commerce throughout the United States continuously since at least January 1, 2014, in connection with, *inter alia*, the manufacture, distribution, offering for sale, sale, marketing, advertising and promotion of "non-downloadable software to facilitate and/or manage the buying or selling of any loan, including whole loans, a portion of any loan, loan assignment, loan participation or any economic interest in a loan."

113. As a result of its widespread, continuous, and exclusive use of the Mark to identify its services and Plaintiffs as to their source, LoanStreet owns valid and subsisting federal statutory and common law rights in and to the Mark.

114. The Mark is distinctive to both the consuming public and Plaintiffs' trade.

115. Plaintiffs have expended substantial time, money, and resources marketing, advertising, and promoting the services offered and sold under the Mark.

116. Troia has marketed, advertised, promoted, and otherwise purchased an infringing mark ("LOANSTREET", hereinafter the "Infringing Mark") as Adwords and keywords via Internet search engines.

117. Troia's acts are willful with the deliberate intent to trade on the goodwill of the Mark, cause confusion and deception in the marketplace, and divert potential

25

sales of LoanStreet services, as well potential new hires, away from LoanStreet.

118. Troia's unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive would-be consumers of LoanStreet's services as well as prospective employees, as to the origin, source, sponsorship, or affiliation, and is likely to cause these same individuals to believe, contrary to fact, that Troia is in some way affiliated, sponsored by, or otherwise endorsed by LoansStreet when he is not.

119. Troia's activities as described above constitute false designation of origin and unfair competition, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

120. Troia's false designations of origin and unfair competition have been intentional, willful, and malicious.

121. Troia's acts of false designations of origin and unfair competition have caused and, unless enjoined, will continue to cause substantial and irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, including at least substantial and irreparable injury to the goodwill and reputation for quality associated with Plaintiffs' services.

### COUNT VI
### COMMON LAW UNFAIR COMPETITION

122. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

123. LoanStreet owns all rights, title to, and interest in the Mark and all common law rights in such trademark including all variations of its Mark.

124. By imitating the Mark in bad faith in furtherance of his false and

26

malicious narrative, Troia has engaged in unfair competition and is infringing the Mark and has made, and is making, false representations that Troia's statements are somehow affiliated, sponsored by, or otherwise endorsed by LoanStreet, when they are not.

125. As a result of Troia's conduct, the public is likely to believe that Troia's statements have been approved by or are in some way affiliated with Plaintiffs when they are not.

126. Troia's conduct is likely to cause confusion, mistake, and deception among consumers, the public, and the trade as to whether Troia's unlawful statements originate from, or are affiliated with, sponsored by, or endorsed by Plaintiffs.

127. As a direct and proximate result of Troia's unlawful conduct, as herein alleged, Plaintiffs have suffered, and will continue to suffer, unless and until such activity is enjoined by this Court, irreparable damage and inherently unquantifiable injury and harm to its business, reputation, and consumer and employee goodwill.

128. Moreover, Troia's conduct has caused, and will continue to cause, LoanStreet to lose sales and prospective job applicants and investors to which it otherwise would be entitled, unless and until such activity is enjoined by this Court.

129. Troia's willful and deliberate conduct is causing, and is likely to continue to cause, injury to the public and to Plaintiffs, and Plaintiff is entitled to injunctive relief and to recover Plaintiffs' actual damages, costs, and reasonable attorneys' fees.

4818-1523-7875, v. 1

## COUNT VII
## PERMANENT INJUNCTIVE RELIEF

130.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

131.    Troia's statements remain accessible on the Internet as of the date of filing this Complaint.

132.    Troia's conduct has caused, and unless enjoined will continue to cause, substantial and irreparable injury to Plaintiffs and their reputation.

133.    By reason of the foregoing, Plaintiffs have suffered, and will continue to suffer, harm that cannot be addressed by monetary damages alone.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendant and award the following relief to Plaintiffs:

A.    A permanent injunction requiring the removal of the Troia Statements as well as the Additional Troia Statements as set forth above;

B.    Presumed, actual, special and/or compensatory damages in an amount to be proven at trial;

C.    Punitive damages;

D.    The costs, disbursements and expenses of this action;

E.    Reasonable attorneys' fees;

F.    Pre- and post-judgment interest on the sum of any presumed, actual, special or compensatory damages; and

G.    Such other relief as the Court may deem just and proper.

28

Respectfully submitted,

Joel G. MacMull
**MANDELBAUM SALSBURG, P.C.**
1270 Avenue of the Americas, Suite 1808
New York, NY 10020
Tel. (212) 776-1834
jmacmull@lawfirm.ms

*Attorneys for Plaintiffs*

July 21, 2021

4818-1523-7875, v. 1