UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LOANSTREET INC. and IAN LAMPL,
Individually,

                      Plaintiffs,

       v.

WYATT TROIA, Individually,

                    Defendant.

No.: 1:21-cv-06166 (NRB)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

### DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT AND COUNTERCLAIMS

---

      Defendant Wyatt Troia ("Defendant"), appearing *pro se*, hereby answers the Complaint of Plaintiffs LoanStreet Inc. and Ian Lampl ("Plaintiffs") as follows below. Defendant denies any allegations in Plaintiffs' Complaint to which he does not specifically respond and reserves the right to assert any additional and future defenses as may be revealed by discovery or otherwise.

## **<u>NATURE OF THE ACTION</u>**

      1.    This action is brought by Plaintiffs to recover, inter alia, damages caused by defendant Wyatt Troia's libelous communications of knowingly false statements in numerous Internet posts directed to third parties, which include Plaintiffs' prospective job applicants, professional colleagues, employees, friends, potential and existing investors, clients, and close associates.

**ANSWER:** Defendant denies the allegations of paragraph 1, except that Defendant admits he has sent communications directed to third parties regarding Plaintiffs on the Internet.

2.      Defendant's communications contain numerous false statements alleging serious criminal conduct sounding in fraud and material misrepresentations on the part of Plaintiffs which further tend to injure Plaintiffs in their trade, business, profession or office such that the statements constitute defamation *per se*.

**ANSWER:** Defendant denies the allegations of paragraph 2.

3.      Defendant's communications also contain false and disparaging statements that are in breach of his Employee Non-Disclosure and Invention Assignment Agreement ("NDIAA") dated March 4, 2019.

**ANSWER:** Defendant denies that his communications contained false or disparaging statements. Defendant further denies that his communications violated his Employee Non-Disclosure and Invention Assignment Agreement ("NDIAA") dated March 4, 2019, given that LoanStreet, as part of a settlement agreement approved by the NLRB on August 12, 2022 in Case 02-CA-280528, agreed, among other things, to waive its claims against Defendant for violation of the non-disparagement provision of the NDIAA; to revise the non-disparagement provision within fourteen days; to inform all current and

2

former employees employed by LoanStreet from May 1, 2021 that LoanStreet would not maintain rules that preclude employees from engaging in activities protected under the National Labor Relations Act, or otherwise stop employees from making statements about wages, hours, and other terms and conditions of employment at LoanStreet; and to not file, maintain, and prosecute a lawsuit against an employee that is preempted by federal law, and which interferes with activity protected by the National Labor Relations Act (*See* Dkt. 40).

4.      The Defendant's actions were malicious in nature, taken solely to damage Plaintiffs' reputation and standing within the business community.

**ANSWER:** Defendant denies the allegations of paragraph 4.

## THE PARTIES

5.      Plaintiff LoanStreet Inc. ("LoanStreet" or the "Company") is a Delaware corporation with a principal place of business located at 29 West 30th Street, New York, NY 10001.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 5.

6.      Plaintiff Ian Lampl ("Lampl") is a resident of New York and resided within the state at all times relevant to this lawsuit. (LoanStreet and Lampl are collectively referred to as "Plaintiffs".)

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 6.

7.      Defendant Wyatt Troia ("Troia" or "Defendant") is a resident of the State of Nebraska and resided within the state at all times relevant to this lawsuit.

**ANSWER:** Defendant denies the allegations of paragraph 7.

**JURISDICTION AND VENUE**

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338(a) and (b) and 15 U.S.C. §§ 1116. This Court has supplemental jurisdiction over Plaintiffs' claims under the laws of the State of New York pursuant to 28 U.S.C. § 1367.

**ANSWER:** To the extent the allegations of paragraph 8 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent a response is required, Defendant admits that the court has subject matter jurisdiction over the portion

of this action related to the Lanham Act and denies that the court has diversity jurisdiction or supplemental jurisdiction.

9.      This Court has personal jurisdiction over the Defendant in that he is responsible for and participated in the unlawful activity described in this Complaint, including the publication as well as facilitating the unlawful conduct complained of herein, and regularly conducts business in the State of New York. This Court further has personal jurisdiction over the Defendant in that (i) he consented to jurisdiction before this Court by executing his NDIAA; and (ii) personal jurisdiction is proper pursuant to CPLR § 302(a) in that he wrongfully caused injury to Plaintiffs in the State of New York and in this District, such that he expected, or should have expected, his acts to have consequences in New York.

**ANSWER:** To the extent the allegations of paragraph 9 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent a response is required, Defendant admits that the court has personal jurisdiction over the Defendant. Defendant denies all factual allegations in paragraph 9, except that Defendant admits he regularly conducts business in the State of New York and consented to jurisdiction of this Court and any state court in the State of New York that is located in New York County (and the appropriate appellate courts from any of the foregoing) by executing his NDIAA.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and to 28 U.S.C. § 1391(b)(3) because the Defendant is subject to personal jurisdiction in this district.

**ANSWER:** To the extent the allegations of paragraph 10 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent a response is required, Defendant admits that the court has personal jurisdiction over the Defendant.

## BACKGROUND FACTS RELEVANT TO ALL CLAIMS

11.     LoanStreet is the first fully integrated online platform that allows users to share, manage, and originate loans, regardless of the size of the loan. It automates, standardizes, and streamlines syndication from origination to maturity, enabling lenders and investors to buy, sell and manage loans directly on the LoanStreet website, providing a unique solution to help lenders grow and diversify their balance sheets.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 11.

12.     LoanStreet was cofounded in 2013 in New York, New York by Lampl.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 12.

13.     At the time of this filing, over 1,000 financial institutions, primarily nonprofit credit unions, are registered to do business with LoanStreet.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 13.

14.     Prior to founding LoanStreet, Lampl served as Deputy Chief Counsel for the Office of Financial Stability which administered the Troubled Asset Relief Program (TARP) for the United States Department of Treasury ("Treasury"). Lampl joined Treasury to serve his country in the aftermath of the greatest financial crisis since the Great Depression. Lampl provided sound legal advice at a time of economic unrest and transition. In recognition of his accomplishments and contributions to the Department of the Treasury, Lampl received the Treasury Secretary's Honor Award.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 14.

15.     Most recently, LoanStreet raised an additional $5,000,000 in private equity in December of 2019.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 15.

16.     Troia met LoanStreet in New York City in or around February 2019, when Defendant, an applicant for the position of software engineer with LoanStreet, interviewed with the Company.

**ANSWER:** Defendant admits the allegations of paragraph 16.

17.     Troia was extended an offer of employment on February 28, 2019, with the term of his employment to begin on or about March 18, 2019.

**ANSWER:** Defendant admits the allegations of paragraph 17.

18.     Troia accepted LoanStreet's offer of employment on or about March 4, 2019.

**ANSWER:** Defendant admits the allegations of paragraph 18.

19.     In addition to providing Troia with an annual six-figure salary, LoanStreet provided Troia with the Company's standard employee benefits, as well as granted him options to purchase common stock of the Company, subject to approval by the Board of Directors and the terms and conditions of the Company's 2016 Equity Incentive Plan and stock option grant agreement, wherein the initial portion of his common stock options

would vest and become exercisable on the first anniversary of his vesting commencement date, provided he continued to be employed by the Company.

**ANSWER:** Defendant admits the allegations of paragraph 19.

20.     In fact, Troia received two separate grants of options, the first option grant on July 22, 2019, to purchase 885 shares of common stock of the Company, and the second option grant, on January 15, 2020, to purchase 500 shares of common stock of the Company. Each option grant had its own vesting schedule.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the specific date of the second option grant, but admits the remaining allegations in paragraph 20.

21.     Indeed, as further reflected below, certain statements made by Troia are defamatory precisely because he purposefully and falsely equates the granting of his options with the vesting of his interest. These are not only two separate legal events, but these distinctions, which are critically important, were spelled out in Troia's initial February 2019 offer letter, and were the subject of further written communications after he received his offer letter.

**ANSWER:** Defendant denies the allegations of paragraph 21.

22.     As a condition of Defendant's employment with LoanStreet, Troia executed an NDIAA dated March 4, 2019, which provided, in relevant part, that he "will not do or say (or omit to do or say) anything that is intended, or might reasonably be expected, to harm or disparage the Company, any of its clients or business partners or prospective client or business partners or any of the Company's employees, or to impair the reputation of any of any of the foregoing, or the reputation of any of the services, products, directors, managers, officers or employees of the Company or any of its clients or business partners."

**ANSWER:** Defendant admits the allegations of paragraph 22.

23.     Troia began his term of employment with LoanStreet on or about March 18, 2019, wherein he proceeded to gain valuable professional experience, in the form of education and training from his relationship with LoanStreet.

**ANSWER:** Defendant admits the allegations of paragraph 23.

24.     At least as early as April 2020, Defendant — eminently aware that his time with the Company was drawing to a close — began to post disparaging and defamatory statements on the Internet about LoanStreet.

**ANSWER:** Defendant denies the allegations of paragraph 24.

25.     In an Internet post dated April 14, 2020, entitled "Worse Professional Experience of My Life," Troia wrote: "Without a doubt the worst job I have ever had. Zero product strategy and the place is run more like a law firm/sweatshop than a technology company. It's a shame because the offering has a ton of potential it's just unlikely to ever get there."

**ANSWER:** Defendant denies the allegations of paragraph 25.

26.     The foregoing statement was followed by another Internet post Troia made a short time later on April 25, 2020, wherein he writes under the heading "Most passive-aggressive place I've ever worked:"

> The founders are not skilled nor experienced leaders, with a bias towards pettiness and cowardice, and have established a poor culture that is the opposite of collaborative. The management are both too eager to hire, and too eager to fire. Rather than providing leadership to get the best of employees, management treats employees with suspicion.

> Poor or disorganized management at a software startup can sometimes be tolerable in a startup if the product work is engaging, but unfortunately that wasn't the case. The overall product strategy was weak. Years of engineering effort went into initiatives that were poorly planned, and unsurprisingly were ultimately scrapped. Do not work at this organization as an engineer if you want to feel that your time is valued.

> LoanStreet aspires to have a valuation like a fintech company, but at their heart they are on track to be just the like the banks and credit unions they work with.

**ANSWER:** Defendant denies the allegations of paragraph 26.

27.     On June 12, 2020, LoanStreet terminated Troia's employment for, among other things, the poor quality of his engineering, his lack of engagement with his team, and his inability to cooperate with his peers or take direction from his superiors. Although Defendant was employed and compensated for the entire day of work, before he departed he fired off a company-wide direct message using LoanStreet's Slack instance — followed by an identical company-wide email — wherein Troia called the Company and its leadership into disrepute, in direct violation of his contractual obligations under his NDIAA.

**ANSWER:** Defendant admits LoanStreet terminated his employment on June 12, 2020. Defendant denies knowledge or information sufficient to form a belief as to why LoanStreet terminated his employment. Defendant denies he was employed for the entire day of work on June 12, 2020. Defendant admits he was compensated as if he were employed for the entire day. Defendant admits he sent a company-wide direct message using LoanStreet's Slack instance that included criticism of LoanStreet and its leadership, but denies that it violated the non-disparagement provision of his NDIAA given that Plaintiffs have rescinded that provision as part of a settlement approved by the National Labor Relations Board. Defendant admits sending a company-wide email from his personal email address on June 12, 2020.  Defendant denies that the email was identical to the Slack message.

28.     More specifically, Troia's June 12, 2020 early evening email to Lampl, wherein he copied the entire Company, included a scathing critique of his direct supervisor and LoanStreet's Vice President of Engineering, Larry Adams.

**ANSWER:** Defendant denies that his direct supervisor on June 12, 2020 was LoanStreet's Vice President of Engineering, Larry Adams. Defendant admits his June 12, 2020 email included criticism of Adams.

29.     Troia's email, laden with factual inaccuracies, also suffered from delusions of grandeur; Troia portrayed himself as a near indispensable part of the LoanStreet engineering team.

**ANSWER:** Defendant denies the allegations set forth in paragraph 29.

30.     In his June 12, 2021 email, Troia announced that he would "be doing [his] best to warn all potential future employees to avoid LoanStreet."

**ANSWER:** Defendant denies he sent any email on June 12, 2021 where he stated he would "be doing [his] best to warn all potential future employees to avoid LoanStreet." Defendant admits he stated this in his June 12, 2020 email.

31.     That same day, Defendant was provided with a termination letter and release ("Release") which offered him certain benefits he would not otherwise be entitled to, including, most obviously, a several thousand-dollar severance payment.

**ANSWER:** Defendant admits the allegations of paragraph 31.

32.     Defendant refused to sign LoanStreet's Release.

**ANSWER:** Defendant admits the allegations of paragraph 32.

33.     Less than two weeks after Troia was fired, he once again breached his NDIAA, this time writing a post on the popular company review website Glassdoor.com entitled "Good people, worst career development" (errors in original):

> The company changed lot during mess hiring process, it reflected the very disorganized management at a software start-up. Also, zero product strategy, most of the decision making not based on the team and research, it just from the top management team with no explanation. The company have a valuation like a fintech, however, they on track to be just like the banks and credit unions they work with.

**ANSWER:** Defendant denies the allegations of paragraph 33.

34.     All appeared quiet from Troia from June 25, 2020 until June 13, 2021 — approximately one year from the date of his termination from LoanStreet — when suddenly, and without provocation, he began an unabashed online smear campaign against Plaintiffs.

**ANSWER:** Defendant denies the allegations of paragraph 34.

35.     From June 13, 2021, up until the filing of this Complaint, Troia has made a series of false and defamatory statements on various Internet websites with the intent and effect of whipping up an angry mob directed against LoanStreet and Lampl.

**ANSWER:** Defendant denies the allegations of paragraph 35, except that Defendant admits making statements on various Internet websites from on or around June 13, 2021 up until the filing of this Complaint.

36.     By all accounts, the first of Defendant's post-2020 online defamatory statements was posted on Glassdoor.com on June 13, 2021, with the heading "Cheated me out of equity compensation. Exploitative, fraudulent dumpster fire. Positive reviews are coerced or fake."

**ANSWER:** Defendant denies making any defamatory statements, but admits to posting a statement on Glassdoor.com on or around June 13, 2021. Defendant denies knowledge or information sufficient to form a belief as to the title of the original version of this post.

37.     Defendant's June 13, 2021 statement in its entirety reads (errors in original):

TLDR: Stay far, far away unless you're truly desperate. LoanStreet is a raging dumpster fire and you will get burned like many before. After 15 months of praising my work and as COVID froze the hiring markets in 2020 - they abruptly fired me and withheld $100k in options that they promised me before I was hired.

The annualized turnover rate in the small NYC office during my time there was around 50%. Every two months or so, someone was fired who said they weren't given any warning and the company would tell the same story that this person was given many warnings and opportunities to respond to feedback. I saw a lot of good workers blindsided, some leaving in tears. I thought it was fishy and eventually it happened to me, despite always having received glowing praise from leadership.

Any promises made to you to entice you to sign an offer should be regarded with extreme skepticism. Get everything in writing and reviewed by a good lawyer.

After hiring employees with a promise of unlimited PTO, management rolled out a PTO tracking tool that explicitly capped PTO at 15 days per year.

Before I joined, Cofounder/COO Christopher Wu told me that the first quarter of my stock options would vest after a year. My offer letter said details on the equity compensation would be provided in a separate equity agreement. I wasn't provided that agreement for nearly a year after my start date, and you can imagine my surprise when I say that I wouldn't begin to vest until nearly 16 months of employment. After 15 months of work. I was abruptly fired and didn't receive a single option.

CEO and Cofounder Ian Lampl refused to discuss the matter. He just pocketed the options he promised me. Based on Lampl's valuation goal for the company, he defrauded me out of over $100k.

Because the offer letter omitted the details of the equity compensation, labor lawyers told me I had no case. Keep in mind, LoanStreet is run by lawyers who used to worth at Cravath, a very prestigious and lucrative NYC law firm. I suspect they knew exactly what they were doing when they wrote the offer letter. If it was just a good-faith mistake, they could have done the right thing and granted me the options I earned. They chose not to.

Ian Lampl is the lowest type of man: one whose word means nothing. He is a rich con man. His bland, polite, and nerdy demeanor is affected to disarm and distract you while he has his hands down your pockets.

Placing my trust in LoanStreet was a costly mistake. If you're reading this. please don't be fooled by the Series B funding or the impressive pedigrees of the leaders: this place is a fraudulent, exploitative mess and you have a good chance of being fired within a year.

CEO Ian Lampl is the ringleader of this racket. but Cofounder/COO Christopher Wu. CTO Larry Adams and the rest of leadership are his spineless sycophants. They either agree with Lampl's despicable abuses of his employees or are too cowardly to stand up for what's right.

16

This group will twist employees' arms to post positive reviews after they see this one, just like they have in the past. but this review is the real story and just the tip of the iceberg, given LoanStreet's practice of paying fired employees to sign permanent                                      non-disparagement                                    agreements.

You deserve to be treated with dignity. Work elsewhere.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to whether the alleged statement accurately reflects the statement he posted on or around June 13, 2021, which is no longer available on Glassdoor. Defendant denies that this was his Glassdoor review in its entirety, because it is missing several required elements of such reviews, like the "Pros" and "Advice to Management" sections.

38.     Troia, in turn, linked or copied this same or a nearly identical statement to other online platforms, including, but not limited to, an alumni Slack instance operated by HackReactor.com — the operator of a 12-week immersive software engineering coding program, Reditt.com, Google Ads and Teamblind.com.

**ANSWER:** Defendant denies that he made any post to Reditt.com. If this was an error in the Complaint and Plaintiffs intended to refer to Reddit.com, Defendant admits linking or copying a similar statement to Reddit.com. Defendant admits he posted statements to the mentioned sites that discussed some of the same topics as his Glassdoor post from on or around June 13, 2021, but reiterates his denial of knowledge or information sufficient to form a belief as to whether the alleged statement in paragraph 37 accurately reflects that post.

39.     In doing so, he also commented on his original posts, in the process committing additional breaches of his NDIAA while continuing to defame Plaintiffs.

**ANSWER:** Defendant denies the allegations of paragraph 39, except that he admits he commented on his posts.

40.     Emblematic of his pernicious intentions, Troia not only posted statements to third-party websites railing against Plaintiffs, but he looked to leverage his posts by also commenting on them, thereby fostering a false and continuing narrative as he encouraged readers to "like" and further disseminate his message.

**ANSWER:** Defendant denies the allegations in paragraph 40, except that Defendant admits he commented on his posts and encouraged readers to engage with and spread his message.

41.     This was in addition to Troia's "tagging" of LoanStreet personnel to their profiles on LinkedIn, which in turn resulted in not only a substantial increase in views of Lampl's, LoanStreet and LoanStreet's personnel's LinkedIn profiles, which, under the circumstances, was certainly always met with an initial negative impression, but has also resulted in unsolicited statements being sent to Plaintiffs, some of which contain a threatening and vile tone, such as, for example:

- "Fuck you Christopher Wu you cheating piece of shit."

- "Literally go fuck yourselves. Treat your employees like real people."

- "Fuck You Wu" and "Stop being scum of the earth Wu."

**ANSWER:** Defendant admits he linked in some of his posts to the public LinkedIn profiles of LoanStreet's leadership team. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 41.

42.     An additional post, filled with the same animus as reflected in his prior post, appeared on Reddit.com on or about June 19, 2021, wherein Troia using the handle "Real_Obligation_4449", wrote:

> I worked for LoanStreet in NYC. My equity was supposed to start vesting after 12 months. After I start, they tell me that they actually meant 12 months after the next quarterly board meeting, and I will now start to vest after 16 months. I ask them to change it and they pretend like they're working on it. After 15 months of praising my work, they abruptly fire me Just as COVID is freezing hiring markets, refuse to vest any of the promised equity, and the head of HR (who is also the wife of the CEO and who had spoken to me warmly the night before) refuses to answer my phone calls asking for an explanation, LoanStreet is run by fancy lawyers and were crafty with the offer letter language so I had no legal case.
>
> The only problem I was aware of was that the CTO Larry Adams was upset with me because I discovered and fixed a critical error in code written by one of his favorite engineers. The engineer didn't remember why he had made the change and refused to help me investigate why tests were failing. I privately spoke to him to ask him to be careful with the code in that area because it was tricky, to leave comments if he writes something that might be confusing to another reader, and to feel free to ask me for help in that area since it was my niche in the company. I was trying to do him a favor by not making a more public complaint about it. He ran crying to the CTO, who told me there was no error because we had tests that would have caught it and scolded me for going out of my lane. I wrote a failing test proving that the error existed and that our tests were incomplete. Then I fixed the error. He brusquely told me to fix anything I had broken by making that change. At the next retro "needs improvement" section I said I hoped we could affirm a team norm of being responsible for your code: being able to explain it and to help fix things if it

breaks something. Larry got mad and shut down the conversation. For the next few weeks he worked behind my back to get me fired, as I understand it.

CEO Ian Lampl, his wife and head of HR Alyssa Guttman, COO Christopher Wu, General Counsel Thaddeus Pitney, and CTO Larry Adams are all dirtbags or dirtbag-accomplices. Copying my full Glassdoor review. Please follow the link and mark it as helpful so that the message is amplified and as many people are warned as possible.

**ANSWER:** Defendant admits he posted a message on Reddit under the handle "Real_Obligation_4449" on or about June 19, 2021. Defendant denies knowledge or information sufficient to form a belief as to whether the post in paragraph 42 accurately reflects that post, which is no longer available on Reddit. Defendant denies the remaining allegations in paragraph 42.

43.     Troia has posted other similar defamatory statements to various other Internet websites after June 21, 2021.

**ANSWER:** Defendant denies the allegations of paragraph 43, except that he admits he posted other statements on other Internet websites after June 21, 2021 that discussed topics similar to those discussed in his Reddit message on or around June 19, 2021.

44.     But if the foregoing breaches of his NDIAA and accompanying defamatory statements were not enough, Troia effectively dared Plaintiffs to do anything about it. On or about June 21, 2021, he used his account with his present employer, Microsoft Inc., to once again disparage LoanStreet on www.teamblind.com, as shown below:





**ANSWER:** Defendant denies the allegations of paragraph 44, except he admits he posted the alleged message on www.Teamblind.com using his account connected to his Microsoft email address.


45.     Troia's "doubling down" on the alleged truth of his statements was no surprise; approximately contemporaneously with making the above remarks he sought to modify prior statements he had made on Reddit.com and other websites just days earlier.

Now, prompted by comments by third parties informing him that his initial statements may indeed be defamatory, Troia sought to backtrack from the severity of his initial statements, writing, in relevant part:



**ANSWER:** Defendant denies the allegations of paragraph 44, except he admits he posted the alleged message.

46.     Of course, Troia's meager effort to "unring the bell" was fruitless, as the damage to Plaintiffs' business and reputation had by this time already been sustained and continues to this day. Moreover, Troia's "modifications," such as they are, are entirely self-serving, in that that merely seek to reduce his legal exposure to Plaintiffs after it was

pointed out to him that his statements were defamatory, as opposed to, intending to reduce

any harm to Plaintiffs.

**ANSWER:** Defendant denies the allegations of paragraph 46.

47.     Troia's attempt to rationalize his earlier defamatory statements is incredible,

does nothing to mitigate the harm he caused, and continues to cause Plaintiffs harm, and,

in fact, is a tacit admission that his earlier initial statements are defamatory.

**ANSWER:** Defendant denies the allegations of paragraph 47.

48.     If there were any doubt as to the wickedness of Troia's intentions, they can

be put to rest. Troia has taken to buying Google Ads using LoanStreet's registered

trademark LOANSTREET (U.S. Reg. No. 4,618,232) (the "Mark") to promote his false

statements; these statements appear at the top of Google searches for "LoanStreet."

**ANSWER:** Defendant denies the allegations of paragraph 48, except that

Defendant admits he purchased Google Ads that contained the term "LoanStreet."

Defendant denies knowledge or information sufficient to form a belief as to whether these

statements appeared at the top of Google searches for "LoanStreet" at the time of the filing

of the Complaint.

49.     Exemplars of Troia's Google Ads, as shown below, when clicked on resolve

to his June 2021 Reddit.com post and the now more than 200 comments that accompany

it:



**ANSWER:** Defendant notes that the ads in paragraph 49 are presented in a grossly

misleading fashion: completely isolated from their contexts, given thick black borders that

the actual ads did not have, and placed in a consecutive sequence of four when Google

would have displayed at most one ad from Mr. Troia on a single page of search results.

Defendant denies knowledge or information sufficient to form a belief as to whether the

alleged ads in paragraph 49 qualify as "exemplars" of his ads. Defendant otherwise admits

the allegations in paragraph 49, except that he denies the phrase "See photos See outside" was part of any of his ads.

50.     The foregoing Google Ads, and others like them, are particularly injurious to LoanStreet because they each independently serve as additional defamatory statements within the context of their publication as a whole and which are based on undisclosed facts or on facts that Plaintiffs' challenge as untrue.

**ANSWER:** Defendant denies the allegations in paragraph 50.

51.     Troia's Google Ad campaign is designed to cause a likelihood of consumer confusion including, *inter alia*, by the use of the same Mark such that the phrase comprising the Mark, "LoanStreet," appears in organic search results for the term "LoanStreet" and link to Troia's false and defamatory statements located at https://www.reddit.com/r/cscareerquestions/comments/o3jpfc/name_and_shame_loanstreet_ny_cheated_me_out_of/.

**ANSWER:** Defendant denies the allegations of paragraph 51, except that Defendant admits his Google Ads containing the term "LoanStreet" and linking to the cited Reddit post have appeared in the *paid* search results for the term "LoanStreet."

52.     Troia's Google marketing campaign deliberately and willfully is designed to, and does, use (i) the Mark in key words for advertising in interstate commerce on Google Ads, so that individuals who use or type the Mark will be presented with Troia's Reddit.com post and, additionally, (ii) the phrase "LoanStreet" in advertisements seen by customers and prospective job applicants, which in context are confusingly similar, and likely to cause confusion as to the affiliation, connection or association, or origin, sponsorship or approval between plaintiff LoanStreet and Troia.

**ANSWER:** Defendant admits his Google marketing campaign was designed to show his ads to individuals who searched for terms including the keyword "LoanStreet." Defendant admits his ads included the word "LoanStreet" to nominatively refer to LoanStreet as the subject of the warnings and criticisms in his linked Reddit post. Defendant denies all other allegations of paragraph 52.

53.     Indeed, Troia baits consumers by using the Mark in keyword advertising, to drive consumers expecting to find LoanStreet, a financial services company, to Troia's defamatory statements, which use the phrase "LoanStreet" in a deceptively similar manner, to confuse, and switch, those consumers searching for LoanStreet to believe they found the Company or statements made by or otherwise endorsed by the Company.

**ANSWER:** Defendant denies the allegations of paragraph 53.

54.     When a consumer searches for LoanStreet and is immediately presented with ads using the phrase "LoanStreet," under the search term "LoanStreet," it creates confusion as a consequence of the expectation that Google returns businesses related to the search term (which because of LoanStreet's inherently distinctive Mark increases the likelihood of association with the returned search results).

**ANSWER:** Defendant denies the allegations of paragraph 54.

55.     Troia's Google Ad campaign also drives up the cost of LoanStreet's own legitimate Google Ad campaign that utilizes its Mark, as Google charges a premium to Adwords users based on the popularity of selected key words.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 55.

56.     On or about June 16, 2021, Plaintiffs discovered that Troia had published defamatory or disparaging statements about them in violation of New York law and Troia's explicit contractual commitments.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to when Plaintiffs learned that Defendant had posted any of his post-2020 statements. Defendant denies all other allegations in paragraph 56.

57.     On June 24, 2021, Plaintiffs served Troia with a letter explaining that his statements (i) were a breach of his NDIAA; and (ii) constituted, at a minimum, defamation *per se.*

**ANSWER:** Defendant admits Plaintiffs sent Defendant the alleged letter.

58.     Plaintiffs' letter further demanded (i) a retraction of all defamatory and disparaging statements concerning Plaintiffs; (ii) an immediate cessation from publishing any defamatory statements about Plaintiffs; and (iii) full compliance with his contractual obligations under his NDIAA.

**ANSWER:** Defendant admits Plaintiffs made these demands in the letter.

59.     Through counsel, Troia refused Plaintiffs' attempt to resolve this matter privately on July 2, 2021.

**ANSWER:** Defendant admits he refused to agree to Plaintiffs' conditions for Plaintiffs not filing this suit. Defendant denies knowledge or information sufficient to form a belief as to the exact date of this refusal, but admits July 2, 2021 is approximately correct.

60.     Troia was aware that the above defamatory statements set forth above were false when he made them. At the very least, these statements were made in reckless or conscious disregard of the truth.

**ANSWER:** Defendant denies the allegations of paragraph 60.

61.     Troia has routinely disregarded and continues to blatantly disregard matters of verifiable fact. He is maliciously defaming Plaintiffs for the sole purpose of increasing traffic to his posts. Troia is generating false and misleading information, by creating sensational, "click-bait" headlines and deceitful posts, purchasing Google Ads to directly increase Internet traffic to his false and defamatory posts, all in an effort to negatively affect LoanStreet's reputation, business and revenues, and decrease the valuation of LoanStreet.

**ANSWER:** Defendant denies the allegations of paragraph 61.

62.     As a direct and proximate result of the foregoing defamatory statements and tortious actions of Troia, Plaintiffs have sustained, and will continue to sustain, immediate and irreparable harm and injury, including, but not limited to, damage to reputation, loss of profits, loss of business relations with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy. These actions also threaten to destroy the livelihoods of LoanStreet's over-50 employees. The irreparable harm to Plaintiffs will continue, without any adequate remedy at law, unless and until Troia's unlawful conduct is enjoined by this Court.

**ANSWER:** Defendant denies the allegations of paragraph 62.

63.     As such, LoanStreet and Lampl now bring claims against Troia for breach of contract, defamation *per se*, defamation, injurious falsehood, federal and common law unfair competition, and seek injunctive relief, as well as monetary damages.

**ANSWER:** Paragraph 63 is a summary of Plaintiffs' claims and sought relief and damages in their Complaint and requires no response. To the extent a response is required, Defendant denies the validity of Plaintiffs' claims and denies that Plaintiffs are due any relief.

## COUNT I: BREACH OF CONTRACT

Plaintiffs' first cause of action has been dismissed with prejudice (*See* Dkt. 40). As a result, no answer is required to paragraphs 64 through 73.

## COUNT II: DEFAMATION *PER SE*

74.     Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

**ANSWER:** Defendant reincorporates herein by reference its answers to the allegations contained in paragraphs 1 through 63 of the Complaint.

75.     Troia intentionally made knowingly false and defamatory statements of fact about Plaintiffs to third-parties that were reasonably understood by those who read or heard them to be statements of fact regarding Plaintiffs' operation of LoanStreet.

**ANSWER:** To the extent the allegations of paragraph 75 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

76.     Specifically, Troia's defamatory *per se* statements include, without limitation, the aforementioned false and defamatory assertions, that:

a) "[LoanStreet] withheld $100k in options that they promised me before I was hired."

b) "[Lampl] just pocketed the options he promised me";

c) "[Lampl] defrauded me out of over $100k";

d) "[Lampl] is a rich con man";

e) "[LoanStreet] is a fraudulent, exploitative mess";

f) "Look in the mirror and ask yourselves how your loved ones would feel if they knew you cheat people just to make your big piles of cash a little bigger"; and

g) "LoanStreet (NY) cheated me out of equity";

(collectively, the "Troia Statements").

**ANSWER:** To the extent the allegations of paragraph 76 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies knowledge or information sufficient to form a belief as whether the alleged statements accurately reflect

31

his posts, most of which are no longer available on the Internet in their original forms, and notes that statements 76(f) and 76(g) are not actually aforementioned in the Complaint.

77.     The Troia Statements are all false, misleading, and defamatory in that they falsely imply that Plaintiffs are engaged in crimes of moral turpitude by virtue of their fraud and have engaged in matters incompatible with the proper conduct of Plaintiffs' business, trade, or office.

**ANSWER:** To the extent the allegations of paragraph 77 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

78.     Troia communicated these lies (the Troia Statements) to LoanStreet's prospective job-applicants and the public at large even though he knew them to be untrue when he made the statements.

**ANSWER:** Defendant denies the allegations of paragraph 78, except that Defendant admits communicating statements to LoanStreet's prospective job applicants and the public at large.

79.     In publishing the Troia Statements, Troia acted maliciously, oppressively, with an improper and evil motive, and if not with knowledge that the Troia Statements were false, then in reckless or conscious disregard of the truth.

**ANSWER:** Defendant denies the allegations of paragraph 79.

80.     Troia acted without any privilege or authorization when he published the Troia Statements.

**ANSWER:** Defendant denies the allegations of paragraph 80, except that Defendant admits he did not have the authorization of Plaintiffs to publish the Troia Statements.

81.     Troia disseminated and published the Troia Statements on, at a minimum, the alumni Slack.com instance for Hack Reactor, Glassdoor.com, Reddit.com, Google Ads, and Teamblind.com and in a manner that achieved widespread exposure to a global Internet audience.

**ANSWER:** Defendant refers to his answer to paragraph 76 as to whether he published the "Troia Statements." Defendant admits he published statements on the specified sites. Defendant denies knowledge or information sufficient to form a belief as to whether these statements achieved "widespread exposure to a global Internet audience."

82.     The Troia Statements were malicious and false statements of fact that expose Plaintiffs to hatred, contempt, or aversion, or induce an evil or unsavory opinion of Plaintiffs in the minds of a substantial number of the community and the financial industry.

**ANSWER:** Defendant denies the allegations of paragraph 82.

83.     The Troia Statements were made with the intent to harm and out of hostility towards Plaintiffs.

**ANSWER:** Defendant denies the allegations of paragraph 83.

84.     The Troia Statements are defamatory *per se* because Troia has charged Plaintiffs with serious criminal offenses.

**ANSWER:** To the extent the allegations of paragraph 84 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

85.     Moreover, the Troia Statements are defamatory *per se* in that they tend to impugn Plaintiffs' reputations in their business, trade, and profession, and indeed have harmed Plaintiffs in their business, trade, and profession.

**ANSWER:** To the extent the allegations of paragraph 85 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

86.     As a result of the Troia Statements published by Defendant, Plaintiffs' relationships with their potential and existing investors, clients, marketing partners, employees, prospective employees, and vendors have been undermined and damaged.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 86.

87.     As a result of the Troia Statements published by Troia, Plaintiffs have been forced to make an expenditure of money and resources to remedy the defamation.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 87.

88.     In addition to the foregoing, Lampl has suffered, and will continue to suffer, non-economic damages, such as personal humiliation, emotional distress, and damage to his reputation and standing in the community.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 88.

89.     The Troia Statements were made about and concerning Plaintiffs with the specific intent to cause harm to Plaintiffs, and Troia did so willfully and with malice, and, thus, Plaintiffs are entitled to, in addition to other damages and amounts, an award of punitive and exemplary damages.

**ANSWER:** To the extent the allegations of paragraph 89 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

90.     As a direct and proximate cause of the false and defamatory statements, Plaintiffs have suffered, and continue to suffer, substantial damages, including, without limitation in the reasonable expectation loss of current and/or future clients and employees, and, accordingly, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $1,000,000.

**ANSWER:** To the extent the allegations of paragraph 90 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

## COUNT III: DEFAMATION

91.     Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

**ANSWER:** Defendant reincorporates herein by reference its answers to the allegations contained in paragraphs 1 through 90 of the Complaint.

92.     Troia published and republished the statements as alleged herein.

**ANSWER:** Defendant admits he published and republished some of the statements alleged in paragraph 93. See answer to paragraph 93 below.

93.     Troia's statements contain false assertions of fact, including the false statements referenced above, which include, but are not limited to:

a)  "Based on Ian Lampl's valuation goal for the company, he defrauded me out of over $100k";

b)  "They promised me substantial equity with a standard one-year vesting cliff, then abruptly fired me after 15 months of work and refused to grant me the options";

c)  "After I started, they told me that they actually meant 12 months after the next quarterly board meeting, and I would only start to vest after 16 months. I asked them to change it. They dragged their feet for months, pretending to work on it";

d)  "After 15 months of praising my work, they abruptly fired me . . .";

e)  "LoanStreet fires people without warning . . .";

f)  "The company has been operating with impunity because they fire people without warning";

g)  "After hiring employees with a promise of unlimited PTO, management rolled out a PTO tracking tool that explicitly capped PTO at 15 days per year"; and

h)  "A large percentage of LoanStreet engineers when I was there were bootcamp grads".

(collectively, the "Additional Troia Statements").

**ANSWER:** Defendant admits making statements 93(c), 93(d), 93(g), and 93(h). As to the remaining statements, Defendant denies knowledge or information sufficient to form a belief as to whether the alleged statements accurately reflect his posts, many of which are no longer accessible on the Internet in their original forms. The Complaint fails to specify where any of the alleged statements in paragraph 93 supposedly originate from, with the exception of 93(g), which is excerpted from the alleged June 13, 2021 Glassdoor statement in paragraph 37. Defendant denies the remaining allegations in paragraph 93.

94.  As a consequence of the Additional Troia Statements, Plaintiffs have suffered actual and special damages as further set forth herein.

**ANSWER:** To the extent the allegations of paragraph 94 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

95.    Troia acted with actual malice consisting of the intent to harm Plaintiffs professionally by virtue of, among other things, publishing his statements which falsely criminalizes and sensationalizes Plaintiffs' legitimate business activities.

**ANSWER:** To the extent the allegations of paragraph 95 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

96.    Troia acted without any privilege or authorization when he published his statements.

**ANSWER:** Defendant denies the allegations of paragraph 96, except that Defendant admits he did not have the authorization of Plaintiffs to publish his statements.

97. In the alternative, Troia acted negligently in his publication of the Additional Troia Statements.

**ANSWER:** To the extent the allegations of paragraph 97 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

98.     Alternatively, the Additional Troia Statements were made with the knowledge that the statements were false or with reckless disregard as to their truth or falsity, and for the purpose of defaming Plaintiffs. To wit, Troia knew that the Additional Troia Statements were false when he published them because he knew, or should have known, of the true state of affairs relating to Plaintiffs.

**ANSWER:** To the extent the allegations of paragraph 98 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

99.     In addition to the foregoing, Lampl has suffered and will continue to suffer non-economic damages, such as personal humiliation, emotional distress, and damage to his reputation and standing in the community.

**ANSWER:** To the extent the allegations of paragraph 99 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

100.    The Additional Troia Statements were made about and concerning Plaintiffs with the specific intent to cause harm to Plaintiffs, and Troia did so willfully and with malice, and, thus, Plaintiffs are entitled to, in addition to other damages and amounts, an award of punitive and exemplary damages.

**ANSWER:** To the extent the allegations of paragraph 100 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

101.    As a direct and proximate cause of the false and defamatory statements, Plaintiffs have suffered, and continue to suffer, substantial damages, including, without limitation in the reasonable expectation loss of current and/or future clients and employees, and, accordingly, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $1,000,000.

**ANSWER:** To the extent the allegations of paragraph 101 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

## COUNT IV: INJURIOUS FALSEHOOD

Plaintiffs fourth cause of action has been dismissed by Opinion and Order, Dkt. 39, so no answer is required to paragraphs 102 through 109.

## COUNT V: UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER § 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(A)

110.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

**ANSWER:** Defendant reincorporates herein by reference its answers to the allegations contained in paragraphs 1 through 101 of the Complaint.

111.    LoanStreet is the owner of a valid and subsisting United States Trademark Registration No. 4,618,232 on the Principal Register for the Mark for "Providing temporary use of non-downloadable software to facilitate and/or manage the buying or selling of any loan, including whole loans, a portion of any loan, loan assignment, loan participation or any economic interest in a loan" in International Class 42, which was issued by the United States Patent and Trademark Office on October 7, 2014, 2020.

**ANSWER:** Defendant admits that United States Trademark Registration No. 4,618,232 ("the '308 Registration") lists "LOANSTREET INC." as its owner. To the extent the remaining allegations of Paragraph 111 deviate from that recited on the face of the '308 Registration, Defendant denies them.

112.    LoanStreet, or its predecessor in interest, has used the Mark in commerce throughout the United States continuously since at least January 1, 2014, in connection with, *inter alia*, the manufacture, distribution, offering for sale, sale, marketing, advertising and promotion of "non-downloadable software to facilitate and/or manage the buying or selling of any loan, including whole loans, a portion of any loan, loan assignment, loan participation or any economic interest in a loan."

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 112.

113.    As a result of its widespread, continuous, and exclusive use of the Mark to identify its services and Plaintiffs as to their source, LoanStreet owns valid and subsisting federal statutory and common law rights in and to the Mark.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 113.

114.    The Mark is distinctive to both the consuming public and Plaintiffs' trade.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 114.

115.    The Mark is distinctive to both the consuming public and Plaintiffs' trade.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 115.

116.    Troia has marketed, advertised, promoted, and otherwise purchased an infringing mark ("LOANSTREET", hereinafter the "Infringing Mark") as Adwords and keywords via Internet search engines.

**ANSWER:** Defendant denies the allegations of paragraph 116, except that he admits purchasing Internet search engine ads containing the word "LoanStreet" on keywords involving the word "LoanStreet."

117.    Troia's acts are willful with the deliberate intent to trade on the goodwill of the Mark, cause confusion and deception in the marketplace, and divert potential sales of LoanStreet services, as well potential new hires, away from LoanStreet.

**ANSWER:** Defendant denies the allegations of paragraph 117.

118.    Troia's unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive would-be consumers of LoanStreet's services as well as prospective employees, as to the origin, source, sponsorship, or affiliation, and is likely to cause these same individuals to believe, contrary to fact, that Troia is in some way affiliated, sponsored by, or otherwise endorsed by LoansStreet [sic] when he is not.

**ANSWER:** Defendant denies the allegations of paragraph 118.

119.    Troia's activities as described above constitute false designation of origin and unfair competition, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER:** To the extent the allegations of paragraph 119 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

120.    Troia's false designations of origin and unfair competition have been intentional, willful, and malicious.

**ANSWER:** To the extent the allegations of paragraph 120 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

121.    Troia's acts of false designations of origin and unfair competition have caused and, unless enjoined, will continue to cause substantial and irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, including at least substantial and irreparable injury to the goodwill and reputation for quality associated with Plaintiffs' services.

**ANSWER:** To the extent the allegations of paragraph 121 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

## COUNT VI: COMMON LAW UNFAIR COMPETITION

122.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

**ANSWER:** Defendant reincorporates herein by reference its answers to the allegations contained in paragraphs 1 through 121 of the Complaint.

123.    LoanStreet owns all rights, title to, and interest in the Mark and all common law rights in such trademark including all variations of its Mark.

**ANSWER:** Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 123.

124.    By imitating the Mark in bad faith in furtherance of his false and malicious narrative, Troia has engaged in unfair competition and is infringing the Mark and has made, and is making, false representations that Troia's statements are somehow affiliated, sponsored by, or otherwise endorsed by LoanStreet, when they are not.

**ANSWER:** To the extent the allegations of paragraph 124 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

125.    As a result of Troia's conduct, the public is likely to believe that Troia's statements have been approved by or are in some way affiliated with Plaintiffs when they are not.

**ANSWER:** Defendant denies the allegations of paragraph 125.

126.    Troia's conduct is likely to cause confusion, mistake, and deception among consumers, the public, and the trade as to whether Troia's unlawful statements originate from, or are affiliated with, sponsored by, or endorsed by Plaintiffs.

**ANSWER:** Defendant denies the allegations of paragraph 126.

127.    As a direct and proximate result of Troia's unlawful conduct, as herein alleged, Plaintiffs have suffered, and will continue to suffer, unless and until such activity is enjoined by this Court, irreparable damage and inherently unquantifiable injury and harm to its business, reputation, and consumer and employee goodwill.

**ANSWER:** To the extent the allegations of paragraph 127 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

128.    Moreover, Troia's conduct has caused, and will continue to cause, LoanStreet to lose sales and prospective job applicants and investors to which it otherwise would be entitled, unless and until such activity is enjoined by this Court.

**ANSWER:** To the extent the allegations of paragraph 128 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

129.    Troia's willful and deliberate conduct is causing, and is likely to continue to cause, injury to the public and to Plaintiffs, and Plaintiff is entitled to injunctive relief and to recover Plaintiffs' actual damages, costs, and reasonable attorneys' fees.

**ANSWER:** To the extent the allegations of paragraph 129 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

## COUNT VII: PERMANENT INJUNCTIVE RELIEF

130.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

**ANSWER:** Defendant reincorporates herein by reference its answers to the allegations contained in paragraphs 1 through 129 of the Complaint.

131.    Troia's statements remain accessible on the Internet as of the date of filing this Complaint.

**ANSWER:** Defendant's Glassdoor post published on or around June 13, 2021 was heavily modified before the filing of the Complaint and thereafter no longer included many of the statements Plaintiffs allege are defamatory. Defendant denies knowledge or information sufficient to form a belief as to whether his statement on HackReactor.com's alumni Slack instance and his Reddit.com post on or about June 19, 2021 were still accessible as of the date of the filing of this Complaint, but both are not accessible today. Defendant admits his Teamblind.com post and Google ads remained accessible on the Internet as of the date of the filing of this Complaint.

132.    Troia's conduct has caused, and unless enjoined will continue to cause, substantial and irreparable injury to Plaintiffs and their reputation.

**ANSWER:** To the extent the allegations of paragraph 132 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

133.    By reason of the foregoing, Plaintiffs have suffered, and will continue to suffer, harm that cannot be addressed by monetary damages alone.

**ANSWER:** To the extent the allegations of paragraph 133 are deemed to be allegations of law, Defendant is not required to plead thereto; to the extent the allegations of said paragraph are deemed to be allegations of fact, Defendant denies the allegations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendant and award the following relief to Plaintiffs:

A.  A permanent injunction requiring the removal of the Troia Statements as well as the Additional Troia Statements as set forth above;

B.  Presumed, actual, special and/or compensatory damages in an amount to be proven at trial;

C.  Punitive damages;

D.  The costs, disbursements and expenses of this action;

E.  Reasonable attorneys' fees;

F.  Pre- and post-judgment interest on the sum of any presumed, actual, special or compensatory damages; and

G.  Such other relief as the Court may deem just and proper.

**ANSWER:** Defendant denies that Plaintiffs are entitled to any of the requested relief set forth in their Prayer for Relief.

## AFFIRMATIVE DEFENSES PREAMBLE

The Complaint, on each of the counts set forth therein, fails to state a claim upon which relief can be granted, due to the affirmative defenses below.

By setting forth the below affirmative defenses, Defendant does not assume any burden of proof as to any fact issue or other element of any cause of action that properly belongs to Plaintiffs.  Defendant reserves the right to amend or supplement his affirmative defenses.

## AFFIRMATIVE DEFENSES TO COUNTS OF DEFAMATION AND DEFAMATION PER SE

### First Affirmative Defense
(Opinion Privilege)

Defendant's statements are statements of opinion, and thus are not defamatory.

### Second Affirmative Defense
(Substantial Truth Privilege)

Even if defendant's statements were considered to be statements of fact, they are substantially true and thus are not defamatory.

### Third Affirmative Defense
(Moral Duty Privilege)

Defendant made his statements while exercising a moral duty to inform current and potential LoanStreet employees about Plaintiffs' mistreatment of its employees. The recipients of the information had a clear interest in receiving it: avoiding harm. The

statements were made without intent to cause harm to Plaintiffs. Thus, Defendants' statements are protected by moral duty qualified privilege and Plaintiffs cannot recover for defamation without proving actual malice or that the one and only cause for the statements was common-law malice.

### Fourth Affirmative Defense
#### (Common Interest Privilege)

Defendant's statements conveyed to Plaintiff's prospective job applicants valuable information about Plaintiffs' mistreatment of its employees. Defendant and his audience shared an interest in their collective welfare as workers. Therefore, Defendant's statements are protected by the common interest qualified privilege. Plaintiffs cannot recover for defamation without proving actual malice.

### Fifth Affirmative Defense
#### (SLAPP Suit Violation)

Plaintiffs' action is a Strategic Lawsuit Against Public Participation ("SLAPP") suit prohibited by New York law. Plaintiffs cannot recover for defamation without proving actual malice.

### Sixth Affirmative Defense
#### (No Actual Malice)

Defendant acted at all relevant times without actual malice.

### Seventh Affirmative Defense
#### (Defendant's Good Faith and Due Care)

Defendant acted at all relevant times in good faith, with due care, and without negligence towards Plaintiffs.

### Eighth Affirmative Defense
(Failure to Mitigate Damages)

Plaintiffs have failed to properly mitigate their damages.

### ADDITIONAL AFFIRMATIVE DEFENSE TO COUNT OF DEFAMATION PER SE

### First Affirmative Defense
(No Accusation of a Serious Crime)

Defendant's statements explicitly do not charge Plaintiffs with a crime, much less a serious crime, and thus are not defamatory *per se*.

### AFFIRMATIVE DEFENSES TO COUNTS OF UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER § 43(a) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(A), AND COMMON LAW UNFAIR COMPETITION

### First Affirmative Defense
(First Amendment)

Defendant's Google ads are communicative, non-commercial expressions of commentary and criticism. They do not use the term "LoanStreet" as a source identifier. As a result, the First Amendment of the United States Constitution's protection of free expression places them beyond the reach of the Lanham Act.

### Second Affirmative Defense

(No Likelihood of Confusion)

Defendant's Google ads are not likely to cause confusion as to whether Plaintiffs are affiliated with, connected with, associated with, originated, sponsored, or approved the ads, and thus do not constitute unfair competition or false designation of origin under the Lanham Act.

### Third Affirmative Defense
(Nominative Fair Use)

Defendant's Google ads are protected under the doctrine of nominative fair use.

## ADDITIONAL AFFIRMATIVE DEFENSE TO COUNT OF COMMON LAW UNFAIR COMPETITION

### First Affirmative Defense
(No Bad Faith)

Defendant at no time used the Plaintiffs' trademark in bad faith, that is, dishonestly or with intent to deceive users of Google's search engine that Plaintiffs were affiliated with, connected with, associated with, originated, sponsored, or approved Defendant's ads. As a result, Defendant's use of Plaintiffs' trademark does not constitute unfair competition under New York law.

## AFFIRMATIVE DEFENSES TO COUNT OF PERMANENT INJUNCTIVE RELIEF

### First Affirmative Defense
(Unclean Hands, Estoppel, Waiver)

Plaintiffs' claims are barred by the doctrines of unclean hands, estoppel, and waiver.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendant hereby demands trial by jury in this action of all issues so triable.

## COUNTERCLAIMS

Wyatt Troia ("Defendant," or "Counterclaimant"), appearing *pro se*, hereby asserts these Counterclaims, pursuant to Rule 13 of the Federal Rules of Civil Procedure, against LoanStreet Inc. and Ian Lampl ("Plaintiffs" or "Counterdefendants"), and alleges as follows:

## THE PARTIES

1.      LoanStreet Inc. ("LoanStreet" or the "Company") is a Delaware corporation with a principal place of business located at 29 West 30th Street, New York, NY 10001.

2.      Ian Lampl ("Lampl") is a resident of New York and resided within the state at all times relevant to this lawsuit.

3.      Wyatt Troia ("Troia") is a resident of New York and resided within the state at all times relevant to this counterclaim.

## JURISDICTION AND VENUE

4.      Since these counterclaims form part of the same case or controversy as Plaintiffs' claims in this action, this Court has supplemental jurisdiction over the counterclaims pursuant to 28 U.S.C. § 1367.

## FACTS

5.      Plaintiffs brought their lawsuit in a calculated, brazen, and unlawful attempt to chill Defendant's protected speech, which aimed to warn people considering employment with Plaintiffs that Plaintiffs have a history of mistreating their employees. Plaintiffs' initiation and continuation of this action infringes upon Defendant's First Amendment rights and violates New York law, which prohibits abusing the justice system in this way. Plaintiffs' unlawful action is especially audacious because it is aimed at covering up Plaintiffs' previous violations of New York law committed when Plaintiffs deprived Defendant of a stock option that Plaintiffs used to entice Defendant to work for Plaintiffs.

6.      Mr. Troia has worked for large and small companies over the last eight years as a brand manager and a software engineer. Mr. Troia currently works as a software engineer for Microsoft. Mr. Troia has never been involuntarily terminated, aside from by Plaintiffs.

**LoanStreet Hires Mr. Troia With Promises of an Equity Grant**

7.      On or around February 28, 2019, Alyssa Guttman, LoanStreet's then-head of human resources and the wife of CEO Lampl, called Mr. Troia to inform him that LoanStreet was extending him an offer of employment.

8.      On February 28, 2019, LoanStreet General Counsel Thaddeus Pitney sent Mr. Troia an email containing an offer letter that detailed the terms and conditions of the proposed employment (the "Offer Letter"). This email and offer letter are attached as

Exhibits A and B. The Offer Letter's "Compensation and Employee Benefits" section's first subsection was entitled "Generally," which read:

> You will be paid a starting annual salary of $100,000, payable on the Company's regular payroll dates. You will be entitled to the Company's standard employee benefits, which may be changed from time to time. This position is classified as exempt in accordance with federal and applicable state wage and hour laws, so you will not be eligible for overtime pay.

and the second subsection was entitled "Equity Grant," which read:

> Subject to the approval of the Board of Directors of the Company (the "Board"), the Company will grant you an option (the "Option") to purchase 885 shares of common stock, $0.0001 par value per share, of the Company (the "Common Stock"). The exercise price per share of the Option will be equal to the fair market value per share of the Common Stock on the date of grant, as determined by the Board. The Option will be subject to the terms and conditions of the Company's 2016 Equity Incentive Plan (the "Plan"), as the same may be amended from time to time, and a separate stock option grant agreement between the Company and you that sets forth the terms of the option grant (e.g. exercise price, expiration date, and vesting schedule of the stock options). Subject to the terms of the Plan and the stock option grant agreement, the Option will vest and become exercisable as to 25% of the shares subject to the Option on the first anniversary of the vesting commencement date and as to 1/36th of the remaining shares subject to the options at the end of each full month thereafter. Vesting will, of course, depend on your continued employment with the Company. Upon receipt of this countersigned offer letter and the Board's approval of the Option, we will prepare the option agreement with all the details.

9.     In this email to Mr. Troia, Mr. Pitney used the phrase "your options" when referencing the equity grant, underscoring how LoanStreet deliberately represented to Mr. Troia that he would be entitled to the equity grant if he performed certain actions that would benefit LoanStreet. Specifically, LoanStreet represented to Mr. Troia that LoanStreet would grant the option to Mr. Troia if he accepted the offer of employment and that LoanStreet would begin vesting the option if he worked for LoanStreet for one year.

10.     During Mr. Troia's call with Ms. Guttman on or around February 28, 2019, Ms. Guttman mentioned the equity grant component of the offer and told Mr. Troia that, if he wanted, LoanStreet Co-founder and then-Chief Operating Officer Chris Wu could call him and further explain the equity grant. Mr. Troia requested that Ms. Guttman ask Mr. Wu to do so. On or around February 28, 2019, Mr. Wu called Mr. Troia. In the call, regarding the vesting schedule, Mr. Wu said that the first quarter of the grant would vest after a year. Mr. Wu said nothing that indicated the timing of this initial vesting would or could be set by LoanStreet for a date substantially after the first anniversary of the beginning of Mr. Troia's employment with LoanStreet.

11.     Relying on Mr. Wu's explanation of the terms of the equity grant, on or around March 4, 2019 Mr. Troia accepted LoanStreet's offer and on or around the same date declined an alternative formal offer of employment with specified terms from Fluz Fluz LLC, which was developing a social cash-back app. The Fluz Fluz offer letter is attached as Exhibit C.

**Mr. Troia Begins Working at LoanStreet, Receives Glowing Praise**

12.     Mr. Troia began working for LoanStreet on March 18, 2019.

13.     Within months, LoanStreet management began praising Mr. Troia's job performance.

14.     In a call on or about June 6, 2019, Ms. Guttman told Mr. Troia that he was "knocking it out of the park." When Mr. Troia expressed concern about a senior engineer coworker who was recently fired without warning, Ms. Guttman – ironically, given LoanStreet's later surprise firing of Mr. Troia – told Mr. Troia that he shouldn't be worried

about getting fired without warning. Ms. Guttman said that the recent firing was an exception and that in the future there would be multiple conversations between an employee and his or her manager to try to fix issues before involuntary termination would happen.

15.     On or about June 19, 2019, Larry Adams, then a senior engineering manager at LoanStreet overseeing Mr. Troia's team, told Mr. Troia that he was a highly valued member of the team because he gets done what he says he will and he figures out what he needs to get the job done.

16.     On or about July 16, 2019, Ranna Bansal – a veteran engineer who had been with LoanStreet since its early years and who was the primary engineer responsible for LoanStreet's only money-making product at the time – and Dae Choi – then the Vice President of Engineering at LoanStreet who oversaw all engineering – told Mr. Troia that people at LoanStreet were very happy with him. They praised Mr. Troia for being versatile, thoughtful, thorough, and mistake-averse.

17.     On or about July 18, 2019, Ms. Guttman told Mr. Troia that LoanStreet couldn't be happier with him. Ms. Guttman said Mr. Troia was very versatile and that management wanted Mr. Troia to assume management responsibilities himself in the future.

18.     On or about July 18, 2019, Mr. Adams praised Mr. Troia for being good about keeping things simple and thereby being a good influence on Mr. Bansal.

19.     Sometime in January 2020, Ms. Guttman told Mr. Troia that his professional experience, analytical skills, and thinking would make him a great manager.

Ms. Guttman told Mr. Troia that LoanStreet really valued him and thought he had a ton of potential.

20.     On January 27, 2020, during a formal performance review, Mr. Adams told Mr. Troia that he had made a big positive impact on the company with his primary engineering project over the past twelve months.

**Mr. Troia Inquires About the Status of His Promised Equity Grant**

21.     On December 31, 2019, in response to Mr. Troia's strong job performance since he had been hired, LoanStreet offered Mr. Troia two options for increased compensation: either a $110,000 salary and the grant of an additional option to purchase 500 shares, or a $115,000 salary and no additional option grant.

22.     In January 2020, Mr. Troia met separately with Mr. Lampl and Mr. Pitney to better understand the value of the option grant being offered to him as part of the first option for increased compensation. Mr. Troia asked Mr. Lampl what the projected range of LoanStreet's potential exit valuation was; Mr. Lampl responded that $1,000,000,000 was the goal for the investors. Mr. Troia asked Mr. Pitney how many fully diluted LoanStreet shares existed; Mr. Pitney responded that LoanStreet was authorized to issue 2,050,000 shares. Mathematically, this would result in a share price of about $500.

23.     At the same meeting in January 2020, Mr. Troia asked Mr. Lampl whether LoanStreet, which kept its employees largely in the dark about the company's financial health, could provide its employees with more financial transparency so that they could make a more informed estimation of the value of the option grants that LoanStreet sometimes offered them in lieu of cash. Mr. Lampl declined, saying that he didn't want to

share information that might demotivate LoanStreet's sales team. Given that Mr. Lampl, as CEO, possessed far more knowledge than Mr. Troia, an employee, about the financial health of LoanStreet and its prospects for an exit, Mr. Troia was left to rely largely on Mr. Lampl's $1,000,000,000 exit valuation target when estimating the value of the option grant included in the first compensation option.

24.     During the course of estimating the value of the option grant, Mr. Troia realized that LoanStreet had never sent him the stock option grant agreement promised in his Offer Letter, which was supposed to set forth the terms of the option grant, including its vesting schedule.

25.     Mr. Troia asked LoanStreet management to send him the agreement.

26.     LoanStreet management finally sent Mr. Troia the agreement and the LoanStreet 2016 Equity Incentive Plan (the "EIP") (attached as Exhibits D and E), nearly a year after Mr. Troia signed the employment Offer Letter.

27.     Mr. Troia was surprised to see that the agreement included a vesting schedule that was dramatically delayed relative to the one LoanStreet had represented to him when enticing him to accept its offer of employment. LoanStreet had chosen a vesting commencement date of July 22, 2019, though Mr. Troia's employment at LoanStreet began more than four months prior to that date, on March 18, 2019. As a result, when the first quarter of the grant would finally vest and become exercisable, on July 22, 2020, Mr. Troia would be significantly closer to having worked for LoanStreet for a year and half than to having worked for LoanStreet for a year – the duration after which LoanStreet had led Mr. Troia to believe the first quarter of the on-hire grant would vest.

28.     Mr. Pitney, in response to questions from Mr. Troia about the delayed vesting schedule, told Mr. Troia for the first time that LoanStreet's policy with respect to options had been to select the date of the LoanStreet Board of Directors' approval of a grant, which only happened at the Board's quarterly meetings, as the grant's vesting commencement date. Mr. Troia, recognizing that this contradicted LoanStreet's earlier representation to him, determined to entreat LoanStreet to resolve the unfairness of the situation by modifying his vesting schedule.

29.     On or around February 21, 2020, Mr. Troia met with Mr. Wu, expressed his concern with the discrepancy between the first anniversary of the beginning of Mr. Troia's employment with LoanStreet and the beginning of the vesting of Mr. Troia's on-hire equity grant, and relayed Mr. Pitney's comment about LoanStreet's alleged options vesting schedule policy. Mr. Troia told Mr. Wu that this was not the impression of the vesting schedule that Mr. Wu gave him in their call about the option before Mr. Troia accepted LoanStreet's offer of employment. Mr. Troia further told Mr. Wu that a reasonable person would expect "after a year" to refer to after a year of employment, and certainly not to one year and four months after the start of employment. Mr. Troia asked Mr. Wu whether Mr. Wu thought this was right and whether Mr. Troia's vesting schedule could be adjusted so that vesting would begin on the first anniversary of his employment with LoanStreet. Mr. Wu responded that he would ask Mr. Lampl and Mr. Pitney about changing the vesting schedule, and that this had been the company's policy so far.

30.     Despite Mr. Troia following up with Mr. Wu several times over the remainder of his employment with LoanStreet, Mr. Wu never answered Mr. Troia's questions.

**Mr. Troia's Discovery of Product Error Upsets Vice President of Engineering**

31.     In March 2020, LoanStreet instructed all of its employees to begin working remotely due to the COVID-19 pandemic.

32.     Mr. Troia complied and, despite the challenges of adjusting to remote work and life during a global pandemic, made strong progress over the next few months on a project he was leading with Mr. Bansal to upgrade the slow, error-prone, and unscalable software that powered LoanStreet's core loan management product, its only ongoing source of revenue. Mr. Troia's work culminated in or around May 2020, when he and Mr. Bansal successfully demonstrated the upgraded software to leaders from multiple LoanStreet departments, who expressed their excitement at the improvements Mr. Troia and Mr. Bansal had implemented.

33.     In or around May 2020, Mr. Troia discovered that Carlos Arias, another LoanStreet engineer working part-time on the same upgrade project, had made changes to the project's software that, for unknown reasons, resulted in the software incorrectly calculating the current principal balance on a loan in certain situations. Mr. Troia, despite Mr. Arias' refusal to help investigate or resolve the error, diagnosed the root cause of the error, fixed the error, and debriefed Mr. Arias over the phone. Mr. Troia offered support and provided tips to Mr. Arias so that similar mistakes could be avoided in the future, given the critical importance of financial calculations in LoanStreet's software, which is used to manage the syndication of hundreds of millions of dollars in home, car, and solar panel loans by credit unions around the United States.

34.     Less than an hour later, Mr. Adams messaged Mr. Troia via LoanStreet's Slack instance and chastised Mr. Troia for overstepping his boundaries in his interactions with Mr. Arias. Mr. Adams denied that an error could have existed since tests of the current principal balance calculation already existed. Mr. Troia told Mr. Adams that the tests must be incomplete and then wrote a new test case that proved the error did in fact exist before Mr. Troia fixed it. At this, Mr. Adams stopped denying the existence of the error but continued to communicate with Mr. Troia with a tone of reproach.

35.     Later the same day, Mr. Adams called Mr. Troia and complained that the project Mr. Troia was working on was "dysfunctional" – despite the project's substantial progress described above – and that Mr. Troia was too "distant" from the rest of the engineering team – despite Mr. Troia working intimately with Mr. Bansal and Mr. Arias and despite it being natural that Mr. Troia would have relatively little interaction with the remainder of the engineering team, since they worked on an entirely different project than Mr. Troia. Nevertheless, Mr. Troia, in the spirit of calming tensions, agreed to take steps to allay Mr. Adams' concerns.

36.     At the next engineering team meeting, during a section dedicated to identifying opportunities for improvement in the way the team worked together, Mr. Troia expressed his hope that the team could agree that each engineer should be responsible for his or her code, be able to explain it, and to help when his or her code caused an error. Mr. Adams became upset and shut down the conversation.

37.     The following week Mr. Bansal informed Mr. Troia that Mr. Adams was complaining about Mr. Troia to Mr. Lampl and Ms. Guttman. Mr. Bansal conveyed to Mr. Troia that Mr. Bansal was not supposed to be sharing this information with Mr. Troia.

Surprised and alarmed that Mr. Adams was trashing Mr. Troia to some of the most powerful executives in the company without bothering to include or inform Mr. Troia, Mr. Troia asked Mr. Bansal how Mr. Troia could rectify the situation. Mr. Bansal advised Mr. Troia to be very compliant and deferential to Mr. Adams.

38.     Following this conversation, Mr. Troia called Ms. Guttman to express his concern about his perception that Mr. Adams had been acting coldly toward Mr. Troia and to inquire about whether she knew anything more about the situation than Mr. Troia did. Ms. Guttman revealed that Mr. Adams had indeed been complaining about Mr. Troia. Ms. Guttman summarized some of Mr. Adams' complaints, all of which were exaggerated, baseless, or able to be easily resolved had Mr. Adams, who had ignored several of Mr. Troia's attempts to engage with him professionally over the previous several months, simply expressed them to Mr. Troia.

39.     A day after Mr. Troia and Mr. Bansal's successful demonstration of the upgraded software he had been working on, Mr. Troia called Mr. Adams to clear the air. Mr. Troia told Mr. Adams that he felt their relationship had been tense recently and that he wanted to understand and work to resolve any issues that Mr. Adams had with him. Despite the successful demonstration the day prior, Mr. Adams told Mr. Troia that his project was not making any progress. Mr. Adams reiterated his complaint that Mr. Troia was too distant from the rest of the engineering team. Mr. Adams said he wanted to move Mr. Troia to the project that the bulk of LoanStreet's engineers were working on. Mr. Troia, disappointed to be taken off a project he had worked hard on and was proud of but mindful of Mr. Bansal's advice, acquiesced to Mr. Adams' concerns and agreed to be moved to a different project.

40.     Mr. Troia spent a week on his new project, becoming oriented and beginning to contribute and engage more closely with the engineers assigned to the project.

41.     On the evening of Thursday, June 11, 2020, Mr. Troia spoke on the phone with Ms. Guttman to catch up and continue his unreciprocated effort to calm tensions. Mr. Troia expressed his happiness at his new project assignment. Ms. Guttman said she was glad to hear it. Ms. Guttman spoke pleasantly to Mr. Troia and gave no hint of the cruel shock LoanStreet had in store for Mr. Troia the next day.

**LoanStreet Fires Mr. Troia Without Cause or Warning**

42.     On Friday, June 12, 2020, the end of Mr. Troia's first week on his new project, Mr. Adams invited Mr. Troia to a Zoom meeting without explaining the meeting's purpose. Upon joining the meeting, Mr. Troia was surprised to find Mr. Pitney present in addition to Mr. Adams. Despite Mr. Adams never having provided Mr. Troia with any warnings that his employment was in jeopardy and despite Mr. Adams having up until then given Mr. Troia the impression that he was on the right track by having changed projects, Mr. Adams informed Mr. Troia that he was being fired for not engaging with the engineering team and for not taking feedback. Mr. Troia expressed shock and requested specific examples of his supposed shortcomings; Mr. Adams provided none.

43.     Following the meeting, Mr. Troia called Ms. Guttman – who on June 6, 2019 had falsely reassured Mr. Troia that he would not be fired without first being given multiple warnings and who on the phone with Mr. Troia the night before his termination had duplicitously acted as though nothing were wrong – and left a voicemail seeking an

explanation for what had happened. Ms. Guttman never answered Mr. Troia's call or voicemail.

44.   Mr. Troia then called Mr. Bansal, who told Mr. Troia that he already knew Mr. Troia had been fired. Mr. Bansal, Mr. Troia's direct manager, said that he thought the decision was wrong and unfair, but that his efforts to protect Mr. Troia had proved unsuccessful.

45.   Mr. Troia – knowing that during his time at LoanStreet there were several instances of employees being fired in which management told the remaining employees that the fired employee had been given many warnings and opportunities to fix issues before being fired while the fired employee denied that and said he or she had been blindsided – determined to make sure his former coworkers learned the truth about his termination, both to empower them to protect themselves from LoanStreet's predation and to defend his reputation.

46.   Before LoanStreet disabled Mr. Troia's access to company resources on June 12, 2020, Mr. Troia posted a Slack message visible to all of LoanStreet's employees that offered his side of the situation. To ensure at least one version of his message to LoanStreet's employees was not able to be easily deleted by LoanStreet management, later that day Mr. Troia also sent an email to LoanStreet's employees from his personal email address. The email read as follows:

> Ian,
>
> I was shocked to hear today that I was being fired without being given any warning that termination was being contemplated. Alyssa spoke with me just last night about a different topic and said nothing. I guess I'm just the latest in a long line of LoanStreet employees to experience a knife in the back. The number of employees who said they were fired without warning in my 16 months at the company was

staggering, and suspicious in contrast to management's explanation each time that the employee had been given many opportunities to improve on specific feedback. Selvin, Mark, design Erin, marketing Erin, Sharon, Kamil, etc. With each firing, my concern grew that the problem was with LoanStreet, not the person laid off. With my own surprise firing, there's no doubt left in my mind.

Ultimately, you are responsible for what happens in your company. I don't think you intended for your company to treat people unfairly, but you have repeatedly delegated authority to people who have. I would have thought you and Alyssa (our head of HR who comes into the office maybe 5 days in a year and hasn't returned my call today), might have taken a more hands-on approach after your last VP Engineering sexually and drunkenly harassed subordinates.

Given the lies that Larry has fed upper management about me, and that fact that you gave me no opportunity to defend myself, I'd like to set the record straight about the last few months, for everyone:

I spent the last few months working on the new Admintools/Reporting tool mostly independently as the rest of the engineering team was focused on PPP. I made tremendous progress towards your goals of running reporting with more speed, fewer mistakes, and fewer buy-side report versions. I successfully ran almost every institution's files, including those from many institutions that currently require time-consuming manual modification, through the new loader. The process of setting up the loader profile for each institution was incredibly tedious and required many late nights but I was excited to transform the reporting process using all the product knowledge I gained while working on closings and reportings myself. During this period, I attended daily-standups, collaborated with Ranna and Carlos, and heard from Larry at most a handful of times.

In May, I was confused by a change another engineer had made in the AdminTools code base. The engineer did not remember the reason for the change, but said he likely did it to pass the tests that match the new reporting system values with those from legacy reports. I found another strange change in the code by the same engineer. Again, the engineer did not remember why he made the change and told me he was too busy to re-familiarize himself with the code. After further investigation, I discovered these odd changes were unintentional hacks that meant our tests passed despite this engineer having broken our principal balance calculation method. The engineer had changed the method so that if you asked for the balance of a loan on May 1st and a payment had been made on May 1st, the balance would exclude that payment and be incorrect.

I fixed these problems. Then I called the engineer and encouraged him to be careful when making changes to critical methods like this one, to leave notes of his rationale when making non-obvious changes to them, and to check in with Ranna or me if he was uncertain about any accounting concepts.

Half an hour later Larry messaged me asking what's going on with me and this engineer. The engineer had complained to Larry about my call. I summarized and said I was trying to ensure that we understand how our new reporting system calculates values, that it wouldn't be a good outcome to have a system that hacks its way to the right answers in a way that no one understands and that doesn't match our business's accounting concepts. I covered for the engineer and did not tell Larry that he refused to help me. Larry chastised me for overstepping my boundaries and told me the tests we have in place prevent anything from being done incorrectly.

I wrote a test showing that our principal balance calculation method is broken without my change. When I send it to Larry, he seems annoyed. He does not apologize and tells me I have to fix any tests that newly fail because of my change.

Larry calls me. He tells me that the AdminTools team is his one team that is dysfunctional. He says the engineer is "sad" that the team doesn't work well together. Larry says I am too "distant" from the rest of the engineering team. I am confused, since the rest of the team is working on a different project, but I agree to begin engaging more with the other engineers and say that much of the problems with Admintools could be resolved through greater clarity on goals and timelines through resumption of planning meetings, which have been canceled since the PPP project began.

At the next engineering retrospective, in the "needs improvement" section, without naming names, I express my hope that we collectively agree that each engineer should be responsible for his or her code, to be able to explain it and to help when it breaks something. I do this in the hope of making the AdminTools team work better together, as Larry asked me to do. Larry brusquely shuts down the conversation, says nothing in support of me, and moves to the next topic.

The next week, I find out Larry is slandering me to you and Alyssa, presumably with the intention of getting me fired:

- Larry said I defied project decisions he made; I have never defied a decision of his. Ranna can confirm that the "A/B testing" meeting Larry referred to involved a debate that concluded with no clear decision. It's absurd for Larry to claim that he communicated anything that would be interpreted by anyone as a binding decision. It is Larry's responsibility to clearly set project plans. I am not a mind-reader.

- Larry said I don't take feedback; Github shows that I have promptly acted on every piece of feedback I have received, either implementing the suggestion immediately or engaging in discussion before implementing what is agreed upon. I asked Larry to cite one example of feedback I hadn't taken as I was being fired today, and he was unable to do so. Larry repeatedly brings up one instance that happened early this year where Ranna and I felt Carlos was nitpicking on one of my PRs (Google's PR review guidelines include

nitpicking as a bad practice). Larry spoke with me about his concern about the exchange and we never had a similar problem again.

- Larry said I expand the scope of pull requests unnecessarily; I expand pull requests because Larry has failed to respond to my pull requests or my questions on his feedback for weeks or months at a time. I was not going to stop working, and the work needed to be submitted somewhere. Larry could have asked me to move work to another pull request, but he didn't.

- Larry said my code is unworkable. I can't pretend to have the engineering judgment someone with Larry's experience does, but I do know that the new AdminTools will be a huge step forward from the creaky legacy system that Ranna has to frequently manually correct. If my code has areas for improvement, perhaps they could have been avoided if Larry had not left my requests for guidance on my pull requests unanswered for long periods of time. I agree that AdminTools needs polishing before going live. My charge over the last few months has been to build an MVP. The point of an MVP is to build the *minimally* viable product. Larry knows that expecting the same level of polish from a single engineer working rapidly to both design and implement a sprawling MVP as he would from his team of half a dozen engineers working on a project that has been under development for literal years is farcical.

- Larry said that I stopped attending meetings. I was unable to attend some meetings in the past due to time-sensitive closings and reporting periods, but that was many months ago and I have consistently attended remote meetings and lunch and learns. I have not attended some meetings that did not seem relevant: for instance, a PPP post-mortem when I did not work on PPP.

If Larry had simply communicated these concerns to me, we could have easily resolved them since I have never had any interest in defying him. It was surprising and disappointing to hear that he had allowed these one-sided tensions to build silently, and then had aired them behind my back to senior management. I can only speculate that this was retaliation for bothering one of his favorite engineers.

I call Larry to clear the air. He says, despite the massive amount of progress that Carlos and I have made on AdminTools - as confirmed by a successful demonstration just the day before (I thank God this demo happened so Larry can't totally rewrite history) - that the project is spinning its wheels. He reiterates that I am too distant from the rest of the engineering team and that this is "not working for him." He says he wants me off the project that I have poured my heart into for the past year just as it hits the home stretch.

Despite the deep disappointment, I accept the change and begin reorienting myself to the Next project. Today, after a week of collaborating with Jonathan, Matt

Brazza, and Kyra to become reoriented, close my first ticket, and provide feedback on a PR, Larry abruptly fires me for "continuing to not engage with the team." Certainly he couldn't have been talking about the time since I moved back to Next. Maybe he was referring to the months when the rest of the engineering team was working on a completely different project? During these months, none of Larry's team reviewed any of my work, so why would I have believed Larry was silently adding "doesn't review others' work to his termination case against me?

I've provided all of these factual rebuttals, but it's clear from the call today that Larry lost interest in facts a long time ago. He simply decided he didn't like me at some point in the last few months and silently built a false case against me to get me fired. That was made crystal clear in the call today when Larry was unable to provide any specifics on what feedback I hadn't taken or when the many imaginary conversations he claims we had to resolve issues actually happened.

You need to ask yourself how you've allowed your lending company to develop into the sort of place where someone gets fired for correcting a mistake in the single most important loan calculation LoanStreet is responsible for. Larry may be a good engineer, but he has demonstrated his inability to fairly or effectively manage people. Frankly, he's a snake. Enough LoanStreet employees have worked with me to know that I am reasonable and competent and to be suspicious of whatever lies Larry tells them about me. Larry will manage from now on with a cloud of suspicion over his head.

I'm disappointed in how LoanStreet has treated me, to say the least. I'll be doing my best to warn all potential future employees to avoid LoanStreet. Clearly I was wrong to place my trust in you and this company to treat me fairly. Other engineers would do well to proactively seek other opportunities.

My number is [REDACTED], if you have the decency to speak to me as you or Alyssa should have done before firing me on one person's word. Given LoanStreet's history, though, I fully expect you to continue to hide behind the glass walls of your office and shirk your responsibility.

Wyatt

P.S. How convenient that you are firing me weeks before the first vesting of my stock options whose vesting clock somehow began a full four months after my start date. Double-crossing someone on promised compensation is shameful.

47.     On June 16, 2020, Mr. Lampl and Mr. Pitney called Mr. Troia.

48.     The phone call was notable in that Mr. Lampl refused to explain why Mr.

Troia was fired – other than a trite claim that there was a "bad fit" between Mr. Troia and

LoanStreet that flew in the face of all the effusive praise LoanStreet had showered on Mr. Troia, as detailed above – and refused to engage with any of the substantial evidence Mr. Troia proffered to contradict Mr. Adams' vague charges against Mr. Troia, for which Mr. Adams had been unable to provide any concrete examples when Mr. Troia requested them in the Zoom meeting in which he was fired.

49.     The phone call was also notable for Mr. Lampl's and Mr. Pitney's reactions to Mr. Troia raising the unfairness of LoanStreet failing to vest any of his on-hire equity grant that he was told he would receive after a year despite Mr. Troia having worked for LoanStreet for 15 months. Mr. Lampl became agitated and raised his voice, interrupting Mr. Troia by repeating Mr. Troia's first name four times. Mr. Pitney pointed to language in the Offer Letter section requiring board approval for any equity grants. When Mr. Troia pointed out that the board didn't have to select the date of the board meeting at which a grant was approved as the grant's vesting commencement date, Mr. Pitney responded that the Offer Letter didn't specify at all when the vesting commencement date would be – implying that LoanStreet could have chosen *any* vesting commencement date, no matter how far in the future – and, in a weak attempt to whitewash LoanStreet's dishonest behavior, disingenuously added, "**That's certainly something that we don't hide. If people ask**, **we explain what our policies are around vesting start date and grant start date**… [emphasis added]"

50.     Yet Mr. Troia *did* ask for an in-depth explanation of the equity grant policies, on or around February 28, 2019, when he asked Ms. Guttman to have Mr. Wu call him to explain the equity grant in detail. Mr. Wu, in the resulting call, simply said the option would begin to vest after a year and said nothing to indicate a delay of almost half

a year was possibly or likely, or that the timing of the next board meeting would impact the dates in Mr. Troia's vesting schedule. LoanStreet deliberately neglected to inform Mr. Troia of the probability of a massive delay in the vesting of the option LoanStreet used to entice him to work for LoanStreet, despite Mr. Troia's request to be fully informed of the practical implications of the terms and conditions of the equity grant. As Mr. Troia said in his June 16, 2020 call with Mr. Pitney and Mr. Lampl, "[I]t's certainly a lie of omission to tell somebody, 'Here's your hiring package. You're going to receive a salary of X dollars and an equity grant of Y options,' and not mention that there could be a delay of up to almost half a year before one of those portions begins the clock." Mr. Pitney was wrong; LoanStreet did hide from Mr. Troia critical knowledge about his compensation package that was, not coincidentally, advantageous to LoanStreet, and did so despite Mr. Troia clearly asking for it.

51. LoanStreet offered Mr. Troia severance only if he signed a separation agreement that included a permanent non-disparagement clause and a waiver of all current and potential claims against LoanStreet, among other provisions (Mr. Pitney's June 12, 2020 email formally extending this offer and the separation agreement are included as Exhibits F and G). Mr. Troia declined.

52. Mr. Troia, unlike LoanStreet, desired to comply in good faith with both the letter and spirit of the agreements they had made together. One of those agreements was an Employee Non-Disclosure and Invention Assignment Agreement (the "NDIAA") that Mr. Troia signed before he began working for LoanStreet. The NDIAA included a non-disparagement provision. Mr. Troia's understanding, agreed with by a lawyer with whom he consulted after being fired, was that the non-disparagement provision only applied for

12 months after his termination. As a result, Mr. Troia refrained from making any public posts about Plaintiffs until that time period had elapsed.

**Mr. Troia Publicly Posts about LoanStreet's Employment Practices**

53.     On or about June 13, 2021, Mr. Troia, having waited the requisite year since his termination for his non-disparagement clause to expire, began posting online to warn prospective employees of LoanStreet's predatory labor practices so that they could avoid harm like that suffered by Mr. Troia and other LoanStreet employees. Some of these statements are purportedly included in Plaintiffs' Complaint, mostly in misleadingly excerpted form, unnaturally severed from their contexts. These statements, most of which have since been substantially modified or removed from the Internet since their initial posting, are included only in their purportedly original versions in Plaintiffs' Complaint.

54.     Mr. Troia's statements met a resoundingly positive response in the technology career-oriented websites where they were posted. Mr. Troia's posts on a section of Reddit dedicated to careers in computer science, for instance, became some of the section's most popular posts of all time. Many readers thanked Mr. Troia for providing a useful warning to the community of technology workers. Hundreds of readers went to Glassdoor.com to mark Mr. Troia's review as helpful.

55.     Plaintiffs, angered that truthful accounts of their deceptive and unfair behavior were becoming popular, began working to suppress Mr. Troia's speech. Plaintiffs, either directly or through intermediaries, temporarily succeeded in getting Mr. Troia's posts removed from Teamblind.com, Reddit.com, and Glassdoor.com by reporting the posts as harassing, containing false information, or violating the guidelines of the hosting

site. Mr. Troia, however, successfully worked with all three sites to restore the original or modified versions of the posts to public view. The Reddit moderator responsible for Mr. Troia's post, for instance, said, "IMO [in my opinion], this continues to meet our Name & Shame bar for 'exceptionally shitty' behavior," when explaining why he decided to allow Mr. Troia's post to remain up despite it naming the LoanStreet executives responsible for the abuses.[1]

56.     Seeing that LoanStreet was trying to silence his story, Mr. Troia, drawing on his experience from his previous career as a marketer, began purchasing ads on the Google search engine that would sometimes appear when a user searched for terms that Mr. Troia believed prospective LoanStreet employees would search for, so that his warnings would be seen by the people who most needed to see them. The ads' text content was highly critical of LoanStreet, such that no reasonable person would mistake them for being placed by LoanStreet. The ads, when clicked, would immediately redirect a user to one of Mr. Troia's Reddit posts, which bore no resemblance to the official LoanStreet website. Some of the ads are presented, in a misleading fashion, in Plaintiffs' Complaint.

**Plaintiffs File Suit Against Mr. Troia to Silence His Public Statements**

57.     LoanStreet, having failed thus far to silence Mr. Troia's truthful speech, decided to abuse the justice system to try to bully Mr. Troia into surrendering one of his most fundamental rights as an American: his freedom of speech.

58.     On June 24, 2021, Plaintiffs sent a cease-and-desist letter to Mr. Troia that claimed that Mr. Troia had made defamatory statements regarding Plaintiffs and that the

---

[1] https://www.reddit.com/r/cscareerquestions/comments/o4y6xa/comment/h2lgyfy/?utm_source=share&utm _medium=web2x&context=3.

non-disparagement provision in Mr. Troia's NDIAA had no expiration. The letter proceeded to threaten Mr. Troia with a lawsuit unless he, among other things, removed all of his supposedly defamatory and disparaging statements regarding LoanStreet or its personnel from the Internet. In the ensuing discussions, Mr. Troia – who, prior to receiving the letter and out of an abundance of caution against saying anything that could be misconstrued as defaming Plaintiffs, had already removed or modified *all* of the statements Plaintiffs' letter alleged as defamatory and many that Plaintiffs' eventual Complaint alleged as defamatory – offered to further modify his posts to address Plaintiffs' concerns but not to remove the core narrative. Plaintiffs, adopting a hard line, refused this reasonable compromise and insisted not only that Mr. Troia remove the posts in their entirety but reimburse Plaintiffs for hefty "reputation management fees" they had incurred in relation to his posts. Mr. Troia refused.

59.     On July 21, 2021, Plaintiffs filed a Complaint against Mr. Troia in the Southern District of New York, alleging breach of contract, defamation *per se*, defamation, injurious falsehood, and unfair competition and false designation of origin ("Plaintiffs' Lawsuit"). Plaintiffs sought damages from Mr. Troia in an amount of no less than $3,000,000.

60.     Plaintiffs' Complaint contains derogatory, false, and completely unfounded allegations against Mr. Troia. The Complaint, among other things, falsely states that Mr. Troia:

a)  Published "libelous communications of knowingly false statements."  ¶ 1

b)  Committed actions that "were malicious in nature." ¶ 4

c) "[P]urposefully and falsely equate[d] the granting of his options with the vesting of his interest." ¶ 21

d) "[P]ost[ed] disparaging and defamatory statements." ¶ 24

e) Wrote an internet post on April 14, 2020 titled "Worse Professional Experience of My Life." ¶ 25

f) Wrote an internet post on April 25, 2020 titled "Most passive-aggressive place I've ever worked." ¶ 26

g) Was terminated by LoanStreet for, "among other things, the poor quality of his engineering, his lack of engagement with his team, and his inability to cooperate with his peers or take direction from his superiors." ¶ 27

h) Sent an email on June 12, 2020 that was "laden with factual inaccuracies" and "suffered from delusions of grandeur," in which Mr. Troia supposedly "portrayed himself as a near indispensable part of the LoanStreet engineering team." ¶ 29

i) Wrote a Glassdoor.com post titled "Good people, worst career development." ¶ 33

j) Engaged in an "unabashed online smear campaign against Plaintiffs." ¶ 34

k) "[M]ade a series of false and defamatory statements on various Internet websites with the intent and effect of whipping up an angry mob directed against LoanStreet and Lampl." ¶ 35

l) Had "pernicious intentions." ¶ 40

m) Had "intentions" of "wickedness." ¶ 48

n) Fielded a Google Ad campaign "designed to cause a likelihood of consumer confusion." ¶ 51

o) "[H]as routinely disregarded and continues to blatantly disregard matters of verifiable fact. He [has] maliciously defam[ed] Plaintiffs for the sole purpose of increasing traffic to his posts. Troia [has] generat[ed] false and misleading information, by creating sensational, "click-bait" headlines and deceitful posts, purchasing Google Ads to directly increase Internet traffic to his false and defamatory posts, all in an effort to negatively affect LoanStreet's reputation, business and revenues, and decrease the valuation of LoanStreet." ¶ 61

p) "[H]as refused to comply with his contractual obligations under the NDIAA." ¶ 70

q) In publishing his statements, "acted maliciously, oppressively, with an improper and evil motive, and if not with knowledge that [his statements] were false, then in reckless or conscious disregard of the truth." ¶ 79

r) Acted "willful[ly] with the deliberate intent to trade on the goodwill of [the "LoanStreet" trademark], cause confusion and deception in the marketplace, and divert potential sales of LoanStreet services, as well potential new hires, away from LoanStreet." ¶ 117

s) Committed "false designations of origin and unfair competition" that "have been intentional, willful, and malicious." ¶ 120

61. Plaintiffs' Complaint is defamatory against Mr. Troia but for any possible judicial or litigation privilege.

62.     Plaintiffs' only intention for bringing this case is to bully, harass, and ultimately censor Mr. Troia by burdening him with the cost of legal defense and publicly disparaging his professional abilities until he retracts his truthful statements, leaving other workers vulnerable to being taken advantage of in the same way Mr. Troia and many other LoanStreet employees have been.

63.     Such a lawsuit is colloquially called a "SLAPP" suit (a "strategic lawsuit against public participation"). As of November 10, 2020, New York now has significant anti-SLAPP remedies,[2] including the right to maintain counterclaims in suits like this one brought and continued by Plaintiffs, namely, as an intimidation tactic to chill Mr. Troia's freedom of speech.

64.     Plaintiffs' efforts to silence Mr. Troia and chill his First Amendment rights through this lawsuit are exactly the kind of conduct that anti-SLAPP statutes are designed to address. New York enacted modifications to its anti-SLAPP law to provide the utmost protection for the free exercise of speech and the kind of publications at issue here: "communications in a…public forum in connection with an issue of public interest."

65.     Mr. Lampl and several of the top executives at LoanStreet were or are veteran lawyers with collective experience at Cravath, Swaine & Moore – the most prestigious law firm in the country[3] – and the U.S. Treasury Department. As such,

---

[2] The New York State legislature passed Assembly Bill A5991A, which was signed into law on November 10, 2021. *See* https://www.nysenate.gov/legislation/bills/2019/a5991. The new law amended portions of N.Y. Civ. Rights Law 70-a & 76-a and NY Civil Practice Law and Rules 3211(g) and 3212(h).

[3] On July 21, 2021, *Vault* magazine announced that Cravath was ranked No. 1 on its *Vault* Law 100, a ranking of the most prestigious law firms across the United States, for the sixth consecutive year. https://www.cravath.com/news/cravath-tops-2022-vault-law-100-ranking-of-most-prestigious-law-firms.html.

Plaintiffs, more than almost anyone else, should know better than to attempt to pervert the justice system to trample on someone's sacred First Amendment rights.

66.     Plaintiffs have already withdrawn the breach of contract claim in this action related to the non-disparagement provision of Mr. Troia's NDIAA as part of a settlement approved by the National Board of Labor Relations on August 12, 2022 in Case 02-CA-280528, which was initiated when Mr. Troia filed a complaint alleging that LoanStreet was attempting to enforce an overly-broad non-disparagement provision that infringed on employee rights protected by the National Labor Relations Act, including the right of employees to discuss wages and working conditions.

67.     Additionally, this Court has already dismissed many of the Plaintiffs' claims of defamation because Plaintiffs failed to provide "*any supporting detail whatsoever*" [emphasis added] for their allegations of the falsity of Mr. Troia's alleged statements that the LoanStreet management team abruptly fired him after 15 months of praising his work, fires people without warning and therefore operates with impunity, deceived prospective employees with a promise of unlimited paid time off only to later impose a cap of 15 days per year, deceived Mr. Troia for months by only pretending to work on changing his vesting schedule to reflect what he had been led to expect before he signed his Offer Letter, and maintained an engineering employee base during Mr. Troia's tenure that contained a large percentage of coding bootcamp graduates,[4] and Plaintiffs declined to amend their Complaint to address these failures.[5]

68.     Plaintiffs have struggled to even *allege* facts in support of their claims because there are none. Plaintiffs' remaining claims are also doomed, and New York's

---

[4] Opinion and Order, Dkt. 39.
[5] Letter, Dkt. 40.

anti-SLAPP law exists precisely so that powerful, deep-pocketed, and sophisticated plaintiffs like LoanStreet cannot use costly, baseless litigation like this to cow into submission individuals like Mr. Troia who are simply exercising their right to free speech in a manner they do not like.

### FIRST COUNTERCLAIM
**Violation of New York's anti-SLAPP law**
**(Asserting rights pursuant to N.Y. Civ. Rights § 70-a, et. al)**
**(Against Both Counterdefendants)**

69.     Mr. Troia repeats and re-alleges each and every allegation in paragraphs 1 to 68 and 80 to 109 of the Counterclaim as if fully set forth herein.

70.     New York's anti-SLAPP law allows a defendant to an action involving public petition and participation, such as Mr. Troia, to maintain a counterclaim to recover damages, including costs and attorney fees, against plaintiffs who have commenced or continued the action. N.Y. Civ. Rights Law § 70-a.

71.     Plaintiff's Lawsuit is an action involving public petition and participation because it is based on Mr. Troia's communications in a place open to the public or a public forum in connection with an issue of public interest, or his other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest.

72.     Plaintiffs' Lawsuit was filed after New York's new anti-SLAPP statute was adopted, so the new statute applies to Plaintiffs' Lawsuit.

73.     Mr. Troia's statements about Plaintiffs constituted "communication in a place open to the public or a public forum." Plaintiffs admitted this in their Complaint.[6]

---

[6] July 21, 2021 Complaint (Dkt. No. 3) ("Compl.") ¶¶ 78, 81, 105.

74.     Mr. Troia's statements concern issues of "public interest." They conveyed information about LoanStreet's labor practices that was vitally important to prospective LoanStreet employees, as evidenced by the enormous and positive response to the statements by the technology worker-focused websites where they were posted. Mr. Troia's statements were also useful to workers more generally for their cautionary tale of improper employer practices to be aware of and for their guidance on how to protect oneself against those practices. Mr. Troia's statements contain reports of improper business practices. Mr. Troia's statements explicitly link LoanStreet's actions to the abuse of corporate power in society generally, a longtime political concern in the United States and elsewhere, removing any doubt about whether his statements concern an issue of public interest.

75.     Plaintiffs have commenced and continued this action without a substantial basis in fact and law and it is not supported by a substantial argument for the extension, modification, or reversal of existing law under § 70-a.

76.     Mr. Troia is thus entitled to attorneys' fees and costs.

77.     Plaintiffs have commenced and continued this action for the purpose of harassing, intimidating, punishing, and otherwise maliciously inhibiting Mr. Troia's free exercise of speech, petition, or association rights under § 70-a (b).

78.     Plaintiffs are thus liable to Mr. Troia for damages.

79.     Plaintiffs have commenced and continued this action for the *sole* purpose of harassing, intimidating, punishing, and otherwise maliciously inhibiting Mr. Troia's free exercise of speech, petition, or association rights, making punitive damages appropriate under § 70-a (c).

## SECOND COUNTERCLAIM

**Violation of the Implied Covenant of Good Faith and Fair Dealing**
**(Against LoanStreet)**

80.     Mr. Troia repeats and re-alleges each and every allegation in paragraphs 1

to 79 and 91 to 109 of the Counterclaim as if fully set forth herein.

81.     LoanStreet's decision to begin vesting Mr. Troia's on-hire equity grant only

after Mr. Troia had worked for LoanStreet for over 16 months – almost a year and a half –

was an arbitrary or irrational exercising of discretion that had the effect of destroying Mr.

Troia's right to receive the fruits of the contract that a reasonable promisee would have

understood to have been included in his Offer Letter.

82.     A vested equity option was clearly part of the "fruits of the contract"

represented by Mr. Troia's Offer Letter that were supposed to accrue to Mr. Troia. The

Offer Letter represented an agreement between Mr. Troia and LoanStreet to exchange

things of value: Mr. Troia would provide his skilled labor to LoanStreet and LoanStreet, in

turn, would provide Mr. Troia with a salary, an equity grant, and other benefits. LoanStreet

included the equity grant as the second bullet point in the "Compensation and Employee

Benefits" section of the Offer Letter (Exhibit B), second only to the salary bullet point,

demonstrating LoanStreet's clear intent to use the promise of the equity grant to entice Mr.

Troia into accepting the offer. Mr. Pitney's reference to the equity grant, in his February

28, 2019 email to Mr. Troia (Exhibit A), as "your options"; Ms. Guttman's highlighting of

the option in her call to Mr. Troia on or about the same day informing Mr. Troia of the

offer; and LoanStreet's dispatching of its Co-founder and COO, Mr. Wu, specifically to

explain the equity grant to Mr. Troia on or about the same day all reinforce this point.

83.     Mr. Troia faithfully and irreversibly fulfilled his end of the bargain for 15

months by providing high-quality engineering services, which elicited enthusiastic praise

from LoanStreet. LoanStreet, on the other hand, reneged, claiming that it had permissibly exercised discretion related to vesting schedule determination granted to LoanStreet by the Offer Letter to deprive Mr. Troia of a substantial portion of the compensation it had promised him.

84.     LoanStreet, however, had no such discretion, because (1) the Offer Letter was silent on when the vesting commencement date would be and so, in order to avoid the finding of an illusory promise and according to the *contra proferentem* principle, must be interpreted in Mr. Troia's favor as requiring that the vesting commencement date coincide with the start of his employment, and (2) the Offer Letter did not contain language sufficient to unambiguously retain absolute discretion to modify or cancel Mr. Troia's option grant. The Offer Letter's attempt to incorporate the EIP, which contained language that might have done so, failed because LoanStreet never provided Mr. Troia with the EIP document before he signed the Offer Letter. As a result, when Mr. Troia signed the Offer Letter, he was unaware of and so could not have consented to the terms of the EIP.

85.     LoanStreet's decision violated Mr. Troia's reasonable expectation that his equity grant vesting commencement date would be on or reasonably soon after the first day of his employment, and at the very least would not be set for a date nearly half a year later.

86.     Mr. Troia's expectation was reasonable for a promisee in his position in February 2019 because, among other things, (1) the vast majority of companies that grant equity compensation to new employees with time-based vesting commence a grant's vesting no later than the calendar month following the start of the grantee's employment,

and (2) LoanStreet's most senior leaders disingenuously encouraged Mr. Troia in his expectation, as detailed in paragraphs 93 through 95 below.

87.     LoanStreet's arbitrary decision to select the date of the board of directors meeting where Mr. Troia's grant was approved as the grant's vesting commencement date *on its own* materially benefitted LoanStreet and injured Mr. Troia by substantially delaying the vesting of Mr. Troia's option, the exercise of which by Mr. Troia would transfer the ownership of valuable equity from LoanStreet to Mr. Troia.

88.     LoanStreet then compounded this self-serving injury of Mr. Troia by firing Mr. Troia without warning or cause shortly before the first anniversary of the selected vesting commencement date – when the first quarter of his equity would vest – which resulted in LoanStreet retaining ownership of *all* of the equity associated with Mr. Troia's option, despite LoanStreet having represented to him in the Offer Letter and in conversations before he was hired that by this time roughly a third of his on-hire option grant would have vested (1/4th of the total grant after his first year of service and 1/36th after each of the additional two full months he worked).

89.     Therefore, LoanStreet violated the implied covenant of good faith and fair dealing in its interactions with Mr. Troia.

90.     As a result, Mr. Troia is entitled to damages in an amount to be determined at trial.

## THIRD COUNTERCLAIM
### Fraudulent Inducement
### (Against LoanStreet)

91.     Mr. Troia repeats and re-alleges each and every allegation in paragraphs 1 to 90 and 104 to 109 of the Counterclaim as if fully set forth herein.

92.     LoanStreet misrepresented and omitted material facts when using a stock option grant to entice Mr. Troia to accept its offer of employment in and around February 2019.

93.     Specifically, LoanStreet omitted the material facts that (1) LoanStreet had a "policy" (apparently unwritten) that the Company set each option grant's vesting commencement date to be the date of the meeting of the LoanStreet Board of Directors in which the grant was approved, (2) the board meeting at which Mr. Troia's grant would be approved was scheduled for more than four months after the start of his employment, and (3) LoanStreet's EIP purported to provide LoanStreet's board with "sole and absolute discretion" to set the terms and conditions of his option grant, including the vesting schedule.

94.     Specifically, the omissions of these material facts were made by:

a.    Mr. Wu, on or about February 28, 2019, in his phone call with Mr. Troia dedicated specifically to explaining terms of the stock option grant, held at Mr. Troia's request.

b.    Mr. Pitney, on February 28, 2019, in his email providing Mr. Troia with his formal Offer Letter and informing Mr. Troia of the current number of authorized shares of LoanStreet common stock.

c.    Ms. Guttman, on or about February 28, 2019, in her phone call with Mr. Troia informing him of his offer of employment and touting the stock option grant.

95.     Mr. Wu, in his phone call on or about February 28, 2019 dedicated to explaining the stock option grant to Mr. Troia, also actively misrepresented the grant's

vesting schedule by simply telling Mr. Troia that the first quarter of his grant would vest after a year. Mr. Troia reasonably understood Mr. Wu to mean the first quarter would vest after a year of Mr. Troia's employment with LoanStreet because the alternative interpretation was far-fetched: that Mr. Wu never, in their entire 16-minute phone call about the grant, explained one of the most important terms of the grant, which was unaddressed by the Offer Letter, namely, when the grant would begin to vest in absolute time (e.g., March 18, 2020) as opposed to relative time (e.g., one year after an unspecified vesting commencement date). Mr. Wu said nothing that indicated he was merely referring to the easily-understood one-year vesting cliff that would follow the vesting commencement date and was clearly explained in the Offer Letter, that the timing of the initial vesting would or could be set by LoanStreet for a date substantially after the first anniversary of the beginning of Mr. Troia's employment, or that his vesting commencement date would be in any way related to the timing of the board meeting at which his grant would be approved.

96.     These misrepresentations (the omissions and Mr. Wu's affirmative statement) were material because the vesting schedule of and LoanStreet's purportedly "sole and absolute discretion" over Mr. Troia's option grant went to the heart of the value of the grant, the importance of which in Mr. Troia's compensation package was emphasized multiple times by LoanStreet to Mr. Troia

97.     These misrepresentations were false, because they conveyed to Mr. Troia that the option grant was a nondiscretionary condition of his employment that would begin to vest to him after a year of employment even though LoanStreet claimed "sole and absolute discretion" over its option grants in its EIP, which LoanStreet unsuccessfully tried

to incorporate into the Offer Letter, and even though LoanStreet had a "policy" and a board of directors meeting schedule that, together, meant that even if LoanStreet chose to grant Mr. Troia the promised option, it wouldn't begin to vest until, at the earliest, 16 months after the start of his employment.

98.     LoanStreet intended to defraud Mr. Troia thereby, because LoanStreet management simultaneously emphasized the equity compensation to entice Mr. Troia to accept their offer of employment while deliberately refraining from providing him with critical information they possessed that dramatically reduced the value of the equity. It is exceedingly unlikely that this critical information would, conveniently for LoanStreet and inconveniently for Mr. Troia, slip the minds of all of the top executives of LoanStreet – Mr. Lampl, Mr. Wu, Mr. Pitney, and Ms. Guttman – when they each individually spoke with Mr. Troia before he signed his Offer Letter and when they, with plenty of time to think and revise, drafted the Offer Letter language related to equity compensation.

99.     Mr. Troia reasonably relied upon these misrepresentations because he was entirely dependent on LoanStreet to provide reasonably complete and accurate information about what the vesting schedule for his equity compensation would be and whether LoanStreet would have unilateral discretion to indefinitely delay or even cancel its granting or vesting, because Mr. Troia explicitly asked LoanStreet to explain the terms and conditions of the equity compensation to him in depth, and because the misrepresentations were made to Mr. Troia by the most powerful people in the company, most notably COO and Co-founder Mr. Wu in a one-on-one phone call specifically dedicated to explaining the terms and conditions of the option grant.

100.    Mr. Troia suffered special damages, which were independent of any harm resulting from LoanStreet's termination of his employment, as a result of his reliance on LoanStreet's misrepresentations because he declined a formal offer of employment with specified terms from Fluz Fluz LLC – whose social cash-back app has since experienced substantial success, having partnered with major merchants such as Nike, Apple Music, and Spotify[7] – in order to instead accept LoanStreet's offer.

101.    Specifically, these special damages, the value of which will be determined at trial, include:

   a.   24,000 Fluz Fluz stock options.

      i.   Fluz Fluz's offer unambiguously provided that "upon the completion of each of [Mr. Troia's] first three years of employment, [Mr. Troia] will receive 8,000 options in Fluz Fluz employee option pool."

   b.   15 premier seats in the Fluz Fluz global network.

      i.   Fluz Fluz's offer unambiguously provided that "upon the completion of each of [Mr. Troia's] first three years of employment, [Mr. Troia] will receive a [sic] five premier seats in the Fluz Fluz global network." These "premier seats" generate income for their holder based upon the volume of transactions in the Fluz Fluz network.

   c.   Career development.

---

[7] https://web.archive.org/web/20221022015607/https://fluz.app/

i.  Mr. Troia suffered the loss of valuable management experience. Fluz Fluz LLC's CEO Maurice Harary planned for Mr. Troia to manage a team of engineers developing Fluz Fluz's mobile consumer application, which would have made Mr. Troia one of the most senior employees at a quickly growing, early-stage technology startup and provided him with unique and sought-after skills and experiences that would have benefitted him for the rest of his new career in the technology industry. This management position would also have allowed Mr. Troia, who had recently embarked on a risky career transition from marketing to software engineering, to accelerate his fledgling new career by leveraging skills from his past career managing multi-billion-dollar consumer brands at multinational companies. At LoanStreet, Mr. Troia instead gained no management experience and remained a junior engineer until his termination. Mr. Troia's career objective – rising the ranks quickly in his new industry – was thus thwarted and grossly undermined during his employment with LoanStreet.

ii. Mr. Troia suffered the loss of valuable technical software engineering experience. At tiny and growing Fluz Fluz, he would have worked on software that was critically important to the company's success and that was used by the company's customers, giving Mr. Troia experience in working under pressure and in the entire software development lifecycle, including important elements

that only arise from customer use of the software, like the maintenance, debugging, deployment, performance testing, and A/B testing of live, production applications. At LoanStreet, Mr. Troia instead gained only trivial experience engineering software that generated revenue or affected customers during his tenure. After starting at LoanStreet, Mr. Troia was surprised to find a highly unusual and complacent situation for a technology startup spending at least hundreds of thousands of dollars each year on software development: LoanStreet hadn't used in its product any substantially new code produced by its engineers in years. LoanStreet's flagship loan syndication and reporting product was still run using code written by overseas contractors during the company's infancy, half a decade earlier. This contractor code, though powering all of LoanStreet's revenue, was prone to errors, slow, unscalable, difficult to maintain or update, and poorly understood by LoanStreet's staff. It failed to automate many routine parts of LoanStreet's business, resulting in an ironically manual technology startup (indeed, part of Mr. Troia's work consisted of performing ripe-for-automation routine clerical tasks like copying and pasting bank account information and dollar amounts into templates for wiring instructions for credit union customers purchasing millions of dollars of loans at a time, copying and pasting customer names into email bodies, copying and pasting customer email addresses

into email "to" fields, and attaching documents to customer emails). LoanStreet relied upon a single early-hire engineer, Mr. Bansal, to scrappily maintain the creaky software with the software engineering equivalent of duct tape. The rest of LoanStreet's product team – engineers, product managers, and designers – had worked for years on a perennially delayed and unfinished project to develop an application to manage commercial loans. Mr. Troia, too, initially worked on this commercial loan project but, because he wanted experience working on software that was actually being used and generating revenue, asked to work with Mr. Bansal and was obliged. Mr. Troia worked with Mr. Bansal on an improved replacement for the problematic loan syndication and reporting software. By June 2020, the prototype of this new software application was nearly complete, but Mr. Adams took Mr. Troia off the project. In the week between this reassignment and Mr. Troia's termination, Mr. Troia began onboarding to a new product that was being used by customers, related to the U.S. federal government's Paycheck Protection Program during the coronavirus pandemic, but only had enough time to gain trivial experience. Therefore, as a result of choosing LoanStreet over Fluz Fluz, Mr. Troia, during his employment with LoanStreet, was deprived of significant exposure to several core facets of the profession of software engineering and

had his professional development stunted during his new career's critical early stages.

102.     LoanStreet's conduct was willful or wanton in that it made these misrepresentations with a conscious and deliberate disregard of the rights of Mr. Troia. Additionally, LoanStreet was emboldened to engage in such wanton conduct by its knowledge that it could likely avoid legal consequences for its misrepresentations by firing Mr. Troia without warning and refusing to pay any severance unless Mr. Troia waived all existing and potential claims against LoanStreet, an underhanded tactic LoanStreet used repeatedly against its vulnerable at-will employees during Mr. Troia's tenure.

103.     As a result of LoanStreet's willful or wanton conduct, Mr. Troia is additionally entitled to punitive damages in an amount to be determined at trial. These damages would serve not only to punish LoanStreet's gross misconduct, but also to deter LoanStreet, as well as other companies who might be so tempted, from similarly exploiting power, sophistication, or information asymmetries when interacting with workers in the future. Punitive damages are especially appropriate in situations like this because they would serve to protect the otherwise-hollow legal rights of the vast majority of Americans, who cannot afford the cost and risk of initiating a lawsuit if a sophisticated, well-heeled employer –keenly aware of its employees' vulnerability – takes advantage of them.

### FOURTH COUNTERCLAIM
**Securities Fraud**
**(Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j and Rule 10b-5**
**promulgated thereunder, 17 C.F.R. § 240.10b-5)**
**(Against LoanStreet)**

104.     Mr. Troia repeats and re-alleges each and every allegation in paragraphs 1 to 103 of the Counterclaim as if fully set forth herein.

105.    In February 2019, LoanStreet offered Mr. Troia the grant of an option to purchase 885 shares of common stock in the Company as an inducement to accept employment. Mr. Troia accepted the offer, changing his way of life and foregoing a formal alternative offer of employment with specified terms in return for the stock option. On July 22, 2019, LoanStreet granted this option to Mr. Troia. This qualifies as a "purchase" of a security under the Exchange Act.

106.    LoanStreet, when inducing Mr. Troia to purchase the option, made false statements or omitted material facts related to the vesting schedule of the option that went to the heart of its value.

107.    The specific false statements or omissions of material facts, the facts giving rise to a strong inference of scienter, and the facts establishing how Mr. Troia's reasonable reliance on LoanStreet's misrepresentations caused Mr. Troia injury that together underlie this securities fraud claim are the same as those underlying the fraudulent inducement claim above.

108.    Therefore, LoanStreet violated the Exchange Act in its interactions with Mr. Troia.

109.    As a result of LoanStreet's actions, Mr. Troia is entitled to damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counterclaimant respectfully requests judgment that he is entitled to:

A.  Attorneys' fees and costs pursuant to N.Y. Civ. Rights Law § 70-a (a);

B.  "[O]ther compensatory damages" in an amount of not less than $3,000,000 (or an amount to be determined at trial) as a result of Counterdefendants bringing their case for the purpose of harassment, intimidation, punishment, or to maliciously inhibit free speech, petition, or association rights, as set forth in N.Y. Civ. Rights Law § 70-a (b);

C.  Punitive damages because the Counterdefendants brought their case "for the sole purpose" of harassing, intimidating, punishing or maliciously inhibiting free speech, petition, or association rights, under § 70-a (c);

D.  A permanent injunction requiring Plaintiffs to cease all efforts to suppress Mr. Troia's speech about Plaintiffs;

E.  A permanent injunction requiring Plaintiffs to retract all the disparaging statements they have made, directly or through intermediaries, about Mr. Troia, in legal proceedings and elsewhere, and to release a public statement affirming Mr. Troia's professional skill and demeanor;

F.  An order reforming the Offer Letter and stock option grant agreement for Mr. Troia's on-hire grant to indicate that the vesting commencement date for the on-hire grant was March 18, 2019, the date on which Mr. Troia's employment at LoanStreet began, and directing LoanStreet to present all consequently-vested portions of the grant to Mr. Troia;

G.  Presumed, actual, special, and/or compensatory damages in an amount to be proven at trial;

H.  Punitive damages;

I.  The costs, disbursements, and expenses of this action;

J.   Reasonable attorneys' fees;

K.   Pre- and post-judgment interest on the sum of any presumed, actual, special,

and/or compensatory damages; and

L.   Such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Counterclaimant

hereby demands trial by jury in this action of all issues so triable.

Dated: November 14, 2022

Respectfully Submitted,
/s/ Wyatt Troia
Wyatt Troia
300 Albany Street, 8G
New York, NY 10280
402-990-3834
mrwnt10@gmail.com

cc: All Counsel of Record (via ECF)