**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LOANSTREET INC. and IAN LAMPL,
Individually,

                Plaintiffs,

      v.

WYATT TROIA, Individually,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No.: 1:21-cv-06166 (NRB)

---

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS TO DISMISS DEFENDANT'S COUNTERCLAIMS AND FOR JUDGMENT ON THE PLEADINGS AS TO PLAINTIFFS' DEFAMATION CLAIMS

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Adelson v. Harris*,
   774 F.3d 803 (2d Cir. 2014) .......................................................................................... 5

*Allstate Ins. Co. v. Vitality Physicians Grp. Practice P.C.*,
   537 F. Supp. 3d 533 (S.D.N.Y. 2021) ........................................................................... 4

*Ashcroft v. Iqbal*,
   556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ........................... 4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007) ........................... 4

*Beth Israel Med. v. Hori. Blue Cross*,
   448 F.3d 573 (2d Cir. 2006) ........................................................................................ 10

*Biro v. Conde Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) ................................................................... 18, 21

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
   850 F.3d 58 (2d Cir. 2017) ........................................................................................... 4

*Chandok v. Klessig*,
   632 F.3d 803 (2d Cir. 2011) ........................................................................... 18, 24, 25

*Cheng v. Neumann*,
   No. 21-cv- 00181, 2022 WL 326785 (D. Me. Feb. 3, 2022) ......................................... 6

*Dealtime.com v. McNulty*,
   123 F. Supp. 2d 750 (S.D.N.Y. 2000) ......................................................................... 13

*Doehla v. Wathne Ltd., Inc.*,
   No. 98 Civ. 6087 (CSH), 2000 WL 987280 (S.D.N.Y. July 17, 2000) ....................... 15

*Dreni v. Printeron Am. Corp.*,
   486 F. Supp. 3d 712 (S.D.N.Y. 2020) .................................................................... 8, 14

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) ................................................................... 18, 20

*Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*,
   09 Civ. 6707 (ER) (S.D.N.Y. Mar. 28, 2013) ............................................................... 9

*First Manhattan Co. v. Sive*,
  Index No. 654799/2018 (N.Y. Sup. Ct. 2020) ............................................................ 22

*Fishoff v. Coty Inc.*,
  634 F.3d 647 (2d Cir. 2011) .......................................................................................... 8

*Fishoff v. Coty Inc.*,
  676 F. Supp. 2d 209, 216 (S.D.N.Y. Dec. 16, 2009) ................................................... 9

*Goldman v. Reddington*,
  No. 18-cv-3662, 2021 WL 4099462 (E.D.N.Y. Sept. 9, 2021) ................................. 5, 6

*Gramercy Wrecking & Envtl. Contractors v. Trucking Emps. of N. Jersey Welfare Fund*,
  Inc.,
  17-cv-7101 (BMC) (E.D.N.Y. May 30, 2018) .......................................................... 13

*Harris v. Am. Acct. Ass'n*,
  No. 20-cv-01057, 2021 WL 5505515 (N.D.N.Y. Nov. 24, 2021) ................................ 6

*Hoesten v. Best*,
  34 A.D.3d 143 (N.Y. App. Div. 2006) ........................................................................ 20

*Klein v. Torrey Point Group, LLC*,
  979 F. Supp. 2d 419 (S.D.N.Y. 2013) ......................................................................... 15

*Knutson v. G2 FMV, LLC*,
  14 Civ. 1694 (RWS) (S.D.N.Y. Jan. 3, 2018)............................................................. 15

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020)......................................................................................... 6, 7

*Lam v. American Express Co.*,
  265 F. Supp. 2d 225 (S.D.N.Y. 2003) .................................................................. 13, 15

*Lee v. Sony BMG Music En't., Inc.*,
  557 F. Supp. 2d 418 (S.D.N.Y. 2008) .......................................................................... 4

*Leidig v. BuzzFeed, Inc.*,
  371 F. Supp. 3d 134 (S.D.N.Y. 2019) ........................................................................ 18

*Marquez v. Hoffman*,
  No. 18-CV-7315 (ALC), 2021 WL 1226981  (S.D.N.Y. Mar. 31, 2021) ................... 16

*Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,
  551 F. Supp. 3d 408 (S.D.N.Y. 2021) .......................................................................... 6

*Palin v. N.Y. Times Co.*,
    482 F. Supp. 3d 208 (S.D.N.Y. 2020) ...................................................................... 7, 23

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017) ......................................................................... 17

*Rozenzweig v. Claimfox, Inc.*,
    251 F. Supp. 3d 449 (E.D.N.Y. 2017) ......................................................................... 14

*Sec. Plans, Inc. v. Cuna Mut. Ins. Soc'y*,
    769 F.3d 807 (2d Cir. 2014) ........................................................................................ 9

*Smith v. Railworks Corp.*,
    10 Civ. 3980 (NRB) (S.D.N.Y. May. 16, 2011) ......................................................... 13

*Sweigert v. Goodman*,
    No. 18-cv-08653, ECF No. 321 (S.D.N.Y. Oct. 29, 2021) ............................................ 6

*Sweigert v. Goodman*,
    No. 18-cv-8653, 2022 WL 168080 (S.D.N.Y. Jan. 19, 2022) ....................................... 6

*Torain v. Liu*,
    279 F. App'x 46 (2d Cir. 2008) ................................................................................... 21

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
    487 F.3d 89 (2d Cir. 2007) .......................................................................................... 16

*Van Valkenburgh v. Hayden Pub. Co.*,
    30 N.Y.2d 34 (N.Y. 1972) ..................................................................................... 12, 13

*Wakefield v. N. Telecom, Inc.*,
    769 F.2d 109 (2d Cir. 1985) ........................................................................................ 14

*Wexler v. Dorsey & Whitney LLP*,
    No. 19-3632 (2d Cir. Jul. 9, 2020) .............................................................................. 21

*Yong Ki Hong v. KBS Am., Inc.*,
    05-CV-1177 (ENV) (VMS) (E.D.N.Y. Sep. 19, 2013) ................................................ 20

*Yookel, Inc. v. United States Steel Corp.*,
    20-CV-4513 (KAM) (CLP) (E.D.N.Y. Feb. 23, 2022) ................................................ 16

*Zigler v. Featherstone Foods, Inc.*,
    20cv2462 (DLC) (S.D.N.Y. Jan. 15, 2021) ................................................................ 12

**Statutes**

N.Y. C.P.L.R. 3211(g) ........................................................................................................ 5, 6

N.Y. C.P.L.R. 3212(h) ........................................................................................... 5
N.Y. Civ. Rights Law § 70-a ....................................................................... iv, 5, 6, 7
N.Y. Civ. Rights Law § 76-a ................................................................................... 7

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 3, 4
Fed. R. Civ. P. 12(c) ............................................................................................. 4
The Application of the New York Anti-SLAPP Scheme in Federal Court (January 18,
    2023), https://ssrn.com/abstract=4328771 ........................................... 5, 6, 7

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT

II.   STATEMENT OF FACTS

III.  STANDARD OF REVIEW

IV.   ARGUMENT

    A.    Defendant's Counterclaims are Adequately Pled

        1.    Defendant has Adequately Pled His New York Anti-SLAPP Counterclaim

            a)    The Substantive Provisions of New York's Anti-SLAPP Scheme, like § 70-a, Are Applicable In Federal Court

            b)    The Court's Order on Defendant's Motion to Dismiss Confirms That Plaintiffs' Action Is a SLAPP

        2.    Defendant has Adequately Pled His Implied Covenant of Good Faith and Fair Dealing Counterclaim

            a)    Mr. Troia Reasonably Expected LoanStreet to Select a Vesting Commencement Date On or Close To His Employment Start Date

            b)    Whether Either Option Agreement Superseded the Offer Letter Is An Affirmative Defense That Requires Fact-Finding

            c)    LoanStreet's Selection of the Vesting Commencement Date Was Arbitrary and Outside of Its Discretion

            d)    Defendant Need Not Present Direct Evidence of Improper Motive

            e)    The Implied Covenant Attaches to At-Will Employment Contracts

        3.    Defendant has Adequately Pled His Fraudulent Inducement Counterclaim

            a)    The Fraudulent Inducement Counterclaim Is Not Redundant of the Implied Covenant Counterclaim Because Defendant Suffered Special Damages

            b)    LoanStreet Misrepresented the Vesting Schedule to Mr. Troia

    B.    Plaintiffs Are Not Entitled to Judgment as a Matter of Law as to Defamation

        1.    Defendant's Statements Are Substantially True

        2.    Defendant's Statements Are Pure Opinion

        3.    Plaintiffs Have Failed to Adequately Plead Actual Malice

        4.    Qualified Privileges Protect Defendant's Statements

V.    CONCLUSION

## I.    PRELIMINARY STATEMENT

LoanStreet convinced Defendant Wyatt Troia to accept an offer of employment by misrepresenting that an option grant would begin vesting after a year of employment. Though LoanStreet enthusiastically praised Mr. Troia's job performance, it abruptly terminated him after 15 months without vesting any of the grant. Mr. Troia posted truthful accounts and opinions of his experience online to warn fellow workers. Mr. Troia's posts explicitly said Plaintiffs' actions were unjust but lawful. Plaintiffs, after demanding money from Mr. Troia, sued him despite his offer to revise his statements to address their concerns. Defendant respectfully requests the Court deny Plaintiffs' deficient motions to dismiss Defendant's counterclaims (Dkt. 55, "First Amended Answer and Counterclaims" or "FAA") and to find Defendant liable for defamation.

## II.    BACKGROUND

On February 28, 2019, LoanStreet sent Mr. Troia an offer of employment (Dkt. 55-2, "Offer Letter") that promised that LoanStreet would grant him an option to purchase LoanStreet stock, subject to approval by LoanStreet's board of directors (FAA, Counterclaims ¶ 8). The Offer Letter did not explicitly specify a vesting commencement date for the grant.

At Mr. Troia's request, LoanStreet Cofounder and COO Chris Wu explained the grant to Mr. Troia (*Id.* ¶ 10). Mr. Wu told Mr. Troia that the first quarter of the grant would vest after a year (*Id.* ¶¶ 10, 95). Since LoanStreet gave Mr. Troia no other information about the vesting commencement date, Mr. Wu's statement led Mr. Troia to reasonably understand that the first quarter of the grant would vest after roughly one year of employment, consistent with industry custom (*Id.* ¶ 86). LoanStreet did not tell Mr. Troia about its highly unusual policy of setting the date of the meeting of its board of directors at which a grant was approved as the grant's vesting commencement date (*Id.* ¶ 93). Neither did LoanStreet tell Mr. Troia that the board only met

quarterly, nor that the meeting in which the board would approve Mr. Troia's grant wouldn't take place until more than four months after his employment start date (*Id.)*.

In reliance on LoanStreet's representations, Mr. Troia accepted its offer on March 4, 2019 and declined an alternative offer of employment from Fluz Fluz LLC around the same time (*Id.* ¶¶ 11, 100-101). Mr. Troia started working at LoanStreet on March 18, 2019 (*Id.* ¶ 12*)*.

LoanStreet effusively praised Mr. Troia's job performance over the next year, and on December 31, 2019 offered him two enhanced compensation package choices, including one with another option grant (*Id.* ¶¶ 12-21). Mr. Troia selected the package with the additional option grant; LoanStreet then sent him an option agreement, which he signed ("Option Agreement 1") (Compl. ¶ 20). This caused Mr. Troia to realize that LoanStreet had never sent him the option agreement for his Offer Letter grant, and he asked LoanStreet to do so (FAA, Counterclaims ¶¶ 24-25). LoanStreet sent another option agreement (Dkt. 55-4, "Option Agreement 2") in response (*Id.* ¶ 26). Neither option agreement made any reference to the Offer Letter.

Option Agreement 2's vesting schedule was dramatically delayed relative to the one LoanStreet had represented to Mr. Troia before he was hired *(Id.* ¶ 27). LoanStreet had chosen a vesting commencement date of July 22, 2019, though Mr. Troia's employment at LoanStreet began more than four months prior *(Id.*). As a result, the first quarter of the grant wouldn't vest until July 22, 2020, after Mr. Troia would have worked for LoanStreet for over 16 months *(Id.*).

Despite having irreversibly provided almost a year of labor to LoanStreet, Mr. Troia, a vulnerable junior engineer without a computer science degree, signed Option Agreement 2 to avoid triggering his own termination, or an uphill legal battle against lawyer-replete LoanStreet, or both *(Id.* ¶ 65). Mr. Troia told LoanStreet before and after signing that the vesting schedule did not reflect what LoanStreet had led Mr. Troia to understand when he was considering the Offer Letter

(*Id.* ¶¶ 28-29). Mr. Wu said he would ask CEO Mr. Lampl and General Counsel Mr. Thad Pitney about changing the vesting schedule, but he never followed up with Mr. Troia (*Id.* ¶¶ 29-30).

When Mr. Troia found and fixed a serious error made by a favorite junior engineer of LoanStreet's engineering head Mr. Larry Adams', Mr. Adams became upset and fired Mr. Troia on June 12, 2020 based on false claims of poor job performance, over the protests of Mr. Troia's manager, during the COVID hiring freeze, and weeks before Option Agreement 2's grant was to begin vesting (*Id.* ¶¶ 33-44). LoanStreet refused to vest any part of Mr. Troia's grants (*Id.* ¶ 49).

In June 2021, Mr. Troia, having waited for a non-disparagement agreement (later voided by a National Labor Relations Board-approved settlement) to expire, posted online to warn fellow workers about the dangers of working for Plaintiffs (*Id.* ¶ 53). LoanStreet attempted to suppress these posts, which explicitly described Plaintiffs' actions as unjust but legal, and Mr. Troia bought Google Ads to show one of his posts to people considering working for LoanStreet (*Id.* ¶¶ 55-56).

Plaintiffs threatened Mr. Troia with a lawsuit (*Id.* ¶¶ 57-58). Mr. Troia had already removed from his posts *all* of the specific language Plaintiffs complained about (*Id.* ¶ 58). Mr. Troia reasonably offered to further rephrase his statements to address Plaintiffs' concerns, but Plaintiffs demanded he remove his posts entirely and compensate them for "reputation management" fees they had incurred (*Id.*). Mr. Troia refused and Plaintiffs sued him for breach of contract, defamation, defamation *per se*, injurious falsehood, unfair competition and false designation of origin, seeking no less than $3,000,000 in damages (*Id.* ¶ 59).

## III.   STANDARD OF REVIEW

### A.   Motion To Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff (here, Mr. Troia). *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc*., 850 F.3d 58, 77 (2d Cir. 2017). The standard "is heavily weighted in favor of the plaintiff," and the Court must "read a complaint generously." *Lee v. Sony BMG Music En't., Inc.*, 557 F. Supp. 2d 418, 423 (S.D.N.Y. 2008).

### B.       Judgment On the Pleadings

"When a plaintiff moves for judgment on the pleadings [under Federal Rule of Civil Procedure 12(c) the question for determination is whether on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law." *Allstate Ins. Co. v. Vitality Physicians Grp. Practice P.C.*, 537 F. Supp. 3d 533, 545 (S.D.N.Y. 2021) (quotes and citation omitted). "In evaluating a Rule 12(c) motion, the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." Id. (quotes and citation omitted). Here, the nonmoving party is Mr. Troia.

## IV.    <u>ARGUMENT</u>
### A.       Defendant's Counterclaims Are Adequately Pled
#### 1.       Defendant Has Adequately Pled His New York Anti-SLAPP Counterclaim

New York devised its anti-SLAPP (strategic lawsuits against public participation) scheme to prevent powerful interests like LoanStreet and Mr. Lampl from punishing and harassing citizens for exercising their right to free speech, such as Plaintiffs are doing with their current action against

Mr. Troia. Plaintiffs brazenly and wrongly ask the Court to deny Mr. Troia a substantive right the

state of New York has seen fit to afford him.

> a.    The Substantive Provisions of New York's Anti-SLAPP Scheme,
> Like N.Y. Civil Rights Law § 70-a, Are Applicable in Federal Court

§ 70-a is a substantive cause of action and is not in conflict with any federal rule:

> *There is no federal rule that controls the issue [addressed by § 70-a] of whether a SLAPP defendant can recover damages for being forced to defend against a SLAPP. Rules 12 and 56 do not speak to the issue because they do not provide a cause of action like § 70-a. Instead, they establish "the circumstances under which a court must dismiss a plaintiff's claim before trial." Rules 12 and 56 are not sufficiently broad to control the issue. ...*

> *Even if these Rules spoke to the issue, § 70-a would not conflict with Rules 12 and 56. Section 70-a has nothing to do with whether a SLAPP claim must be dismissed. ... 70-a does not define standards for dismissal before trial. To the extent the anti-SLAPP scheme speaks to dismissal at all, it does so only in Rules 3211(g) and 3212(h). Those rules—not the cause of action in § 70-a—deal with standards on a motion to dismiss. .... Section 70-a provides a means to recover damages from a litigant who asserted a SLAPP that lacked a substantial basis. We belabor [these] points...because they have caused significant confusion.*

> *This analysis is consistent with recent decisions applying § 70-a in federal court. In Goldman v. Reddington[, No. 18-cv-3662, 2021 WL 4099462, at \*5 (E.D.N.Y. Sept. 9, 2021], Judge Rachel Kovner found that § 70-a applied in federal court. There, the plaintiff argued the defendant should not have been allowed to assert a counterclaim under § 70-a because Rule 3212(h) conflicted with federal Rule 56. But the SLAPP defendant, Judge Kovner observed, did not invoke any special summary-judgment procedures under the anti-SLAPP [scheme]. Rather, the defendant asserted a substantive claim under § 70-a. The plaintiff, Judge Kovner wrote, had not explained "why a litigant would be unable to bring an anti-SLAPP counterclaim . . . merely because" another "portion of the anti-SLAPP statute contain[ed] special summary-judgment rules" that might conflict with Rule 56. While the anti-SLAPP [scheme] "contemplate[d] that a party pursuing an anti-SLAPP claim will be able to use those special summary-judgment procedures," it made clear that an anti-SLAPP [defendant] could seek damages under § 70-a "without using those procedures."*

Schafer, Matthew and Valsangikar, Tanvi, The Application of the New York Anti-SLAPP Scheme

in Federal Court (January 18, 2023) at 24-25, https://ssrn.com/abstract=4328771 (citations

omitted). Therefore, federal courts are obligated to apply § 70-a under the *Erie* doctrine. *See*

*Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (finding a similar Nevada anti-SLAPP

mandatory fee shifting provision to be "unproblematic" because the provision "(1) would apply in state court had suit been filed there; (2) is substantive within the meaning of *Erie*, since it is consequential enough that enforcement in federal proceedings will serve to discourage forum shopping and avoid inequity; and (3) does not squarely conflict with a valid federal rule"). "The Second Circuit and eleven district courts applied the 1992 version of § 70-a in federal court without question,"[1] and these courts continue to apply § 70-a after 2020 amendments that "did not significantly alter § 70-a's text."[2] ("The Application of…" at 22; *see also Id.* at 8-9).

The aberrant opinions cited by Plaintiffs to argue § 70-a is inapplicable in federal court suffer from the confusion identified in the block quote above. In fact, Judge Valerie Caproni, who decided *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408 (S.D.N.Y. 2021), which Plaintiffs rely upon heavily, later clarified this confusion when she adopted a report and recommendation that found that Rule 3211(g)'s summary judgment procedures and § 70-a's damages provision operated independently. *Sweigert v. Goodman*, No. 18-cv-8653, 2022 WL 168080, at *9 (S.D.N.Y. Jan. 19, 2022) (denying summary judgment "to the extent [plaintiff's] counterclaim does not invoke the statute's particular summary judgment procedures but is simply seeking costs and attorney's fees pursuant to the statute"). The aberrant opinions misread *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020):

> The issue [in La Liberte] was whether the special motion to strike under the California anti-SLAPP law could be used to seek dismissal of a SLAPP in federal court and seek fees. The Second Circuit reasoned that it could not because the special motion to strike imposed

---

[1] See the long list of case citations in "The Application of…" at 23, n. 206.

[2] *Harris v. Am. Acct. Ass'n*, No. 20-cv-01057, 2021 WL 5505515, at *14 (N.D.N.Y. Nov. 24, 2021) (D'Agostino, J.); *Goldman v. Reddington*, No. 18-cv-3662, 2021 WL 4099462, at *4–*5 (E.D.N.Y. Sept. 9, 2021) (Kovner, J.); *Cheng v. Neumann*, No. 21-cv- 00181, 2022 WL 326785, at *3 (D. Me. Feb. 3, 2022); see also *Sweigert v. Goodman*, No. 18-cv-08653, ECF No. 321 (S.D.N.Y. Oct. 29, 2021) (Aaron, M.J.) (admitting, without deciding, that "[i]t may be that Defendant can seek to obtain costs pursuant to § 70-a without invoking the special summary judgment procedures and, therefore, avoid a conflict with Rule 56"), adopted by 2022 WL 168080, at *9 (S.D.N.Y. Jan. 19, 2022) (Caproni, J.).

> *a different, higher standard on the plaintiff than Rule 12. But that reasoning is of little use in construing § 70-a, which is neither a motion to strike nor a motion to dismiss and does not tie recovery of damages to such motions.*

("The Application of…" at 30). Indeed, the *La Liberte* court said California "could have awarded attorneys' fees to the prevailing party in any defamation action, but it chose not to do so." *La Liberte*, 966 F.3d 79, 89 n.6 (2d Cir. 2020).

> b. The Court's Order on Defendant's Motion to Dismiss Confirms that Plaintiffs' Action Is a SLAPP

Plaintiffs do not and cannot dispute that Mr. Troia's statements constituted "public petition and participation," as defined by § 76-a of New York's Civil Rights Law, because they were posted on public forums (Compl. ¶¶ 78, 81, 105 and Dkt. 66 at 23-24) in connection with an issue of public interest (FAA, Counterclaims ¶ 74). § 76-a requires plaintiffs in actions involving such statements to establish "by clear and convincing evidence" that an allegedly defamatory statement was made with actual malice – that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 214 (S.D.N.Y. 2020) (quotes and citation omitted). The Court's August 2022 Memorandum and Order held that many of Plaintiffs' defamation claims lacked facial plausibility even *without* using the stringent actual malice standard (Dkt. 39 at 19-20). This demonstrates that, at the very least, *these* claims had no basis in law, confirming Plaintiffs' suit is a SLAPP.

> **2. Defendant Has Adequately Pled His Implied Covenant of Good Faith and Fair Dealing Counterclaim**

"New York law implies a covenant of good faith and fair dealing in all contracts. This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. A claim for breach of this covenant may be brought, if at all, only where one party's conduct, though not

breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *Dreni v. Printeron Am. Corp.*, 486 F. Supp. 3d 712, 729 (S.D.N.Y. 2020) (quotes and citations omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion. (Courts have equated the covenant of good faith and fair dealing with an obligation to exercise that discretion reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Fishoff v. Coty Inc*., 634 F.3d 647, 653 (2d Cir. 2011) (quotes and citations omitted).

Defendant's first counterclaim describes facts that constitute such a violation.

        a.      <u>Mr. Troia Reasonably Expected LoanStreet to Select a Vesting Commencement Date On Or Close To His Employment Start Date</u>

The Offer Letter omitted a vesting schedule for the grant, saying only that "all the details" would come in a separate option agreement that LoanStreet was supposed to send Mr. Troia but didn't until nearly a year after he signed the Offer Letter, and only after he asked for it specifically. Before Mr. Troia signed the Offer Letter, the only information LoanStreet had given him conceivably related to when the specific vesting commencement date would be was Mr. Wu telling Mr. Troia that the first quarter of his grant would vest in one year. Mr. Troia reasonably understood Mr. Wu to have told him that the vesting commencement date would be on or shortly after his employment start date, consistent with industry custom. Plaintiffs insist that Mr. Wu was only unhelpfully regurgitating to Mr. Troia what the Offer Letter already said: that 25% of the grant would vest on the first anniversary of some unspecified vesting commencement date (Dkt. 66 at 12). In Plaintiffs' implausible telling, Mr. Wu never addressed the basic issue of *when* the grant would vest while explaining its terms and conditions to Mr. Troia at Mr. Troia's request. Plaintiffs fault Mr. Troia for not specifically asking when the vesting commencement date would be, but the

implied covenant does not require a party to a contract to be abnormally skeptical or paranoid, only reasonable.

Never, despite Mr. Troia's request to be fully explained the terms and conditions of the grant and his multiple interactions with the most senior executives at LoanStreet regarding the grant, did LoanStreet inform Mr. Troia, before he signed the Offer Letter, of LoanStreet's highly unusual policy of selecting the date on which its board of directors approved a grant as the grant's vesting commencement date, or of the date when Mr. Troia's grant would be approved.

Plaintiffs argue that these communications between Mr. Troia and LoanStreet's executives are not applicable because they are "pre-contract conduct," but such parole evidence is admissible "if a court finds an ambiguity in the contract." *Sec. Plans, Inc. v. Cuna Mut. Ins. Soc'y*, 769 F.3d 807, 816 (2d Cir. 2014) (quotations and citation omitted). Here, the Offer Letter is not just ambiguous but silent on a key term, so these communications are admissible.

If the Offer Letter did not even *implicitly* set a vesting commencement date and instead gave LoanStreet unfettered discretion to select it, as Plaintiffs contend, LoanStreet could have selected such a far-away date that Mr. Troia would never actually receive the grant, rendering the Offer Letter an illusory agreement. However, "[u]nder New York law, courts should avoid a contractual interpretation that renders an agreement illusory." *Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*, 09 Civ. 6707 (ER), 22 (S.D.N.Y. Mar. 28, 2013).

In addition, "New York follows the well established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter." *Fishoff v. Coty Inc.*, 676 F. Supp. 2d 209, 216 (S.D.N.Y. Dec. 16, 2009) (quotes and citation omitted). LoanStreet drafted the Offer Letter. Therefore, the Offer Letter's omission of a

vesting commencement date should be construed in Mr. Troia's favor to mean that it would be on or soon after the date when his employment with LoanStreet began.

The implied covenant of good faith and fair dealing is meant to deter exactly the kind of half-truths and lies of omission that LoanStreet made to Mr. Troia. The Offer Letter didn't explicitly say Mr. Troia's salary would first be paid on LoanStreet's first payday after his first date of employment (as opposed to a later payday), once or twice a month (as opposed to once a or twice a year), or in United States dollars (as opposed to any of the other currencies that use the same dollar sign symbol), but it was reasonable for Mr. Troia to expect all of these things. A prospective employer acting in good faith would inform a prospective employee if things were otherwise, because they would be highly unusual and to the detriment of the prospective employee. For the same reason, it was eminently reasonable for Mr. Troia to expect LoanStreet to select a vesting commencement date on or soon after his employment start date.

> b. Whether Either Option Agreement Superseded the Offer Letter Is An Affirmative Defense That Requires Fact-Finding

Plaintiffs seek refuge in one of the two option agreements Mr. Troia signed in January 2020 that included a specific vesting commencement date. Plaintiffs claim, arbitrarily, that Option Agreement 2 superseded the Offer Letter (Dkt. 66 at 9).

In New York, "waiver of a contract right is the voluntary abandonment or relinquishment of a known [contract] right. It is essentially a matter of intent which must be proved." *Beth Israel Med. v. Hori. Blue Cross*, 448 F.3d 573, 585 (2d Cir. 2006) (quotes and citation omitted). "[T]he intent to waive is usually a question of fact…So much depends upon the intention of the parties that, where such intent is disputed, it necessarily becomes a question for the determination of a jury." *Id.* (quotes and citations omitted). Defendant objected, both before and after signing Option Agreement 2, that its vesting schedule wasn't what LoanStreet promised him in the Offer Letter,

10

and he disputes that he intended to waive his right under the Offer Letter to a reasonable vesting schedule by signing Option Agreement 2 (FAA, Counterclaims ¶¶ 27-30), so the Court must deny Plaintiffs' motion and allow fact-finding and jury determination to proceed.

Even so, the undisputed facts show that no agreement superseded the Offer Letter.

First, Option Agreement 2 contained *no reference whatsoever* to the Offer Letter. Option Agreement 2's integration clause says "[t]he [2016 Equity Incentive] Plan and [the option agreement] … supersede … all prior … agreements … with respect to the subject matter hereof." Dkt. 55-4 at 6. Nowhere, however, does Option Agreement 2 say its subject matter is the Offer Letter grant. Plaintiffs' attempt to read in such a specification now contradicts their own admonitions that such integration clauses establish "the parties' intent that the [a]greement [in question] is to be considered a completely integrated writing" and that "extrinsic proof to add to or vary [the] terms [of the option agreement] may not be considered" (Dkt. 66 at 9). The number of shares in Option Agreement 2's grant does equal the number of shares in the Offer Letter grant, but this is insufficient to establish that the two contracts have the same subject matter. Plaintiffs, who insist on such a strict interpretation of the Offer Letter's integration clause as to exclude the implied covenant, cannot plausibly simultaneously advocate such a loose interpretation of Option Agreement 2's integration clause as would be required to conclude that its subject matter is the same as that of a separate, unreferenced, and year-old agreement simply because both agreements deal with grants of the same number of shares.

Second, Mr. Troia signed not one, but *two* LoanStreet option agreements in January 2020. Option Agreement 1 is neither in the case record nor in the possession of the Defendant, another reason dismissal would be premature. However, presuming both agreements were identical except for their vesting commencement dates and number of shares, their two integration clauses, both

11

claiming to supersede all prior agreements on their ambiguous subject matters, together pose a serious problem for Plaintiffs. Did either, neither, or both of these agreements supersede the Offer Letter? The only reasonable interpretation is neither. Neither agreement contains any reference to the Offer Letter or to each other. The Offer Letter and the two option agreements deal with three distinct subject matters.

Finally, even if Option Agreement 2's subject matter actually was the Offer Letter grant, it would be unenforceable because LoanStreet would have provided no new consideration to Mr. Troia in it. "Under New York law, [a]ll contracts must be supported by consideration, consisting of a benefit to the promisor or a detriment to the promisee." *Zigler v. Featherstone Foods, Inc.*, 20cv2462 (DLC), 8 (S.D.N.Y. Jan. 15, 2021) (quotes and citation omitted).

c.    <u>LoanStreet's Selection of the Vesting Commencement Date Was Arbitrary and Outside of Its Discretion</u>

Mr. Troia's position – that the meeting schedule of LoanStreet's board of directors did not nullify LoanStreet's obligation to honor its contractual promise to reasonably vest the Offer Letter grant – is far from "bizarre," as Plaintiffs claim (Dkt. 66 at 10-11). LoanStreet's board of directors could have approved any vesting commencement date – past, present, or future. Plaintiffs have not even tried to provide a rational or non-arbitrary reason for its alleged, highly unusual policy of selecting a grant's approval date as its vesting commencement date (*Id.).*

Plaintiffs indirectly cite *Van Valkenburgh v. Hayden Pub. Co.*, 30 N.Y.2d 34, 46 (N.Y. 1972) as saying that the obligation not to act arbitrarily or irrationally "cannot undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit" (Dkt. 66 at 11), but the cited sentence continues: "[yet] there may be a point where that activity is so manifestly harmful to the [the other party], and must have been seen by the [first party] so to be harmful, as to justify the court in saying there was a breach of the

covenant." LoanStreet's substantial delay of the grant's vesting was manifestly harmful to Mr. Troia, and certainly not incidentally, because "the vesting of stock options goes to the root of their value." *Dealtime.com v. McNulty*, 123 F. Supp. 2d 750, 760 n.2 (S.D.N.Y. 2000). LoanStreet does not and cannot explain how its alleged, highly unusual policy of selecting a grant's approval date as its vesting commencement date could possibly serve its "interests" in way that would only "incidentally" harm a grantee. This direct and obvious harming of Mr. Troia is a far cry from the facts of *Van Valkenburgh*, where a publisher had merely published books on the same subject as that of a book it published for an author whose contract with the publisher had a best-efforts clause.

Plaintiffs claim to have retained absolute discretion over the terms of the on-hire grant (Dkt. 66 at 9, 11 n.3), but a New York employer who wishes to retain such discretion over incentive compensation must do so unambiguously, which LoanStreet did not. *See Lam v. American Express Co.*, 265 F. Supp. 2d 225, 237 (S.D.N.Y. 2003). The 2016 Equity Incentive Plan, whose language might have done so, was not given to Mr. Troia before he signed the Offer Letter and so was not incorporated into it. *See Gramercy Wrecking & Envtl. Contractors v. Trucking Emps. of N. Jersey Welfare Fund*, Inc., 17-cv-7101 (BMC), 5-6 (E.D.N.Y. May. 30, 2018) ("A general reference to another document is insufficient as a matter of law to incorporate that other document into the subject agreement or contract. To the contrary, it must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid.") (quotes and citations omitted). The Offer Letter's statement that the grant was subject to approval by LoanStreet's board of directors was also insufficient to retain such absolute discretion. *See Smith v. Railworks Corp.*, 10 Civ. 3980 (NRB), 8-12 (S.D.N.Y. May. 16, 2011) (holding that a contract saying an incentive was "subject to approval by executive management" was insufficient to retain absolute discretion to decide whether to pay it).

This alleged policy also meant that Mr. Troia's grant was treated less favorably than grants provided to employees whose start dates were shortly before a board meeting.

####   d.   Defendant Need Not Present Direct Evidence of Improper Motive

"While courts generally find that a defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive, a plaintiff need not present direct evidence of an improper motive. Rather, bad faith can be inferred from evidence that the defendant's conduct was arbitrary or contrary to reasonable expectations." *Dreni*, 486 F. Supp. 3d 712, 731 (quotes and citation omitted). Defendant's counterclaim presents plentiful such evidence, including LoanStreet's affirmative statement that the grant's first quarter would vest after one year; its omissions of its vesting commencement date selection policy and its board meeting schedule; and its withholding of the vesting schedule from Mr. Troia until *almost a year after his employment began*, and only after he had to specifically request it – all within the context of Mr. Troia's request for a full explanation of the terms and conditions of the grant and an industry custom of vesting commencement dates starting no later than the calendar month following a grantee's employment start date (FAA, Counterclaims ¶¶ 10, 24-26, 86, 92-97).

####   e.   The Implied Covenant Attaches to At-Will Employment Contracts

Plaintiffs wrongly claim that no implied covenant of good faith and fair dealing attaches to at-will employment contracts. On the contrary, an employer can violate this covenant by, for instance, terminating an at-will employee "for the purpose of avoiding the payment of commissions which are otherwise owed." *Rozenzweig v. Claimfox, Inc.*, 251 F. Supp. 3d 449, 460 (E.D.N.Y. 2017) (citing *Wakefield v. N. Telecom, Inc.*, 769 F.2d 109 (2d Cir. 1985)).

"Under New York law, an employer is free to change the terms of at-will employment … prospectively, subject to the employee's right to leave such employment if the new terms are

unacceptable; significantly, however, an employer may not retroactively change the terms of the employment agreement he entered into with that employee." *Klein v. Torrey Point Group, LLC*, 979 F. Supp. 2d 419, 432 (S.D.N.Y. 2013) (quotes and citation omitted). LoanStreet didn't inform Mr. Troia of its selected vesting schedule for his on-hire grant until LoanStreet had employed Mr. Troia *for nearly a year*, depriving him of his right to leave his employment if the schedule was unacceptable to him. Plaintiffs cite inapposite cases in which at-will employees were terminated before their stock options vested according to an uncontested vesting schedule. In this case, however, Mr. Troia's option should have partially vested by the time he was terminated. LoanStreet refused to honor the vesting schedule reasonably understood as part of the Offer Letter and so deprived Mr. Troia of the portion of his option to which he was indeed entitled.

### 3.   Defendant Has Adequately Pled His Fraudulent Inducement Counterclaim

   a.   <u>The Fraudulent Inducement Counterclaim Is Not Redundant of the Implied Covenant Counterclaim Because Defendant Suffered Special Damages</u>

A plaintiff may maintain a claim of fraud alongside a breach of contract claim if he or she "seek[s] special damages that are caused by the misrepresentation and unrecoverable as contract damages" *Lam*, 265 F. Supp. 2d at 230. Mr. Troia suffered special damages due to LoanStreet's misrepresentations of his grant's vesting schedule – namely, the loss of the valuable career development, stock options, and other benefits he would have received had he not declined an alternative, formal offer of employment from Fluz Fluz (FAA, Counterclaims, ¶¶ 100-101). "The Second Circuit takes a flexible approach to the out-of-pocket rule … permitting compensation for foregone economic opportunities such as lost career development." *Knutson v. G2 FMV, LLC*, 14 Civ. 1694 (RWS), 13 (S.D.N.Y. Jan. 3, 2018). *See Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087 (CSH), 2000 WL 987280, 7 (S.D.N.Y. July 17, 2000) (denying a motion to dismiss a fraud claim

because the plaintiff, who accepted an offer of employment from the defendants and declined an alternative offer, had sufficiently alleged that "the [d]efendants' fraud induced him to decline a lucrative position…which, once foregone was gone forever."). Plaintiffs' object that the existence and details of the Fluz Fluz offer were never shared with them (Dkt. 66 at 4, 15), but all New York law requires is that special damages be "fairly within the contemplation of the parties." *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d Cir. 2007), LoanStreet cannot credibly claim it could not contemplate that the then-unemployed Mr. Troia's acceptance of its offer might cause him to decline an alternative job offer.

b.   <u>LoanStreet Misrepresented the Vesting Schedule to Mr. Troia</u>

Mr. Troia pleads actionable misrepresentations, consisting of an affirmative statement and omissions, which are summarized in § IV(A)(2)(d), *supra*.

An omission of material fact can only serve as the basis of a fraudulent inducement claim when there exists a duty to disclose. *See Marquez v. Hoffman*, No. 18-CV-7315 (ALC), 2021 WL 1226981, at *33 (S.D.N.Y. Mar. 31, 2021). LoanStreet had such a duty in this case under the special facts doctrine. "[A]bsent a fiduciary relationship between the parties, a duty to disclose arises only under the special facts doctrine where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair…[T]o state a claim based on the special facts doctrine, a plaintiff must plead facts showing that (1) the omitted information was peculiarly within the knowledge of the defendant and (2) the information could not have been discovered through the exercise of ordinary intelligence. *Yookel, Inc. v. United States Steel Corp.*, 20-CV-4513 (KAM) (CLP), 21-23 (E.D.N.Y. Feb. 23, 2022) (quotes and citations omitted). Only LoanStreet knew of its highly unusual grant policies. Mr. Troia exercised ordinary intelligence in trying to discover the terms and conditions of his grant, and made clear to LoanStreet their

importance to him, when he asked for and obtained an explanation of them from no less than LoanStreet's COO. He did not have to exercise the paranoid skepticism that Plaintiffs claim he should have. LoanStreet, therefore, had a duty to disclose these material facts to Mr. Troia. Since it didn't, its transaction with Mr. Troia was inherently unfair.

Mr. Troia can satisfy the requirement of alleging facts giving rise to a "strong inference of fraudulent intent" by "(1) alleging facts to show that [LoanStreet] had both motive and opportunity to commit fraud, or ... (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017) (quotes and citations omitted). Mr. Troia's counterclaim does both. As to the former, it shows LoanStreet's motive was to entice Mr. Troia to accept its offer by promising a vesting schedule more friendly to Mr. Troia than it really was. The four-month difference was enough to reduce the share of the grant that was vested when Mr. Troia was terminated from one-third to *none*, saving LoanStreet roughly $100,000 (Compl. ¶ 37). As a result, existing LoanStreet stockholders, such as executives like Mr. Wu, avoided dilution of their own holdings. The opportunity was provided by LoanStreet's information asymmetry with Mr. Troia and LoanStreet's perpetuation thereof by withholding the vesting schedule from Mr. Troia *for almost a year,* until he specifically requested it. As to the latter, such facts from the Counterclaim are summarized in § IV(A)(2)(d), *supra*. Defendant's remark that he didn't think Mr. Lampl, the person, "intended for [his] company to treat people unfairly" when he founded LoanStreet in 2013 says nothing about the intent or recklessness of LoanStreet, the company, when hiring Mr. Troia in 2019. In fact, Mr. Troia said, "If it was just a good-faith mistake, they could have done the right thing and granted me the options I earned. They chose not to." (Compl. ¶ 37).

### B.      Plaintiffs Are Not Entitled to Judgment as a Matter of Law as to Defamation

Plaintiffs' remaining claim for defamation is premised on nine alleged statements by Mr. Troia (collectively, the "Troia Statements") (Compl. ¶¶ 76(a)-(g), 93(a)-(b)).

"To state a claim for defamation under New York law, a plaintiff must allege that the defendant made a statement that was: (1) false, defamatory, and of and concerning the plaintiff; (2) published to a third party; (3) made with the applicable level of fault; and (4) defamatory *per se* or caused the plaintiff special harm." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 280 (S.D.N.Y. 2016) (citing *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011). As explained in § IV(A)(1)(b), *supra,* the applicable level of fault here is actual malice. Plaintiffs have failed to allege facts that support several of these required elements.

### 1.    Defendant's Statements Are Substantially True

"It is axiomatic that truth is an absolute, unqualified defense to a civil defamation action ... and that substantial truth is all that is required." (*Id.* at 281) (quotes and citation omitted). "A statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012) (quotes and citation omitted). "Despite truth often being framed as a defense to [defamation], the burden of proving the falsity of a statement rests with the plaintiff." *Leidig v. BuzzFeed, Inc.*, 371 F. Supp. 3d 134, 143 (S.D.N.Y. 2019).

*Plaintiffs have not identified a single falsity in the Troia Statements.* Plaintiffs' failed attempt to do brazenly ignores the Troia Statements' clear contextual meaning and grossly misrepresents them as having alleged that LoanStreet unlawfully violated one of Mr. Troia's stock option agreements. The Troia Statements, however, *never claimed LoanStreet violated either stock option agreement or acted unlawfully in any way*. Mr. Troia's statements were emphatically clear that the promise he believed LoanStreet violated was a moral*, legally unenforceable* one it made

when enticing him to sign the Offer Letter, *almost a year before it provided him with either stock option agreement*: that the first quarter of his on-hire option would vest after a year of employment.[3] Mr. Troia denies that he accused Plaintiffs of unlawfulness. (FAA, Answer ¶¶ 2, 84, 95). The Court has *already* held that Plaintiffs failed to factually refute Mr. Troia's statement, Compl. ¶ 93(c), that LoanStreet communicated a different vesting schedule to him after he was hired than before (Dkt. 39 at 19-20). Though Plaintiffs point to Option Agreement 2 as if it were a smoking gun, the Troia Statements *mention that agreement specifically*, saying it was a violation of the pre-hire promise. They make clear that Mr. Troia signed it because he didn't think he had the power to contest its vesting schedule even though he considered it unfair, and that he did not consider it to have *morally* voided the pre-hire promise. Even if the Troia Statements were open to Plaintiffs' baseless interpretation that Mr. Troia accused Plaintiffs of unlawfulness, the Court, for this motion, is obliged to reasonably infer in Mr. Troia's favor that he did not.

Plaintiffs' pleaded truth (Compl. ¶¶ 19-20) – which offers no fact inconsistent with Mr. Troia's narrative and instead merely nitpicks word choices, like Mr. Troia saying "grant" when "give the value of" might have been more strictly precise (*Id.* ¶ 21) – would fail to have "a different effect on the mind of the reader" than the Troia Statements. The gist of the Troia Statements is that LoanStreet legally stiffed Mr. Troia out of compensation he had morally earned. Nothing Plaintiffs have pleaded, and certainly nothing undenied by Mr. Troia, changes that basic story. In any case, as explained above, the text of Option Agreement 2 shows that it did not supersede the Offer Letter

---

[3] "After 15 months of praising my work and as COVID froze the hiring markets in 2020 – they abruptly fired me and withheld **$100k in options that they promised me before I was hired**. … **Any promises made to you to entice you to sign an offer** should be regarded with extreme skepticism. … **Before I joined, Cofounder/COO Christopher Wu told me that the first quarter of my stock options would vest after a year.** My offer letter said details on the equity compensation would be provided in a separate equity agreement. **I wasn't provided that agreement for nearly a year after my start date, and you can imagine my surprise when I say [sic] that I wouldn't begin to vest until nearly 16 months of employment.** After 15 months of work. I was abruptly fired and didn't receive a single option." (Compl., ¶ 37) (emphases added).

and so Plaintiffs *did* act unlawfully after all. Even if Mr. Troia had accused Plaintiffs of unlawfulness, "Courts have repeatedly held that an accusation that a party has breached a contract or other legal agreement is not defamatory *per se* unless the declarant has made or implied additional defamatory assertions of fact." *Yong Ki Hong v. KBS Am., Inc.*, 05-CV-1177 (ENV) (VMS), 57 (E.D.N.Y. Sep. 19, 2013). In addition, because Mr. Troia's posts arose out of a "labor dispute" within the meaning of the National Labor Relations Act, or arguably constituted protected activity under section 7 of that Act, or both, Plaintiffs' defamation claims are partially preempted to the extent that they were not made with actual malice. *See Hoesten v. Best*, 34 A.D.3d 143, 155 (N.Y. App. Div. 2006).

When the Court held that Plaintiffs "sufficiently alleged the falsity of defendant's statements related to his stock option" (Dkt. 39 at 18), it was ruling on Mr. Troia's motion to dismiss and had to "draw all reasonable inferences in favor of" Plaintiffs. For Plaintiffs' motion for judgment on the pleadings, by contrast, the Court must now "draw all reasonable inferences in favor of" *Mr. Troia* and "assum[e] as true all the material allegations of fact in the answer."

### 2.    Defendant's Statements Are Pure Opinion

A threshold question in any defamation action is whether the statements at issue assert facts or opinions. "Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action." *Enigma*, 194 F. Supp. 3d 263, 281 (quotes and citation omitted).

"Distinguishing between opinion and fact requires a consideration of the following factors: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and

surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Wexler v. Dorsey & Whitney LLP*, No. 19-3632, 7-8 (2d Cir. Jul. 9, 2020) (quotes and citation omitted). In conducting this analysis, the overarching "inquiry is whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff." *Torain v. Liu*, 279 F. App'x 46, 46 (2d Cir. 2008).

A statement is a non-actionable "pure opinion" if it is either "accompanied by a recitation of the facts upon which it is based" or "does not imply that it is based upon undisclosed facts." *Biro,* 883 F. Supp. 2d 441, 461 (quotes and citation omitted).

Mr. Troia's statements expressed his subjective opinion that Plaintiffs unjustly but legally broke their pre-hire promise that the first quarter of his option would vest after a year of employment. The Troia Statements are pure opinion because they are accompanied by a recitation of all the facts upon which they are based, namely, that (1) LoanStreet enticed Mr. Troia to work for it with a promise that it would compensate him with an option that would begin to vest after a year of employment,[4] (2) after almost a year of employment, LoanStreet finally provided him with a formal stock option agreement that contained a dramatically delayed vesting schedule relative to what LoanStreet had promised,[5] (3) LoanStreet did not violate this formal stock option agreement,[6]

---

[4] "Before I joined, Cofounder/COO Christopher Wu told me that the first quarter of my stock options would vest after a year." (*Id.,* ¶ 37). "My vesting was supposed to start vesting after 12 months." *(Id.,* ¶ 42).
[5] "My offer letter said details on the equity compensation would be provided in a separate equity agreement. I wasn't provided that agreement for nearly a year after my start date, and you can imagine my surprise when I say [sic] that I wouldn't begin to vest until nearly 16 months of employment." (*Id.,* ¶ 37). "After I start, they tell me that they actually meant 12 months after the next quarterly board meeting, and I will now start to vest after 16 months." (*Id.,* ¶ 42).
[6] "Because the offer letter omitted the details of the equity compensation, labor lawyers told me I had no case." (*Id.,* ¶ 37). "LoanStreet is run by fancy lawyers and were [sic] crafty with the offer letter language so I had no legal case." (*Id.* ¶ 42). "There is legality and there is morality. This post is about legal, immoral behavior. As I said, I don't have a legal case…There was a power and information imbalance in my interaction with LoanStreet. Ian Lampl saw a legal way to take advantage of it, and he did." (*Id.* ¶ 45).

and (4) LoanStreet fired him without warning shortly before the delayed vesting start.[7] *No key fact is omitted*. It is permissible that Mr. Troia, on casual internet forums, summarized the general significance of one of the stock option agreements as it related to his opinion – that LoanStreet would only begin to vest his stock options after more than 16 months of work instead of after 12 as it had promised him – instead of including low-level details, like the specific dates involved, that would not change the Troia Statements' "effect on the mind of the reader."

The Troia Statements did not have a precise meaning of accusing Plaintiffs of unlawful behavior because they precisely stated the opposite. At worst, they used imprecise words like "defraud" and "fraud" that have multiple dictionary definitions and can mean either lawful or unlawful deception. The statements acknowledged this ambiguity and explicitly used these words to designate lawful deception.[8] The statements' uses of terms like "defrauded", "cheated", "rich con man," and "fraudulent, exploitative mess" were hyperbolic and colorful expressions of Mr. Troia's opinion that LoanStreet had treated him unfairly, not literal accusations of unlawfulness.[9] *See First Manhattan Co. v. Sive*, Index No. 654799/2018, 13-16 (N.Y. Sup. Ct. 2020) ("[B]oth the United States Supreme Court and New York courts have emphasized that intemperate, abusive or insulting language used in the particular social setting of a labor dispute is especially unlikely to be treated as assertions of literal fact. … No reasonable reader would believe that [the defendant, who said his employer's actions constituted 'fraud'] is accusing the company of literally engaging

---

[7] "They abruptly fired me and withheld $100k in options that they promised me before I was hired…After 15 months of work. I was abruptly fired and didn't receive a single option" (*Id.,* ¶ 37). "After 15 months of praising my work, they fire me Just as COVID is freezing hiring markets, refuse to vest any of the promised equity..." (*Id.,* ¶ 42).
[8] I use the word 'defraud' not with its legal definition but in it's [sic] colloquial, dictionary definition of 'to deprive of something by deception or fraud.' 'Fraud' I mean in its definition of: 'DECEIT, TRICKERY specifically : intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right…When I say Lampl 'pocketed' the options, I am speaking of him operating in his role as the chief executive of the company, not saying that he personally took possession of the options.'" (*Id.* ¶ 45).
[9] The Troia Statements were rife with such rhetorical hyperbole, such as "dirtbags," "dirtbag-accomplices," "raging dumpster fire," "spineless sycophants", "ringleader of this racket," and "lowest kind of man." (*Id.* ¶¶ 37, 42).

in fraud. Rather, [the defendant] is using hyperbolic language to express his opinion that he has been treated unfairly for compensation purposes. Courts have routinely dismissed claims like this one arising out of complaints about 'fraud,' especially made in the context of heated [labor] disputes, exactly on that basis.") (quotes and citations omitted).

The Troia Statements are incapable of being proved false because they provided Mr. Troia's inherently subjective moral opinion of Plaintiffs' actions and never claimed Plaintiffs acted unlawfully.

Plaintiffs' selective presentation of the cherry-picked, sometimes-abridged texts of Mr. Troia's statements – artificially isolated from the hyperbolic and irreverent websites on which they were posted and the reactions of readers in the form of responsive comments – misleadingly strips them of rich context that is critical to their interpretation (FAA, Answer, ¶¶ 37, 42, 44, 45, 76, 93). Finding Mr. Troia liable for defamation before his unabridged statements, their full contexts, and how readers interpreted them are determined via discovery would be premature.

### 3.    Plaintiffs Have Failed to Adequately Plead Actual Malice

The actual malice standard, applicable here as explained in § IV(A)(1)(b), *supra,* is comprised of two elements and requires Plaintiffs to prove "by clear and convincing evidence" "actual malice with respect to meaning as well as falsity." *Palin*, 482 F. Supp. 3d 208 at 216-18 (S.D.N.Y. 2020). Plaintiffs have not proved either element.

Plaintiffs mouth the words "actual malice" (Compl. ¶ 95), but provide no evidence that Mr. Troia knew of or was reckless to any potential defamatory meaning or falsity of his statements. Plaintiffs' own self-serving and baseless interpretation of the Troia Statements is irrelevant.

On the contrary, Plaintiffs and Defendant have only provided evidence that Defendant believed wholeheartedly in the truth of his statements. As alleged in the Complaint and admitted

by Mr. Troia, Mr. Troia said, "everything I've said is true…Suing me for describing factual events [would backfire on LoanStreet]." (Compl. ¶ 44; FAA, Answer ¶ 44). In addition, Mr. Troia denies having made his statements with actual malice (FAA, Answer ¶¶ 60, 75, 78, 79, 95, 97, 98).

### 4.     Qualified Privileges Protect Defendant's Statements

"A statement is generally subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral." *Chandok*, 632 F.3d 803 at 814 (quotes and citation omitted). The moral-duty qualified privilege protects the Troia statements, which Mr. Troia made while discharging a moral duty to inform current and potential LoanStreet employees about LoanStreet's mistreatment of its employees. These recipients' clear interest in receiving this warning was avoiding being harmed by LoanStreet. Readers thanked Mr. Troia for providing a useful warning and hundreds marked his Glassdoor post as helpful (FAA, Counterclaims ¶ 54). The Court already dismissed Plaintiffs' defamation claims related to several of Mr. Troia's statements alleging that LoanStreet mistreated its employees because Plaintiffs insufficiently alleged their falsity (Dkt. 39 at 19-20). Mr. Troia's statements were intended to protect workers, not cause harm to Plaintiffs. On the day Mr. Troia was terminated, for instance, said, "I'll be doing my best to warn all potential future employees to avoid LoanStreet. Clearly I was wrong to place my trust in you and this company to treat me fairly. Other engineers would do well to proactively seek other opportunities." (FAA, Counterclaims ¶ 46). None of his statements called for harm to Plaintiffs. They simply warn workers of potential danger: "Stay far, far away unless you're truly desperate. LoanStreet is a raging dumpster fire and you will get burned like many before…You deserve to be treated with dignity. Work elsewhere." (Compl. ¶ 37).

"In addition, a qualified privilege extends to a communication made by one person to another upon a subject in which both have an interest." *Chandok*, 632 F.3d 803 at 815 (quotes and

citation omitted). This common-interest qualified privilege also protects the Troia Statements, as Mr. Troia and his audience shared an interest in their collective welfare as workers.

Mr. Troia did not publish his statements "to persons with an insufficient interest in [them] … to warrant protection" under qualified privilege, as Plaintiffs claim (Dkt. 66 at 25). He posted *only* on professional forums for technology workers and targeted the displaying of his Google Ads to people considering working at LoanStreet (FAA, Counterclaims ¶ 54, 56).

"A qualified privilege may be overcome by a showing either of 'actual' malice … or of common-law malice. Common-law malice mean[s] spite or ill will … Further, … common-law malice will defeat such a privilege *only* if it was the one and only cause for the publication." *Chandok*, 632 F.3d 803 at 815. (quotes and citations omitted).

Plaintiffs have failed to prove actual malice, and the pleadings show that the publication of Mr. Troia's statements had at least one cause that wasn't common-law malice: his desire to help other workers avoid being mistreated by Plaintiffs as he and his coworkers had been. Mr. Troia also denies having acted with common-law malice (FAA, Answer ¶ 83, 89, 95, 100).

Since Plaintiffs have failed to plead actual malice or falsity, and since the Troia Statements are protected as pure opinion and by the moral-duty and common-interest privileges, which are affirmative defenses that may require discovery to prove, Plaintiffs are not entitled to judgment as a matter of law as to defamation.

## V.   **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion to dismiss Defendants' counterclaims and motion for judgment on the pleadings in their entirety.

Dated: March 10, 2023

Respectfully Submitted,
/s/ Wyatt Troia
Wyatt Troia
300 Albany Street, 8G
New York, NY 10280
402-990-3834
mrwnt10@gmail.com

cc: All Counsel of Record (via ECF)