UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOANSTREET, INC., and IAN LAMPL, Individually,<br><br>                  Plaintiffs,<br><br>        -against-<br><br>WYATT TROIA, Individually,<br><br>                  Defendant. | Case No. 1:21-cv-06166-NRB |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1(a) STATEMENT**

Pursuant to Local Rule 56.1(a), Plaintiffs LoanStreet Inc. and Ian Lampl ("Plaintiffs") submit the following response to Defendant's Local Rule 56.1 Statement, Dkt. No. 120:

## I.    <u>LOANSTREET AND THE LOANSTREET MARK</u>

1.      Plaintiff Ian Lampl ("Lampl") co-founded LoanStreet, Inc. ("LoanStreet"; collectively, "Plaintiffs") an online platform that allows financial institutions and other users to share, manage, and originate loans.  (Lin Dec. Ex. 4, Complaint ("Compl."), ¶¶ 11-12.)

**Plaintiffs' Response:**  Undisputed.

2.      LoanStreet owns a valid trademark in its name "LoanStreet." Said trademark is registered with the United States Patent and Trademark Office, United States Registration No. 4,618,232 on the Principal Register.  (Lin Dec. Ex. 5.)

**Plaintiffs' Response:**  Undisputed.

3.      LoanStreet's trademark was issued on October 7, 2020.  (Lin Dec. Ex. 5.)

**Plaintiffs' Response:**  Dispute. LoanStreet's trademark was registered on October 7, 2014. (Lin Dec. Ex. 5).

4.      The mark is registered for "providing temporary use of non-downloadable software to facilitate and/or manage the buying or selling of any loan, including whole loans, a portion of any loan, loan assignment, loan participation or any economic interest in a loan." (Lin Dec. Ex. 5, LoanStreet Trademark/Service Mark Statement of Use; Ex. 4, Compl., ¶ 111.)

**Plaintiffs' Response:**  Undisputed.

## II.    DEFENDANT TROIA AND HIS USE OF THE MARK

5.      Troia was hired by LoanStreet to work as an engineer in February 2019.  (Lin Dec. Ex. 4, Compl., ¶ 17.)  In June 2020, Troia was terminated by LoanStreet.  (Lin Dec. Ex. 4, Compl., 27.)

**Plaintiffs' Response:**  Undisputed.

6.      Troia does not provide any loan or adjacent services.  As he testified under oath on June 7, 2024, Troia is a software engineer.  (Lin Dec. Ex. 6, W. Troia Dep. June 7, 2024 (22:19-25; 23:8).

**Plaintiffs' Response:**  Undisputed.

7.      Defendant is and has at all relevant times been employed as an engineer, currently employed by Microsoft.  (Lin Dec. Ex. 6, W. Troia Dep. June 7, 2024 (22:19-25; 28:10-16; 127:14-18.)  LoanStreet provides services that helps their clients manage their portfolio loans, typically for others in the financial industry, and as Lampl testified, "the bulk of our clients are US credit unions."  (Lin Dec. Ex. 7, I. Lampl Dep. June 4, 2024 (150:24-25; 151:10-12).

**Plaintiffs' Response:**  Undisputed.

8.      Defendant Wyatt Troia posted on Glassdoor a review of LoanStreet, stating, among other things, "Why not more bad reviews? LoanStreet only pays severance if you agree

not to badmouth them – Software Engineer LoanStreet (NY) Employee Review." Lin Dec. Ex.9 (W. Troia Dep. June 7, 2024 Ex. 8).

**Plaintiffs' Response:** Undisputed.

9. The post went on to say: "Stay far, far away unless you're truly desperate. LoanStreet is a raging dumpster fire and you will get burned like many before. … Any promises made to you to entice you to sign an offer should be regarded with extreme skepticism. Get everything in writing and reviewed by a good lawyer. … Before I joined, Cofounder/COO Christopher Wu told me that the first quarter of my stock options would vest after a year. My offer letter said details on the equity compensation would be provided in a separate equity agreement. I wasn't provided that agreement for nearly a year after my start date, and you can imagine my surprise when I saw that I wouldn't begin to vest until nearly 16 months of employment. After 15 months of work, I was abruptly fired and didn't receive a single option. … Because the offer letter omitted the details of the equity compensation, labor lawyers told me I had no case. Keep in mind, LoanStreet is run by lawyers who used to worth at Cravath, a very prestigious and lucrative NYC law firm. I suspect they knew exactly what they were doing when they wrote the offer letter. If it was just a good faith mistake, they could have done the right thing and granted me the options I earned. They chose not to. … Placing my trust in LoanStreet was a costly mistake. If you're reading this, please don't be fooled by the Series B funding or the impressive pedigrees of the leaders: this place is a fraudulent, exploitative mess and you have a good chance of being fired within a year….. You deserve to be treated with dignity. Work elsewhere." Lin. Dec. Ex.9 (W. Troia Dep. June 7, 2024 Ex. 8).

**Plaintiffs' Response:** Undisputed.

10.    Troia additionally made a post on Reddit titled: "Name and Shame: LoanStreet (NY) cheated me out of equity." Lin Dec. Ex.10 (W. Troia Dep. June 7, 2024 Ex. 4). The body of the post began "I worked for LoanStreet in NYC." The post proceeded to describe Troia's perception of his interactions and experiences with LoanStreet. *Id.*

**Plaintiffs' Response:**  Disputed. While the post was titled "Name and Shame: LoanStreet (NY) cheated me out of equity." and the body of the post began "I worked for LoanStreet in NYC," it did not proceed to "describe Troia's perception of his interactions and experiences with LoanStreet."  In fact, the post proceeded to contain the following statements about Plaintiffs that the Court has ruled to be defamation *per se* with malice: "[LoanStreet] withheld $100k in options that they promised me before I was hired," "[Lampl] just pocketed the options he promised me," "[Lampl] defrauded me out of over $100k," "[Lampl] is a rich con man," "[LoanStreet] is a fraudulent, exploitative mess," and "Look in the mirror and ask yourselves how your loved ones would feel if they knew you cheat people just to make your big piles of cash a little bigger."  Lin Dec. Ex.10 (W. Troia Dep. June 7, 2024 Ex. 4); September 8, 2023 Order [DE 74].

11.    The post continued as follows:  "Cofounder/COO Christopher Wu told me my equity would start vesting after 12 months. After I started, they told me that they actually meant 12 months after the next quarterly board meeting. … LoanStreet is run by fancy lawyers and were crafty with the offer letter language so I had no legal case." *Id.*

**Plaintiffs' Response:**  Undisputed.

12.    The posts use the term "LoanStreet" in reference to Plaintiff LoanStreet.  *Id.*

**Plaintiffs' Response:**  Undisputed.

13.    Troia wrote his posts to try and warn people about what he viewed as unfair labor practices at LoanStreet. Troia wrote: "Copying my Glassdoor review below. Please follow the link and mark it as helpful so that the message is amplified and as many people are warned as possible……" Lin Dec. Ex.10 (W. Troia Dep. June 7, 2024 Ex. 4). And then he inserted the text of the Glassdoor post including the following: "Stay far, far away unless you're truly desperate. LoanStreet is a raging dumpster fire and you will get burned…. You deserve to be treated with dignity. Work elsewhere." *Id.*

**Plaintiffs' Response:**  Disputed that "Troia wrote his posts to try and warn people about what he viewed as unfair labor practices at LoanStreet," a conclusory statement that is not accompanied by a citation to documentary evidence, and is not supported by the quotes later contained in the paragraph (or in the document from which those quotes are taken).  In fact, this assertion about Defendant's intent is contradicted by admissible evidence showing that Defendant wrote his post with the intent to seek revenge for being terminated and to harm Plaintiffs, specifically to cause LoanStreet to "never hire another decent engineer again" (Norkin Dec. Ex. A), which would cause the collapse of the company, and as part of broader campaign to harm Mr. Lampl with the hope that he would be removed as CEO by the investors (Norkin Dec. Ex. B; Norkin Dec. Ex. C (Troia Dep. at 91:3 – 92:4)).  To those ends, Defendant's Glassdoor post in fact contained the following statements about Plaintiffs that the Court has ruled to be defamation *per se* with malice: "[LoanStreet] withheld $100k in options that they promised me before I was hired," "[Lampl] just pocketed the options he promised me," "[Lampl] defrauded me out of over $100k," "[Lampl] is a rich con man," "[LoanStreet] is a fraudulent, exploitative mess," and "Look in the mirror and ask yourselves how your loved ones would feel if they knew

you cheat people just to make your big piles of cash a little bigger." Lin Dec. Ex.10 (W. Troia

Dep. June 7, 2024 Ex. 4); September 8, 2023 Order [DE 74].

14.    LoanStreet contacted several of the platforms that hosted Troia's posts and

requested that they delete the posts. I. Lampl Dep. June 4, 2024 (37:22-24; 52:18-21). By June

21, 2021, at least one of these platforms, Glassdoor, had deleted Troia's posts. *See* Lin. Dec. Ex.

26.

**Plaintiffs' Response:** Disputed that the platform Glassdoor "had deleted Troia's posts,"

since the email cited indicates Glassdoor had removed one post of Defendant's, and does not

reference the multiple posts Defendant made. Lin. Dec. Ex. 26.

15.    In the comments on a Reddit post of Troia's titled "Name & Shame: LoanStreet

(NY) wants federal judge to force Reddit to de-anonymize every post and comment I've written

in my entire life," Troia commented "I've been clear on this all along: what [LoanStreet] did was

unethical, not illegal. My initial Reddit post and Glassdoor review explicitly said labor lawyers

told me I had no legal case." (Lin Dec. Ex. 24). Another Reddit user named "DZ_tank" replied to

this comment saying, "So why didn't you let it go instead of continuing to post your review

*everywhere* and pay for google ads to promote it?" *Id*.  Troia responded, "LoanStreet was

working very hard to take down my posts/reviews and having success. A warning is useless if

the people who need to see it can't." *Id*.

**Plaintiffs' Response:** Undisputed.

16.    Starting June 21, 2021, Troia bought Google ads for the term "LoanStreet"

linking to Troia's Reddit post referenced in paragraph 10, *supra*. W. Troia Dep. June 7, 2024

(109:16-19).  Those ads were clearly labeled as ads and clearly linked to Reddit.com.  Lin Dec.

Ex. 12 (W. Troia Dep. June 7, 2024 Ex. 22); Lin Dec. Ex. 13 (W. Troia Dep. June 7, 2024 Ex. 23).

**Plaintiffs' Response:** Disputed that Defendant's Google ads were "clearly" labeled as ads and "clearly" linked to Reddit.com, which are fact-intensive conclusory assertions that are more appropriately determined by a fact-finder. The evidence contained in paragraphs 72-88 below show that, whatever label was attached to Defendant's ads, there was significant confusion over the source of the ads and their connection to Plaintiffs.

17.     Troia also paid to display the same ads for other related keywords including: "LoanStreet Glassdoor", "LoanStreet Careers", and "What's it like to work at LoanStreet". Lin Dec. Ex.11 (W. Troia Dep. June 7, 2024 Ex. 19). Troia configured his ads to always start their titles with "LoanStreet horror story." (Lin Dec. Ex. 25) ("LoanStreet horror story" asset is "pinned" in "1st position"). The titles of Troia's ads would also include the phrases "'a terrible place to work'", "'Hush money severance pay'", "'What's it like at LoanStreet'", "'abruptly fired me'", "LoanStreet software engineer," "LoanStreet engineering", "'super messed up'", "'Cheated me out of equity'", "'Fired me right before vesting'", "LoanStreet careers'", and "'red flags everywhere'". Lin Dec. Ex. 25. The descriptions of Troia's ads would include the phrases "'You deserve to be treated with dignity. Work elsewhere.", "They abruptly fired me & withheld the $100k in stock options they promised me'", and "'Placing my trust in LoanStreet was a costly mistake'". *Id.*

**Plaintiffs' Response:** Undisputed.

18.     While the Google ads that Troia purchased were still running, at least one Google search result for "loanstreet" displayed the "LoanStreet horror story – LoanStreet engineering" as the top result, with the word "Ad" displayed in bold and a visible link to Reddit, with the

following URL displayed: "https://www.reddit.com/csjobquestions/loanstreetshame". Lin Dec.

Ex. 12 (W. Troia Dep. June 7, 2024 Ex. 22).

**Plaintiffs' Response:** Disputed that "Ad" was displayed in bold and that a visible link to

Reddit with URL was displayed in a manner that was evident to someone conducting a Google

search for "loanstreet" in a way that did not cause confusion. This assertion requires a fact-

intensive inquiry more appropriately determined by a fact-finder. The evidence contained in

paragraphs 72-88 below shows that, whatever label or URL was attached to Defendant's ads,

there was significant confusion over the source of the ads and their connection to Plaintiffs.

19.    The same Google search result also displayed the LoanStreet website as the top

organic result, right below the "LoanStreet horror story" result, with a title of "LoanStreet," a

URL of https://www.loan-street.com, and a description of "LoanStreet is the first fully-

integrated, online platform that streamlines the process of sharing, managing, and originating

loans for credit unions, banks …" *Id.*

**Plaintiffs' Response:** Undisputed.

20.    The same Google search result also displayed organic third-party results that

included multiple results with the "LoanStreet" trademark in the name and descriptions that were

more similar to the LoanStreet result's description than the Troia ad's description was. For

example, the third result was titled "LoanStreet Inc. | LinkedIn," displayed a URL of

"https://www.linkedin.com > company > loanstreet-llc," and had a description of "About

LoanStreet Inc. LoanStreet is the first fully-integrated, online platform that streamlines the

process of sharing, managing, and originating loans for …" Another result titled "LoanStreet

LLC Information | LoanStreet LLC Profile" was displayed with a URL of "https://rocketreach.co

> loanstreet-llc-profile_b5f385b7" and a description of "About LoanStreet Inc. LoanStreet is the

first fully-integrated, online platform that streamlines the process of sharing, managing, and

originating loans for …". a result titled "Working at LoanStreet (NY) | Glassdoor" appeared with

a description of "See what employees say it's like to work at LoanStreet (NY). Salaries, reviews,

and more – all posted by employees working at LoanStreet (NY). *Id.*

    **Plaintiffs' Response:**  Disputed that the other Google search results were "more similar"

to the LoanStreet result's description than was Troia ad's description, which is a fact-intensive

conclusory assertion that is more appropriately determined by a fact-finder.

    21.    The same Google search result also displayed an organic third-party result with

almost the exact same title as that of LoanStreet's top-ranked organic result. The result page

displayed a result titled "Loanstreet" with a URL of "https://loanstreet.com.my" and a

description of "LoanStreet is Malaysia's leading independent personal finance website. Compare

personal loans, home loans, credit cards, and vehicle insurances with our tools …" *Id.*

    **Plaintiffs' Response:**  Disputed that the organic third-party results had "almost the exact

same title" as that of LoanStreet's result, which is a fact-intensive conclusory assertion that is

more appropriately determined by a fact-finder.

    22.    All of the ads Troia purchased started with the word "Ad" in bold font, displayed

a link to Reddit (either "https://www.reddit.com/csjobquestions/LoanStreetShame",

"https://www.reddit.com/csjobquestions/loanstreetshame", or

"https://www.reddit.com/csjobquestions"), and had a title beginning with the phrase "LoanStreet

horror story" and then another phrase such as "abruptly fired me," "cheated me out of equity" or

"fired me right before vesting." W. Troia Dep. June 7, 2024 (115:16-17); Lin Dec. Ex.13 (W.

Troia Dep. June 7, 2024 Ex. 23).

**Plaintiffs' Response:** Disputed that "Ad" was displayed in bold and that a visible link to Reddit was displayed in a manner that was evident to someone conducting a Google search for "loanstreet" in a way that did not cause confusion. This assertion requires a fact-intensive inquiry more appropriately determined by a fact-finder. The evidence contained in paragraphs 72-88 below shows that, whatever label or URL was attached to Defendant's ads, there was significant confusion over the source of the ads and their connection to Plaintiffs.

23.     Troia explained that he used the "LoanStreet" trademark as part of the "LoanStreet horror story" phrase in the titles of the ads because he felt that it was necessary to avoid reader confusion about who had placed the ad and what he was referring to and trying to warn other workers about: "I think that actually would have been more confusing. I felt describing the topic of my post was the clearest way to clearly communicate what the ad was for." W. Troia Dep. June 7, 2024 (116: 6-9)

**Plaintiffs' Response:** Disputed that Defendant used the LoanStreet trademark in his ads to "avoid reader confusion about who had placed the ad" or to "[try] to warn other workers," neither of which is referenced in or supported by the quoted deposition language. W. Troia Dep. June 7, 2024 (116: 6-9). Defendant ran the "google AdWords campaign to tout the negative Glassdoor reviews," Norkin Dec. Ex. A, which in turn contained the following statements about Plaintiffs that the Court has ruled to be defamation *per se* with malice: "[LoanStreet] withheld $100k in options that they promised me before I was hired," "[Lampl] just pocketed the options he promised me," "[Lampl] defrauded me out of over $100k," "[Lampl] is a rich con man," "[LoanStreet] is a fraudulent, exploitative mess," and "Look in the mirror and ask yourselves how your loved ones would feel if they knew you cheat people just to make your big piles of cash a little bigger." Lin Dec. Ex.10 (W. Troia Dep. June 7, 2024 Ex. 4); September 8, 2023

Order [DE 74]. Defendant's use of the "LoanStreet" trademark was likely to confuse readers, because "anyone doing a search for LoanStreet's website would expect that website to appear as the first search result and would be confused by Defendant's ad appearing at the top of the page with the same branded, trademarked name as the company website." Norkin Dec. Ex. K at 32.

24.    Under the "LoanStreet horror story" title the ad then displayed small excerpts from the post, such as "'Placing my trust in LoanStreet was a costly mistake' 'You deserve to be treated with dignity. Work elsewhere'" or "'They abruptly fired me & withheld the $100k in stock options they promised me' 'You deserve to be treated with dignity. Work elsewhere'". Lin Dec. Ex.13 (W. Troia Dep. June 7, 2024 Ex. 23).

**Plaintiffs' Response:** Undisputed.

25.    On Troia's posts other people could and did comment in response. The responses discussed the "naming and shaming" and what the company did and what "you" did addressed to Troia. Lin Dec. Ex.14 (W. Troia Dep. June 7, 2024 Ex. 29).

**Plaintiffs' Response:** Disputed, as there were numerous responses in addition to the few Defendant has selectively quoted. Separately, the quotes are inadmissible hearsay as they reflect out of court statements offered for the truth of what is asserted.

26.    Specifically, one commenter wrote: "If your story's accurate, the circumstances surrounding your firing suck mightily. You tried to do the right thing and got crapped on for it. For that, name and shame all you want." Troia. Lin Dec. Ex.14 (W. Troia Dep. June 7, 2024 Ex. 29).

**Plaintiffs' Response:** Disputed, as this quote is inadmissible hearsay as it reflects an out of court statement offered for the truth of what is asserted and should not be relied on by the Court in deciding summary judgment.

11

27. One commenter with the screenname OBPSG, wrote "FWIW, you've accomplished your goal of convincing me that I will never want to work for LS on account of the risk of getting embroiled in a shitstorm like this one." Lin Dec. Ex. 15 (A. Guttman Dep. June 21, 2024 Ex. 7).

**Plaintiffs' Response:**  Disputed, as this quote is admissible hearsay as it reflects an out of court statement offered for the truth of what is asserted and should not be relied on by the Court in deciding summary judgment.  Undisputed that LoanStreet, and specifically Ms. Guttman, who was head of human resources, received messages informing her that candidates were declining offers of interview and employment due to Defendant's posts.

28. Another wrote, "Loanstreet actually asked me if I want to join, then I remembered reading up on them. Compared the CEO/CTO/HR names and they were a match. If it makes you feel any better, op, I simply said not interested…" Lin Dec. Ex.15 (A. Guttman Dep. June 21, 2024 Ex. 7).

**Plaintiffs' Response:**  Disputed, as this quote is admissible hearsay as it reflects an out of court statement offered for the truth of what is asserted and should not be relied on by the Court in deciding summary judgment.  Undisputed that LoanStreet, and specifically Ms. Guttman, who was head of human resources, received messages informing her that candidates were declining offers of interview and employment due to Defendant's posts.

29. Additionally, after this case was filed commenters continued to comment on the posts. One wrote: "There is a screenshot in their complaint, they look like normal google ads and it's obvious they go to reddit." Another wrote: "here is a screenshot of the ads, as copied from the legal complaint. This is clearly a review, not an impersonation of LoanStreet." Lin. Dec. Ex. 24

**Plaintiffs' Response:** Disputed, as the quoted statements are inadmissible hearsay as they reflect out of court statements offered for the truth of what is asserted and should not be relied on by the Court in deciding summary judgment.

30. Another user wrote: "It's not like he pretended to own the copyright / imitated the company." Another wrote: "The 'trademark' is literally the company name. What a BS claim by LoanStreet. Oops, I just used their trademark, Maybe they'll sue me too now. LoanStreet is a shady company. Does this mean I just defamed them? I'm with OP on this one". *Id.*

**Plaintiffs' Response:** Disputed, as the quoted statements are inadmissible hearsay as they reflect out of court statements offered for the truth of what is asserted and should not be relied on by the Court in deciding summary judgment.

31. One individual, a software engineer, posted on Facebook, that he had posted about a story a few weeks earlier about a former employee posting about "a seemingly toxic and unethical company, LoanStreet Inc." and updated his followers that "now they are suing the former employee." Lin Dec. Ex. 16 (A. Guttman Dep. June 21, 2024 Ex. 2).

**Plaintiffs' Response:** Disputed, as the quoted statements are inadmissible hearsay as they reflect out of court statements offered for the truth of what is asserted and should not be relied on by the Court in deciding summary judgment, but undisputed that Ms. Guttman stated during her deposition that she had seen comments referencing the defamation lawsuit. Lin Dec. Ex. 16 (A. Guttman Dep. June 21, 2024 Ex. 2).

32. Troia discussed his satisfaction with the success of his ad campaign in achieving its intended purpose of warning others about what he perceived to be the unfair labor practices occurring at LoanStreet: "I was happy that the situation of LoanStreet being able to take

advantage of people naïve to their deception was over." W. Troia Dep. June 7, 2024 (124:13-16).

       **Plaintiffs' Response:** Disputed that "Troia discussed his satisfaction with the success of his ad campaign in achieving its intended purpose of warning others about what he perceived to be the unfair labor practices occurring at LoanStreet," which is a conclusory statement not supported by the quoted deposition language. W. Troia Dep. June 7, 2024 (124:13-16). Defendant's intended purpose for his Google ad campaign was to seek revenge for being terminated and to harm Plaintiffs, specifically to cause LoanStreet to "never hire another decent engineer again" (Norkin Dec. Ex. A), which would cause the collapse of the company, and as part of broader campaign to harm Mr. Lampl with the hope that he would be removed as CEO by the investors (Norkin Dec. Ex. B; Norkin Dec. Ex. C (Troia Dep. 91:3 – 92:4)). To that end, Troia "tout[ed] the negative Glassdoor reviews," Norkin Dec. Ex. A, which in turn contained the following statements about Plaintiffs that the Court has ruled to be defamation *per se* with malice: "[LoanStreet] withheld $100k in options that they promised me before I was hired," "[Lampl] just pocketed the options he promised me," "[Lampl] defrauded me out of over $100k," "[Lampl] is a rich con man," "[LoanStreet] is a fraudulent, exploitative mess," and "Look in the mirror and ask yourselves how your loved ones would feel if they knew you cheat people just to make your big piles of cash a little bigger". Lin Dec. Ex.10 (W. Troia Dep. June 7, 2024 Ex. 4); September 8, 2023 Order [DE 74].

       33.    When asked why he shared photos of his ads/posts with Sharmeen Malik, a former LoanStreet employee who was also fired, Troia stated: "just to show Sharmeen that my efforts to educate people were bearing fruit." W. Troia Dep. June 7, 2024 (125:10-11)

**Plaintiffs' Response:** Disputed that Sharmeen Malik was a former LoanStreet employee "who was also fired," which is not supported by the cited evidence.

### THERE IS NO LIKELIHOOD OF CONFUSION

A. Plaintiff has not put forth any evidence showing consumer confusion

34.   In an interrogatory response, Plaintiff LoanStreet stated that: "Defendant's unauthorized use of the infringing mark was likely to confuse and deceive prospective employees and potential customers of LoanStreet services because Defendant's unauthorized use of the LoanStreet trademark in his Google ads, when combined with his purchase of LoanStreet-related search terms for his Google ads, was done with the purpose of diverting Internet users searching for LoanStreet……and likely confused or deceived some amount of them into choosing to view Defendant's desired webpage rather than LoanStreet's website." Lin Dec. Ex.17 (I. Lampl Dep. June 4, 2024 Ex. 19) (LoanStreet Response to interrogatory 4).

**Plaintiffs' Response:** Undisputed.

35.   Plaintiff LoanStreet further stated: "Defendant's unauthorized use of the Infringing Mark served as direct competition for viewership of and access to LoanStreet's website by those prospective employees and potential customers, and likely confused or deceived some amount of them into choosing to view Defendant's desired webpage rather than LoanStreet's website." Lin Dec. Ex.17 (I. Lampl Dep. June 4, 2024 Ex. 19) (LoanStreet Response to interrogatory 4).

**Plaintiffs' Response:** Undisputed.

36.   And Plaintiff LoanStreet stated "Defendant's unauthorized use of the LoanStreet trademark was likely to confuse and deceive LoanStreet's prospective employees and potential customers because, when they searched Google using a LoanStreet-related search term and were

immediately presented with advertisements featuring the trademark "LoanStreet" as the very first word, it created confusion and/or deception as a consequence of the expectation that Google returns businesses related to the search term used, which because of LoanStreet's inherently distinctive trademark increases the likelihood of confusion." Lin Dec. Ex.17 (I. Lampl Dep. June 4, 2024 Ex. 19) (LoanStreet Response to interrogatory 4). Plaintiffs have made clear that they believe the placement of Defendant's ad would likely confuse people, however, Plaintiffs have offered no further evidence to support this proposition.

**Plaintiffs' Response:** Disputed that "Plaintiffs have offered no further evidence to support" the proposition that "Defendant's ad would likely to confuse people." To the contrary, the facts referenced in paragraphs 72-88 below constitute evidence of likely confusion.

37.    Plaintiff LoanStreet stated that the "bases for claiming that the alleged unauthorized use of the Infringing Mark, as defined in the Complaint, was likely to confuse and deceive LoanStreet's prospective employees and potential customers will be addressed by an expert witness versed in reputation and brand valuation." Lin. Dec. Ex.17 (I. Lampl Dep. June 4, 2024 Ex. 19) (LoanStreet Response to interrogatory 4).

**Plaintiffs' Response:** Undisputed.

38.    However, Plaintiffs have failed to produce any evidence showing any actual customer confusion. In the course of this action Plaintiffs served one expert report on Defendant. This one report was from Mr. Allen Adamson, who submitted an expert report and sat for a deposition. In neither did Mr. Adamson provide any actual evidence of any studies conducted to measure or report on consumer confusion. (Lin. Dec. ¶ 4)

**Plaintiffs' Response:** Disputed that "Plaintiffs have failed to produce any evidence showing any actual customer confusion." To the contrary, the facts referenced in paragraphs 72-

16

88 below constitute evidence that confusion actually occurred. Additionally, disputed that Mr. Adamson did not "provide any actual evidence of any studies conducted to measure or report on consumer confusion." Mr. Adamson's proffered expert report and declaration itself addressed consumer confusion, as referenced in paragraphs 82 and 85 below.

39.     In fact, Adamson, testified during his deposition: "I did not do an analysis of trademark confusion." (Lin Dec. Ex. 3, A. Adamson Dep. August 20, 2024 (72:3-10).

**Plaintiffs' Response:** Disputed. The referenced deposition quote at 72:3-10 is in fact: "I did not do an analysis of trademark confusion because the issue in this case is not were there customers confused as to what LoanStreet did or what their offer was to the market. The issue in this case was it doesn't matter what they do, I don't want to do business with them because they are not trustworthily [sic]." Lin Dec. Ex. 3, A. Adamson Dep. August 20, 2024 (72:3-10).

40.     During his deposition, Adamson again specifically stated that he did not investigate whether any consumers were confused about the source of the Google ads. A. Adamson Dep. August 20, 2024 (244:7-24).

**Plaintiffs' Response:** Disputed. The referenced deposition quote at 244:7-24 is in fact: "Q. Okay. So you did not look into whether customers were confused as to whether the ads, Google ads actually came from LoanStreet, the company, versus a third-party or anything like that? A. I only reviewed the materials that are in those sources so I did not, you know, investigate whether those were created by LoanStreet or other people. And, as I said, the relevance of who created them is less so than the impact of the content within them. Q. And did you see any evidence that anyone was confused as to who created them? A. I -- I was not looking through that lens so I -- I don't know." A. Adamson Dep. August 20, 2024 (244:7-24). Mr.

Adamson does opine on consumer confusion in his expert report, as stated in paragraphs 82 and 85 below.

41.    In Adamson's expert report there is one reference to confusion as follows: "indeed, anyone doing a search for LoanStreet's website would expect that website to appear as the first search result and would be confused by Defendant's ad appearing at the top of the page with the same branded, trademarked name as the company website. As a result, prospects considering doing business with LoanStreet and investors considering backing LoanStreet, in addition to potential employees, would likely encounter these negative messages before even having the opportunity to visit the company's website and learn the truth about the company." Lin Dec. Ex. 2 (Declaration of Allen Adamson dated June 21, 2024, pg. 32). Adamson, however, provided no data to support his claim that such an expectation existed or that any such confusion occurred. Adamson also provided no discussion on these Google users' potential awareness of the practice of competitive search advertising and its effect on their ability to understand the origin of various search result items.

**Plaintiffs' Response:**  Disputed. In addition to the quoted language, Mr. Adamson opines as to the facts contained in paragraphs 82 and 85 below, which constitute a "discussion on these Google users' potential awareness of the practice of competitive search advertising and its effect on their ability to understand the origin of various search result items."

42.    When discussing the alleged trademark infringement and potential confusion Plaintiffs only point to the use of LoanStreet in the title of Troia's ad and as a keyword for ads and not to any explicit claim that others supposed LoanStreet was the source or sponsor of the ads or in any way affiliated with the ads or linked post. Lin Dec. Ex.17 (I. Lampl Dep. June 4,

2024 Ex. 19) (LoanStreet Response to interrogatory 4); Lin Dec. Ex. 2 (Declaration of Allen
Adamson dated June 21, 2024, pg. 32).

**Plaintiffs' Response:** Disputed. The facts contained in paragraphs 72-88 below
constitute evidence put forward by Plaintiffs that "others supposed LoanStreet was the source or
sponsor of the ads or in any way affiliated with the ads or linked post" in the context of
"trademark infringement and potential confusion".

43.    In promoting his posts, Troia never made any statements attributing said ads or
post to LoanStreet or claiming any affiliation with LoanStreet.  Rather, Defendant stated he used
the term LoanStreet in order to *avoid* confusion about the ads among Google users searching for
LoanStreet. W. Troia Dep. June 7, 2024 (116:6-9).

**Plaintiffs' Response:** Disputed. Defendant began the title of every one of his ads with
LoanStreet's trademarked name "LoanStreet."  Norkin Dec. Ex. F; Norkin Dec. Ex. C (Troia
Depo. 115:3-20). Defendant never ran a Google ad about LoanStreet without LoanStreet's
trademarked name "LoanStreet" beginning its title.  Norkin Dec. Ex. C (Troia Depo., 116:3-6).
For the display of his ads on Google, Defendant purchased approximately ten search keywords,
each containing at a minimum the trademarked term "LoanStreet" or its variation "Loan Street".
Norkin Dec. Ex. G; Norkin Dec. Ex. C (Troia Dep. at 110:25-111:25).  Defendant ran the
"google AdWords campaign to tout the negative Glassdoor reviews," Norkin Dec. Ex. A, which
in turn contained the following statements about Plaintiffs that the Court has ruled to be
defamation *per se* with malice: "[LoanStreet] withheld $100k in options that they promised me
before I was hired," "[Lampl] just pocketed the options he promised me," "[Lampl] defrauded
me out of over $100k," "[Lampl] is a rich con man," "[LoanStreet] is a fraudulent, exploitative
mess," and "Look in the mirror and ask yourselves how your loved ones would feel if they knew

you cheat people just to make your big piles of cash a little bigger." Lin Dec. Ex.10 (W. Troia

Dep. June 7, 2024 Ex. 4); September 8, 2023 Order [DE 74].  Defendant's use of the

"LoanStreet" trademark was likely to confuse readers, because "anyone doing a search for

LoanStreet's website would expect that website to appear as the first search result and would be

confused by Defendant's ad appearing at the top of the page with the same branded, trademarked

name as the company website." Norkin Dec. Ex. K at 32.

B. <u>When Discussing the Post Plaintiff has not referred to Any Confusion Caused</u>

44.      In discussing the employees the company is looking for, Guttman stated "we are

still always opportunistically looking for high quality candidates."  Lin Dec. Ex. 8 (A. Guttman

Dep. June 21, 2024 (51:18-22)). Lampl similarly stated: "we are always opportunistically

looking to hire highly talented individuals." I. Lampl Dep. June 4, 2024 (149:4-6).

**Plaintiffs' Response:**  Undisputed.

45.      In general, when discussing hiring efforts and qualifications for candidates,

Guttman described an engineer working at Amazon as looking "like they could be good targets

for our company."  A. Guttman Dep. June 21, 2024 (134:13-25). And in describing a different

individual, Guttman stated "being a software engineer at Facebook, he otherwise would have

been a target for us… the type of candidate we would have liked to recruit" A. Guttman Dep.

June 21, 2024 (66:1-7).

**Plaintiffs' Response:**  Undisputed.

46.      Ian Lampl emailed LinkedIn Customer Support and wrote: "how do we untag

LoanStreet from the post…..it is this type of posts that we view squarely meets the criteria for

removal as being maliciously defamatory…" Lin Dec. Ex.18 (I. Lampl Dep. June 4, 2024 Ex. 4).

**Plaintiffs' Response:**  Undisputed.

47.     Ian Lampl stated during his deposition: "the purpose of my contacting LinkedIn was to mitigate the harm being caused by defamatory content on LinkedIn." I. Lampl Dep. June 4, 2024 (53:8-10).

**Plaintiffs' Response:**  Undisputed.

48.     Ian Lampl stated: "so while I'm not able to provide an exhaustive list of all harms caused by Wyatt's defamatory campaign, Wyatt's defamatory campaign harms all of the business relationships LoanStreet can enter into covering employee relationships, client relationships, vendor relationships." I. Lampl Dep. June 4, 2024 (60:5-16).

**Plaintiffs' Response:**  Undisputed.

49.     In discussing the harm allegedly incurred as a result of Troia's post Lampl said it harmed LoanStreet's ability to hire new people: "but for example in order to hire new employees, frequently they would want to meet with me specifically before joining LoanStreet, because they wanted to meet with me given all of the defamatory content that was said about me online and make a determination for themselves about whether they believed Wyatt and his defamatory content…." I. Lampl Dep. June 4, 2024 (118:25; 119:2-10).

**Plaintiffs' Response:**  Undisputed.

50.     Lampl also stated that when hiring people they began to "specifically ask me about the defamatory content and Wyatt's posts." I. Lampl Dep. June 4, 2024 (123:25; 124:2-3).

**Plaintiffs' Response:**  Undisputed.

51.     Alyssa Guttman, during her deposition, discussed similar alleged difficulties in hiring caused by Troia's posts: "I'm aware that prospective employees, were concerned about the defamation campaign…. there were concerns by candidates about relating to the lies that Wyatt had put online, you know, about the defamation campaign." A. Guttman Dep. June 21, 2024

(53:24-25; 54:1). Guttman further explained the difficulty LoanStreet allegedly faced when trying to make new hires: "when you're trying to recruit through a smear campaign, people are concerned – prospective candidates are concerned about the content of that –you know of that campaign." A. Guttman Dep. June 21, 2024 (88:16-21).

**Plaintiffs' Response:**  Undisputed.

52.    For example: a candidate for a position at LoanStreet emailed the company saying she has concerns about the position "after reading the reviews from the ex-employee." Lin Dec. Ex.19 (A. Guttman Dep. June 21, 2024 Ex. 8). Another person on the recruiting team received an email stating:  "Hi Mackenzie, thank you for reaching out, but I am not interested at this time. Heard terrible things about loanstreet." Lin Dec. Ex. 20 (A. Guttman Dep. June 21, 2024 Ex. 13).

**Plaintiffs' Response:**  Undisputed.

53.    This was also seen by posters on Reddit stating that after seeing these posts they would never work for LoanStreet. Lin Dec. Ex.15 (A. Guttman Dep. June 21, 2024 Ex. 7).

**Plaintiffs' Response:**  Disputed to the extent that "This was also seen" is unclear and the "This" does not appear to refer to anything specific.

54.    Similarly LoanStreet, specifically Guttman received an email stating "Sorry I do not work for companies that sue their former employees." Lin Dec. Ex.21 (A. Guttman Dep. June 21, 2024 Ex. 1).

**Plaintiffs' Response:**  Undisputed.

55.    Lampl further worked with Google and was successful in getting Troia's ads removed: "I believe Google ultimately did confirm that LoanStreet, our company LoanStreet, owns the trademark LoanStreet, and stopped allowing the Ads with the name LoanStreet in the

Ad." I. Lampl Dep. June 4, 2024 (130:8-12); Lin Dec. Ex. 22 and 23 (A. Guttman Dep. June 21, 2024 Ex. 9 and 10).

**Plaintiffs' Response:** Undisputed.

56.     In discussing the company's concern about new hires, Guttman, stated that the company's priority was "getting high-qualified candidates in the door". A. Guttman Dep. June 21, 2024 (234:20-25).

**Plaintiffs' Response:** Undisputed.

57.     In these discussions of the harms allegedly suffered by LoanStreet there is no mention of confusion or potential customers or employees thinking the ads or linked post came from LoanStreet when they read them or saw the ads.

**Plaintiffs' Response:** Disputed. This is a fact-intensive conclusory allegation made without a citation to evidence, and it is unclear what "discussions of the harms allegedly suffered by LoanStreet" are being referred to. The facts in paragraphs 72-88 below constitute evidence of confusion and less viewership of the LoanStreet website is a harm that translates to reputational and financial damages.

58.     No survey, consumer studies, or expert report was proffered stating that any confusion was caused by the ads or posts. (See Lin Dec. ¶ 6.)

**Plaintiffs' Response:** Disputed. The proffered expert report of Allen Adamson addresses confusion caused by Defendant's Google ads, as stated in paragraphs 82 and 85 below.

59.     There is no evidence that any confusion actually occurred.

**Plaintiffs' Response:** Disputed. The facts in paragraphs 72-88 below constitute evidence that confusion actually occurred.

60.     In this litigation, Plaintiffs are asserting two claims for unfair competition—Count V is brought under the Lanham Act and Count VI is brought under New York common law (collectively, the "Unfair Competition Claims").  (Lin Dec. Ex. 4, Compl. Counts V and VI.)

**Plaintiffs' Response:**  Undisputed.

61.     In November 2021, Defendant filed a motion to dismiss (Dkt. # 26) that was directed at multiple claims in Plaintiffs' Complaint, including Counts V and VI.  In August 2022, this Court ruled on Defendant's motion to dismiss.  (See Lin Dec. Ex. 1, August 2022 Order).  This Court granted that motion to dismiss in part but not as to Plaintiffs' Unfair Competition Claims.  (*See id*.)

**Plaintiffs' Response:**  Undisputed.

62.     As the Court explained in the August 2022 Order, the Unfair Competition Claims "arise from defendant's purchase of Google advertisements that displayed LoanStreet's registered trademark."  (Lin Dec. Ex. 1, August 2022 Order at 27.)

**Plaintiffs' Response:**  Undisputed.

**PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS**

63.     Defendant initiated his defamatory campaign June 2020 because he believed he had officially become free of the non-disparagement clause of the non-disclosure agreement he had signed with LoanStreet.  Norkin Dec. Ex. A.

64.     Defendant texted a friend on June 15, 2021: "I am officially free of my non disparagement clause and celebrated by posting this review [laughing crying emoji]").  Norkin Dec. Ex. A.

65.     On June 20, 2021, Defendant texted the same friend: "I'm also running a google AdWords campaign to tout the negative Glassdoor reviews"; "Might get sued. Don't care at this

24

point. Feels good to fight back"; and "I'm hoping I've made it so they can never hire another decent engineer again".  Norkin Dec. Ex. A.

66.    On June 21, 2021, Defendant messaged his friend a screenshot of his defamatory post entitled "Name & Shame: LoanStreet (NY) cheated me out of equity" appearing at the top of a list of "Hot Posts" in the "Tech Industry" community of TeamBlind.com, and followed it with the text: "Burn, baby, burn [fire emoji]".  Norkin Dec. Ex. A.

67.    On June 22, 2021, Defendant emailed at least two groups of LoanStreet's investors under the false name "Tom Watson," bringing to their attention a TeamBlind.com tweet sharing the same defamatory post entitled "Name & Shame: LoanStreet (NY) cheated me out of equity".  Norkin Dec. Ex. B; Norkin Dec. Ex. C (Troia Dep. 104:16-25).

68.    The text of Defendant's email to LoanStreet's investors read:

> Your portfolio company LoanStreet's mistreatment of its employees has been highlighted in some of the top posts of the last few days in the subreddit/r/cscareerquestions and TeamBlind's tech industry community.  These are two of the most important forums for software engineers.  LoanStreet's attempts to silence the posts have only drawn more attention to its wrongdoings. It is unlikely LoanStreet will ever be able to hire a decent software engineer again.
>
> As an investor with many portfolio companies, I'm assuming you aren't aware of how unethically LoanStreet has behaved under Ian Lampl, and I wanted to bring this to your attention so that you can help stop it. Investors have a moral responsibility to protect the employees of their companies from egregious mistreatment. Besides, a tech company that can't attract engineers has a bleak future.

Norkin Dec. Ex. B.

69.    Defendant admitted his understanding that, for a company that employees software engineers to develop the code for its primary product, it is accurate to say that software engineers are the life blood of the company. Norkin Dec. Ex. C (Troia Dep. at 23:22 – 24:5).

70.     Defendant also admitted that he sent emails to LoanStreet's investors using a false name and that he wrote those emails in the hope that the investors would remove Mr. Lampl as CEO.  Norkin Dec. Ex. C (Troia Dep. at 91:3 – 92:4).

71.     At some time during or after the same month of June 2021, Defendant used another false name "John Williams" to post a "review" of the company on its public- and customer-facing Google Business page in which Defendant pretended to be a former client of LoanStreet.  The Defendant claims he "inadvertently deleted" this review while collecting documents for this litigation.  Defendant claims that, per his recollection, the review had expressed that "LoanStreet was one of the most error-prone companies that he had ever worked with," and that if the company "was using its own technology, it was not very good."  Norkin Dec. Ex. D; Norkin Dec. Ex. C (Troia Dep. at 97:15-22).

72.     Defendant began paying for his Google ads, aimed at "tout[ing]" his defamatory online posts about Plaintiffs, at the outset of his defamatory campaign in June 2021.  Norkin Dec. Ex. E; September 2023 Order at 29-30.

73.     Defendant's Google ads were displayed in at least eleven permutations, with the title of each one beginning with LoanStreet's trademarked name "LoanStreet."  Norkin Dec. Ex. F; Norkin Dec. Ex. C (Troia Dep. at 115:3-20).

74.     Defendant never ran a Google ad about LoanStreet without LoanStreet's trademarked name "LoanStreet" beginning its title.  Norkin Dec. Ex. C (Troia Dep. at 116:3-6).

75.     For the display of his ads on Google, Defendant purchased approximately ten search keywords, each containing at a minimum the trademarked term "LoanStreet" or its variation "Loan Street".  Norkin Dec. Ex. G; Norkin Dec. Ex. C (Troia Dep. at 110:25-111:25).

76.     Defendant's Google ads were most commonly seen by users who had searched the terms "LoanStreet" and "Loan Street" without modifiers.  Norkin Dec. Ex. C (Troia Dep.at 108:7-13); Norkin Dec. Ex. H.

77.     Google users who used the "LoanStreet"-related terms Defendant purchased viewed his Google ads thousands of times, and clicked on the ads, at a minimum, hundreds of times.  Norkin Dec. Ex. H.

78.     LoanStreet markets its website on Google, such that a Google user who searches "LoanStreet"-related terms like "loanstreet" and "loan street" will see the website as a result. Norkin Dec. Ex. I.

79.     "Organic search," including from Google, has been the most common source of incoming traffic to LoanStreet's website, not including direct traffic to the site where a user inputs LoanStreet's home page address directly into their browser, during the period for which data is available. Norkin Dec. Ex. I.

80.     Also during the period for which data is available, the two most common terms used that resulted in impressions of LoanStreet's website link on Google were "loanstreet" and "loan street". Norkin Dec. Ex. I.

81.     As a result, Google users searching for those and other "LoanStreet"-related terms would be confronted with both one of Defendant's Google ads and LoanStreet's own website, with at least some of the time the former appearing above the latter.  Norkin Dec. Ex. J.

82.     Plaintiffs' expert witness on branding and marketing, Allen Adamson, has testified in his sworn declaration regarding Google users confronting these results:

> anyone doing a search for LoanStreet's website would expect that website to appear as the first search result and would be confused by Defendant's ad appearing at the top of the page with the same branded, trademarked name as the company website.  As a result, prospects considering doing business with

LoanStreet and investors considering backing LoanStreet, in addition to potential employees, would likely encounter these negative messages before even having the opportunity to visit the company's website and learn the truth about the company.

Norkin Dec. Ex. K at 32.

83.    Defendant has professional experience in marking, including having "led a marketing campaign" for a former employer. Norkin Dec. Ex. C (Troia Dep. at 8:14-20).

84.    Defendant admits that companies rely on Google searches to drive traffic to their website.  Norkin Dec. Ex. C (Troia Dep. at 21:16-21).

85.    Plaintiffs' expert Allen Adamson testified in his expert report regarding the efficacy of a Google ad campaign like Defendant's:

> Defendant's mastery of Google ads and the reach it enabled allowed him to comprehensively define the LoanStreet brand in a negative light for nearly anyone who encountered them:
>
> - Comprehensive targeting: By bidding on keywords related to LoanStreet's brand, products, services, and other relevant topics, Defendant ensured that his defamatory message would appear for virtually any search a user might perform to learn about LoanStreet.
> - First impression bias: In today's fast-paced world, people often make rapid judgments based on the first impression they get. By occupying the top ad position, the defendant's negative message became the crucial first impression for anyone searching for information on LoanStreet.
> - Recruiting impact: Top talent researching LoanStreet as a potential employer were immediately confronted with Defendant's attack ad, likely leading many high-quality candidates to visit Defendant's ad instead of LoanStreet's own website, and to remove LoanStreet from consideration.
> - Investor impact: Investors considering partnering with LoanStreet often begin due diligence with online research. A negative ad as the top search result could quickly lead them to dismiss LoanStreet as a risky or untrustworthy opportunity.
> - Customer impact: Potential customers searching for LoanStreet's offerings were immediately exposed to Defendant's disparaging ad before seeing the company's own website, likely leading the potential customers to visit Defendant's ad instead of LoanStreet's own website, and planting seeds of distrust and doubt.
>
> […]

As noted above, Defendant's purchased Google ads allowed him to define the LoanStreet brand in a negative light for nearly anyone who encountered them by searching for "LoanStreet" related terms on Google, including current and prospective LoanStreet customers.

Norkin Dec. Ex. K at 16-17, 24.

86.    Due to Defendant's smear campaign, there was a significant amount of negative traffic to LoanStreet employee email accounts and LinkedIn profiles (Norkin Dec. Ex. L (Lampl Dep. at 29:20 – 30:3)), and an inundation of vitriolic commentary on the company's email sales channel, used by potential clients and potential employees to engage with the company, forcing the company to suspend it for a period of time (Norkin Dec. Ex. L (Lampl Dep. at 45:17 – 46:20)).

87.    LoanStreet experienced a marked reduction in interest from the company's prospective employee recruits, due to their concerns about the defamatory posts, resulting in a struggle to engage with candidates with whom, before the campaign, LoanStreet never struggled to engage. (Norkin Dec. Ex. M (Guttmann Dep. at 90:17-25)).

88.    Plaintiffs made tremendous efforts to mitigate the harm resulting from Defendant's defamation, including contacting the websites where defamatory content is hosted, engaging with counsel, and developing strategies to mitigate the harm to existing and prospective

employees, existing and prospective investors, and the full range of the company's business

relationships.  (Norkin Dec. Ex. L (Lampl Dep. at 68:20 – 69:17)).

Dated: January 31, 2025
     New York, New York

                            AKRIVIS LAW GROUP, PLLC

                By:    /s/ Walter Norkin
                      Walter M. Norkin, Esq.
                      (WN-4321)
                      747 Third Avenue
                      32nd Floor
                      New York, New York 10022
                      Telephone: (347) 949-0548
                      Email: wnorkin@akrivislaw.com