UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
LOANSTREET, INC., and IAN LAMPL,
Individually,

              Plaintiffs,

      - against –

WYATT TROIA, Individually,

              Defendant.

---------------------------------------X

**MEMORANDUM AND ORDER**

21 Civ. 6166 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This case arises out of an ongoing dispute between plaintiffs LoanStreet, Inc. ("LoanStreet") and LoanStreet CEO Ian Lampl ("Lampl," and together with LoanStreet, "plaintiffs") and a former employee, defendant Wyatt Troia ("Troia"). Now pending before the Court are: (i) Troia's motion to exclude plaintiffs' proposed expert, Mr. Allen Adamson; (ii) plaintiffs' motion to exclude Troia's proposed experts, Mr. Deepak Sabiki and Dr. Lamarcus Bolton; and (iii) Troia's motion for summary judgment with respect to plaintiffs' claims for unfair competition.

For the reasons set forth below, Troia's motion to exclude plaintiffs' expert is denied, plaintiffs' motion to exclude Troia's experts is denied with respect to Mr. Sabiki and granted with respect to Dr. Bolton, and Troia's motion for summary judgment is denied.

**BACKGROUND**

Because the Court has previously addressed the facts of this case at length, we need only summarize the facts relevant to the present motion.  See LoanStreet, Inc. v. Troia, No. 21 Civ. 6166 (NRB), 2022 WL 3544170 (S.D.N.Y. Aug. 17, 2022) ("Aug. 2022 Order"); LoanStreet, Inc., No. 21 Civ. 6166 (NRB), 2023 WL 5836237 (S.D.N.Y. Sept. 8, 2023).

## I.    Factual Background[1]

LoanStreet, a online platform which provides services to help clients share, manage, and originate loans, hired Troia to work as a software engineer in February 2019.  ECF No. 120 (Defendant's Rule 56.1 Statement, or "Def. 56.1") ¶¶ 1, 5.  In June 2020, LoanStreet terminated his employment.  Id. ¶ 5.

Troia subsequently posted disparaging statements about LoanStreet, Lampl, and other LoanStreet employees on various websites, including Glassdoor.com and Reddit.com.  ECF No. 140 (Plaintiffs' Counterstatement to Defendant's Rule 56.1 Statement, or "Pl. 56.1") ¶¶ 8-13.  Troia's statements centered primarily on

---

[1]    The facts herein are drawn from: (i) Defendant's Rule 56.1 Statement, ECF No. 120; (ii) Plaintiffs' Counterstatement to Defendant's Rule 56.1 Statement, ECF No. 140; (iii) Defendant's Response to Plaintiffs' Local Rule 56.1(a) Counterstatement of Material Facts, ECF No. 149 ("Def. Response to Pl. 56.1"); (iv) exhibits attached to the Declarations of David D. Lin, ECF Nos. 126 ("Lin Decl."), 148; and (v) exhibits attached to the Declaration of Walter M. Norkin, ECF No. 139 ("Norkin Decl.").  The Court cites only to defendant's Rule 56.1 Statement when the facts are not in dispute.

his accusation that LoanStreet and/or Lampl cheated him out of stock options which he was owed under his employment agreement. Id.

Most importantly for purposes of this motion, beginning in June 2021, Troia also purchased advertisements on Google that would appear when users searched the following terms or phrases: "LoanStreet"; "Loan Street"; "LoanStreet Glassdoor"; "LoanStreet careers"; "LoanStreet engineering"; "LoanStreet software engineering"; "What it's like to work at LoanStreet"; and "LoanStreet Jobs." Id. ¶¶ 16-17; Lin Decl. Ex. 11.

Each of Troia's Google advertisements began with the heading: "LoanStreet horror story" and linked to a Reddit post he had made, titled: "Name and Shame: LoanStreet (NY) cheated me out of equity." Pl. 56.1 ¶¶ 10, 16-18, 22. An example of one such advertisement is reproduced below:



Ad · https://www.reddit.com/csjobquestions/LoanStreetShame                    WT_000274

**LoanStreet horror story - LoanStreet careers**

'They abruptly fired me & withheld the $100k in stock options they promised me' 'You deserve to be treated with dignity. Work elsewhere'                    WT_000274

Lin Decl., Ex. 13 at 7.

As depicted above, each advertisement included the word "Ad" and displayed a URL link to Reddit.  Id.; see also Pl. 56.1 ¶ 18.[2] Each advertisement also included one or more of the following phrases, each of which was selected by Troia: "red flags everywhere"; "LoanStreet horror story"; "LoanStreet careers"; "They abruptly fired me & withheld the $100k in stock options they promised"; "super messed up"; "LoanStreet engineering"; "abruptly fired me"; "Placing my trust in LoanStreet was a costly mistake"; "Fired me right before vesting"; "Cheated me out of equity"; "LoanStreet software engineer"; "Hush money severance pay"; "You deserve to be treated with dignity.  Work elsewhere."; "What's it like at LoanStreet"; and "a terrible place to work."  Lin Decl. Ex. 25 at 1; Def. 56.1 ¶ 17.  While the text of Troia's Google advertisements varied, each one began with the trademarked name, "LoanStreet."  Def. Response to Pl. 56.1 ¶ 74.

In a message sent to a fellow former LoanStreet employee on June 20, 2021, Troia stated that this advertising campaign was intended "to tout the negative Glassdoor reviews."  Norkin Decl., Ex. A at 3-4.  Later that day, he wrote: "I'm hoping I've made it

---

[2]    Each of the Google advertisements purchased by Troia linked to one of the following    URLs:    https://www.reddit.com/csjobquestions/LoanStreetShame; https://www.reddit.com/csjobquestions/loanstreetshame;    or https://www.reddit.com/csjobquestions.  Pl. 56.1 ¶ 22.

so they can never hire another decent engineer again[.]"  Id. at 4.

Data from Google Analytics indicates that, between December 3, 2022 and June 3, 2023, the two Google search terms that resulted in the most impressions of and clicks on LoanStreet's website were "loanstreet" and "loan street[.]"  Norkin Decl., Ex. I at 1-2. Troia purchased both terms during his advertising campaign.  Lin Decl., Ex. 11.  Further, data from Hubspot Analytics indicates that, between January 1, 2021 and December 31, 2022, traffic from search engines served as the second most common source of incoming traffic to LoanStreet's website.  Norkin Decl., Ex. I at 2-3.[3]

## II.  Procedural Background

Approximately one month after Troia first purchased his Google advertisements, on July 21, 2021, plaintiffs brought suit against him, asserting seven causes of action: breach of contract, defamation per se, defamation, injurious falsehood, unfair competition and false designation of origin under Section 43(a) of the Lanham Act, common law unfair competition, and permanent injunctive relief.  See ECF No. 3 ("Compl.") ¶¶ 64-133.[4]  Troia

---

[3]    The most common source of incoming traffic to LoanStreet's website was direct traffic, i.e., traffic from users who typed LoanStreet's URL directly into their browsers.  Norkin Decl., Ex. I at 2-3.

[4]    Plaintiffs identified fifteen allegedly defamatory statements in their complaint, seven of which plaintiffs argued constituted defamation per se.  See Compl. ¶¶ 76(a)-(g) (defamation per se), 93(a)-(h) (defamation).

filed a motion to dismiss these claims, ECF Nos. 25-28, which the Court granted in part and denied in part, see Aug. 2022 Order.[5]

On October 6, 2022, Troia filed an Answer to plaintiffs' Complaint and asserted three counterclaims, alleging violations of New York's anti-SLAPP statute by both LoanStreet and Lampl, violation of the implied covenant of good faith and fair dealing by LoanStreet, and fraud by LoanStreet. ECF No. 51 ¶¶ 69-96.[6] Plaintiffs filed a motion to dismiss Troia's counterclaims and a motion for judgment on the pleadings with respect to their remaining defamation claims. ECF Nos. 66, 68. The Court subsequently granted plaintiffs' motions in full. LoanStreet, Inc., 2023 WL 5836237, at *14.

The parties proceeded to discovery with respect to the remaining issues in this action, namely: (i) plaintiffs' Lanham Act and common law unfair competition claims; and (ii) damages as to all claims, including plaintiffs' defamation claims. ECF Nos.

---

[5]    Specifically, the Court granted Troia's motion to dismiss plaintiffs' injurious falsehood claim, as well as their defamation claims with respect to the statements in paragraphs 93(c) through (h). Aug. 2022 Order, at *8-9. The Court denied Troia's motion to dismiss plaintiffs' defamation claims with respect to the statements in paragraphs 76(a) through (g) and 93(a) through (b), as well as their unfair competition claims. Id. at *8, *12.

[6]    On November 14, 2022, Troia amended his Answer and Counterclaims to add a fourth counterclaim against LoanStreet for violation of Section 10(b) of the Exchange Act. ECF No. 55 ¶¶ 104-09. However, on March 10, 2023, Troia filed a notice stating that his fourth counterclaim was voluntarily dismissed without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). ECF No. 67.

75, 85.  Fact discovery closed on May 31, 2024, ECF No. 85, and expert discovery closed on August 30, 2024, ECF No. 97.

On September 27, 2024, plaintiffs filed a letter requesting a pre-motion conference regarding a proposed motion to preclude the testimony of defendant's two proposed expert witnesses, Dr. Lamarcus Bolton and Deepak Sabiki, ECF No. 103, and defendant filed letters requesting pre-motion conferences regarding a proposed motion for summary judgment with respect to plaintiffs' unfair competition claims, ECF No. 102, and a proposed motion to preclude the testimony of plaintiffs' proposed expert witness, Allen Adamson, ECF No. 101.  Each party subsequently filed letters opposing the other party's proposed motion, ECF Nos. 104-06, and the Court requested that the parties submit copies of the proposed expert reports prepared by Adamson, Bolton, and Sabiki, ECF No. 108, which they provided on November 1 and 4, 2024, ECF Nos. 110-11.

During a conference on December 5, 2024, at defendant's request, the Court granted permission for the parties to file supplemental letters regarding the proposed Daubert motions. Defendant filed these supplemental letters on December 19, 2024, ECF Nos. 114-15, and plaintiffs submitted responses on January 9, 2025, ECF No. 122-23.  On January 22, 2025, this Court wrote to the parties and advised that it was prepared to decide the motions

"based on the letters submitted and without formal briefing." ECF No. 130. Troia, however, objected to this proposal and requested formal briefing on the proposed Daubert motions. ECF No. 131. Troia filed his Daubert motion on March 7, 2025, ECF Nos. 155-58,[7] and plaintiffs requested leave from the Court to rely on their prior submissions as their moving papers, ECF No. 159, and their opposition, ECF No. 161, and reply, ECF No. 167.[8] We granted each of plaintiffs' requests. Troia also filed an opposition to plaintiffs' motion to exclude the testimony of Dr. Bolton and Mr. Sabiki, ECF No. 162-64,[9] and a reply brief in further support of his motion to exclude Mr. Adamson's report and testimony, ECF Nos. 169-70.[10]

---

[7]    In addition to his Motion, ECF No. 155, and Memorandum of Law, ECF No. 157, Troia also filed a Declaration in Support of the Motion attaching 27 exhibits, ECF No. 156.

[8]    Specifically, plaintiffs requested that the Court accept their letters of September 27, 2024, ECF No. 103, and January 9, 2025, ECF Nos. 122-23, as well the statements made during the unrecorded conference with the parties on December 5, 2024, in lieu of formal briefing in support of plaintiffs' motions to preclude Troia's two proposed experts, and in lieu of a formal reply in response to Troia's opposition to plaintiffs' motion. ECF Nos. 159, 167. Plaintiffs also requested that Court to accept their letters of September 27, 2024, ECF No. 103, October 2, 2024, ECF No. 106, and January 9, 2025, ECF No. 123, as well as their arguments made during the unrecorded conference on December 5, 2024, in lieu of formal opposition briefs countering defendant's motion to preclude plaintiffs' proposed expert. ECF No. 161.

[9]    In addition to his Memorandum of Law in Opposition to Plaintiffs' Motion, ECF No. 163, Troia also filed a Declaration in Support of his Opposition attaching 21 exhibits, ECF No. 164.

[10]    In addition to his reply brief, ECF No. 170, Troia submitted a Declaration in Further Support of his Motion attaching one exhibit, a copy of a Decision and Order in First Manhattan co. v. Sive, Index No. 654799/2018 (Sup. Ct. N.Y. Cty. Jan. 7, 2020), ECF No. 169.

Separately, on January 9, 2025, Troia filed a motion for summary judgment with respect to plaintiffs' remaining claims for unfair competition and false designation of origin under Section 43(a) of the Lanham Act and common law unfair competition. See ECF Nos. 124-27. In support of this motion, he submitted an affidavit from attorney David Lin attaching various exhibits, including, inter alia: a declaration by plaintiffs' proposed expert Allen Adamson, Lin Decl., Ex. 2; excerpts from the deposition testimony of Adamson, id., Ex. 3; a copy of plaintiffs' trademark registration, id., Ex. 5; excerpts from the deposition testimony of Troia, Lampl, and Alyssa Guttman, LoanStreet's Chief People Officer, id. Exs. 6-8; and various documents produced in discovery, id. Exs. 9-26.[11]  Troia also filed a Rule 56.1 Statement. Def. 56.1.

---

[11]    The other exhibits attached to Mr. Lin's Declaration are: a copy of this Court's Aug. 2022 Order, Lin Decl., Ex. 1; a copy of plaintiffs' Complaint, id., Ex. 4; a screenshot of one of defendant's posts on Glassdoor.com, id., Ex. 9; screenshots of one of defendant's posts on Reddit.com, id., Ex. 10; a list of Google advertising search keywords purchased by defendant, id., Ex. 11; a screenshot of Google search results for "loanstreet[,]" which includes defendant's advertisement, id., Ex. 12; additional screenshots depicting various configurations of defendant's Google advertisements, id., Ex. 13; screenshots of comments made by Troia and other users on his Reddit.com post, id., Ex. 14; a screenshot of comments made by other users on defendant's Reddit.com post, id., Ex. 15; a screenshot of a LinkedIn.com post by a third party linking to a post by defendant on TeamBlind.com, id., Ex. 16; LoanStreet's response and objections to defendant's first set of interrogatories, id., Ex. 17; an email exchange between Lampl and LinkedIn Customer Support regarding his request to block defendant from viewing LoanStreet's company page on LinkedIn and remove one of defendant's posts, id., Ex. 18; an email exchange between a job candidate and a LoanStreet employee in which the candidate expresses concern about the company "after reading [] reviews from [an] ex-employee[,]" presumably Troia, id., Ex. 19; a LinkedIn message exchange between a job candidate and a LoanStreet employee in which he states that he has "[h]eard terrible things

Plaintiffs filed an opposition to this motion on January 31, 2025, ECF Nos. 138-41, and submitted a declaration by plaintiffs' counsel attaching various documents produced in discovery, including: excerpts from a text message thread between defendant and a former colleague, dated between June 2021 and March 2022, Norkin Decl., Ex. A; an email sent by Troia to LoanStreet's investors using a pseudonym, in which he stated that the company "mistreat[ed] . . . its employees" and behaved "unethically[,]" id., Ex. B; excerpts from the deposition testimony of defendant and Guttman, id., Exs. C, L-M; a letter from Troia's counsel dated May 28, 2024, in which he advised that Troia had inadvertently deleted a review posted on LoanStreet's Google Business page under the pseudonym "John Williams[,]" id., Ex. D; copies of Google advertising billing statements, id., Ex. E; a compilation of screenshots of defendant's Google advertisements, id., Ex. F; a copy of the Google search terms featuring the terms "LoanStreet" and "Loan Street[,]" id., Ex. G; a copy of the Google search

---

about loanstreet[,]" id., Ex. 20; a message received from a job candidate stating that he "do[es] not work for companies that sue their former employees[,]" id., Ex. 21; an email exchange between Lampl and the Google Business Profile Team confirming removal of defendant's Google Business reviews, id., Ex. 22; an email exchange between Lampl and the Google Business Profile Team confirmating that no new reviews could be posted without further notice following removal of defendant's Google Business reviews, id., Ex. 23; and a screenshot of a Reddit post by defendant titled: "Name & Shame: LoanStreet (NY) wants federal judge to force Reddit to de-anonymize every post and comment I've written in my entire life[,]" which includes user comments on the post, id., Ex. 24.

results for "LoanStreet" and "Loan Street[,]" <u>id.</u>, Ex. H; an affidavit executed by a former LoanStreet employee regarding the company's marketing analytics, <u>id.</u>, Ex. I; a screenshot of the Google search results for "loanstreet," depicting defendant's Google advertisement, <u>id.</u>, Ex. J; a copy of Adamson's expert report and sworn declaration, <u>id.</u>, Ex. K; and a copy of plaintiffs' Rule 26 disclosure, <u>id.</u>, Ex. N.  Plaintiffs also filed a Response to Troia's Rule 56.1 Statement and a Counterstatement of Material Facts.  Pl. 56.1.  The motion was fully briefed on February 11, 2025.  ECF Nos. 147-49.[12]

---

[12]    On January 28, 2025, Troia's counsel filed a motion to withdraw, citing Troia's voluntary dismissal of his counsel, and requested that this Court permit Troia to proceed <u>pro se</u> with limited-scope representation by Mr. Lin.  ECF Nos. 132-35.  Following correspondence with the parties and an in-person conference, this Court granted counsel's motion to withdraw on March 4, 2025 and denied Troia's request for limited-scope representation.  ECF No. 154.

Because Troia's motion for summary judgment and reply brief were signed and submitted by Mr. Lin, we need not review these papers with the deference normally reserved for pro bono parties in civil actions.  However, the formal briefing submitted in connection with the parties' <u>Daubert</u> motions was signed and submitted by Troia, rather than his former counsel.  Accordingly, given his <u>pro se</u> status, the Court will "broadly construe his motion papers and interpret them to raise the strongest arguments that they suggest."  <u>Dixon v. Zenk</u>, 361 Fed. App'x 218, 219 (2d Cir. 2010) (citing <u>Weixel v. Bd. of Educ. of the City of N.Y.</u>, 287 F.3d 138, 146 (2d Cir. 2002)).  We remain mindful, however, that the letter briefing initially filed by defendant in support of his motion and in opposition to plaintiff's motion, which substantially outlined Troia's arguments in connection with these motions, was prepared and submitted by his former counsel, Mr. Lin.

**DISCUSSION**

## I.    The Parties' Daubert Motions

We begin by addressing the parties' Daubert motions.   The admissibility of expert testimony is governed by Fed. R. Evid. 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Id.

Rule 702 imposes on the Court a "gatekeeping" obligation that includes the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  A district court's "gatekeeping inquiry must be 'tied to the facts' of a particular case." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999) (quoting Daubert, 509 U.S. at 591 (internal quotation marks and citation omitted)).   Courts in this Circuit frequently distill Rule 702 to a three-part test that requires the proponent of expert evidence to show "that (1) the expert is qualified; (2) the proposed opinion is based on reliable

data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." Nike, Inc. v. StockX LLC, No. 22 Civ. 983 (VEC), 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024) (citing Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005)).

In addition to Rule 702, "'a judge assessing a proffer of expert [] testimony . . . should also be mindful of other applicable [Federal Rules of Evidence],' including Rule 403, which permits exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" United States v. Pollok, 139 F.4th 126, 140 (2d Cir. 2025) (quoting Daubert, 509 U.S. at 595).    For instance, expert testimony "which merely 'tell[s] the jury what result to reach' creates a significant risk of unfair prejudice." Scottsdale Ins. Co. v. McGrath, No. 19 Civ. 7477 (LJL), 2024 WL 4512210, at *6 (S.D.N.Y. Oct. 17, 2024) (citations omitted).    Moreover, "expert testimony that seeks to address 'lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help' is not relevant and is therefore inadmissible." United States v. Jiau, 734 F.3d 147, 154 (2d Cir. 2013) (citation omitted).

#### a. Troia's __Daubert__ Motion

Troia has moved to exclude the report and testimony of plaintiffs' proposed expert, Mr. Allen Adamson. ECF No. 157. Mr. Adamson is a co-founder and managing partner of Metaforce, a marketing and brand consultancy, and he is an Adjunct Professor and guest lecturer at New York University's Stern School of Business. ECF No. 110-1 ("Adamson Rep.") at 3-4. He received his B.S. from the S.I. Newhouse School of Public Communications at Syracuse University and his MBA from New York University's Stern School of Business. Id. at 4.

In his thirty-six-page report, Mr. Adamson evaluates the damage sustained to LoanStreet's brand as a result of defendant's defamatory statements, focusing on the impact of his advertisements and posts on the company's brand, and specifically on its ability to recruit software engineers and other prospective employees, id. at 10-21, attract and retain investors, id. at 21-22, and appeal to customers, id. at 22-26. Mr. Adamson further assessed the reputational damage sustained by Lampl's "personal brand" due to defendant's statements. Id. at 26-28. He ultimately determined that LoanStreet would need to spend a total of $3,700,000 over at least two years to repair its reputation with software engineers, prospective customers, and investors, id. at 28-34, and that Lampl would be required to spend between $750,000

-14-

and $2,500,000 over the next three to five years in order to
adequately restore his reputation and safeguard his future career
prospects, id. at 34-36.

Citing Daubert, Federal Rules of Evidence 403 and 702, and
Federal Rule of Civil Procedure 26, Troia claims that Adamson's
testimony should be excluded as "irrelevant, unreliable, and
prejudicial[,]" ECF No. 157 at 3, 25, and raises a variety of
concerns centering primarily upon the assertion that Mr. Adamson's
report does not adequately establish causation by isolating the
harm caused by defendant's defamatory statements, id. at 14-16.
He also asserts that Mr. Adamson's damages calculation
impermissibly accounts for the republication of defendant's
defamatory statements by third parties, which Troia contends is
speculative and results in an "artificially inflated" damages
amount. Id. at 16-17.

As plaintiffs note, broad general damages are permitted in
cases involving defamation per se, ECF No. 123, and Adamson's
testimony is thus squarely relevant to those claims.[13] Troia's

---

[13]    Troia cites a case from 1999 to support his contention that broad general
damages should not be permitted in cases involving defamation. See Fashion
Boutique of Short Hills, Inc. v. Fendi USA, Inc., 75 F. Supp. 2d 235 (S.D.N.Y.
1999), aff'd 314 F.3d 48 (2d Cir. 2002).    That case, however, involves
significantly different facts than those at issue in this action.    There, the
court excluded testimony from an expert regarding damages where the expert
premised his opinion on "[an] assumption that the sharp decline in plaintiff's
sales . . . was caused by a 'campaign of disparagement' by defendants." Id. at
239.    However, the court in that case noted that plaintiff's sales had begun to
decline a full year before defendants made the allegedly defamatory statements,
noting also that the defamatory statements were not widely disseminated.    Id.

remaining concerns regarding Mr. Adamson's report and proposed testimony go primarily to the weight of his testimony, rather than its admissibility, and are best addressed on cross examination. See, e.g., AU New Haven, LLC v. YKK Corp., No. 15 Civ. 3411 (GHW) (SN), 2019 WL 1254763, at *3 (S.D.N.Y. Mar. 19, 2019), objections overruled, 2019 WL 2992016 (S.D.N.Y. July 8, 2019) ("Any contentions that the expert's 'assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted); In re: Gen. Motors LLC Ignition Switch Litig., No. 14 MDL 2543 (JMF), 2015 WL 9480448, at *1 (S.D.N.Y. Dec. 29, 2015) ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith . . . , other contentions that the assumptions are unfounded go to the weight, not the admissibility of the testimony.'") (citation omitted).

---

at 238-42. Defendant has not provided any evidence showing that LoanStreet was experiencing financial or other operational difficulties before his defamatory posts, nor has he provided evidence sufficient to show that his posts were not widely disseminated. In a case such as this one, involving internet posts that were defamatory per se, "injury is assumed[,]" and the defamatory statements are "actionable without 'pleading and proof of special damages.'" a plaintiff is entitled to damages sufficient to repair the "impairment of [his or her] reputation and standing in the community." Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 179-80 (2d Cir. 2000) (quoting Davis v. Ross, 754 F.2d 80, 82 (2d Cir. 1985)); see also Goldfarb v. Channel One Russia, 663 F. Supp. 3d 280, 299 (S.D.N.Y. Mar. 21, 2023) (where "defamation is defamatory per se, a plaintiff is exempt from having to prove 'special damages' in the form of pecuniary or economic loss caused by the defamation") (citations omitted).

Accordingly, Troia's motion to exclude plaintiff's proposed expert is denied.[14]

### b. Plaintiffs' **Daubert** Motion

Next, we address plaintiffs' motion to exclude defendant's proposed experts, Mr. Deepak Sabiki and Dr. Lamarcus Bolton, pursuant to Daubert and Federal Rules of Evidence 403 and 702. ECF Nos. 103, 122-23.

### i. Deepak Sabiki

Deepak Sabiki is a principal at Sabiki Consulting LLC, and he serves as a consulting and testifying expert in "forensic accounting, compliance, and litigation matters." ECF No. 111 at 4, 14. Mr. Sabiki received his B.S. in Finance and Economic Theory Analysis from New York University's Stern School of Business. Id.

Mr. Sabiki reviewed Mr. Adamson's expert report and, after reviewing additional documents in this case, issued a ten-page rebuttal report in which he concluded that Mr. Adamson's report is "speculative and not reliable, because it fails to tie the wrongful acts of Troia to the economic harm that LoanStreet and Mr. Lampl

---

[14]    Troia also argues that Mr. Adamson's report violates Fed. R. Civ. P. 26(a), which requires expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." See ECF No. 157 at 25. However, Mr. Adamson's report is not "so general and lacking in detail [as] to warrant exclusion." See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 638 F. Supp. 3d 227, 302-04 (E.D.N.Y. Oct. 26, 2022) (admitting expert testimony and distinguishing cases in which expert reports were deemed incomplete under Rule 26(a) and inadmissible) (internal quotation marks and citation omitted).

allegedly suffered." Id. at 5.[15]  Further, Mr. Sabiki determined that "Mr. Adamson's calculations do not rely on any generally accepted damages methodology, contain arbitrary and speculative assumptions, and are unsupported and illogical." Id. at 5-6. Among other things, Mr. Sabiki specifically took issue with Mr. Adamson's purported failure to perform "an appropriate study of economic causation" and with Mr. Adamson's analysis of damages that he deems "invisible." Id. at 5-7.

Plaintiffs contend that Mr. Sabiki's report should be precluded because: (i) he has no expertise in branding and reputational harm or repair; (ii) he did not perform his own analysis or proffer a contrary damages calculation; and (iii) his proposed testimony presents arguments that counsel could make equally well without a witness.  ECF No. 103 at 2.

---

[15]    In addition to Mr. Adamson's report, Mr. Sabiki cites the following documents in his report: Plaintiff's Complaint; Defendant's Answer to Plaintiff's Complaint and Counterclaims; this Court's September 2023 Order; this Court's August 2022 Order; sixteen pages of redacted financial statements produced by LoanStreet; a news release announcing the appointment of Scott Thompson, former CEO of Yahoo, as CEO of Tuition.io; a web page stating that Brendan Eich, former CEO of Mozilla, is now CEO of Brave Software; a news article stating that LoanStreet raised $25 million in funding on February 8, 2022 and two additional news articles stating that this funding round was the largest in the company's existence and "five times larger than the $5 million it raised in December 2019"; a document produced by LoanStreet during discovery listing its expenses on recruiting tools between June 15, 2021 and June 30, 2023; and a document produced by LoanStreet during discovery "appearing to sum the earnings of salaried employees and inflate those values for 'scale factor[.]'"  ECF No. 111 at 5-13.

As an initial matter, as an experienced consulting and testifying expert in litigation and forensic accounting with a degree in Finance and Economic Theory Analysis, Mr. Sabiki is qualified to testify as a rebuttal expert regarding Mr. Adamson's analysis of the economic damages sustained by plaintiffs as a result of defendant's defamatory posts.

Moreover, defendant makes clear that Mr. Sabiki is intended solely as a rebuttal expert. The "task of a rebuttal expert is different from that of an affirmative expert." Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G., No. 11 Civ. 681 (KBF), 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015). "There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." Id. Accordingly, "a rebuttal expert need not identify alternative or better methodologies," Joffe v. King & Spalding LLP, No. 17 Civ. 3392 (VEC), 2019 WL 4673554, at *14 (S.D.N.Y. Sept. 24, 2019), but may instead use his expertise "to identify purported flaws" in an opposing expert's approach, Henkel v. Wagner, No. 12 Civ. 4098 (AJN), 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016).

The testimony offered by Mr. Sabiki falls within the permissible bounds of rebuttal testimony. Although plaintiffs contend that Mr. Sabiki's analysis consists of observations that

-19-

"can be observed readily by jurors and/or brought out in cross examination without benefitting from any aid by an expert[,]" ECF No. 123 at 3-4 (quoting <u>Carroll v. Trump</u>, No. 22 Civ. 10016 (LAK), 2023 WL 2652636 at *5 (S.D.N.Y. Mar. 27, 2023)), they have not raised sufficient concerns regarding Mr. Sabiki's qualifications or the reliability and relevance of his testimony. Mr. Sabiki's opinion raises questions regarding Mr. Adamson's analysis and methodologies, centering primarily on his failure to perform an economic causation analysis and a comparative damages analysis, as well as the data and assumptions underlying Mr. Adamson's report. Although plaintiffs may disagree with Mr. Sabiki's conclusions, those disagreements are best addressed on cross-examination. Accordingly, plaintiffs' motion to exclude the report and testimony of Deepak Sabiki is denied.[16]

### ii. Dr. Lamarcus Bolton

Finally, Dr. Lamarcus Bolton is a Principal at Insightful Holdings, a research firm based in Los Angeles, California. ECF No. 111 at 158. He attended St. Louis University, where he

---

[16] Defendant also argues that Mr. Sabiki's expert opinion should be admissible on its own, even if Mr. Adamson's report is excluded. ECF No. 115 at 5. Given our holding that both reports are admissible, we need not address this argument. However, we note that Mr. Sabiki's expert opinion would not be admissible on its own because Mr. Sabiki does not offer his own analysis or calculation with respect to damages.

received his B.A. in Psychology and his M.S. and PhD in Industrial/Organizational Psychology.  Id. at 161.

Troia offers Dr. Bolton as a survey expert.  In preparing his report, Dr. Bolton conducted two surveys intended to "analyze public perceptions of the defendant's online statements regarding" LoanStreet and "gauge how these perceptions influenced potential employees' and potential customers' decisions to work for or engage in business with LoanStreet[.]"  Id. at 22.  One survey focused solely on one of defendant's Reddit posts, and the other focused on one of his Glassdoor posts.  ECF No. 104 at 2.  Each survey only polled respondents who self-identified as working in either the "Information Technology/Computing" or "Banking/Financial" sectors.  ECF No. 111 at 32.

In his 137-page report, Dr. Bolton concluded, inter alia, that the survey results suggested that "the vast majority of the readers" of Troia's posts "did not think the post[s] accused LoanStreet of breaking the law when it withheld equity compensation from Troia[,]" that "half of the readers of Troia's posts who thought the posts accused LoanStreet of breaking the law . . . likely believed it was possible that Troia did not intend to claim that LoanStreet broke the law[,]" and "roughly one-third of the minority of readers . . . who did believe the posts accused LoanStreet of breaking the law likely didn't believe the accusation

was true." Id. at 54-55. He then determined that "respondents who understood the posts to contain [] defamatory meaning (i.e., that LoanStreet broke the law) were significantly less likely to report that the posts would negatively influence their decision to work for or do business with LoanStreet than respondents who did not understand the posts to contain defamatory meaning." Id. at 57. Finally, he concluded that "[t]he majority of respondents felt it was possible that Troia was entirely motivated to make his posts by a desire to protect fellow workers[,]" and the overwhelming majority "felt Troia's posts had public utility." Id. at 68, 70.

Plaintiffs contend that Dr. Bolton's surveys contain fundamental structural flaws warranting their preclusion, asserting that: (i) each survey contains questions designed to impermissibly "re-litigate issues the Court already decided," including whether defamation occurred and whether it was done with actual malice; (ii) neither survey inquired whether respondents already possessed opinions about plaintiffs or were aware of defendant's online statements; (iii) the surveys only permitted responses from people who worked in the Information Technology ("IT") and Banking/Financial industries and excluded people from other fields; (iv) the survey questions were asked in a leading manner; and (v) the Reddit survey examined a later post in which

certain of defendant's statements that were determined to be defamatory had been removed.  ECF No. 103 at 1-2.

The primary issue with Dr. Bolton's survey and report, as plaintiffs note, is its focus on whether respondents believed that defendant had accused plaintiffs of "breaking the law."  Indeed, one of the very first questions after narrowing the pool of respondents based on their career field, collecting demographic information, and checking for respondents' reading comprehension is: "Does the post claim that LoanStreet <u>broke the law</u> when it withheld equity compensation from the post's author?"  ECF No. 111 at 97-98, 115-16 (emphasis in original).  The phrase "broke the law" is then repeated in seven of the following survey questions and bolded or displayed in all capital letters each time it is repeated.  <u>Id.</u> at 98-108, 116-28.

The use of this phrase appears to be designed to determine whether the survey respondents believed defendant's posts conveyed defamatory meaning.  However, "breaking the law" carries an indisputably criminal connotation, and its use is entirely inappropriate in a survey carried out to assist in the determination of damages owed in a civil litigation.  Although Dr. Bolton stated during his deposition testimony that he did not "necessarily believe that the respondents will always associate breaking the law with criminal [behavior]" and that he believed

"respondents [would] consider the full range of law breaking when
. . . interpreting these questions[,]" the survey design contained
no safeguards or definitions to help guide respondents in their
answers.    ECF  No.  164-5  ("Bolton  Dep.")  35:4-25,  39:16-20.
Accordingly, in the absence of any defined meaning of "breaking
the  law[,]"  it  is  nearly  impossible  to  know  what  respondents
intended or understood when completing these surveys.[17]

        Further,  we  agree  with  plaintiffs  that  both  surveys
impermissibly attempt to relitigate the question of liability and
defendant's intent in crafting his posts by asking whether it "is
possible"  that  the  author  of  the  posts  "did  not  intend  to  claim
LoanStreet  broke  the  law"  or  was  "motivated  . . .  by  a  desire  to
protect  fellow  workers"  and  asking  whether  the  author's  post  was
"useful  to  public  debate  about  workers'  rights."   ECF  No.  111  at
99,  105,  107-08,  117,  125,  127-28.   Such  questions  undoubtedly
speak  to  legal  issues  that  have  already  been  decided  by  this  Court
and  thus  are  irrelevant  to  the  remaining  issue  of  damages.   See
Dongguk  Univ.  v.  Yale  Univ.,  No.  08  Civ.  441  (TLM)(HBF),  2012  WL
1977978,  at  *5  (D.  Conn.  June  1,  2012)  (excluding  survey  where

---

[17]    Defendant writes that Dr. Bolton "selected survey question language that
was appropriate for [a survey] audience generally made up of non-lawyers, who
do not necessarily know . . . the difference between a criminal and a civil
infraction."  ECF No. 114 at 3.  However, defendant's own argument proves the
point: this lack of precision is particularly concerning where the survey
respondents might have different, and inaccurate, understandings of what the
phrase "broke the law" means.

reputation question was inappropriately "followed by a series of broad questions about the respondents' view of [plaintiff's] reputation"). Moreover, while defendant asserts that Dr. Bolton's report does not address liability, but rather speaks to damages owed, ECF No. 104 at 3; ECF No. 114 at 2, Dr. Bolton himself repeatedly stated during his deposition testimony that he was not a damages expert and that his survey was not intended to quantify damages or harm.[18]

Finally, the other arguments raised by plaintiffs are equally concerning. The fact that Dr. Bolton's survey examining defendant's Reddit post did not include all the defamatory statements contained in the original post renders that survey unusable. See Dongguk Univ., 2012 WL 1977978, at *5 ("Further

---

[18] Specifically, Dr. Bolton stated, inter alia:

- "I am not an expert on defamation or damages." Bolton Dep. 29:14-30:3.

- "Q: Your survey . . . does not quantify any damages or harm, correct? A: There is no quantification. I am not a damages expert." Bolton Dep. 40:1-4.

- "Q: [I]s the survey meant to compare impact between defamatory and not defamatory statements or is it not meant for that? A: No. So the survey is not meant to consider defamatory statements at all. So that really wasn't incorporated into the survey. The survey was actually . . . geared towards determining the impact of each of the non-defamatory statements on one's likelihood for working for or doing business with LoanStreet." Bolton Dep. 141:7-19.

- "Q: Do you have an opinion on if something is found to be a defamatory statement, when harm occurs or how long it lasts or anything like that? A: That's something I would leave to a damages expert, for example." Bolton Dep. 154:22-155:2.

-25-

undermining the survey's conclusion is the fact that respondents were never asked about [the] misstatements [at issue] or told the substance of [those] statements."). Additionally, both surveys are less reliable because they failed to exclude survey respondents with prior knowledge of defendant's posts regarding plaintiffs or who had pre-existing perceptions regarding LoanStreet.[19]

Taken together, these flaws sufficiently diminish the reliability and probative value of Dr. Bolton's survey such that exclusion is warranted under Fed. R. Evid. 403 and 702. See Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 574-75 (S.D.N.Y. 2007) ("While . . . each methodological flaw, standing alone, may not mandate exclusion, . . . the cumulative effect of the methodological flaws . . . so diminishes the reliability and probative value of the . . . survey that its exclusion is warranted under Rules 403 and 702.").[20]

---

[19]    See Bolton Dep. 109:4-15 ("Q: [W]ere any of the respondents . . . asked if they knew or heard of LoanStreet before? A: No.  Q:  So you don't know if there were any existing perceptions of LoanStreet that a respondent might have had before the survey?  A: That's correct[.])"

[20]    Defendant requests that, if the Court takes issue with use of the term "broke the law[,]" then the portion of Dr. Bolton's survey before that term appears should be admitted to the extent that it is relevant to examine readers' understanding of defendant's posts.  ECF No. 114 at 5.  This suggestion is puzzling.  Even if the Court were inclined to allow only a portion of the survey evidence, which it is not, there is only one substantive question before the first question using the phrase "broke the law."  See ECF No. 111 at 96-98, 114-16.  Permitting the admissibility of such limited and incomplete survey responses would run contrary to the Court's gatekeeping obligation under Daubert.

**II.  Troia's Motion for Summary Judgment**

We next address Troia's motion for summary judgment with respect to plaintiffs' Lanham Act and common law unfair competition and false designation of origin claims.  This Court first addressed plaintiffs' Lanham Act claims when resolving Troia's motion to dismiss.  See Aug. 2022 Order, at *9-12.  Defendant now contends that the facts developed in discovery demonstrate that there is no evidence sufficient to show a genuine dispute as to any material fact regarding likelihood of confusion and that, as a result, summary judgment should be granted as to plaintiffs' Lanham Act and common law claims.  Mot. at 1-2.

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom

-27-

summary judgment is sought[.]"  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citations omitted).

### a. Lanham Act Claims

Section 43(a) of the Lanham Act prohibits:

Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his goods, services, or commercial activities by another person, or

(B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

Claims of unfair competition under the Lanham Act are governed by a "two-prong test."  Soter Techs., LLC v. IP Video Corp., 523 F. Supp. 3d 389, 397 (S.D.N.Y. 2021) (quotation marks and citation omitted).  "[A] plaintiff must show (1) that it has a valid trademark that is entitled to protection under the Act, and (2) that use of the defendant's mark infringes, or is likely to

infringe, the mark of the plaintiff," such that it "creates a likelihood of confusion[.]" Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1508 (2d Cir. 1997) (citations omitted).

In establishing the first prong of this test, a certificate of registration with the United States Patent and Trademark Office serves as "prima facie evidence that the mark is registered and valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." Guthrie Healthcare Sys. v. Context Media, Inc., 826 F.3d 27, 37 (2d Cir. 2016) (internal quotation marks and citation omitted). Here, the parties agree that LoanStreet possesses a valid trademark in the name "LoanStreet[,]" which is registered with the United States Patent and Trademark Office, Registration No. 4,618,232. Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2; Lin Decl., Ex. 5.[21]

In addressing the second prong of this test, in order to find infringement, "a probability of confusion, not a mere possibility, must be found to exist." Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993) (citation omitted); see also Savin Corp. v. Savin Grp., 391 F.3d 439, 456 (2d Cir. 2004) ("The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of

---

[21]    LoanStreet's trademark was registered by the U.S. Patent and Trademark Office on October 7, 2014. Lin Decl., Ex. 5 at 2.

ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.") (internal quotation marks and alterations omitted).  "Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification."  Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc., No. 02 Civ. 861 (LMM), 2002 WL 1543817, at *2 (S.D.N.Y. 2002) (citing McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268, 1273 (S.D.N.Y. 1986) (citations omitted)).

The parties agree that, to assist in evaluating likelihood of confusion, the Court must consider the eight-factor test identified in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961), cert. denied, 368 U.S. 820 (1961).  Mot. at 5-6; Opp. at 9-10.  These factors are: "[(1)] the strength of [plaintiff's] mark, [(2)] the degree of similarity between the two marks, [(3)] the proximity of the products, [(4)] the likelihood that [plaintiff] will bridge the gap, [(5)] actual confusion, [(6)] . . . defendant's good faith . . . , [(7)] the quality of defendant's product, and [(8)] the sophistication of the buyers."  See Polaroid Corp., 287 F.2d at 495.  "Application of the Polaroid test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'"  Soter, 523 F. Supp. 3d at

405 (quoting Star Indus., Inc. v. Bacardi & Co., Ltd., 412 F.3d
373, 384 (2d Cir. 2005)).

Notably, plaintiffs allege the existence of "initial-interest
confusion," in which one party creates initial interest in its
competing product, service, or website, "even though no actual
sale is finally completed as a result of the confusion." 1-800
Contacts, Inc. v. JAND, Inc. 119 F.4th 234, 251 (2d Cir. 2024)
(quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
Competition § 23.6 (5th Ed. 2024)).   "In the context of the
internet, the concern [with initial-interest confusion] is that
potential customers of one website will be diverted and distracted
to a competing website." Alzheimer's Disease & Related Disorders
Ass'n, Inc. v. Alzheimer's Found. of Am., 307 F. Supp. 3d 260, 286
(S.D.N.Y. 2018) (internal quotation marks and citation omitted).
At that point, "even if the customer quickly becomes aware of the
competing source's actual identity and can rectify the mistake,
the damage to the first user may already have been done." Id.
(internal quotation marks and citation omitted).   In order to
sufficiently   demonstrate   internet-related   initial-interest
confusion, the Second Circuit also requires a plaintiff to prove
intentional deception by the defendant. See 1-800 Contacts, Inc.,
119 F.4th at 247 (citing Savin Corp., 391 F.3d at 462 n.13
(requiring intentional deception because "consumers diverted on

the Internet can more readily get back on track than those in actual space")).

The question of whether there is a likelihood of confusion is "usually reserved for a jury[.]" Capri Sun GmbH v. Am. Bev. Corp., 595 F. Supp. 3d 83, 149, 178 (S.D.N.Y. 2022) (denying cross-motions for summary judgment where "neither party ha[d] solidly established that, viewed in the totality, the undisputed evidence . . . lead[s] to only one conclusion as to whether confusion is likely.") (internal quotations and citation omitted).  However, a plaintiff's unfair competition claims may be dismissed as a matter of law at the summary judgment stage "where 'the court is satisfied that the . . . marks are so dissimilar that no question of fact is presented.'" Pirone v. MacMillan, Inc., 894 F.2d 579, 584 (2d Cir. 1990) (quoting Universal City Studios, Inc. v. Nintendo Co. Ltd., 746 F.2d 112, 116 (2d Cir. 1984)).

Below, we address each Polaroid factor in turn.

### i. Strength of LoanStreet's Mark and Similarity of Competing Marks

For purposes of this analysis, we have combined the first and second Polaroid factors: (i) strength of plaintiff's mark; and (ii) the similarity of the competing mark.  287 F.2d at 495.  In assessing the strength of a plaintiff's mark, courts consider the mark's "tendency to uniquely identify the source of the product." Star Indus., 412 F.3d at 384.  In evaluating the similarity of

competing marks, "courts look to the overall impression created by the [marks] and the context in which they are found[.]" Id. at 386 (internal quotations and citation omitted).

In our August 2022 Order, we determined that both factors "plainly favor[ed] plaintiffs," noting that Troia "[did] not dispute the strength of plaintiffs' mark and copied the trademark verbatim." Aug. 2022 Order at *11. In his motion for summary judgment, Troia again does not dispute the strength of LoanStreet's registered trademark, nor does he claim that he did not copy the mark. However, Troia contends that, in evaluating the similarity of the marks, the Court must examine the full context of his use of LoanStreet's mark. Specifically, he argues that he used the LoanStreet mark in his Google advertisements to "provide critical commentary," noting his use of phrases such as "horror story[,]" which indicated to consumers that LoanStreet itself had not sponsored the advertisements. Mot at 6-7. He also notes that each advertisement was labeled with the word "Ad" on the Google search page. Id.

Defendant relies heavily on the Second Circuit's recent decision in 1-800 Contacts, Inc., in which the Second Circuit upheld the district court's dismissal of plaintiffs' claims for trademark infringement and unfair competition and stated that, "in the search advertising context, the similarity-of-the-marks factor

-33-

should be assessed as it relates to the paid advertisement's appearance on the result page." 119 F.4th at 251 (citation omitted). In that case, plaintiff, an e-commerce company selling contacts, sued defendant, a company selling both contacts and glasses under the name "Warby Parker," after the defendant ran a targeted advertising campaign that appeared when Google users searched for various terms related to plaintiff's business name. Id. at 241-43.

However, it is crucial to note a key difference between that case and the one before us, aside from the differing procedural posture of the case: in 1-800 Contacts, Inc., the defendant did not "actually display[] or use[] [plaintiff's] trademarks" in "the paid advertisement displayed on the search results page, in the domain name of the URL linked in the paid advertisement . . . , or on the landing webpage displayed to consumers who clicked on the URL in the paid advertisement." Id. at 240, 255. Rather, the defendant merely purchased search terms related to and including plaintiff's business name. Id. at 241-42. The Second Circuit ultimately affirmed the district court's dismissal of plaintiffs' claim and held that the parties' use of the marks at issue were substantially different, noting in particular that "the word 'Ad' [wa]s displayed directly next to Warby Parker's domain name at the top of its paid search ad in bold" and the text of the advertisement

-34-

and "linked URL contain[ed] only [defendant's] domain name[.]"
Id. at 251.[22]

By contrast, Troia used LoanStreet's mark repeatedly: at
least once in bold in the heading of the advertisement; sometimes
in the body of the advertisement; and in the URL he linked.  See
Lin Decl., Ex. 13 at 2-12.  As an initial matter, plaintiffs assert
that the question of whether these advertisements were "clearly
labeled" as advertisements is fact-intensive and should be
evaluated by the jury.  Mot. at 13.  Given defendant's repeated
and verbatim use of the LoanStreet mark, we agree.  Despite the
fact that defendant's advertisements contained language critical
of LoanStreet, the advertisements clearly displayed plaintiff's
mark, referring in some cases to "LoanStreet Careers" or
"LoanStreet Software Engineer."  See Lin Decl., Ex. 13 at 7-8, 10.
Moreover, as plaintiffs' expert noted in his report, "anyone doing
a search for LoanStreet's website would expect that website to
appear as the first search result and would be confused by

---

[22]    Defendant also cites to Ebony Media Operations, LLC v. Univision
Communications Inc., in which a court in this District dismissed plaintiff's
unfair competition claim based on defendant's publication of an online opinion
article criticizing plaintiff and displaying an image that used plaintiff's
"distinctive . . . logo" alongside several mock headlines.  No. 18 Civ. 11434
(AKH), 2019 WL 8405265, at *1-2 (S.D.N.Y. June 3, 2019).  In dismissing the
claim, the court noted that the context in which the mark was used "immediately
removed any semblance of true similarity[,]" pointing to the "harshly and
unambiguously critical" mock headlines.  Id. at *5.  The crucial distinction
here is that Troia's advertisements were not merely published on a website known
to contain opinion articles, but rather presented as search results designed
specifically to target internet users who searched for LoanStreet.

[d]efendant's ad appearing at the top of the page with the same branded, trademarked name as the company website." Norkin Decl., Ex. K at 33.

Accordingly, the first two <u>Polaroid</u> factors weigh in plaintiffs' favor. The first factor weighs heavily in plaintiffs' favor, and, at a minimum, a reasonable juror could find in plaintiffs' favor with respect to the second factor.

### ii. Competitive Proximity of the Marks

We next turn to the third <u>Polaroid</u> factor. In assessing the competitive proximity of the marks, courts examine "the nature of the products themselves and the structure of the relevant market." <u>Vitarroz v. Borden, Inc.</u>, 644 F.2d 960, 967 (2d Cir. 1981) (citation omitted). This factor "has two elements, market proximity and geographic proximity." <u>Brennan's, Inc. v. Brennan's Rest., L.L.C.</u>, 360 F.3d 125, 134 (2d Cir. 2004). "Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products[,]" and courts use both elements "to determine whether the two products have an overlapping client base that creates a potential for confusion." <u>Id.</u> Because defendant's use of plaintiffs' mark occurred on the internet, we need not evaluate the element of geographic proximity.

In addressing this factor in our August 2022 Order, we wrote
that "the 'plaintiff's web site and defendant's web site are both
on the Internet[] [so] the parties are vying for users in the same
'market,' . . . using the exact same mark[,]" Aug. 2022 Order at
*11 (quoting Planned Parenthood Fed. of America, Inc. v. Bucci,
No. 97 Civ. 0629 (KMW), 1997 WL 133313 at *8 (S.D.N.Y. Mar. 24,
1997)), and this "'degree of competitive proximity . . . increases
the likelihood of confusion among Internet users[,]'" id. (quoting
Planned Parenthood, 1997 WL 133313 at *8).

Troia contends that this analysis was too broad, stating that
the parties were not competing within the same market because "he
has never offered or sold any loan-related products or services[,]"
"is not offering a good or service[,]" and cannot compete for
prospective employees because he is not offering employment.  Mot.
at 7-8, 12.

However, although Troia did not offer a competing good or
service, he cannot truthfully assert that he did not intend to
attract Google users searching for the real LoanStreet when he
purchased his Google advertisements.  Rather, Troia's own
arguments state that he intended to "educate people about his
firsthand experience there[,]" Mot. at 12, and he wrote at the
time that he "hop[ed] [he'd] made it so [plaintiffs] can never
hire another decent engineer again[,]" Norkin Decl., Ex. A at 4.

By purchasing his Google advertisements, he ensured that his advertisements – and the posts to which they linked – would compete directly with LoanStreet's website for the attention of internet users.

These statements are sufficient to demonstrate that Troia sought to compete with LoanStreet for users within the same market – the internet and, in particular, the Google search engine context. LoanStreet is an online platform, without a physical product or brick-and-mortar storefronts, and therefore relies on internet traffic to attract prospective customers. See, e.g., https://loan-street.com/about/ ("LoanStreet is [a] fully integrated, online platform . . ."); see also Norkin Decl., Ex. I ¶ 4. Plaintiffs have submitted evidence demonstrating that the second-most common source of incoming traffic to LoanStreet's website was from internet users who reached the website using Google searches, Norkin Decl. Ex. I ¶ 4 (stating also that the most common source of incoming traffic was direct traffic), and that the two search terms that resulted in the most clicks on LoanStreet's website were two of the exact search terms purchased by Troia, id. ¶ 3 ("loanstreet" and "loan street"); see also id. Ex. G. Accordingly, this factor supports plaintiff.

-38-

### iii. Likelihood that Plaintiff Will Bridge the Gap

Next, we address the fourth <u>Polaroid</u> factor.  "'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." <u>Star Indus.</u>, 412 F.3d at 387 (citing <u>The Sports Auth., Inc. v. Prime Hospitality Corp.</u>, 89 F.3d 955, 963 (2d Cir. 1996)).  In our August 2022 Order, we stated that "there is no need to consider whether plaintiff will bridge the gap between the markets" because "the parties are vying for users in the same market[,]" namely, the internet.  Aug. 2022 Order at *11 (quoting <u>Planned Parenthood</u>, 1997 WL 133313 at *8 (citing <u>Paddington Corp. v. Attiki Importers & Distributors, Inc.</u>, 996 F.2d 577, 586 (2d Cir. 1993))).

In addressing this factor, Troia reiterates his argument that the parties were not "in the same market or competing for anything or anyone[.]"  Mot. at 8.  However, for the reasons stated above, this argument is unpersuasive.  Accordingly, we need not address this factor.

### iv. Actual Confusion

The fifth <u>Polaroid</u> factor is actual confusion.  "It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." <u>Virgin Enters. Ltd. v. Nawab</u>, 335 F.3d 141, 151 (2d Cir. 2003) (citing <u>Nabisco</u>, 191 F.3d at 228).

-39-

In our August 2022 Order, we determined that this factor presented "a closer call[,]" Aug. 2022 Order at *11, noting that "it seems unlikely that an Internet user who reads defendant's advertisements would believe that they belong to or are endorsed by plaintiffs[,]" id. at *12.

Troia asserts that the evidence revealed in discovery makes "clear that [d]efendant's Google Ads were not confusing in the context in which Google users saw them[,]" contending that his advertisements were "obviously different from LoanStreet's organic search result in their title, displayed URL, tone, and content" and had "a critical, accusatory, worker-to-worker tone that no Google user would expect a financial services company to use[.]" Mot. at 9-10.[23]  In support of this argument, he cites two comments left by users on his Reddit post.  Mot. at 15 (citing Def. 56.1 ¶¶ 29, 30).  However, these comments were made by anonymous internet

---

[23]    Troia also argues that "several of the other third-party search results also contained the 'LoanStreet' trademark and were substantially more similar to the official LoanStreet company search result than [d]efendant's Google Ad[,]" citing organic search results from LinkedIn, RocketReach, and Glassdoor that included references to LoanStreet.  Mot. at 10-11.  However, none of these results is relevant to this Court's analysis, as none of them were paid advertisements employing the LoanStreet mark.

Troia also contends that plaintiffs have failed to produce any screenshot or description of their home page that would permit the Court to compare landing pages of plaintiff's and defendant's Google ads, to assist the Court in determining whether the Reddit page linked by the Google advertisements bears any resemblance to LoanStreet's website or brand "look and feel."  Mot. at 11.  This is also irrelevant, as plaintiffs allege only initial interest confusion and do not base their unfair competition claims on Troia's Reddit posts, only his advertisements.

users in an online forum dedicated to career questions, and their knowledge of Troia's Google advertisements came from reading his posts in that forum.  In the absence of any evidence regarding the authenticity of these comments or showing that these individuals actually encountered his advertisements organically, in the context of performing a Google search, and without prior knowledge of this dispute, we must disregard them for purposes of this analysis.

Troia further asserts that the absence of consumer survey data is "'evidence that actual confusion cannot be shown[,]'" citing the Second Circuit's recent opinion in 1-800 Contacts, Inc., 119 F. 4th at 253 (quoting Sports Auth., 89 F.3d at 964).  While this is correct, he conveniently omits the next sentence: "Nevertheless, 'a [court] may still conclude that actual confusion exists . . . , so long as there is other evidence of actual confusion[.]'"  Id. (quoting Sports Auth., 89 F.3d at 964).

Plaintiffs have proffered evidence demonstrating that internet users searching for LoanStreet-related search terms clicked on Troia's Google advertisements more than one thousand times between June and October 2021, Norkin Decl., Ex. E at 3-11,[24]

---

[24]    Specifically, Troia's Google statements indicate that internet users clicked on his advertisements 98 times in June 2021, 196 times in July 2021, 282 times in August 2021, 191 times in September 2021, and 254 times in October 2021.  Norkin Decl., Ex. E at 3-11.

and Guttman testified that LoanStreet struggled to engage with job applicants after the advertisements were posted, when they had never experienced prior difficulty with attracting or hiring talent, <u>id.</u> Ex. M at 90:17-25.[25]   Taken together, such evidence indicates, at the very least, that Troia's advertisements attracted attention, causing internet users who had searched for LoanStreet and related terms to click on his posts and read their defamatory content.

Although the evidence presented by plaintiffs is not decisive, Troia has wholly failed to present any admissible evidence demonstrating a lack of actual confusion.  Accordingly, given that "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought[,]"  <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004) (citations omitted), we cannot hold that no reasonable juror could find in LoanStreet's favor with respect to the existence of actual confusion.

---

[25]    Troia also provided evidence confirming that his internet activity had an impact on LoanStreet's ability to hire software engineers, providing examples of communications in which prospective software engineers wrote to LoanStreet to say they had "[h]eard terrible things," Lin Decl., Ex. 20, and "[did] not work for companies that sue their former employees," <u>Id.</u>, Ex. 21.

### v. Bad Faith

The sixth Polaroid factor considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." W.W.W. Pharmaceutical Co., Inc. v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993) (citation omitted). In our August 2022 Order, we determined that Troia "patently did not use LoanStreet's trademark in good faith." Aug. 2022 Order at *12, n.13.

Troia attempts to rebut this prior conclusion, arguing that "[b]ad faith or intent for purposes of Polaroid is specific to the issue of sowing confusion" and that he did not intend to confuse users, but rather designed the advertisements to "alert [them] that they were viewing critical commentary about LoanStreet by a third party and that clicking on the Ads would bring them more of the same." Mot. at 17 (citing Def. 56.1 ¶¶ 8-23). In support of this argument, Troia cites a recent case in this District, Fizz Social Corp. v. Flower Ave, Inc., No. 23 Civ. 8840 (LAK) (BCM), 2024 WL 4264842, at *1 (S.D.N.Y. Aug. 5, 2024), in which the alleged infringer referred to the mark holder and used its mark with disparaging language in an Instagram post. Mot. at 17-18. In dismissing plaintiff's claim, the Fizz court determined that the complaint did not allege facts demonstrating that defendant's

-43-

post "was meant to confuse or deceive its audience." Id. at *6. Notably, the relevant post was not a paid advertisement, but rather a "single-image promotional campaign" posted on defendant's Instagram account published to defendant's followers. Id. at *2.

Here, defendant did not merely post on the internet using plaintiffs' mark. Rather, he purchased paid advertisements that he explicitly intended to divert internet users who were searching for LoanStreet. See Norkin Decl., Ex. A at 3-4 (in which Troia writes that he is "running a google AdWords campaign to tout the negative Glassdoor reviews" and hopes to "ma[ke] it so that [LoanStreet] can never hire another decent engineer again"). Such actions suffice to raise a genuine issue of material fact with respect to Troia's bad faith and intent to sow confusion.

### vi. Sophistication of the Consumer Group

The final Polaroid factor focuses on the sophistication of the relevant consumer group, examining "the level of care [such consumers] exercise when purchasing the products at issue." Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 326 (S.D.N.Y. 2000) (citing Sports Auth., 89 F.3d at 965).[26] The theory of this factor is that "the more sophisticated the purchaser, the

---

[26]    The parties agree that the seventh Polaroid factor is not applicable because Troia does not offer a competing product, good or service. Mot. at 16, n.6; Opp. at 11, n.4.

less likely he or she will be confused by the presence of similar marks in the marketplace." Savin, 391 F.3d at 461 (citation omitted).

Troia asserts that LoanStreet's website and services are "directed at sophisticated individuals" and that any overlap in the parties' targeted audience "would be limited to sophisticated enterprise financial services purchasers and/or skilled technology job seekers" unlikely to be confused as to the source of the relevant advertisements. Mot. at 18.[27] Plaintiffs, however, assert that the relevant audience should instead be "the typical user of Google's search function." Opp. at 20 (citing Norkin Decl., Ex. K at 32 (in which Mr. Adamson stated that "anyone searching for LoanStreet online would be exposed to [defendant's] devastating brand-damaging messaging")). Neither party has provided evidence to support these assertions.

Ultimately, however, this factor does not tip the scales in either direction. It is thus neutral.

---

[27]    Troia again cites 1-800 Contacts, in which the district court determined that "would-be consumers of . . . an entirely online retailer of contact lenses" "conducting internet searches in the year 2022, would likely be familiar with both the concept of paid search results and the significance of website address links." 608 F. Supp. 3d at 158. However, as noted above, this case is less persuasive given that the advertisements at issue did not feature plaintiff's name or other trademarks.

-45-

### vii. Nominative Fair Use

Because defendant has also invoked the doctrine of nominative fair use, the Court must consider additional factors beyond the standard eight-factor <u>Polaroid</u> test.  <u>See</u> <u>Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Security Univ., LLC</u>, 823 F.3d 153, 165 (2d Cir. 2016).  The Court addresses these below.

Nominative fair use "allows a defendant to use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of the defendant's product or the mark-holder's sponsorship or affiliation."  <u>Tiffany (NJ) Inc. v. eBay Inc.</u>, 600 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks and citations omitted); <u>see also</u> <u>Int'l Info. Sys.</u>, 823 F.3d at 165 (nominative fair use protects the "use of another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services" (quotation marks and citation omitted)).  This doctrine arises most often in the context of comparative advertising, as defendants are permitted to "use a trademarked name to convey to consumers what it is their product seeks to copy[.]" <u>Merck & Co. v. Mediplan Health Consulting, Inc.</u>, 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006) (stating also that "in such cases, defendants are not trying to get the good will of the name, but the good will of the goods") (internal quotation marks and citation omitted)).

In evaluating a defendant's invocation of nominative fair use, a court must consider the following three factors:

> (1) [W]hether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without the use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder[.]

Int'l Info. Sys., 823 F.3d at 156.

In assessing the second factor, "courts are to consider whether the alleged infringer 'step[ped] over the line into a likelihood of confusion by using the senior user's mark too prominently or too often, in terms of size, emphasis, or repetition.'" Id. (quoting McCarthy § 23:11).

Troia contends that his use of LoanStreet's mark was necessary to identify plaintiffs' service, and that his references to LoanStreet were "limited and only as needed to make clear that LoanStreet was the topic of his critical commentary[.]" Mot. at 21. He also asserts that he "carefully crafted his Google Ads to eliminate any indication of sponsorship of endorsement by plaintiffs" by "us[ing] no other brand asset of [p]laintiffs' and ma[king] it clear in the Ads that he was being strongly critical of [p]laintiffs." Id. at 22.

This may very well be true. However, "the third element of the nominative fair use defense requires that the use of the trademark not create a likelihood of confusion as to the mark-holder's sponsorship, endorsement, or affiliation." Merck & Co., Inc., 425 F. Supp. 2d at 414 (citation omitted). As plaintiffs note, the evidence shows that Troia purchased at least ten different search terms to display his advertisements in Google searches, Norkin Decl., Ex. G at 2, and employed LoanStreet's mark "repeatedly[,]" beginning each advertisement using the mark, id., Ex. F. Each advertisement also appeared at the top of the page, such that internet users would see his advertisement before LoanStreet's website appeared in the search results. Lin Decl., Ex. 12 at 2. While defendant's use of LoanStreet's mark may have been necessary to identify the company for purposes of his post and limited in use, as stated above, his use of the mark "clearly implicates the likelihood of confusion analysis and requires an evaluation of the [advertisement] in context." Jackson v. Odenat, 9 F. Supp. 3d 342, 361 (S.D.N.Y. 2014). For the reasons recited above, supra Section 2.a.i.-vi., such an analysis "is a matter best left for the jury." Id.

Accordingly, because likelihood of confusion remains a genuine dispute of material fact, Troia is not entitled to summary

judgment on plaintiffs' unfair competition claims based on the doctrine of nominative fair use.[28]

### viii. Expressive Use

Troia also argues that, regardless of the Court's analysis of the Polaroid factors and even if it has determined that his use of LoanStreet's mark did not constitute nominative fair use, this Court should grant summary judgment with respect to plaintiffs' Lanham Act claims because his use of the LoanStreet mark was expressive and intended "to convey a message of critical commentary[.]" Mot. at 24-25.

Where a defendant's use of a mark is determined to be part of a work of "artistic expression[,]" the traditional likelihood of confusion inquiry is applied more narrowly. Rogers v. Grimaldi, 875 F.2d 994, 998-1000 (2d Cir. 1989). Specifically, the

---

[28] In invoking the doctrine of nominative fair use, Troia relies heavily on Weight Watchers Int'l, Inc. v. Noom, Inc., 403 F. Supp. 3d 361 (S.D.N.Y. 2019), in which a court in this District relied on this doctrine in granting defendant's motion to dismiss plaintiff's unfair competition claims stemming from defendant's use of the Weight Watchers mark in advertisements. See 403 F. Supp. 3d at 368 (describing advertisements referring to Noom as "Weight Watchers® 2.0" or "Weight Watchers® for the 21st century"). The court determined that "a reasonable consumer encountering the ads would not perceive them to claim that . . . Weight Watchers is affiliated with or endorses Noom[.]" Id. at 380. In reaching this conclusion, the court relied on the fact that "[t]he advertisements [we]re expressly posted by Noom, a 'noom.' logo appears in each of the advertisements, and Weight Watchers is invoked once in the text[.]" Id. By contrast, Troia's advertisements do not explicitly include his name or any other identifying information, including only a link to a Reddit forum dedicated to asking and answering career questions, and Troia used the LoanStreet mark at least twice in his advertisement, including at the start of each heading. See Lin Decl., Ex. 13. As a result, unlike the advertisements posted by Noom, it cannot be said that Troia's advertisements clearly designated their source or affiliation.

likelihood of confusion involving an expressive work must be compelling enough "to outweigh the [defendant's] First Amendment interest." Twin Peaks Productions, Inc. v. Publications Intern., Ltd., 996 F.2d 1366, 1379 (2d Cir. 1993).

The Second Circuit has held that "the Lanham Act should not apply to 'artistic works' as long as the defendant's use of the mark is (1) artistically relevant to the work, and (2) not 'explicitly misleading' as to the source or content of the work." Vans, Inc. v. MSCHF Product Studio, Inc., 88 F.4th 125, 136 (2d Cir. 2023) (citing Rogers, 875 F.2d at 999). Courts in this Circuit have applied this exception only in limited contexts, including with respect to: "the title and cover of books and magazines, see, e.g., Rogers, 875 F.2d at 1001-02 (film title); Twin Peaks, 996 F.2d at 1379-80 (book title); [Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc., 886 F.2d 490, 495 (2d Cir. 1989)] (book title), and the use of trademarked products in feature films and video games, see, e.g., Louis Vuitton Malletier S.A. V. Warner Bros. Ent. Inc., 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (film); AM Gen. LLC v. Activision Blizzard, Inc., 450 F. Supp. 3d 467, 479-80 (S.D.N.Y. 2020) (video game)." Id.

Here, defendant's use of the LoanStreet mark does not fall cleanly into any of these categories. Although he contends that his Google advertisements constituted works of criticism, he does

not cite to a single case in which a court held that paid advertisements involving the use of another's trademark constituted works of artistic expression under Rogers. Moreover, although the First Amendment "protects an individual's right to speak out against a mark holder, [] it does not permit an individual to suggest that the mark holder is the one speaking[.]" SMJ Grp., Inc. v. 417 Lafayette Restaurant LLC, 439 F. Supp. 2d 281, 291 (S.D.N.Y. 2006). Where, as here, plaintiffs have presented evidence sufficient to raise a genuine issue of material fact as to whether Troia intentionally used the LoanStreet mark to confuse and re-direct internet users searching for LoanStreet's website, the Rogers test does not apply.

*    *    *

In conclusion, we note that neither party has cited to a case that is precisely on point, namely one in which a plaintiff brought an unfair competition claim under the Lanham Act against a defendant who offered no competing business or product but rather used plaintiff's mark in an internet search advertisement designed solely to disparage plaintiff's company. Accordingly, despite our analysis that LoanStreet prevails with respect to five of the seven Polaroid factors recited above, it remains unclear what the result would have been had LoanStreet cross-moved for summary judgment.

However, it is clear that, based on the evidence presented by the parties, a rational jury could conclude that a likelihood of confusion existed with respect to Troia's use of plaintiff's mark. Accordingly, Troia is not entitled to summary judgment on these grounds.

### b. Common Law Unfair Competition Claim

Finally, we address Troia's argument that plaintiffs' common law unfair competition claims must also be dismissed.  Mot. at 25. "[L]iability for trademark infringement under New York law [largely] mirrors liability under the Lanham Act[,]" Tiffany & Co. v. Costco Wholesale Corp., 971 F.3d 74, 91 n.13 (2d Cir. 2020), "except that New York law requires an additional showing of bad faith," Soter, 523 F. Supp. 3d at 397 (internal quotation marks, alteration, and citation omitted); see also Adidas Am., Inc. v. Thom Browne Inc., 599 F. Supp. 3d 151, 158 n.3 (S.D.N.Y. 2022) ("It is well established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law and the Lanham Act are essentially the same and may be analyzed together." (collecting cases)).

For the reasons stated above, plaintiffs have raised sufficient issues of material fact regarding consumer confusion and defendant's bad faith.  Accordingly, Troia is not entitled to

summary judgment with respect to plaintiffs' common law unfair competition claim.

### CONCLUSION

In sum, Troia's motion for summary judgment is denied, as is his motion to exclude plaintiffs' expert. Plaintiffs' motion to exclude Troia's experts is denied with respect to Mr. Sabiki and granted with respect to Dr. Bolton. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 124 and 155.

**SO ORDERED.**

Dated:    New York, New York
          September 3, 2025.

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE