UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LOANSTREET INC., *et al.*

Plaintiff,

v. 21 Civ. 6166 (NRB)

WYATT TROIA,

Conference

Defendant.

------------------------------x

New York, N.Y.
May 5, 2026
3:00 p.m.

Before:

HON. NAOMI REICE BUCHWALD,

District Judge

APPEARANCES

AKRIVIS LAW GROUP PLLC
Attorneys for Plaintiff
BY: AMIR TOOSI

WYATT TROIA, *pro se*

THE DEPUTY CLERK: This is 21 Cv. 6166, *LoanStreet Inc. et al. v. Troia*.

Is plaintiff present and ready to proceed?

MR. TOOSI: Yes.

THE COURT: State your name, please, for the record.

MR. TOOSI: Amir Toosi for LoanStreet and Ian Lampl.

Good afternoon, your Honor.

THE DEPUTY CLERK: And is defendant present and ready to proceed?

MR. TROIA: Yes. This is Wyatt Troia for myself.

THE COURT: Mr. Toosi, when we left off on April 28, I believe there were some matters for plaintiff to consider, so can you sort of give us the position, the answer.

MR. TOOSI: Yes, your Honor.

And thank you for giving us the opportunity to speak to our client about it. I want to take each one in turn. One is about the Lanham Act -- I'll take that one first -- and one is about the punitive damages.

With respect to the Lanham Act, our client is -- we spoke to our client about dismissing that claim. But in considering -- in considering that position, our client is -- our clients are amenable to going forward that way. But there is one concern one issue that we want to bring to the Court's attention, and it's this. It's that of the claims that survived motions to dismiss and motions for summary judgment

and all that, the Lanham Act claim is actually the only federal jurisdiction claim. The remaining are defamation claims.

And now, obviously, at this late stage, your Honor would have the discretion to move forward with the case, but our concern is that if we were to dismiss that claim, that we're going to -- there's going to be a motion for removal that's coming down the pike. And obviously that would be for your Honor to decide in your discretion, but given that the defendant tried to open up another front in state court, we think that that's likely to come.

THE COURT: I think you misspoke, motion to remand.

MR. TOOSI: Remand, correct.

THE COURT: But I'm not sure -- two things. Your point is an interesting one.

One, this case was brought in federal court --

MR. TOOSI: Correct.

THE COURT: -- in the first place, so there is no motion to remand. They can't have it unless it was removed.

MR. TOOSI: It would be a subject matter jurisdiction motion.

THE COURT: Conceivably, a motion to dismiss, but I don't think, offhand -- and again, I'm not positive -- that when a case has been litigated in four, five years or so, the fact that at a later point in time, the basis for federal jurisdiction, for whatever reason, no longer exists -- I

mean, you could have diversity jurisdiction and someone moves and destroys diversity, I don't believe the law requires or anticipates that the case be dismissed at the five-year juncture.

MR. TOOSI: So, the law is clear that as soon as pendent jurisdiction vanishes, whatever stage of the case that is, that there can be a motion to have it -- to dismiss on those grounds, on the subject matter jurisdiction grounds. The trial court has the -- there's factors that the trial court can consider. Chief among them are how far into the case you are. The law states it more eloquently than I just did. Essentially, how much sweat equity has the federal court put in, and also the equities of sending it to state court at that stage of the litigation.

But, ultimately, it's within the trial court's discretion whether to hold on to the case at that point, and that decision is reviewed for abuse of discretion by the Second Circuit.

I believe it's § 1367, your Honor.

THE COURT: Okay. It's something I'll look at. I must say that this issue did not cross my mind, and it was not in any way a sneaky way.

MR. TOOSI: No, no, no. And it's not taken that way, your Honor.

THE COURT: I'm not suggesting that. That was a joke.

MR. TOOSI: Yeah, and I would also say that I think that, given the case law that we looked at on this issue, it is for -- I mean, it's rare for a federal claim, the last remaining federal claim to be dismissed at this juncture in a case, two months away from trial. But our read of the case law is that, generally, when you're anywhere this close to trial -- and this happens -- it's generally the case where trial courts will proceed on the state claims.

Now, in order to address that -- I mean, I don't know if you want to look at that issue, your Honor, and have us come back to you, come back on this issue, but that's our concern, is that there's subject matter jurisdiction as a result of making that move. But we are amenable to doing that as long as we're upon the understanding that that's not going to result in us having to move to state court where that could present a whole lot of complications for our clients.

THE COURT: All right. Just to be clear, you would be prepared not to proceed on the Lanham Act claim so long as that decision does not result in a dismissal of the entire case for lack of subject matter jurisdiction.

MR. TOOSI: Correct.

THE COURT: And I guess you would add to that that the decision to consider dismissing the Lanham Act claim is not based on a merits position that it -- that you not based on a view that the claim which has been upheld --

MR. TOOSI: Correct.

THE COURT: -- lacks merit.

MR. TOOSI: Correct. And just to be clear -- and I meant to say this earlier -- we still view the Lanham Act claim as being meritorious. Obviously, it has survived a motion for summary judgment. I heard what your Honor said in terms of the Polaroid factors and all of that. We still think that it's a valid claim, so our decision to dismiss it would be based on a lot of the -- we took into consideration what your Honor said about making sure that this trial proceeds expeditiously and is on the core issues of the case.

So, that -- and we do have -- I mean, obviously, our client has an interest in trying to -- there's costs associated with presenting those claims, so our decision to dismiss would have nothing to do with the merits or the evidence for the claim. It would have to do strictly for judicial economy and streamlining the case.

THE COURT: Fair enough. That was my only thought in the first place. My suggestion -- was not in any way to back away from rulings that I had made.

MR. TOOSI: Sure.

THE COURT: Okay.

MR. TOOSI: Okay. Now, in terms of the punitive damages, we're also amenable to withdrawing the claim for punitive damages, but there's a concern with that as well, and

it is this: It's the experience that we've had with this defendant -- which I think that your Honor has shared -- and the fact that he's going *pro se*, that defines this concern.

In terms of our experience with him, he has taken every single opportunity that he could to talk about his looking out for the working class, looking at his intent, what he intended to do, challenging your Honor's ruling in terms of what he was intending to do with the defamatory comments that he made about our clients. And he has made them even when they're not relevant to the discussion that we are -- that, you know, that's happening at the moment.

And so our concern about that is that we can't -- we can object. We can do curative instructions. We could do limiting instructions, but we believe that he is going to bring the -- say these things, especially acting *pro se* in front of the jury, and put the issues of his intent before the jury, even if we were to remove that by dismissing the punitive damages claim.

So, we are amenable to dismissing the punitive damages claim, but because he is proceeding *pro se* -- if we were to do that and he was represented by counsel, we could safely assume that his counsel understands the scope of what is relevant, and we would stay confined within that. With him acting *pro se*, we don't have that same security.

And I'm sure your Honor has heard the adage: You

can't throw a skunk in the jury box and instruct them not to smell it.

THE COURT: I never have, but go ahead.

MR. TOOSI: It's one of my favorites.

So, the point that I'm trying not so concisely to get to is this, is that we're content to move forward on the case without the punitive damages, but we want the defendant to be advised so that he understands the concept of opening the door, so to the extent that he puts certain things in issue that would not be relevant in a trial for compensatory damages, if he puts those out there that we have -- that he effectively opens the door for us to introduce evidence in rebuttal to that point.

Specifically, and just to draw an example of how, I think that this might play out, he's consistently said that he had no intent to defame. He -- and he talked about the context of how he was fired from LoanStreet, you know. On our direct case, we're not bring in any evidence of that. We're not going to be talking about the decision to fire him or anything like that, because that's not really relevant to the compensatory damages issue.

They might be relevant to punitive damages. And his intent on what he meant to do by posting all those posts on social media and whatnot would be relevant for punitive damages, but if he gets in front of the jury and he's saying:

I was a champion for the working class; I was looking out for workers; I was trying to warn people about LoanStreet and this, we should be able to bring in evidence that contradicts that point in rebuttal, but it technically would not be relevant to punitive damages.

THE COURT: Well, I think the fundamental question -- in a sense, it may be the fist issue -- is, if the trial was limited to plaintiff's damages because there has already been finding as a matter of law that Mr. Troia has defamed the plaintiffs and all the elements of a defamation claim have been found as a matter of law, would there be any place in a trial limited to the plaintiff's damages, because there's already been a finding of liability to Mr. Troia trying to offer another explanation, period.

MR. TOOSI: Yeah, I think -- I think that there would be, and the time that he would be able to do that would be when he gets to put on his direct case, and he would be --

THE COURT: What is his direct case?

MR. TOOSI: I think he's going to testify.

THE COURT: But, I mean, what is it?

You will have an expert. He will testify as to the cost to restore the reputation of the plaintiff.

You will, presumably, have some of the individuals testify about the consequences that they were subjected to.

MR. TOOSI: Correct.

THE COURT: Or maybe subjected is too strong, but they -- that occurred.

Certainly, Mr. Troia or any defendant would be in a position to cross-examine them, but I am not sure where does an alternative, in a sense, an explanation contrary to the earlier rulings come in in that scenario.

MR. TOOSI: There's two thoughts I have on that, your Honor. The first is that in order to present the evidence, as you correctly pointed out, we're going to call witnesses that dealt with the fallout of the defamation. But in order to understand the fallout of the defamation, you have to understand the company. You have to understand how the company operated beforehand. There has to be a comparison before and after.

And in eliciting questions about what happened before the defamatory posts, I anticipate that Mr. Troia will -- and by the way, I'm a little bit weary of giving him ideas today, but I'm anticipating that he will be able to cross-examine as to that period of time, which included his period of time of working there.

The second thought that I had -- and I think that's just one example of a way that he can find ways during cross-examination to get these concepts out before the jury.

But I think that -- and of course, again, I think he's going to testify, and he'll have to testify in a narrative way

because he's *pro se*. And at that point, I don't even have an opportunity to hear the question and object to it before he starts saying things in front of the jury. So, that's one. There's a lot of ways that I think he can find ways to get that thought out.

The second thought that I have on that, your Honor, is that while I think your question presupposes that there's a defined box that the defendant is going to color within, I think that what we've found in your course of dealing with him -- and just in the last conference with him where he started to argue the case when it wasn't relevant to anything that we were discussing at the moment, a -- I don't think that we can -- I don't think that my clients are comfortable relying on his good faith to say: I'm going to stay within those boxes, and I'm not going to throw that -- that's the comment about throwing the skunk in the jury box and asking them not to smell it.

And so I think that just as a basic rule of trial law, right, if I'm on one side and I can't introduce something because it's not relevant but then the opposing side has introduced that same concept, I'm not in a position where I can't say anything about it. Now, they've opened the door to it.

THE COURT: Sure.

MR. TOOSI: And I just don't think the defendant knows that concept. And I think that especially because we do

anticipate that he will appeal after this case, I think it's important for him to understand what the -- what it means to open the door and what the consequences might be.

Because for us to say we're not going to seek punitive damages, that means that there's certain evidence of intent that we're not putting in because it's no longer relevant for compensatory damages. There's some evidence that I think was in both worlds that's still admissible, but there might be some pure evidence of intent that we would be able to introduce in a punitive stage that we're essentially saying: Okay. We are not going to do that; there's an advantage to him.

And what we are trying to avoid is a situation where we say: Okay. For the purpose of streamlining the case, for the purpose of making this about the core issue that we're not disadvantaged by that, by the defendant then saying all sorts of things at the trial -- actually, that just also -- I mean, because he's *pro se*, he's the one asking the questions. He's not bound by any sort of ethical questions and he can ask questions that pose -- I mean, I'm just thinking out loud.

THE COURT: Well, let's just make it clear. He's still like every person, whether it's the witness, the lawyer, the party. The Court sets the rules, and failure to abide by the rules can find you in contempt of Court.

That's not my style, you know. I expect everyone to play by the rules, some of which I set, some which are just set

as they are the rules of the game.

MR. TOOSI: Yep.

THE COURT: And I don't ever want to reach the point of, you know --

MR. TOOSI: And I'm also --

THE COURT: -- just thinking about contempt, but --

MR. TOOSI: And I'm also -- I was a federal law clerk in a prior job, and I've been doing this long enough to know that -- and I expect that your Honor is going to give the defendant more latitude because he is *pro se*.

THE COURT: Within reason.

MR. TOOSI: Yeah.

THE COURT: There's only one person that runs the courtroom, and that's me.

MR. TOOSI: Yes; that's right.

THE COURT: But the question that -- what you just said, it raises -- does it complicate things more to eliminate the request for punitive damages? Because if the punitive damages claim remained, we all would agree, I think, that at that point, Mr. Troia is entitled to offer an explanation about why he did what he did, which is not for exposing the plaintiffs to public opprobrium and shaming.

And if it were clear that the punitive damages claim was still on in the case, there would be, in effect, a split trial. The first trial is on compensatory damages. That is,

how did the plaintiffs -- how were they harmed? How were they harmed in a way that is measurable in money?

MR. TOOSI: How would they get back to a position they were in before.

THE COURT: Ow would they get back to where they were before.

MR. TROIA: Your Honor.

THE COURT: Excuse me. I was in the middle of a thought. Could you just wait? I'll let you talk, I promise.

MR. TROIA: Sorry.

THE COURT: And then, potentially, the compensatory phase, the damages suffered by the plaintiffs would be phase one, after the jury decides what the amount is, if any. I mean, I don't make the numbers.

MR. TOOSI: It could be a dollar.

THE COURT: Then there's the second part of the trial. So, it's a split. The jury is told right up front that the issue of liability has been determined. This is what the Court has already found. This trial is only about compensatory damages.

Then they get a little surprise after that that: Guess what? We have some more work to do. And then there's the opportunity, for sure, for Mr. Troia to explain himself in -- and try to say: I had good motives and because I had good motives, there should be no punitive damages here.

But I, honestly, did not see phase one as somehow backdoor introducing the good motive position of the defendant.

MR. TOOSI: And I --

THE COURT: But I don't know what you were planning on, you know -- I don't know what your testimony is.

MR. TOOSI: Sure. And it's not based on what we would be introducing just to be clear; it's based on what we --

THE COURT: I'm not sure it would be relevant.

MR. TOOSI: I think it would 100 percent be irrelevant at that stage, but I guess I'm alerting for the Court -- and I could be totally wrong about this, but I suspect that there is a risk with this defendant that that is going to find its way into the compensatory damage stage, and our position is, if it does -- we don't plan to go there, but if it comes out during the compensatory damage stage, then it's our position that we're entitled at that point to rebut it with similar evidence that may not have been originally relevant. And I don't know if the defendant understands that as a trial matter.

THE COURT: He's pretty bright. He's going to learn.

Mr. Troia you wanted to say something.

MR. TROIA: Yes. I think, your Honor, that I'll present the Court, during motions *in limine*, with case law establishing that I have a right as a defendant under New York law to present evidence of alternative causes of the alleged defamation damages.

And I think that plaintiff's own expert witness's theory opens the door to all of this evidence, because it is so broad. Mr. Adamson said in his deposition that he would recommend his $8 million repair campaign no matter how many people or how few saw the posts. His explanation for this is that through word of mouth, even if just one person sees the post, it can cause the entirety of the plaintiff's alleged damages.

THE COURT: May I just stop you. What you're talking is not the same thing as what plaintiff's counsel was talking about. What you're talking about is, were there other things happening in the world that caused harm to the plaintiff, to LoanStreet and the individual plaintiffs unrelated to anything that you said. That's fine. There's no problem about that, because it isn't -- so long as it's not about you.

I mean, I'm not sure what the other things -- maybe I should ask you: What are the other things in the world that were happening that have nothing to do with what you said about the plaintiffs that caused them to have an issue with their reputation.

MR. TROIA: Multiple things, your Honor.

First of all, in plaintiff's own damages evidence, people reference posts by other people, by third parties. Two of them, actually, plaintiffs said in the complaint were by me. They were not, and they presented no

evidence of that. Now they want to do a switcheroo where they say that damage that was formerly caused by me, now that they found that their allegations were false, is not caused by me.

THE COURT: Well, that becomes -- isn't that a good thing for you?

MR. TROIA: Well, plaintiff should not --

THE COURT: You don't want more defamatory statements attributed to you, right?

MR. TROIA: No, your Honor.

THE COURT: Okay.

MR. TROIA: So that's part one is third party's speech, which I would say, also, the damages theory that Mr. Adamson is going to present is, in part, based on those false allegations, so he's including third-party harm as part of the defamation damages.

But also, I think we should remember that plaintiffs brought many defamation claims that failed to survive dismissal receive. They cannot now receive damages for defamation claims that they failed to prevail on.

THE COURT: And believe me, they won't.

MR. TROIA: Well, you said, your Honor, that I have to proved causes unrelated to what I said. They cannot gain damages for my lawful speech, which is much of what my speech was.

THE COURT: Mr. Troia, you need to fully understand

that you have been found, as a matter of law, to have committed defamation. Okay? If there were other things that you said that I did not find to be defamatory, they cannot be the basis for harm to the plaintiffs. They're just out of the case; they're irrelevant.

They can't rely on them. You can't rely on them.

MR. TROIA: They're an alternative cause of the alleged damages, though.

THE COURT: No.

MR. TROIA: If people chose not to work at LoanStreet because --

THE COURT: If things that you said that I found were not defamatory, you should take the win. Take the win.

MR. TROIA: Your Honor, they're trying to get defamatory damages for non-defamatory statements. I am allowed by law to present evidence that it was my non-defamatory speech that may have caused their defamation alleged damages, such as the fact that their CEO is married to the head of HR; such as the fact that they fired people without warning; such as the fact that they promise not to do these things and then it to their employees; such as the fact that they had an illegal non-disparagement agreement that they require all employees to sign before working -- that's the federal government's opinion, that it was an illegal suppression of speech -- all of these are things that people have cited in plaintiffs' own damages

evidence as reasons why they didn't want to work at LoanStreet.

One thing they have never cited is the narrow defamatory meaning that I am liable for, which is an accusation of a serious crime or perhaps, at the minimum, breaking a contract.

That is the only thing that plaintiffs are entitled to gain damages for, and they are trying to expand the universe to everything that I said and even to third-party conduct and to their own litigation conduct in this case, and those are things that I have a right to present evidence about as alternative causes of their alleged damages.

MR. TOOSI: Your Honor, if I may.

THE COURT: Yeah.

MR. TOOSI: So, I actually think what Mr. Troia is talking about is -- I wanted, at some point in our conference, to set a motion for -- set a schedule for motions *in limine*. I think actually what he's talking about is more appropriate for a motion *in limine*.

THE COURT: Yeah.

MR. TOOSI: And, you know, as I stand here today, I don't remember exactly what comments -- there's a number of things that he said that I don't think are accurate about the record, and I think that whatever he's talking about right now should be fully briefed and put before the Court in order for you to make a decision on what can be and can't be discussed at

the trial. Yeah. That was the only point that I was going to make.

But I think that what my point was about not about you know alternative causes of damages. It was about his intent and things about his intent.

But I will say, he said something that caught my attention. He said that they fire people without warning. And I'm not going to argue this case; I'm just using this as an example. The defendant has constantly said that he was fired without warning. I actually don't think that that's one of the defamatory comments that was found here, but the -- the fact of the matter is, the truth of the matter is that he was put on a performance improvement plan several months before he was fired.

MR. TROIA: That's not true. There's no evidence of that.

MR. TOOSI: Well, okay.

But my point --

THE COURT: That's either going to be a fact or not. That is something that is in writing. I have no idea what the truth is, right?

MR. TOOSI: My point is -- my point is that he is taking an opportunity, on a legal basis, where something may -- where -- I'd have to go back and look at each separate statement and how the Court ruled on each separate statement to

fully address this, but he's -- as I'm hearing how, he's basically trying to take advantage of a legal ruling on whether a specific statement was defamatory or not, which is not just whether it's true or untrue. There's more elements to it than that, right? And then saying: Well, that's the case, then the thing that I said is actually true, and that's exactly the time of thing that I'm talking about in terms of opening the door to us putting in evidence.

If he says -- this is just as an example; I'm not trying to litigate that now -- but I was fired without warning and this it is what happens at LoanStreet all the time, my concern is that he puts that in front of the jury. It's actually not true, and we have a --

THE COURT: Then you have every right to rebut that.

MR. TOOSI: And that's --

THE COURT: No question.

MR. TOOSI: Because in our view, it's opening the door to that point.

THE COURT: You know, a trial is a search for truth, not a: throw it at the wall and see it four if it sticks.

But I think you're right. Look, I think that these issues are challenging. My gut says that after five years of litigation, four serious opinions, that the withdrawal of the Lanham Act claim would result in the case being dismissed for

lack of subject matter jurisdiction.

But we can certainly look into that. And thank you for raising it, because it had absolutely not crossed my mind, and I certainly wouldn't have wanted to proceed and then go further and then have another investment of time, only to waste that time.

MR. TROIA: Your Honor, just to tie back what we were saying to the intent evidence, I do believe that intent evidence can be relevant to compensatory damages under the theory, Mr. Adamson's theory that any individual person with a negative perception of LoanStreet could, through word of mouth, cause $8 million worth of damage, plus. If somebody developed a negative perception because they had personal knowledge of my intent and how I was treated by LoanStreet, that would be relevant to compensatory damages to alternative causes of what plaintiffs claim is their defamation damages, and so I think that it still would be relevant.

THE COURT: I think that this is the point at which *in limine* motions, stuff on paper, is the way to go and with the understanding that the rulings are the rulings and they need to be followed. Whatever rulings are forthcoming need to be followed.

I don't know how many motions the plaintiff is contemplating, and I don't know how many the defendant is contemplating. I need to have some idea of what you're

contemplating, so that a reasonable schedule can be set. And I'm all in favor of having things resolved well in advance. We're not having rulings the week before trial or the morning of. Many weeks before trial.

I think trials are stressful enough without not knowing clearly what the rules of the game are.

MR. TOOSI: Yeah. It reminds me that they say that chess grand masters are more prone to going insane because they have so many different variables to consider. That's sometimes how I felt as a trial lawyer.

I have in my mind a couple of the motions *in limine* that we would be filing. What I had envisioned was an omnibus motion *in limine* with different issues. They're mainly on either preclusion of evidence -- I can tell you right now that one of our motions is going to be to preclude a lot of the witness and witnesses that the defendant has essentially sprung on us in the last couple of months, long after the close of fact discovery. And that motion will be based not only on timeliness, but on relevance and admissibility.

I think, right now, that's the biggest one. There might be some other limited things, but that's -- in our mind that's, the biggest one right now.

The schedule that I had in mind was --

THE COURT: Hold on. I do want the plaintiff, because I do think -- not only numerically but substantively -- the

proposal to have all these witnesses is a real issue, and from the plaintiff, I want an offer of proof as to what each of them he proposes to have them testify to, then I'll be in a position to decide whether their testimony is relevant or it's not relevant or it's limited in some way. But I think we need to go through that exercise sooner rather than later.

MR. TOOSI: I agree.

THE COURT: It's really -- if nothing else, it's polite to the potential witnesses, so that they should know if they should expect to come, or they don't need to come.

MR. TOOSI: And to be clear, I believe the defendant has informed us that -- well, just briefly, I believe you misspoke, your Honor. In your last comments, I think you said the plaintiff. I think you meant the defendant.

THE COURT: I take that back. The defendant.

MR. TOOSI: But, I think the defendant has indicated that he hasn't interviewed a lot of these people that he's proffering as witnesses at this point, so I think that there is everyone more, you know, uncertainty about that.

And I think, we've -- he's given us something. It's like a chart with, like, here's the topics that they would testify about, which, I'm not even sure it would past Rule 26 muster, but at this late stage --

THE COURT: No, the offer of proof begins with the following: If called to testify, Joe Jones would testify to --

and then there's a paragraph.

Because there is -- you cannot have a situation of people being called as witnesses, get on the stand, start to say something and then: No, get off the stand, because you're testifying about something you can't testify to.

It has to be civilized and resolved in advance. But to do that, I need from you, Mr. Troia, the offers of proof and then I may have some views on my own, but that plaintiff also gets a chance to weigh in.

MR. TROIA: Yes, your Honor.

MR. TOOSI: And I'm also I'm not diminishing -- I don't want talk about the relevance or admissibility and give short shrift to the timeliness here. The whole purpose of fact discovery is to give us an opportunity to depose these people, to evaluate their --

THE COURT: I didn't mean to do that, but, I mean -- at all. And it is conceivable that the plaintiffs' motion could be decided simply on: too late; too little, too late.

MR. TROIA: Your Honor.

THE COURT: Yeah.

MR. TROIA: With regard, I will make the best effort I can with the offers of proof. I am in a bit of a tough situation, because many of these witnesses do not respond to outreach. They were identified by plaintiffs. They were relied upon by plaintiffs' expert witness for his damages

opinion without interviewing them, I might add, only by their hearsay statements, and so IO think it would be fundamentally unfair to allow plaintiffs to present a damages theory and an expert opinion based on witnesses but depriving me of the opportunity to actually cross-examine these people. And so I will do the best to describe the topics I will ask them about, but I --

THE COURT: They, apparently, are not interested in testifying on your behalf.

MR. TROIA: At least one witness has described their fear of retaliation by LoanStreet, similar to what I've received. So, I think that if I'm not going to be allowed to cross-examine these people, then we need to talk about how to exclude the Adamson opinion, which relies upon their hearsay statements.

THE COURT: It doesn't quite work that way.

You are welcome to cross-examine Mr. Adamson on the basis that he didn't actually speak to the people whose statements he is relying on and that undermines what he is saying. That would be your argument.

But in a civil case, you don't have a criminal defendant right to compulsory process, so it's much harder for you to compel people to testify. And it is, of course, risk risky, if you subpoena somebody -- which you can do -- that doesn't mean they get to testify. But you can try. You can

try to serve a subpoena on them.

And let's say they show up, but they really don't want to testify for you. It can really blow up in your face. It's a risky approach. That's all I'm saying.

MR. TROIA: Sure. I think it's worth noting that the two witnesses who were part of plaintiffs' damages theory who did respond outreach have completely rebutted plaintiff's characterization of their reasons for disengaging with LoanStreet.

One says she was not ever a prospective employee.

THE COURT: If they were to testify for you and they undermine the plaintiff's expert in a way that you can explain to me and it makes sense, I'm not saying that you can't call them, but that's between you and them. Okay?

MR. TROIA: Sure. I just want to make sure the Court understands I cannot, for every witness, say exactly what they will say, because they have not told me --

THE COURT: Well, let me suggest that, just generally, it's not really a good idea to call witnesses when you don't know what they're going to say. It's very risky. You can understand that.

MR. TROIA: That's fair.

THE COURT: It just is. And it's an old adage that you should never question on cross-examination unless you know what the answer is.

MR. TROIA: That's fair.

THE COURT: Yeah, so, I'm not -- you know, this is not a small course in trial practice, but I just offer that.

But what you need to do is get me these offers of proof. That's the only way that we're going to be able to work our way through them and figure out which people are relevant, whose testimony is just simply not relevant.

MR. TROIA: Yes. I'm working on that with citations to plaintiff's own documents.

THE COURT: Okay. That would be helpful.

MR. TROIA: Yes.

MR. TOOSI: Your Honor, the schedule that I was going to propose for the Court on the motions to *in limine* was May 22 for the opening motions for both sides, June 5 for responses, and June 15 for replies. And that would --

THE COURT: Remind me what's the trial date.

MR. TOOSI: I think it's July 14; is that right?

THE DEPUTY CLERK: Yeah.

MR. TOOSI: Okay.

THE COURT: Also, remember that there also are requests to charge.

MR. TOOSI: Right. I was going to get to that.

In terms of the jury instructions, I wanted to ask the Court whether you want to us submit separate competing charges or whether you want us to work together to try to --

THE COURT: I don't even believe in that with lawyers.

MR. TOOSI: Okay.

THE COURT: I think that parties are entitled to advocate for the charge that they want. And also, we need proposed voir dire questions.

I would actually propose somewhat truncating that schedule, because you just can sort of count up the number of motions, in effect, you're giving me. There are dozens of decisions that you're going to ask me to be making, so if you can tighten this up a little bit that would be helpful.

MR. TOOSI: What date do you want us to hit in terms of when the motions are fully submitted?

(The Court conferred with the Deputy Clerk)

THE COURT: Okay. Why don't we leave your briefing schedule the way that you have it, but add that the request to charge and voir dire proposals are due by June 22.

MR. TOOSI: Just instructions proposed just instructions and voir dire June 22 that makes sense, and then, what -- if your Honor could also set a date for the parties to exchange marked exhibits for the trial. I was thinking an early July date.

THE COURT: I agree with that.

About July 2.

MR. TOOSI: July 2.

MR. TROIA: Would the verdict form also be due on

June 22?

THE COURT: Say that again?

MR. TROIA: Verdict form.

THE COURT: That's fine, too.

That's okay, thank you for thinking about it.

Good for you.

MR. TOOSI: And --

THE COURT: Which, of course, will depend on, ultimately, what the structure of the trial is.

MR. TOOSI: Right, right.

THE COURT: Which, we're not really there yet. I think that's gotten more complicated than less complicated.

MR. TOOSI: Maybe. Maybe, yeah.

I just want to make sure that I understand, so on the jury instructions, you want us to meet and confer, or not meet and confer?

THE COURT: No, just put it in your own.

I'm going to do what I --

MR. TOOSI: Yeah, got it.

THE COURT: I'm certainly going to do what I'm going do, but it's helpful to know what the parties are thinking should be the area of what I cover.

MR. TOOSI: Got it.

And in terms of the Lanham Act, that claim.

THE COURT: We'll try to get you some response. I

don't know. I mean, I should ask Mr. Troia.

If they drop the Lanham Act claim, would you intend to move to dismiss this case for lack of subject matter jurisdiction because there would be no federal claim left and proceed -- it would then -- I guess, I don't know if it gets refiled in state court because -- I don't know how that works.

MR. TOOSI: I think that the --

THE COURT: I think they use remand.

MR. TOOSI: I think that it's -- the remand is if you get moved to federal court and the remand is back to state court because it started there. I believe that the term is removal when there's a subject matter jurisdiction issue and the case is mass been progressing. But I'm not positive about that, about the terminology.

MR. TROIA: I'd have to analyze it, your Honor.

THE COURT: Yeah. Okay. Well, we'll definitely take a look at the law on that since, as I indicated, it was not something I had thought about.

Well, let's conclude for the day. We have a schedule going forward, though I suspect we may have to get together again.

MR. TROIA: Your Honor, just housekeeping.

THE COURT: Sure.

MR. TROIA: I submitted that form for permission to bring in electronics for the trial, just wanted to see if you

needed anything else from me on that.

THE COURT: Typically, those forms, you can have devices but you can't have wifi access.

But we do have it, okay? I'm aware of it.

MR. TROIA: Okay.

MR. TOOSI: Thank you very much, your Honor.

MR. TROIA: Thank you.

(Adjourned)