UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X

LOANSTREET, INC., and IAN LAMPL, Individually,

Plaintiffs,

- against -

WYATT TROIA, Individually,

Defendant.

--------------------------------------X

**MEMORANDUM AND ORDER**

21 Civ. 6166 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Before the Court are the parties' motions in limine in this longstanding dispute between plaintiffs, LoanStreet, Inc. and Chief Executive Officer Ian Lampl, and defendant Wyatt Troia.

## BACKGROUND

### Factual Background[1]

LoanStreet operates an online platform that allows users to share, manage, and originate loans. LoanStreet II, 2023 WL 5836237, at *1.

[1] The Court has issued four substantive opinions in this case. See LoanStreet, Inc. v. Troia, 2022 WL 3544170 (S.D.N.Y. Aug. 17, 2022) (denying Troia's motion to dismiss the complaint) ("LoanStreet I"); LoanStreet, Inc. v. Troia, 2023 WL 5836237 (S.D.N.Y. Sept. 8, 2023) (granting plaintiffs' motion for judgment on the pleadings on plaintiffs' defamation claims and to dismiss Troia's counterclaims) ("LoanStreet II"); LoanStreet, Inc. v. Troia, 2025 WL 2530884 (S.D.N.Y. Sept. 3, 2025) (denying Troia's motion for summary judgment as to plaintiffs' unfair competition claims and granting in part and denying in part the parties' respective Daubert motions) ("LoanStreet III"), reconsideration denied, 2025 WL 3687498 (S.D.N.Y. Dec. 19, 2025) ("LoanStreet IV"). The following facts, which are undisputed, are taken largely from LoanStreet II and LoanStreet III.

In February 2019, LoanStreet offered Troia a position as a software engineer. Id. LoanStreet's offer letter stated that, "[s]ubject to the approval of the Board of Directors of the Company," LoanStreet would issue certain stock options to Troia, which would be subject to the terms and conditions of "a separate stock option grant agreement." Id. at *1-2. The offer letter further provided that the options would "vest and become exercisable . . . on the first anniversary of the vesting commencement date" and that such vesting "will, of course, depend on your continued employment with the Company." Id. at *2.

Troia accepted the offer on or around March 4, 2019, and began working at LoanStreet on March 18. Id. As a condition of his employment, Troia also executed an "Employee Non-disclosure and Invention Assignment Agreement" (the "NDIAA") that prevented Troia from making any disparaging statements about LoanStreet for one year following his exit from the company. Id.

LoanStreet's Board of Directors approved Troia's option grant four months later, and Troia signed an option agreement for 885 shares of LoanStreet common stock, which stated that his "Date of Grant" was July 22, 2019. Id. The option agreement also provided

that the option would "vest and become exercisable . . . on the first anniversary of the Date of Grant." Id.[2]

On June 12, 2020, LoanStreet terminated Troia's employment. Id. Prior to Troia's termination, Troia had received several critiques from his coworkers. For example, Troia's amended answer acknowledges that there had been "tensions" with coworkers, that he had been told he had "overstepp[ed] his boundaries," that his team was "dysfunctional," that a coworker had been "complaining about [Troia]," and that Troia had to be removed from a project on which he was working. Id. (citing FAA ¶¶ 34-41). It is also undisputed that Troia's stock options had not vested when he was fired, and thus he was not entitled to any vested stock. Id. (citing FAA ¶¶ 27, 49).

In June 2021, immediately after the one-year non-disparagement period in the NDIAA expired, Troia made a series of posts on various websites accusing LoanStreet and Lampl of, inter alia, "defrauding" and "cheating" Troia out of equity in the company. Id. at *3. Of particular note, Troia authored a post on Reddit.com

[2] Plaintiffs also allege that Troia received a separate grant of options to purchase 500 shares of common stock on January 15, 2020, with its own vesting schedule. ECF No. 3 ("Compl.") ¶ 20. Troia "denie[d] knowledge or information sufficient to form a belief as to the specific date of the second option grant" but otherwise admitted the allegations in paragraph 20 of the complaint. ECF No. 55 ("First Amended Answer" or "FAA") ¶ 20. Neither party has filed a copy of the second option agreement. However, the date of the second grant does not have any effect on any of the Court's findings or holdings in this case, so the Court has not had any occasion to resolve this ambiguity and does not need to do so now.

titled "Name and Shame: LoanStreet (NY) cheated me out of equity" and made a similar post on Glassdoor.com.[3] Id.

Additionally, Troia took several steps to increase the reach of his statements. For instance, in the body of the posts, he asked users to "follow [his] link and mark it as helpful so that the message is amplified and as many people are warned as possible." Id. Troia also purchased advertisements on Google using LoanStreet's trademark, so that when users performed Google searches for LoanStreet, they were shown advertisements that directed potential customers to Troia's disparaging posts. Id.

On June 24, 2021, counsel for plaintiffs served Troia with a letter demanding that he delete the defamatory posts and cease publishing any others, but Troia refused to delete the posts. Id. As of the date of this opinion, Troia's statements remain accessible online.

**Procedural History**

Plaintiffs brought suit against Troia on July 21, 2021, asserting six causes of action: breach of contract related to the NDIAA; defamation per se; defamation; injurious falsehood; unfair competition and false designation of origin under Section 43(a) of

---

[3] Plaintiffs allege that the title of the Glassdoor.com post was "Cheated me out of equity compensation. Exploitative, fraudulent dumpster fire. Positive reviews are coerced or fake." Compl. ¶ 36. Troia "denie[d] knowledge or information sufficient to form a belief as to the title of the original version of this post" but otherwise admitted to making the post. FAA ¶ 36.

the Lanham Act; and common law unfair competition. Compl. ¶¶ 64–133. Plaintiffs identified 15 allegedly defamatory statements in their complaint, seven of which they argued constituted defamation per se. See id. ¶¶ 76(a)–(g) (defamation per se), 93(a)–(h) (defamation).

Five days after plaintiffs filed their complaint, Troia filed a charge against LoanStreet with the National Labor Relations Board regarding the validity of the NDIAA. See LoanStreet Inc., NLRB Case No. 02-CA-280528.

On November 1, 2021, back before this Court, Troia brought a motion to dismiss plaintiffs' claims for defamation per se, defamation, injurious falsehood, and unfair competition based on purported failure to state a claim, see ECF Nos. 25–27, which the Court granted in part and denied in part in a detailed 36-page order. See LoanStreet I, 2022 WL 3544170. The Court granted Troia's motion to dismiss plaintiffs' injurious falsehood claim, as well as plaintiffs' defamation claims with respect to the statements in paragraphs 93(c) through (h) of the complaint. The Court denied Troia's motion to dismiss plaintiffs' defamation claims with respect to the statements in paragraphs 76(a) through (g) and 93(a) through (b), as well as their unfair competition claims. In so ruling, the Court carefully evaluated each of the 15 allegedly defamatory statements and held that plaintiffs had

adequately pleaded defamation as to only nine of those statements. Id. at *3-8.

On August 25, 2022, plaintiffs voluntarily dismissed their claim for breach of contract with prejudice following a settlement agreement between the parties in the NLRB proceeding. ECF No. 40.

On September 16, 2022, Troia's counsel filed a motion to withdraw, citing Troia's "desire and intent" to proceed pro se. ECF No. 44. The Court granted the motion on September 21, 2022, ECF No. 49, and Troia proceeded pro se.

On October 6, 2022, Troia filed an answer to plaintiffs' complaint and asserted three counterclaims, alleging violations of New York's anti-SLAPP statute, a violation of the implied covenant of good faith and fair dealing, and fraud. ECF No. 51, Counterclaims ¶¶ 69-96. Troia then filed an amended answer and counterclaims on November 14, 2022, modifying the third counterclaim from "fraud" to "fraudulent inducement" and adding a fourth counterclaim alleging securities fraud. FAA, Counterclaims ¶¶ 91-109.

On February 10, 2023, plaintiffs filed a motion for judgment on the pleadings with respect to their remaining defamation claims and to dismiss Troia's counterclaims, which the Court granted in full in a 39-page order on September 8, 2023. See LoanStreet II, 2023 WL 5836237. In so doing, the Court made several rulings that

streamline the issues to be presented at trial and that guide the resolution of certain of the pending motions.

First, based on the undisputed facts, the Court held that each of the following statements, which were contained in Troia's Glassdoor.com and Reddit.com posts, constituted defamation per se as a matter of law:

- "[LoanStreet] withheld $100k in options that they promised me before I was hired";
- "[Lampl] just pocketed the options he promised me";
- "[Lampl] defrauded me out of over $100k";
- "[Lampl] is a rich con man";
- "[LoanStreet] is a fraudulent, exploitative mess";
- "Look in the mirror and ask yourselves how your loved ones would feel if they knew you cheat people just to make your big piles of cash a little bigger";
- "LoanStreet (NY) cheated me out of equity";
- "Based on Ian Lampl's valuation goal for the company, he defrauded me out of over $100k";
- "They promised me substantial equity with a standard one-year vesting cliff, then abruptly fired me after 15 months of work and refused to grant me the options."

Id. at *3-4, *9-14. In so ruling, the Court found that no qualified privilege applied to relieve Troia of liability. Id. at *14.

Second, the Court held that Troia acted with malice when he made the defamatory statements. Id. at *11-13. A brief explanation is necessary. The Court granted plaintiffs' motion to dismiss Troia's counterclaim based on New York's anti-SLAPP statute, N.Y. Civ. Rights Law § 70-a, because (i) Troia's counterclaim could not be brought in federal court as a matter of law, id. at *6, and (ii) even assuming Troia's counterclaim was not procedurally foreclosed, it would fail on the merits because the complaint had a "substantial basis in fact and law," id. at *7.[4] The Court then noted that a negligence standard likely applied to plaintiffs' defamation claims because LoanStreet and Lampl are both "private figures" and the substance of the dispute was "a purely private gripe." Id. at *12. However, the Court also noted that Troia argued for the "actual malice" standard under § 76-a of New York's amended anti-SLAPP statute because he claimed this action "involve[d] public petition and participation." Id. Rather than resolve the dispute about the applicable standard, the Court ruled that, "even assuming that the Court were required to

[4] Following the dismissal of Troia's anti-SLAPP counterclaim, Troia brought an anti-SLAPP suit against LoanStreet and Lampl in state court. See Troia v. LoanStreet, Inc. et al., Case No. 150354/2024, NYSCEF Doc. No. 1 (Jan. 1, 2024). The state court dismissed the case, agreeing with this Court's determination that LoanStreet and Lampl's claims had a "substantial basis in fact and law." See id., NYSCEF Doc. No. 33 (May 27, 2025). Troia appealed the dismissal, and the Appellate Division dismissed Troia's appeal as "frivolous" and ordered Troia to pay the expenses and fees incurred by plaintiffs in responding to the appeal. See Troia v. LoanStreet, Inc., 252 N.Y.S.3d 99 (1st Dep't 2026).

apply actual malice, the unusual set of facts here meet that exacting standard." Id. at *13. The Court explained:

> [W]e infer Troia's reckless disregard for the truth from his obvious ill will towards LoanStreet and Lampl together with the indisputable facts which contradict his statements. First, Troia's ill will is evident from his calculated decision to wait the full requisite year for his non-disparagement clause to expire . . . before embarking on a multifaceted smear campaign to attack plaintiffs using charged -- and in some cases abusive -- language. If that were not sufficient, Troia amplified his posts in the hopes that LoanStreet would face maximum ridicule, even paying for advertisements bearing titles such as "LoanStreet horror story – LoanStreet careers," and "LoanStreet horror story – 'a terrible place to work.'" The Court thus has no doubt that Troia was motivated by personal animus towards plaintiffs such that malice was the one and only cause for the publication of his statements.

Id. (internal citations and quotation marks omitted) (emphases added).

On October 24, 2023, a new attorney, David Lin, filed an appearance on behalf of Troia. ECF No. 76. The parties proceeded to discovery on the remaining issues in this action, namely: (i) plaintiffs' Lanham Act and common law unfair competition claims; and (ii) damages as to all claims, including plaintiffs' defamation claims. Fact discovery closed on May 31, 2024, ECF No. 85, and expert discovery closed on August 30, 2024, ECF No. 97.

In late 2024 and early 2025, the parties filed several letters concerning proposed Daubert and summary judgment motions. See ECF Nos. 101-06, 114-15, 122-23. After rejecting the Court's proposal

to decide the Daubert motions on those letters, Troia requested formal briefing, ECF No. 131, and filed his Daubert motion on March 7, 2025, ECF Nos. 155-58. Plaintiffs relied on their prior submissions as their moving papers (ECF No. 159), their opposition (ECF No. 161), and their reply (ECF No. 167).

On January 9, 2025, Troia filed a motion for summary judgment on plaintiffs' remaining claims for unfair competition and false designation of origin under Section 43(a) of the Lanham Act and common law unfair competition, which was fully briefed on February 11, 2025. ECF Nos. 120, 124-27, 138-41, 147-49.

On January 28, 2025, Troia's new counsel filed a motion to withdraw, citing Troia's voluntary dismissal of his counsel, and requested that this Court permit Troia to proceed pro se with limited-scope representation. ECF Nos. 132-35. This Court granted counsel's motion to withdraw on March 4, 2025, but denied Troia's request for limited-scope representation. ECF No. 154. Since March 4, 2025, Troia has proceeded pro se.

On May 21, 2025, nearly a year after the close of fact discovery, Troia wrote to the Court for permission to "supplement [his] pretrial disclosures" with an unspecified number of new witnesses and hundreds of new documents. ECF No. 174. Troia blamed his former attorney for the "oversight" of omitting these witnesses and documents, which he claimed were critical for his

defense at trial. Plaintiffs opposed the request, arguing that they would be prejudiced by the untimely disclosure of the witnesses and documents, which they argued did not have any substantial relevance to the issues to be decided at trial -- namely, Troia's liability on plaintiffs' unfair competition claims and any damages owed for Troia's defamation per se. ECF No. 175.

On June 13, 2025, the Court found that Troia had not shown good cause to re-open discovery, that Troia was not entitled to a do-over on discovery simply because he fired his attorney, and that the untimely disclosures pertained to issues already decided. ECF No. 176. The Court further noted that Troia's efforts to place the blame on his former counsel rang hollow given Troia's attempt to retain Mr. Lin's services for limited-scope representation while he proceeded pro se in this case and Troia's continued retention of Mr. Lin in the state court action.[5]

Thereafter, Troia wrote to the Court requesting a conference for a contemplated motion for reconsideration and informing the Court that, despite the Court's order, he had nevertheless served "supplemental disclosures" of the new witnesses and documents. ECF No. 177. The Court denied Troia's request for a conference, noting that he made no showing that reconsideration was appropriate and had "simply restated positions that the Court rejected." ECF

[5] See supra n.4.

No. 179. Troia then wrote to the Court again to "seek clarification" of the Court's order. ECF No. 180. Troia noted for the first time that plaintiffs had not opposed his request to supplement his disclosures with six then-current or former LoanStreet employees that plaintiffs had themselves listed on their own disclosures. Given the parties' agreement, the Court observed that there was no dispute for the Court to resolve regarding the six agreed-upon witnesses. ECF No. 183.

On September 3, 2025, the Court issued a 53-page opinion denying Troia's motion for summary judgment on the remaining claims for unfair competition. LoanStreet III, 2025 WL 2530884. With respect to the Daubert motions, the Court (i) denied Troia's motion to exclude plaintiffs' expert witness Mr. Allen Adamson, (ii) denied plaintiffs' motion to exclude Troia's expert witness Mr. Deepak Sabiki, and (iii) granted plaintiffs' motion to exclude Troia's expert witness Dr. Lamarcus Bolton.

Troia then filed a motion for reconsideration, which was fully briefed on November 7, 2025. See ECF Nos. 190-94. On December 19, 2025, the Court denied Troia's motion, finding that Troia's contentions that the Court "overlooked controlling authority" really amounted to "mere disagreement" with the Court's conclusions. LoanStreet IV, 2025 WL 3687498.

On December 29, 2025, the Court requested that each party provide certain information pertaining to trial, including a proposed witness list. ECF No. 200. In response, Troia filed a witness list on January 7, 2026, that included only himself and Lampl, ECF No. 201, and plaintiffs filed a letter on January 13, 2026, listing Troia, Lampl, and the six previously referenced then-current or former LoanStreet employees who were on plaintiffs' initial disclosures, ECF No. 202. A month later, Troia wrote to "supplement" his previous response with the six then-current or former LoanStreet employees plaintiffs included on their list. ECF No. 204. Two months after that, Troia again wrote to "supplement" his previous responses with 41 new witnesses, all of whom he had disclosed to plaintiffs only after the Court ruled in June 2025 that he had not shown good cause to re-open discovery. ECF No. 219. Troia grouped the new witnesses into three buckets: (i) 12 "[a]lleged prospective LoanStreet employees identified by Plaintiffs in support of their damages claim," (ii) 19 additional "[c]urrent or former LoanStreet employees," and (iii) 10 "[p]ersonal and professional contacts of mine." Id. Plaintiffs objected, calling the letter "an attempted end run around the Court's prior ruling [ECF No. 176] declining Defendant's request to re-open discovery based on late Rule 26(e) disclosures." ECF No. 221. Plaintiffs also informed the Court that Troia had

recently produced hundreds of new exhibits, 239 of which he had included on his proposed exhibit list. Id. One day later, Troia responded to plaintiffs' letter and asked that the issue of his untimely disclosed witnesses be adjudicated only after formal briefing on the parties' motions in limine. ECF No. 223. That same day, Troia wrote another letter "supplement[ing]" his list of trial witnesses, adding two new "[p]rospective LoanStreet employees identified by Plaintiffs in support of their damages claim." ECF No. 224. Two days later, Troia filed another letter "supplement[ing]" his witness list with four "[a]dditional LoanStreet personnel identified by Plaintiffs in support of their alleged employee-salary damages," bringing the total number of untimely disclosed witnesses to 47. ECF No. 225.

At a status conference on May 5, 2026, the Court set a briefing schedule for motions in limine and directed Troia to file offers of proof for each untimely disclosed witness with the subject matter on which Troia would seek testimony. See ECF No. 293 at 23:24-25:10.

On May 22, 2026, Troia brought 12 motions in limine totaling over 200 pages of briefing and 4,000 pages of exhibits. ECF Nos. 231, 234, 237, 239, 240, 242, 243, 245, 246, 247, 248, and 249 (and accompanying memoranda and declarations). Plaintiffs filed an omnibus motion in limine. ECF No. 244. Both sides filed

an opposition to the other's motions, ECF Nos. 280-81, and a reply in support of their own motions, ECF Nos. 284 and 286.

## DISCUSSION

The Court begins by resolving certain issues that affect numerous motions brought by both sides. The Court notes at the outset that, because Troia proceeds pro se, the Court does its best to "broadly construe his motion papers and interpret them to raise the strongest arguments that they suggest." Dixon v. Zenk, 361 F. App'x 218, 219 (2d Cir. 2010) (citing Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 146 (2d Cir. 2002)).

### I. Bifurcation of Trial

First, the Court agrees with the parties that the trial should be bifurcated. The first phase of trial shall be limited to the remaining liability and compensatory-damages questions, and the second phase will adjudicate plaintiffs' claims for punitive damages.

Accordingly, the only issue regarding plaintiffs' defamation claim that shall be adjudicated during the first phase of trial is plaintiffs' entitlement, if any, to compensatory damages based on Troia's defamatory statements. During this phase, plaintiffs may seek general and special damages in accordance with, and as permitted by, New York law. Thus, any evidence or argument about Troia's motivations in making the defamatory statements -- which goes only to punitive damages -- is irrelevant to the first phase

of trial and shall be excluded pursuant to Federal Rules of Evidence 402 and 403. Accordingly, evidence and argument regarding the circumstances of Troia's termination are similarly irrelevant and shall be excluded from the first phase of trial. These issues have no bearing on whether plaintiffs were damaged by Troia's conduct.

**II. Malice and Punitive Damages**

Second, the parties dispute whether the Court has already found that Troia acted with the requisite malice such that plaintiffs are entitled to seek punitive damages. Plaintiffs argue that the Court has already decided the issue in LoanStreet II. See, e.g., ECF No. 280 at 30. Troia argues that LoanStreet II decided only constitutional malice but not common-law malice. See, e.g., ECF No. 251 at 8-10. Troia further argues that the jury must affirmatively decide that he acted with common-law malice during the first phase of a bifurcated trial before plaintiffs can proceed to a second phase on punitive damages. See, e.g., ECF No. 284 at 21-23.

Troia is correct that to be entitled to punitive damages, plaintiffs must have established common-law malice.[6] Troia is also

[6] Common-law malice can be shown by establishing "hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another or the injurious effect of defendant's conduct upon another." See 2A N.Y. Pattern Jury Instr. § 3:30 (2025) (citing, inter alia, Prozeralik v. Capital Cities Communications, Inc., 82 N.Y.2d 466, 479-80 (1993)).

correct that the law distinguishes between so-called "constitutional malice" and so-called "common-law malice." See, e.g., Carroll v. Trump, 151 F.4th 50, 75–76 (2d Cir. 2025) ("[U]nlike actual malice, in the constitutional sense, which focuses on the defendant's state of mind with respect to the truth or falsity of the defamatory statement(s), . . . common-law malice focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity.") (internal citations and quotation marks omitted) (emphasis in original).

However, Troia reads LoanStreet II too narrowly. Though the Court, to be sure, did find that Troia acted with actual malice in the constitutional sense, the Court's Order went beyond that finding. For example, the Court explained that it inferred Troia's actual malice from "his obvious ill will towards LoanStreet and Lampl together with the indisputable facts" that "contradict[ed] his statements," that "Troia's ill will [wa]s evident from his calculated decision to wait the full requisite year for his non-disparagement clause to expire . . . before embarking on a multifaceted smear campaign to attack plaintiffs using charged -- and in some cases abusive -- language," and that the "Court thus ha[d] no doubt that Troia was motivated by personal animus towards plaintiffs such that malice was the one and only cause for the publication of his statements." 2023 WL 5836237, at *13. These

findings easily establish that Troia's actions were motivated by "hatred, ill will, spite or wanton . . . disregard . . . the injurious effect of defendant's conduct upon another."

Thus, plaintiffs are correct that the Court "has already made an express judicial determination on the pleadings sufficient to establish common law malice, such that a jury determination is no longer necessary." ECF No. 280 at 30; see also In re Initial Pub. Offering Sec. Litig., 544 F. Supp. 2d 277, 284 (S.D.N.Y. 2008) ("The law of the case doctrine generally forecloses relitigation of issues expressly or impliedly decided earlier in the proceeding." (citing United States v. Becker, 502 F.3d 122, 127 (2d Cir.2007)).

The Court will instruct the jury, at the appropriate time, that common-law malice has already been found such that the jury may assess an award of punitive damages in the second phase of trial. However, just because plaintiffs are permitted to pursue punitive damages does not mean that they are automatically entitled to such an award. Thus, Troia may introduce evidence and argument about his motivations in making the defamatory statements to try to reduce or altogether stave off an award of punitive damages. However, in doing so, Troia may not relitigate any of the Court's prior holdings, which are law of the case. For example, while

Troia can argue that he does not believe he acted with malice, he cannot dispute that he has been found to have acted with malice.

**III. Troia's Untimely Disclosed Witnesses and Documents**

Third, the parties dispute whether Troia can call the 47 witnesses and use the hundreds of additional documents that were first disclosed to plaintiffs long after the close of discovery. As explained above, this dispute traces back to June 2025, more than a year after the close of fact discovery, when the Court denied Troia's request to re-open discovery by "supplementing" his initial disclosures with the new witnesses and documents, finding that Troia's firing his lawyer -- for a second time -- did not amount to good cause to redo discovery. ECF No. 176. The Court noted then that Troia's description of the new witnesses and documents indicated that they pertained to issues that had already been decided and would not be before the jury. Id. The only changed circumstances since May 2025 are Troia's decisions to serve supplemental disclosures despite the Court's ruling and to include the untimely disclosed witnesses and documents on his witness and exhibit lists.

Plaintiffs now move to exclude the untimely disclosed witnesses and documents from trial pursuant to Federal Rule of Civil Procedure 37(c)(1). ECF No. 244 at 1-3. Plaintiffs argue principally that they would be prejudiced by the untimely

disclosures based on their lack of discovery into the witnesses and documents. They also argue that the proposed witnesses are irrelevant to the remaining issues and that Troia's witnesses are duplicative and cumulative of one another.

If a party fails to disclose a witness under Federal Rule of Civil Procedure 26(a) or (e), a party may not use that witness unless the failure to disclose was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). Courts considering preclusion under Rule 37(c)(1) weigh the following factors: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (alterations adopted). The preclusion of a witness pursuant to Rule 37(c)(1) "remains in the trial court's discretion, and the dilatory party bears the burden of establishing justification or harmlessness." Pearlman v. Cablevision Sys. Corp., 2015 WL 8481879, at *11 (E.D.N.Y. Dec. 8, 2015) (citation and quotation marks omitted).

Troia, for his part, filed a motion "to Apply the Patterson Factors Equally to Both Parties' Post-Discovery Disclosures." ECF No. 267. Apparently recognizing that he has a problem regarding

his untimely disclosed witnesses, Troia seeks to manufacture a reciprocal problem for plaintiffs, who omitted Troia from their initial disclosures. Troia's gambit fails because plaintiffs' omission of Troia is the definition of a "harmless" omission. See Fed. R. Civ. P. 37(c)(1) Advisory Committee's note to 1993 amendment (the omission of "a potential witness known to all parties" is "harmless"); Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A., 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[W]hile [plaintiff] technically violated Rules 26(a) and 26(e) . . . its error was innocent and harmless."). Troia concedes that he is the "paradigmatic example of a harmless omission warranting exemption from preclusion sanctions" because he is "the opposing party, a deponent in this case, and has been on actual notice of his potential trial-witness status from the day this lawsuit was filed." ECF No. 267 at 6. The Court thus sees no relation between plaintiffs' omission of Troia from their initial disclosures and Troia's untimely disclosure of 47 trial witnesses.

On the other hand, plaintiffs' application to exclude the witnesses at issue must be granted, at least in large part. In short, Troia seeks to call (i) previously identified prospective LoanStreet employees to testify about their reasons for not joining LoanStreet, (ii) current and former LoanStreet employees to testify about LoanStreet's business practices and the

circumstances of Troia's firing, and (iii) personal and professional contacts to testify about Troia's motivations in making the defamatory statements. See ECF Nos. 174, 219. The first Patterson factor weighs heavily in favor of exclusion because the Court has already rejected Troia's explanation for his failure to comply with the disclosure requirement. Troia was free to develop any of his theories during discovery, either via requests for documents or through depositions, but failed to do so. Troia offers no sufficient justification for why dozens of witnesses were not disclosed during the discovery period, and his efforts to blame his former counsel continue to fail for the reasons the Court explained in ECF No. 176. The third factor similarly weighs in favor of exclusion -- plaintiffs would obviously be prejudiced by Troia calling witnesses when plaintiffs had no opportunity for discovery.

While Troia is correct that the Second Circuit has directed courts to "consider less drastic responses [other than preclusion]," the very same Second Circuit opinion directs courts to "inquire more fully into the actual difficulties which the violation causes." Outley v. City of New York, 837 F.2d 587, 591 (2d Cir. 1988). The Court did so here, ordering Troia to submit offers of proof in so that the Court could better evaluate Troia's request.

As to the first two categories of witnesses, Troia's offers of proof, see ECF No. 282-1, support the Court's earlier determination that the prejudice to plaintiffs -- and the "actual difficulties" caused -- far outweigh any limited relevance to the remaining issues. The first category of witnesses is relevant only if plaintiffs seek damages based on any of those prospective employees. If they do, Troia can cross-examine plaintiffs or their expert about those prospective employees and the basis on which plaintiffs are seeking damages. For example, if Troia believes that plaintiffs' damages calculations are based in any part on prospective LoanStreet employees who did not join the company for some reason other than his defamation, he is free to attempt to undermine plaintiffs' methodology. Similarly, the second category has no bearing on whether Troia's defamation damaged plaintiffs. As the Court has explained, evidence about LoanStreet's business practices and the circumstances of Troia's firing is irrelevant during the first phase of trial and shall be excluded pursuant to Federal Rules of Civil Procedure 402 and 403. To the extent Troia wishes to open the door to evidence about the circumstances of his termination during the punitive damages phase, see Section V.6., he can testify to those facts himself. Thus, for the first and second categories of witnesses, the second Patterson factor, to the extent it weighs in favor of Troia's argument at all, is

strongly outweighed by the first and third factors. Put simply, the issues to be litigated at trial are narrow, and the Court sees no reason to excuse Troia's discovery failures where the prejudice to plaintiffs is great and Troia may advance his aforementioned theories either by cross-examination or through his own testimony.

However, as to the third category of witnesses, as explained above, Troia's motivations for making the defamatory statements are central to the issue of punitive damages. Accordingly, the Court believes that the importance of the potential testimony of Troia's "personal and professional contacts" identified in ECF No. 219, who will purportedly testify about Troia's motivations for making the defamatory statements during the punitive damages phase of trial, outweighs the prejudice that will be suffered by plaintiffs. Still, Troia's request to call ten witnesses without adequate specification about the subject matter of their testimony causes the Court serious concern about duplicative and cumulative testimony. Upon review of Troia's offers of proof for the ten witnesses, the Court is of the preliminary view that five witnesses should be sufficient, along with Troia's own testimony, to establish his motivations. Troia is directed to make his selection of no more than five witnesses by no later than Monday, November 16, 2026, at 12:00 p.m. If Troia seeks to call more than five witnesses for this purpose, he must submit a letter describing

each witness's expected testimony, explaining why that testimony is necessary for his defense, and explaining how that testimony would not be duplicative or cumulative of other witnesses. See United States v. Holmes, 44 F.3d 1150, 1157 (2d Cir. 1995) (a "trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence"). Troia must also make any new witnesses available for deposition in advance of trial to mitigate the prejudice inflicted on plaintiffs.[7]

---

[7] As previously noted, plaintiffs consented to Troia amending his disclosures to include six then-current or former LoanStreet employees: Conor McGeehim, Alyssa Guttman, Michelle Doohan, Larry Adams, Mike Lanzarone, and Jeff Hallyburton. Plaintiffs listed these witnesses on their own witness list, ECF No. 202, and Troia "supplement[ed]" his witness list with these witnesses, ECF No. 204. Troia then filed requests for trial subpoenas for these six witnesses, Lampl, and three others (Matthias Jenny, Ranna Bansal, and Lee Koch, who were each included on his April 23 "supplement" to his witness list, ECF No. 219). Plaintiffs have since indicated that they may only "possibly" call five of the six current or former LoanStreet employees on their witness list. If plaintiffs intend to call these six witnesses, each witness will be called only once during trial, during plaintiffs' case, so Troia's requests for subpoenas for these witnesses are unnecessary. The Court appreciates plaintiffs' counsel's expressed willingness to accept service of subpoenas for present or former LoanStreet employees. If plaintiffs do not intend to call any of the six witnesses at issue, the Court would appreciate it if plaintiffs' counsel would facilitate the availability of those witnesses at trial without the necessity of formal subpoenas. Accordingly, plaintiffs are directed to immediately inform the Court and Troia whether they will call McGeehim, Doohan, Adams, Lanzarone, and Hallyburton at trial, and, if not, whether plaintiffs will facilitate these witnesses' presence at trial.

Troia's requests for a subpoena as to Jenny and Bansal, who are among the untimely disclosed witnesses, are denied for the reasons explained above. Troia's request for a subpoena as to Koch is held in abeyance pending Troia's response to the Court's directive. Troia should be aware that calling Koch, his former attorney who represented him in pre-suit discussions with plaintiffs, raises a host of potentially troublesome attorney-client privilege issues. The Court is of the opinion that he should carefully consider his decision to do so, especially when he can testify to the facts underlying the subject matter about which he intends for Koch to testify, as explained in Section V.6. below.

Finally, Troia filed a motion to compel LoanStreet to provide last known contact information for the thirty-six current, former, or prospective

As to the documents, Troia still provides no sufficient justification for their omission during discovery, the prejudice to plaintiffs is substantial, and they appear to have limited relevance to the issues at trial. Accordingly, they are excluded.

## IV. Damages Law in Defamation Cases

Next, the Court explains how some general principles of defamation damages law will apply in this case, which informs several of its rulings. Since the Court has found that Troia's statements were defamatory per se, injury is presumed. Celle v. Filipino Rep. Enters. Inc., 209 F.3d 163, 180 (2d Cir. 2000). Additionally, plaintiffs may -- but need not -- show entitlement to "special damages," which refers to "'the loss of something having economic or pecuniary value.'" Id. at 179 (quoting Matherson v. Marchello, 473 N.Y.S.2d 998 (2d Dep't 1984)). In addition to special damages, plaintiffs may recover for general damages, which include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Id. (quoting Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2.8.7.1.).

The amount of general damages "must be supported by competent evidence concerning the injury, although there need be no evidence

LoanStreet employees on his witness list, ECF No. 319. Given the foregoing, Troia's motion is denied.

which assigns an actual dollar value to the injury." Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974). It is well settled in New York that "[t]he question of the amount of damages to be awarded in defamation actions is peculiarly within the jury's province." Carroll, 151 F.4th at 82 (citation omitted).

* * *

With the above background, law, and rulings in mind, the Court turns to the parties' motions in limine.

## V. Defendant's Motions in Limine

### 1. Motion to Limit Damages Evidence to Harm Proximately Caused by the Specific Publications Adjudicated as Defamatory

Under the premise of seeking a seemingly straightforward ruling that any damages be tethered to the conduct at issue, Troia seeks a plethora of rulings that misapprehend the law and seek to artificially constrain the arguments and evidence that plaintiffs may advance at trial. See ECF Nos. 231-33.

First, Troia seeks a ruling that plaintiffs should only be able to recover if they can establish damages that stem from a third party who read the posts and understood them as accusing plaintiffs of criminal conduct. In support, Troia argues that "damages must be proximately caused by the adjudicated defamatory meaning of the nine adjudicated statements in the two adjudicated publications" and that damages "must flow from harm caused by the

readers' understanding of the adjudicated statements in that specific defamatory sense." ECF No. 232 at 4-5. He further posits that "a plaintiff may recover damages only for harm caused by the defamatory meaning -- not for harm caused by readers who understood the statement as ethical criticism rather than an accusation of criminal conduct." Id. at 14-15. He also seeks the exclusion of 90 of plaintiffs' 94 exhibits on the grounds that "damages evidence not tethered to an adjudicated defamatory meaning must be excluded" and that he does not think plaintiffs' witnesses will "lay the foundation required to link this evidence to harm caused by the adjudicated defamatory meaning in the nine adjudicated statements in the two adjudicated publications." Id. at 16-17.

These arguments are premised on a misunderstanding of the relevance of the Court's defamation per se holding in LoanStreet II and a misunderstanding of what the law requires regarding causation. In LoanStreet II, the Court did not "adjudicate a defamatory meaning" of Troia's statements. Instead, the Court explained that plaintiffs had established defamation per se as a matter of law because Troia's statements were false and "charge[d] plaintiffs with a serious crime or tend[ed] to injure plaintiffs in their trade, business, or profession." 2023 WL 5836237, at *13. Because Troia accused plaintiffs of fraud, the Court found that plaintiffs established defamation per se and thus did not have to

establish specific economic harm. Thus, at trial, plaintiffs need only seek and prove general damages (e.g., reputational harm).

None of Troia's cases are to the contrary, particularly because they concern the sorts of damages -- special damages -- that are not at issue here. Plaintiffs seeking special damages, which require a showing of specific economic harm, have a different burden than plaintiffs seeking general damages. See, e.g., Drug Rsch. Corp. v. Curtis Pub. Co., 166 N.E.2d 319, 322 (N.Y. 1960) (explaining the burden for establishing special damages). For example, Chamilia, LLC v. Pandora Jewelry, LLC was a lost-customer case that required the lost customers at issue to have heard the defamatory statements. 2007 WL 2781246, at *17 (S.D.N.Y. Sept. 24, 2007). Similarly, Wolf St. Supermarkets, Inc. v. McPartland required that the plaintiff be compensated only for the lost profits that could be proximately linked to the libel. 487 N.Y.S.2d 442, 449 (4th Dep't 1985). Plaintiffs here, however, are seeking general damages related to reputational harm. Thus, the burden that would apply to a plaintiff seeking special damages does not apply here.[8]

[8] Nor does Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 62 (2d Cir. 2002), support Troia's position. The issue there was whether the defendant could be held responsible for a third party's republication. Its logic does not require the test Troia would impose here.

At trial, plaintiffs will be entitled to an award of compensatory damages, including for reputational harm, if any, commensurate with the magnitude of the injury that plaintiffs are able to establish was caused by Troia's defamation. That is all the law requires. Once defamation per se is established, plaintiffs need not, as Troia claims, prove that the damages flow from the specific allegation of fraud. As explained in Section IV, the appropriate amount of damages to compensate plaintiffs for the injury is left largely to the discretion of the jury.

Second, Troia seeks to limit any damages to certain time periods immediately following the defamatory posts. ECF No. 232 at 7-9. In support, he claims that, soon after publishing, he edited his posts with disclaimers that he was not accusing plaintiffs of illegal behavior. Id. Troia then argues that plaintiffs can only seek damages from the time period before he added the disclaimers, which he claims "negat[ed] [the posts'] defamatory meaning." Id.

Plaintiffs correctly note that this is a thinly veiled attempt to relitigate an issue that the Court has already decided. See LoanStreet II, 2023 WL 5836237, at *13 (rejecting Troia's argument "that his statements are non-actionable because he expressed his subjective opinion that plaintiffs unjustly but legally broke their pre-hire promise"). Moreover, Troia again misunderstands

LoanStreet II. The defamatory nature of his statements did not turn on whether anyone read his posts and understood the posts to be alleging criminal conduct. Thus, Troia's "disclaimers" did not "negat[e]" the defamatory meaning of his posts at all, and Troia's temporal limit on damages is inapposite.

Third, Troia argues that plaintiffs may not recover from harm caused by "third-party conduct, plaintiffs' own conduct, or the prosecution of this lawsuit." ECF No. 232 at 12–14. He cites a string of cases standing for the proposition that someone liable for defamation "is not responsible for its voluntary and unjustifiable repetition, without his authority or request" and seeks a general ruling that he may not be held responsible for damages stemming from third-party republication, including press coverage of this lawsuit. Id. at 13. Plaintiffs concede that damages for third-party republication are not normally recoverable but point to Karaduman v. Newsday, Inc., 51 N.Y.2d 531, 541 n.2 (1980), which they say provided an exception for a defendant who "participated in the original publication with knowledge or a reasonable expectation that republication was likely." ECF No. 280 at 6.

Both parties overstate the law. In Geraci v. Probst, 15 N.Y.3d 336 (2010), the New York Court of Appeals clarified its earlier holding in Karaduman. The court called the quotation

supplied by plaintiffs "dicta" and further clarified that it had not adopted the "foreseeability" standard embodied in the Restatement (Second) of Torts § 576. Id. at 343-44. The court did not provide clear guidance on when republication is foreseeable under New York law, but it made clear that republication is not foreseeable where the perpetrator "had no knowledge of and played no role in" the republication. Id.

Upon careful review of Troia's motion papers, the Court understands Troia to advance two separate arguments under the umbrella of "republication." First, he argues that the rule against damages for republication "forecloses any damages theory that attributes to Defendant's conduct (i) the three 'threatening and vile' third-party messages the Complaint alleges were sent to LoanStreet personnel in reaction to Defendant's LinkedIn 'tagging' (Compl. ¶ 41), (ii) any downstream Glassdoor or other online reviews allegedly prompted by third-party reactions to Defendant's speech, or (iii) any other unauthorized third-party communications." ECF No. 232 at 14. Second, he argues that "plaintiffs cannot recover for their lawsuit's consequences," which he means to include damages purportedly stemming from press coverage of the lawsuit. ECF No. 284 at 6-7.

Both arguments miss the mark. As to the first, neither the LinkedIn messages nor the comments on Troia's posts are

"republications" of his defamatory statements. Instead, they are the foreseeable -- and, indeed, intended -- reactions to Troia's posts. Put more plainly, the third parties in question were not republishing Troia's defamation; they were reacting to it. The Court does not understand plaintiffs to argue that each of these instances is itself a republication of the defamatory statements from which plaintiffs can recover. Instead, the Court understands that plaintiffs will attempt to use these statements to prove that their reputation was harmed by Troia's defamation, which is different from seeking compensatory damages for "republication."

As to the second argument, Troia asserts that plaintiffs may not "recover for reputational injury that is self-inflicted -- including harm arising from the publicity generated by prosecuting the lawsuit itself." ECF No. 232 at 12 (citing Wachs v. Winter, 569 F. Supp. 1438, 1447 (E.D.N.Y. 1983)). However, Troia's reliance on Wachs is misplaced. In Wachs, the court explained that the defamatory statements had not actually harmed the reputation of the plaintiff in part because the statements were not widely circulated and "many of the persons who learned of the defendant's allegations obtained this knowledge as a result of plaintiff's perfectly proper efforts to prosecute this lawsuit." Id. at 1447. Wachs does not, as Troia advances, stand for the proposition that bringing a meritorious defamation lawsuit can

somehow be used against plaintiffs at the damages stage. Indeed, to the extent that press coverage of this lawsuit amplified Troia's false and defamatory statements, it did so only in the context that plaintiffs contended that those statements were defamatory.[9] Moreover, as Troia concedes, he "solicited press coverage of this lawsuit" by messaging dozens of news organizations and asking them to publish articles. See ECF No. 284 at 9; see also ECF No. 286-1 (screenshots of direct messages produced by Troia showing his reaching out to various journalists and requesting they write about "how my former employer, fintech startup LoanStreet, is suing me for $3M in federal court because I warned potential employees about how the company cheated me out of equity compensation"). Thus, it cannot be said that Troia "played no role" in the publications, which were a foreseeable consequence of his outreach. Troia's culpability therefore exceeds that of the defendants in the cases upon which he relies, and those cases consequently provide no authority for his request.

Consistent with Geraci, the Court will preclude plaintiffs from seeking compensatory damages based on third-party

[9] For example, Troia cites a publication by Business Insider, "A Bad Glassdoor Review Led to a $1 Million Lawsuit." However, the article at issue does not repeat the defamatory statements at face value. Instead, the article notes that the complaint calls the statements "false and malicious" and claims that Troia "misstated the terms of his equity grant." Thus, Troia's defamatory statements were not "republished" in the same way as the statements were in the cases upon which he relies, namely where one person hears a defamatory statement and then repeats it to another as if the substance of the statement were true.

republications of Troia's defamatory statements where Troia had "no role" in the publication.[10] The Court otherwise declines to circumscribe plaintiffs' case by determining in advance, before any evidence is put forward, whether they can establish damages caused by Troia's conduct, which is a question for the jury. To the extent Troia seeks a ruling that the Court will instruct the jury, consistent with New York law, that any damages must have been caused by Troia's defamation, he has one. Otherwise, Troia's motion is denied.

### 2. Motion to Limit the Scope of Mr. Adamson's Trial Testimony

Troia next asks the Court to prohibit plaintiffs' expert Allen Adamson from (i) offering any opinions as to causation, (ii) presenting aggregate or blended damages figures, (iii) disclosing documents or statements not admitted into evidence, or (iv) referring to Troia's conduct as a "defamatory

[10] For example, Troia asks the Court to exclude "any downstream Glassdoor or other online reviews allegedly prompted by third-party reactions to Defendant's speech," but Troia does not provide any specific examples, and the Court is not otherwise aware of any such posts or of plaintiffs seeking damages from them. To the extent that plaintiffs do seek to introduce such evidence, that evidence may well implicate New York's prohibition on recovery for injury due to republication of defamatory statements by third parties. Troia cites Fashion Boutique for the proposition that evidence of republication "is not admissible at trial, even to prove widespread dissemination of the defamatory statements." ECF No. 284 at 11 (quoting 314 F.3d at 59). However, Troia omits the immediately preceding sentence, which makes clear that this rule applies only "absent a showing that the original author was responsible for or ratified the republication." Id. The Court will not make a ruling on hypothetical third-party republication in the abstract without being able to evaluate Troia's role in the republication, especially given the Court's finding regarding Troia's efforts to promote his defamatory statements, see LoanStreet II, 2023 WL 5836237, at *3.

campaign," "orchestrated," "strategic," "targeted," "malicious," or "calculated." Alternatively, Troia asks the Court to exclude Adamson's testimony altogether because plaintiffs "cannot establish the causal predicate on which his testimony was represented to depend." ECF Nos. 234-36.

First, Troia misrepresents plaintiffs' representations about Adamson's analysis and testimony. Troia claims that plaintiffs and Adamson disclaimed any opinions about causation. ECF No. 235 at 4-8. Not so. Plaintiffs have consistently represented to the Court that, while Adamson did not conduct a causation analysis that would support an award of special damages (i.e., the loss of something having economic or pecuniary value), Adamson does analyze (i) the extent to which plaintiffs sustained reputational and brand damages as a result of Troia's defamation and (ii) the monetary costs necessary to remediate that injury. See ECF Nos. 106, 123, 280 at 8-9. No part of the testimony from Adamson's deposition that is cited by Troia is to the contrary.

Troia's second request is yet another flavor of his argument that any damages must be traceable to his specific allegation of fraud. This argument is rejected for the reasons already explained in Section V.1. Otherwise, Troia asks the Court to step into the role of the jury. That request is denied. The Court already ruled

that Adamson's opinions are relevant and admissible as expert testimony. See LoanStreet III, 2025 WL 2530884, at *5-7.

Third, Troia's argument that several of the documents relied upon by Adamson are inadmissible hearsay or cannot be authenticated is inapposite. While the Court will not allow Adamson to serve as a "conduit" for inadmissible evidence, Federal Rule of Evidence 703 permits an expert to rely on inadmissible evidence if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Further, plaintiffs point out that Adamson, as a branding and reputational harm expert, bases his opinions on "his evaluation of marketplace evidence, audience reactions, recruiting impacts, online search results, customer-facing communications, and similar information that branding professionals routinely consider when assessing reputational injury." ECF No. 280 at 14. The Court agrees that this is precisely the sort of evidence that, even if inadmissible, an expert such as Adamson may rely on in reaching his opinions. Moreover, as explained in more detail below in Section V.4., Troia does not make the requisite showing to justify exclusion of these documents at this time, particularly because plaintiffs argue many of these documents will be used for an admissible purpose other than the truth of the matter asserted and that they will authenticate the documents at trial. Thus, it would

be premature for the Court to constrain Adamson's testimony in the way Troia asks, particularly where the Court declines to exclude the underlying evidence at this stage.

Finally, the Court grants Troia's request to preclude Adamson from using vocabulary that characterizes Troia's intent, such as "calculated," "strategic," or "malicious." As explained above, Troia's mental state and intent are irrelevant during the first phase of trial where the jury will be tasked only with determining compensatory damages. Thus, any testimony characterizing Troia's intent will be excluded pursuant to Federal Rules of Evidence 402 and 403. And though plaintiffs' counsel can permissibly advance argument characterizing Troia's intent based on admissible evidence, Adamson has no expertise that would support such testimony. The Court otherwise declines Troia's request to police Adamson's vocabulary, especially where Adamson's vocabulary is consistent with the Court's prior holdings.

Accordingly, Troia's motion is granted in part and denied in part.

**3. Motion to Confirm Scope of Admissible Damages-Causation Evidence**

Troia's next motion contends that he must be allowed at trial to present evidence of ten so-called potential "alternative causes" of plaintiffs' alleged reputational harm. See ECF Nos. 237-38, 250. His argument reflects a misunderstanding of

plaintiffs' burden and how he can permissibly rebut plaintiffs' claim for damages.

While the Court does not dispute that there may well be some reasons -- other than Troia's defamation -- that third parties hold a negative view of LoanStreet, the question at this trial is whether Troia's defamation harmed LoanStreet and, if so, how much. At trial, plaintiffs intend to introduce evidence that Troia's conduct harmed their reputation, and that they are entitled to some amount of compensation for that harm. Troia is free to dispute that plaintiffs' reputation was harmed to the extent that they claim, or at all. He is also free to dispute that his conduct caused such an injury, or any injury at all. But merely positing to the jury that there are other reasons someone might have a negative view of LoanStreet is not sufficiently probative of whether and how much Troia's conduct injured plaintiffs.

This is particularly true here because Troia has advanced no sufficient offer of proof that any of his "alternative causes" have actually impacted LoanStreet's reputation. In these circumstances, his "alternative causes" amount to mere conjecture that would have little, if any, probative value and would inevitably devolve into confusing and time-wasting mini-trials.

Moreover, many of Troia's "alternative causation" theories are really backdoor attempts to elicit otherwise inadmissible

character evidence by attributing any reputational harm to a host of perceived transgressions. For example, Troia argues that he may submit to the jury that plaintiffs' reputation was harmed because they fired Troia and then sued him for his defamation. However, Troia may not attempt to negate a showing of reputational harm with evidence of specific acts of wrongdoing. See, e.g., Fraser v. Park Newspapers of St. Lawrence Inc., 684 N.Y.S.2d 332, 333-34 (3d Dep't 1999). Put differently, Troia cannot attempt to litigate every prior act by LoanStreet or Lampl under the guise that it was a potential "alternative cause" of plaintiffs' reputational harm.

Thus, Troia cannot introduce evidence about LoanStreet's corporate and labor practices, ECF No. 238 at 16-18, by offering specific examples of supposed wrongdoing, including Troia's termination. The same is true of his contention that LoanStreet's reputation may have been harmed because it required employees to sign a non-disparagement agreement that was the subject of the dispute before the NLRB. See ECF No. 238 at 17. Troia has made no showing that this policy affected LoanStreet's reputation one way or the other. Troia also may not argue to the jury that plaintiffs have injured themselves by litigating his defamation. Troia makes no showing that certain claims or allegations that were included in the complaint but are no longer part of this

litigation have harmed plaintiffs' reputation, so these allegations amount to "specific acts" rather than reputation evidence. The Court has serious concerns that permitting Troia to argue that plaintiffs' meritorious lawsuit should reduce or limit plaintiffs' damages would implicate troubling public policy considerations.

Many of Troia's other "alternative causes" are just re-packaged versions of arguments that the Court has precluded elsewhere in this opinion. See, e.g., ECF No. 238 at 19–20 (referring to "reader perceptions formed from non-actionable versions of the publications" and "reader perceptions of Defendant's statements in a non-defamatory sense," both of which are based on a misunderstanding, or misapplication, of LoanStreet II, as explained in Section V.1.). Accordingly, this evidence must be excluded pursuant to Federal Rules of Evidence 402 and 403, and Troia's motion must be denied, unless Troia first submits a detailed offer of proof that explains the admissible evidence and potential witness testimony, as circumscribed by this opinion, he believes would establish any of his theories.

**4. Motion to Exclude Hearsay and Unauthenticated Evidence**

Troia's fourth motion in limine takes issue with 60 out of the 94 exhibits on plaintiffs' exhibit list, alleging that they are either hearsay, irrelevant or prejudicial, or unauthenticated.

ECF Nos. 239, 261-62. Troia makes general statements about the rules of hearsay, while claiming -- in the abstract -- that the exhibits do not meet the requirements of any of the hearsay exceptions or exclusions. ECF No. 261 at 5-8. However, Troia does not explain why any particular exhibit should be barred by any of the rules against hearsay. Alternatively, Troia argues the exhibits should be excluded under Federal Rules of Evidence 401 and 403. Id. at 9.

In response, plaintiffs contend that they do not intend to offer the exhibits for the truth of the matter asserted but rather for some other admissible purpose: "Plaintiffs seek to show that Defendant's false statements entered the marketplace, were encountered by prospective employees and business contacts, and caused LoanStreet to devote substantial time and resources to repairing the resulting reputational damage. The fact that the statements were made -- and the effect they had -- is what matters." ECF No. 280 at 10-11. Plaintiffs also contend the challenged exhibits are highly relevant to their damages and mitigation efforts and that Troia confuses weight with admissibility. Id. at 12-13.

The Federal Rules of Evidence do not exclude out-of-court statements that are offered only to show that they were made and the effect they had on the listener. Further, many of the

statements appear to be plainly relevant to show, inter alia, marketplace dissemination and reaction. The Court declines, at this juncture and before plaintiffs actually offer any given exhibit into evidence, to undertake an exhibit-by-exhibit analysis of whether each of the challenged exhibits can conceivably be offered for an admissible purpose, especially where Troia has not tailored any of his hearsay arguments to any particular exhibit. The Court will apply the Federal Rules of Evidence at trial to bar hearsay and irrelevant or prejudicial evidence.

Next, Troia argues that 12 of the exhibits "are subject to authentication objections." ECF No. 261 at 10-11. Plaintiffs counter that Troia asks the Court to exclude evidence before they have an opportunity to lay the necessary foundation at trial and that they "will easily satisfy the authentication burden with respect to the exhibits identified in Defendant's motion." ECF No. 280 at 14-15. The Court agrees that Troia's request is premature. Plaintiffs will be given the opportunity at trial to lay the necessary foundation for any of the exhibits they seek to admit.

Accordingly, Troia's motion is denied.

**5. Motion to Preclude Unsubstantiated Complaint Allegations**

Troia's next motion seeks the exclusion of two categories of allegations in plaintiffs' complaint based on some combination of Federal Rule of Evidence 901, Federal Rule of Civil Procedure

37(c)(1), or Federal Rule of Evidence 403: (i) allegations related to three pre-2021 anonymous Glassdoor posts, which Troia denies authoring; and (ii) allegations that Troia was terminated for cause, which Troia claims have no support in the record. ECF Nos. 240, 259-60. More specifically, he claims that plaintiffs cannot authenticate the anonymous Glassdoor posts and that Federal Rule of Evidence 901 accordingly forecloses their admission into evidence. ECF No. 259 at 9-10. As to the circumstances of his termination, Troia argues primarily that plaintiffs have failed to adduce any evidence during discovery supporting their allegations. Accordingly, he argues that Federal Rule of Evidence 403 requires exclusion of this evidence because an "unsupported for-cause characterization has no probative value; [while] the prejudicial impact on the jury's view of Defendant, and on its damages assessment, is substantial." Id. at 12.

Plaintiffs concur that the Glassdoor posts and the circumstances of Troia's firing "are irrelevant to the issues before the jury." ECF No. 280 at 27. However, if Troia offers evidence related to either issue, plaintiffs contend that they should be allowed to "introduce such evidence as rebuttal evidence to Defendant's own arguments." Id. In this respect, plaintiffs note that one of Troia's motions, ECF No. 237, seeks permission to

introduce evidence of LoanStreet's alleged mistreatment of Troia as an alternative cause of any reputational harm.

In reply, Troia seeks to preserve his ability to raise these issues to the jury while preventing plaintiffs from responding to his allegations. ECF No. 284 at 20. As to the Glassdoor posts, Troia claims (i) that he may confront Adamson with whether plaintiffs are claiming damages based on the posts, and (ii) that "a jury could reasonably conclude that a company and CEO who made demonstrably false allegations in a federal lawsuit against a former employee are the cause of their own alleged reputational harm." As to the circumstances of his firing, Troia claims that they are relevant to his alternative causation theories and to common-law malice and reprehensibility.

Plaintiffs' position is more reasonable. Neither the anonymous Glassdoor posts nor the circumstances of Troia's firing have any relevance to whether plaintiffs were damaged by Troia's conduct. In the second phase of trial, Troia has the right to contest punitive damages by providing evidence of his motivation. During the punitive damages phase, Troia may argue that his termination was a motivating factor in his decision to post the defamatory statements, but he may not attempt to litigate the validity of his termination, which is irrelevant and would only waste the jury's time and confuse the issues. If Troia does try

to litigate the circumstances of his termination, he will open the door for plaintiffs to rebut his evidence.

Accordingly, Troia's motion is granted, and evidence of the allegations at issue is excluded pursuant to Federal Rules of Evidence 402 and 403.

**6. Motion to Admit Pre-Suit Correspondence**

Troia next seeks to admit pre-suit correspondence in which he offered to modify, but not delete, the posts at issue. ECF Nos. 242, 265-66. He argues that the exhibits do not fall within the scope of Federal Rule of Evidence 408, or that they otherwise qualify for the "another purpose" exception. See generally ECF No. 265. He further argues that the exhibits show his lack of malice due to his willingness to engage with plaintiffs and delete the offending language. See id. at 9-11. Plaintiffs argue that the exhibits are classic settlement negotiations offered to disprove the validity of plaintiffs' claim for punitive damages and are thus barred under Federal Rule of Evidence 408. See ECF No. 280 at 18-20 (citing Pierce v. F.R. Tripler & Co., 955 F.2d 820, 827 (2d Cir. 1992)). Plaintiffs are correct that the evidence is best read as within the scope of Rule 408 because the correspondence clearly occurred against the backdrop of litigation. Additionally, plaintiffs are correct that they would be prejudiced by the admission of the discussions, which reflect

a willingness to resolve the dispute and may therefore be viewed by the jury as an indicator that plaintiffs' claims for damages are not meritorious.

Moreover, the exhibits at issue are unquestionably irrelevant to any of the issues during the first phase of trial. However, Troia is correct that the exhibits have some probative value on the issue of punitive damages. Accordingly, the exhibits themselves are barred by Federal Rules of Evidence 408, 402, and 403, but Troia may testify that he offered to modify the posts. If he does so, he will open the door for plaintiffs to inform the jury that Troia refused to delete the posts and that the posts are still available online.

All of Troia's other arguments are without merit. Accordingly, Troia's motion is denied.

**7. Motion on Punitive Damages and Bifurcation**

Troia seeks an order (i) bifurcating trial, with phase one to include all issues except punitive damages (including whether plaintiffs have established their entitlement to punitive damages), (ii) precluding plaintiffs from introducing evidence or argument about Troia's finances or ability to pay a judgment in phase one, (iii) precluding plaintiffs from introducing evidence or argument concerning the financial condition of Troia's family, (iv) requiring that common-law malice be submitted to the jury following phase one before the trial proceeds to phase two, and

(v) confirming that phase two of trial will "conform to . . . constitutional guideposts." See ECF Nos. 243, 251-52.

As explained above in Sections I and II, trial will be bifurcated, but the question of common-law malice has already been determined and will not be submitted to the jury. Further, plaintiffs agree that evidence of non-party wealth should be excluded. See ECF No. 280 at 30. Finally, to the extent that Troia has expressed concerns about the legal principles that will be applied to the punitive damages phase, he should rest assured that the Court will apply established law. The Court will resolve jury charge issues at the appropriate time.

Accordingly, Troia's motion is granted in part and denied in part.

**8. Motion to Preclude Rhetoric, Legal-Conclusion Characterizations, and Opinions About Defendant's Mental State**

Troia next seeks an order (i) precluding plaintiffs from using so-called "aggregating rhetoric," such as "defamation campaign," "defamatory campaign," "campaign of defamation," "campaign," "course of conduct," "pattern," "orchestrated," "coordinated," "sophisticated brand attack," (ii) precluding plaintiffs from using "legal-conclusion or pejorative characterization" language, such as "defamation," "defamatory," "libelous," "false," "malicious," "reckless," "smear," "smear

campaign," "vendetta," "attack," "harassment," "harassment campaign," "lies," "lying," "lied," "made things up," "made up," (iii) precluding plaintiffs from offering opinions about Troia's subjective mental state, and (iv) "limiting Plaintiffs' witnesses' testimony on these subjects to factual descriptions of what each witness personally perceived." See ECF Nos. 245, 253-54.

Troia's effort to orchestrate the trial by endeavoring, in extraordinary breadth, to circumscribe the testimony of witnesses is staggering. While witnesses may not offer their opinion on the ultimate issue before the jury (e.g., a witness may not testify that the doctor committed malpractice), here, defendant seeks to avoid the prior rulings of the Court. For example, certain of Troia's statements have been held to be defamatory. Their status as such is not an issue for the jury. The Court will not prohibit witnesses from correctly saying that Troia's posts were "false" or from using vocabulary that tracks the Court's own rulings.

Troia's attempt to sanitize his statements and conduct for the jury through overreaching efforts to control the vocabulary of witnesses is rejected. Both parties should rest assured that the Court will control the courtroom so that the trial will be conducted pursuant to the rules of evidence and with the dignity with which all trials should be conducted.

Plaintiffs represent that they are not offering any witnesses to testify as to Troia's mental state other than Troia himself, so Troia's third request is moot. ECF No. 280 at 27. Finally, the Court will not limit plaintiffs' witnesses' testimony beyond the limitations of the Federal Rules of Evidence, and plaintiffs' counsel may make proper arguments based on admissible evidence.

Accordingly, Troia's motion is denied.

**9. Motion to Limit Emotional Distress and Mental Anguish Damages**

Troia next seeks an order (i) confining Lampl's emotional-distress recovery, if any, to "garden-variety" distress and anguish damages, (ii) precluding medical or psychological opinions about Lampl's "psychological symptoms," (iii) precluding evidence that LoanStreet employees experienced emotional distress, fear, anxiety, harassment, intimidation, or concern for their physical safety, and (iv) precluding argument that the finding of defamation per se entitles plaintiffs to any emotional-distress award. See ECF Nos. 246, 255-56.

In response, plaintiffs confirm that Lampl seeks no more than "garden-variety" distress and mental anguish damages and do not contest Troia's second or fourth requests, so each is granted.

Plaintiffs further clarify that they are not seeking emotional distress or mental distress damages for LoanStreet but correctly note that evidence of employee fear and harassment is

admissible as relevant to LoanStreet's claims for damages based on reputational harm and mitigating reputational harm. See ECF No. 280 at 26 (citing Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n, 226 N.Y. 1, 8 (1919) ("[T]he injured party who makes a successful effort to avoid or reduce damages will be allowed to recover the expenses necessarily incurred in so doing, but also . . . he will be allowed to recover the expenses of a proper effort even though it proves unsuccessful.")).

Accordingly, Troia's motion is granted in part and denied in part.

**10. Motion to Preclude Recovery of Attorneys' Fees as Compensatory Damages**

Troia next asks the Court for an order precluding plaintiffs from seeking attorneys' fees as compensatory damages at trial. ECF Nos. 247, 257-58. In response, plaintiffs clarify that they "will not seek recovery of their attorneys' fees for purposes of their defamation per se claim" but "reserve their right, however, to seek attorneys' fees under the Lanham Act for their trademark infringement claim." ECF No. 280 at 29 (citing 15 U.S.C. § 1117(a), which permits a court to award "reasonable attorney fees to the prevailing party" in "exceptional cases").

Accordingly, the Court understands there to be no dispute regarding attorneys' fees at this stage. Because the Court sees

no reason for any evidence of attorneys' fees to be submitted to the jury, Troia's motion is granted.

### 11. Motion to Admit Declarations of Mindy Huynh and Kylie Cannon Under Federal Rule of Evidence 807

Troia next seeks to admit two declarations of prospective LoanStreet employees under Federal Rule of Evidence 807. See ECF Nos. 248, 263-64. In plaintiffs' interrogatory responses, they identified Mindy Huynh and Kylie Cannon as prospective employees whose relationships with LoanStreet were undermined or damaged by Troia's statements, but both declarants have since refuted, in signed declarations acquired by Troia, that they were prospective employees who withdrew because of Troia's statements. ECF No. 263 at 5.

The Second Circuit has explained that Rule 807 "permits admission of hearsay if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." United States v. Dawkins, 999 F.3d 767, 791 (2d Cir. 2021) (internal quotation marks omitted). Troia argues that each declaration meets this residual hearsay exception. More specifically, Troia argues that the declarations have sufficient guarantees of trustworthiness because they are on topics within

the witnesses' personal knowledge, they are sworn under penalty of perjury, the witnesses have no motive to lie, the statements are against interest because LoanStreet might retaliate against them, and there is no evidence in the record contradicting the statements. ECF No. 263 at 7-13. Troia further argues that the other factors are met and notes that the witnesses reside more than 100 miles from the courthouse and are thus outside of subpoena range. Id. at 13-18.

Plaintiffs submit that (i) Troia has made no showing that the declarants are actually unavailable to testify at trial, (ii) the declarations do not have sufficient guarantees of trustworthiness because they were made years after the events described and were prepared specifically for litigation, (iii) plaintiffs have had no opportunity to cross-examine the witnesses, and (iv) the declarations "suspiciously track and advance themes that mirror arguments" Troia has made in this litigation. ECF No. 280 at 16-17. Finally, plaintiffs contest that the declarations bear on any material fact because their damages calculations do not rely in any way on Huynh or Cannon. Id. at 17-18.

The declarations must be excluded. As out-of-court statements submitted for the truth of the matters asserted therein, the declarations constitute textbook hearsay. See Fed. R. Evid. 801. Additionally, "[a]t trial, the witnesses' testimony must be

taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise." Fed. R. Civ. P. 43(a). Troia's read of Rule 807 would blow a chasm in the rules against the admission of hearsay and would justify admitting nearly any self-serving declaration by an out-of-district witness. Moreover, the declarations do not have "sufficient guarantees of trustworthiness," Fed. R. Evid. 807(a), that would justify admission of a witness's testimony without the opposing party having an opportunity to cross-examine that witness. Troia's argument that the declarations are trustworthy because this litigation shows plaintiffs might retaliate against the declarants is without any support. The Court has already found that plaintiffs' complaint was meritorious. His other arguments are equally unconvincing.

Finally, the Court does not understand plaintiffs' expert to have relied on Huynh or Cannon in reaching his damages estimates and therefore agrees with plaintiffs that the exhibits are of limited probative value. That the declarants were listed in response to an interrogatory at an earlier stage of the litigation is not to the contrary.

Accordingly, Troia's motion is denied.

**12. Motion to Apply the Patterson Factors Equally to Both Parties' Post-Discovery Disclosures**

Finally, Troia seeks an order declaring his omission of the 47 untimely disclosed witnesses as "harmless" under the four-factor test articulated in Patterson, 440 F.3d at 117. ECF Nos. 249, 267-68. Troia's motion is denied for the reasons explained in Section III.

## VI. Plaintiffs' Motions in Limine

**1. Motion to Bifurcate Trial for Jury Assessment of Defendant's Wealth and Other Evidence Solely Appropriate for Punitive Damages Decision**

Plaintiffs seek an order bifurcating trial, with evidence relating only to punitive damages reserved for the second phase. See ECF No. 244 at 1. Plaintiffs' motion is granted for the reasons explained in Section I.

**2. Motion to Exclude Defendant's Untimely Disclosed Witnesses and Documents**

Plaintiffs next seek the exclusion of the witnesses and documents that Troia first disclosed over a year after the close of fact discovery. See ECF No. 244 at 1-3. Plaintiffs' second motion is granted in part and denied in part for the reasons explained in Section III.

**3. Motion to Exclude Defendant's Proposed "Fact Witnesses" in DE 219, 224, and 225**

Next, plaintiffs seek the exclusion of the same witnesses based on relevance. See ECF No. 244 at 3-5. Plaintiffs' third

motion is granted in part and denied in part for the reasons explained in Section III.

#### 4. Motion to Exclude Exhibits That Are Irrelevant, or Whose Probative Value Is Substantially Outweighed by Potential for Jury Confusion and Undue Prejudice

Plaintiffs' fourth motion seeks the exclusion of certain categories of documents on the grounds that the documents are inadmissible hearsay and/or irrelevant to the issues at trial. See ECF No. 244 at 5–10. In response, Troia principally objects that (i) the documents are relevant because "[w]hether actual readers understood the words 'defraud,' 'cheat,' and 'con man' in the adjudicated defamatory sense — or in any of the non-literal senses these terms routinely carry — is a damages-causation question for the jury on the developed record" and (ii) the documents will not be offered for their truth. ECF No. 281 at 12–13. Troia's first argument fails for the reasons already explained several times herein. The Court takes each category of documents in turn.

**Documents defining "fraud" or "cheat."** Troia contends that these documents will be "offered not for their truth but to show these words are routinely used in non-literal senses (hyperbole, ethical critique, grievance) rather than as accusations of crime." ECF No. 281 at 13. As explained above, the Court has already found Troia liable for defamation per se. At trial, the only defamation

issue remaining is whether and to what extent plaintiffs have been damaged. In the second phase of trial, Troia may argue that he did not intend to accuse plaintiffs of a crime, but he may not relitigate the Court's liability holding. These exhibits are therefore irrelevant and of no probative value.

**Documents related to how other companies, which are not related to this litigation, grant employee stock options.** Troia contends that these documents -- publicly available contracts filed with the Securities and Exchange Commission -- are "verbal acts, not offered for their truth," showing that LoanStreet's option-vesting policy is "unusually employer-friendly relative to industry norms." ECF No. 281 at 13. Troia's argument makes clear that, rather than offer these exhibits to establish any operative legal act between the parties to this litigation, he does in fact intend to offer these out-of-court statements for their truth: that the companies in question offer stock options pursuant to the terms of the document. In these circumstances, these documents do not qualify as "verbal acts" and are inadmissible hearsay. United States v. Fox, 2025 WL 2076664, at *9 (E.D.N.Y. July 23, 2025) ("Statements, such as contracts, that themselves affect the legal rights of the parties constitute 'verbal acts' and are excluded from the definition of hearsay" (emphasis added)); United States v. Sterritt, 2023 WL 7386660, at *4 (E.D.N.Y. Nov. 8, 2023)

(admitting into evidence contracts between the parties "to establish that [the defendant] and others entered into the relevant contracts and agreements"). Additionally, whether or not LoanStreet's policy was in line with industry norms is immaterial, so the documents are also excluded pursuant to Federal Rules of Evidence 402 and 403.

**Documents relating to Troia's employment at LoanStreet.** Troia offers a host of rationalizations for these documents, see ECF No. 281 at 13-14, all of which fail. Documents relating to Troia's employment are irrelevant or of extremely limited probative value for the reasons explained in Sections I, V.3., and V.5. Thus, they are excluded under Federal Rules of Evidence 402 and 403. Additionally, many of the exhibits, such as Troia's own notes of conversations he had with LoanStreet employees, are textbook examples of hearsay, so these documents are excluded under Federal Rule of Evidence 802.

**Publications by plaintiffs, such as "Securitizations vs participations: Balance sheet flexibility vs. leverage" and "The shifting landscape of loan participations."** Troia argues that these documents show that plaintiffs "continued to be published, and be invited to publish, in industry media throughout the period," which he claims is "no-harm evidence central to plaintiffs' multimillion-dollar reputation-repair claim." ECF

No. 281 at 14. Plaintiffs argue that these exhibits say "little, if anything, about whether they suffered reputational harm." ECF No. 286 at 6. The Court tends to agree but will nevertheless decline to exclude the exhibits at this time. The documents are not hearsay as Troia intends to use them, and, though they are of limited relevance, plaintiffs make no showing that the probative value is substantially outweighed by the risk of jury confusion. Argument about whether LoanStreet's reputation has been damaged to the extent that plaintiffs claim is fair game.

**News Articles about Labor Strife at Other Companies.** Troia contends that these exhibits "show that labor-rights advocacy routinely uses trademarked company names without consumer confusion," which makes them relevant to plaintiffs' Lanham Act theory and plaintiffs' damages theory. ECF No. 281 at 15. Plaintiffs counter that "Defendant's examples bear little resemblance to the conduct at issue here." ECF No. 286 at 6. The Court agrees. As plaintiffs correctly note, "[g]eneralized articles discussing labor protests in which protestors included unrelated companies' names in their picket signs do not make any fact of consequence in this case more or less probable and would only confuse the issues before the jury." Id. at 6-7. Moreover, admitting this evidence would invite mini-trials on conduct that has nothing to do with this case. These exhibits are thus excluded

pursuant to Federal Rule of Evidence 403 because the risk of time wasting and confusion substantially outweighs any limited probative value.

**Photos of Current and Former LoanStreet Personnel.** Troia clarifies that the photos will be used as demonstratives for witness identification, ECF No. 281 at 15 -- to which plaintiffs have no objection, ECF No. 286 at 7 -- so the issue appears to be moot. Nevertheless, the photos are only to be used as demonstratives and are not to be admitted into evidence and should be destroyed after trial.

**Communications with Nicholas Schrider and the Huynh and Cannon Declarations.** Troia claims the Schrider communications "are offered for the existence of an independent third-party fraud accusation against LoanStreet, from a source unconnected to Defendant — alternative-cause evidence, not for their truth." He further claims the Huynh and Cannon declarations qualify under Federal Rule of Evidence 807. ECF No. 281 at 15.

The Huynh and Cannon declarations are excluded for the reasons explained in Section V.11. The Schrider communications are also inadmissible hearsay. Troia cannot simultaneously claim that the substance of the accusations tends to prove an alternative cause of reputational damage while disclaiming that the communications are being offered for their truth.

Accordingly, plaintiffs' motion is granted in part and denied in part.

**5. Motion to Exclude Evidence and Arguments Suggesting that Defendant Did Not Defame Plaintiffs Per Se**

Plaintiffs seek an order excluding arguments that contradict the Court's prior holdings, apparently concerned that Troia's deposition testimony and pretrial filings evidence an intention to litigate issues not before the jury. See ECF No. 244 at 10-11. The Court shares plaintiffs' concern. Troia's response reveals that he intends to try to litigate issues he incorrectly deems not sufficiently addressed.

Troia is hereby prohibited from advancing any evidence or argument that contradicts any of the Court's findings or holdings. Because those findings or holdings are law of the case and final, any such evidence is irrelevant and would risk jury confusion. Troia shall strictly hew any evidence and argument to the Court's holdings in LoanStreet I, LoanStreet II, LoanStreet III, LoanStreet IV, and this Order. Plaintiffs' motion is granted.

**6. Motion to Exclude Evidence and Arguments Pertaining to Claims That Are No Longer Active**

Plaintiffs next ask the Court to exclude evidence or argument about any claims -- including their breach of contract claim -- that are no longer part of the case. See ECF No. 244 at 11-12. Plaintiffs' motion is granted for the reasons explained in Section

V.3. The only issue at trial regarding plaintiffs' defamation claims is whether and to what extent Troia's conduct harmed plaintiffs' reputation. Claims that are no longer in the case have no relevance to this issue and are excluded under Federal Rules of Evidence 402 and 403.

### 7. Motion to Preclude Defendant from Arguing that His Other Statements Regarding Plaintiffs Are Protected Speech or Caused Plaintiffs Harm

Plaintiffs seek an order prohibiting Troia from arguing that any of his statements other than those adjudicated defamatory by this Court are "protected speech." See ECF No. 244 at 12-13. Plaintiffs argue that just because certain of his statements have not been ruled defamatory by this Court does not make them "protected speech," which is a question of law for courts to decide.

Troia counters that the "constitutional status" of his other speech is relevant to arguments about alternative causation, common-law malice, and the amount of any punitive damages owed. ECF No. 281 at 19-20. He further argues that any damages must stem only from the defamatory statements, rather than any of his other speech.

Whether Troia's speech is "protected" or "constitutional" has no relevance to the issues at trial. Troia's arguments about alternative causation and common-law malice are rejected for the

reasons explained in Sections V.3. and II, respectively. As to punitive damages, what matters is Troia's intent and mental state. It is true that the jury may take into account all circumstances, including Troia's other speech, but that does not counsel in favor of permitting Troia to refer to unadjudicated speech as "protected speech." Troia is free to point the jury to his other statements as context for the defamatory statements. He is also free to explain to the jury which statements have been deemed defamatory and which have not. But he cannot self-adjudicate otherwise unadjudicated speech as "protected" or "lawful."

Plaintiffs also argue that neither they nor the jury should have to "parse out whether the defamatory per se statements or other statements intertwined with the defamatory per se statements caused the harm." ECF No. 244 at 12-13. However, plaintiffs' only case is inapposite. See ECF No. 244 at 12-13 (citing Stepanov v. Dow Jones & Co., 120 A.D.3d 28, 37-38 (1st Dep't 2014) for the proposition that the "communication as a whole is considered for establishing liability"). Stepanov was a pleading-stage case holding that "[t]o survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true, the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference." 120 A.D.3d at 37-

38. Thus, Stepanov does not stand for the proposition that the jury does not have to isolate the harm caused by the defamatory statements. Plaintiffs indicate that they intend to seek a jury instruction consistent with their argument, which the Court will consider at the appropriate time.

Accordingly, plaintiffs' motion is granted in part and denied in part.

**8. Motion to Exclude Evidence and Arguments Suggesting That Plaintiffs Have Failed to Seek or Prove Special Damages**

Plaintiffs' next motion asks the Court for an order barring Troia or his expert witness Deepak Sabiki from arguing that plaintiffs have not offered the type of evidence that would prove special damages pursuant to Federal Rules of Evidence 401, 402, and 403. See ECF No. 244 at 13-15. Plaintiffs claim that Troia and Sabiki attempt to hold plaintiffs and Adamson to the type of direct causation evidence that would be required to prove special damages.

Proving special damages requires a showing of financial loss that proving general damages does not. See 2A N.Y. Pattern Jury Instr. § 3:29 (2025) (general damages are "not limited to pecuniary loss and include impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering"). An award of general damages needs to be supported only by "competent evidence concerning the injury" caused by

Troia's defamatory statements and there "need be no evidence which assigns an actual dollar value to the injury." Gertz, 418 U.S. at 350.

Plaintiffs are correct that Troia and Sabiki blur the distinction between special and general damages -- and the evidence required for each. For example, in paragraph 10 of his report, Sabiki opines that "[a]n appropriate study of economic causation allows an expert to trace and measure any effects of a wrongful act by a defendant and translate them to losses suffered by a plaintiff. . . . Damages are established by estimating the difference between (i) a plaintiff's profitability in the 'but for' world, that is, the world as it would have existed 'but for' the harm caused by a defendant, and (ii) the plaintiff's profitability in the 'actual' world." See ECF No. 111 at 6. Sabiki is describing the type of proof needed to establish special damages. However, this is precisely the sort of analysis that Adamson is not required to do to support an award of general damages. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 760 (1985) ("The rationale of the common-law rules has been the experience and judgment of history that 'proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted

in fact.'" (quoting W. Prosser, Law of Torts § 112, p. 765 (4th ed. 1971))).

Troia may attempt to show on cross-examination or to argue in summation, as circumscribed in this opinion, that the injury that plaintiffs allege was not caused by Troia's defamatory statements. Additionally, Sabiki may rebut Adamson's testimony, including his conclusions regarding the magnitude of the injury. But as explained in Sections V.1. and V.2., Troia provides no support for his argument that plaintiffs or the jury must comb through each post and link their general damages to economic harm caused by a particular statement. The Court will not allow Troia or Sabiki to impose on plaintiffs a higher standard than the caselaw supports -- to permit such argument would risk impermissibly confusing the jury. Therefore, neither Troia nor Sabiki may submit to the jury that Adamson's analysis is insufficient because he fails to link his estimated damages to economic losses suffered by plaintiffs as would have been required if plaintiffs were seeking special damages.

However, though it is true that plaintiffs do not have to prove special damages, it does not follow that Troia cannot point out their failure to provide examples of specific economic losses. Accordingly, plaintiffs' motion is granted in part and denied in part.

**9. Motion to Preclude Evidence and Argument That This Lawsuit Is a Failure to Mitigate Damages or Is an Alternative Cause of Plaintiffs' Harm**

Plaintiffs next seek an order precluding Troia from introducing evidence or argument that plaintiffs' lawsuit should be held against plaintiffs as either a failure to mitigate or as an "alternative cause" of reputational harm. See ECF No. 244 at 15–17. Plaintiffs' motion is granted for the reasons explained in Sections V.1., V.3., and VI.6. Allowing evidence or argument to this effect would run afoul of public policy considerations, confuse the jury, prejudice plaintiffs, and devolve into irrelevant mini-trials and is thus excluded pursuant to Federal Rules of Evidence 402 and 403.

**10. Motion to Preclude Defendant from Arguing that He Defamed Plaintiffs Without Malicious Intent**

Plaintiffs next seek an order precluding Troia from introducing evidence or argument that contradicts the Court's finding that Troia acted with common-law malice. See ECF No. 244 at 17–19. Plaintiffs' motion is denied for the reasons explained in Section II. The jury will be instructed that Troia has been found to have acted with the requisite common-law malice such that the jury may award punitive damages. However, though Troia may not dispute that he has been found to have acted with common-law malice, evidence or argument about his mental state and intent are relevant to the quantum of punitive damages, if any, that the jury

will award. Thus, the Court will not bar him from presenting such evidence to the jury.

**11. Motion to Preclude Evidence that LoanStreet Lacks a Legally Protected Trademark**

Plaintiffs next seek an order barring Troia from litigating whether LoanStreet has a legally protected trademark as irrelevant and inadmissible under Federal Rules of Evidence 401 and 402. See ECF No. 244 at 19. The Court previously found that "the parties agree that LoanStreet possesses a valid trademark in the name 'LoanStreet.'" LoanStreet III, 2025 WL 2530884, at *11. Troia does not oppose plaintiffs' motion, see ECF No. 281 at 2, so the motion is granted.

**12. Motion to Exclude Evidence of Compromise or Settlement Negotiations**

Finally, plaintiffs move to exclude the pre-suit settlement negotiations discussed in Section V.6. See ECF No. 244 at 20-21. Plaintiffs' motion is granted for the reasons explained in that section.

## CONCLUSION

Plaintiffs' and defendant's respective motions in limine are granted in part and denied in part, as provided above. The Clerk of Court is respectfully directed to terminate the motions pending

at ECF Nos. 231, 234, 237, 239, 240, 242, 243, 244, 245, 246, 247, 248, 249, and 319.

Dated: November 12, 2026
New York, New York

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE